## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

*In re:* Application Pursuant to
28 U.S.C.§ 1782 of

FARHAD AZIMA
5921 Ward Parkway
Kansas City, Missouri 64113

No. 22 mc-

          Petitioner,

   v.

GLOBAL IMPACT SERVICES
3010 N Military Trail, Suite 318
Boca Raton, Florida, 33431

          Respondent,

EITAN ARUSY
3010 N Military Trail, Suite 318
Boca Raton, Florida, 33431

          Respondent, and

TRUIST FINANCIAL CORPORATION
214 N Tryon Street
Charlotte, NC 28202

          Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

## <u>DECLARATION OF DOMINIC HOLDEN</u>

    **I, DOMINIC HOLDEN**, do hereby declare under penalty of perjury pursuant to 28 U.S.C.§1746 the following.

### <u>Introduction</u>

1.    I am admitted to practice law, as a solicitor, before the Courts of England and Wales and I am a partner of the London-based law firm located in London, United Kingdom (**"UK"**),

Burlingtons Legal LLP (**"Burlingtons"**).  Burlingtons acts for Mr. Farhad Azima, the Defendant and Counterclaimant in civil proceedings pending in the High Court of Justice of England and Wales, Business and Property List captioned: Mr Farhad Azima -v- RAKIA & Ors (Claim no.: HC-2016-002798) (**"the UK Proceedings"**).

2. I respectfully submit this Declaration in support of Mr. Azima's application for an order under 28 U.S.C. § 1782 directing that Global Impact Services LLC ("**GIS**"), Eitan Arusy ("**Arusy**"), and Truist Financial Corporation ("**Truist**") (collectively **"Respondents"**) produce discovery for use in the UK Proceedings, including documents and depositions as described in the application.

3. Nothing in this statement is intended, and I am not authorized, to waive any legal privilege on behalf of Mr. Azima. I am authorized by Mr. Azima to make this Declaration on his behalf.

4. As detailed below, the pending UK Proceeding is a counterclaim brought by Mr. Azima against the Ras Al Khaimah Investment Authority (**"RAKIA"**) – the sovereign wealth fund of Ras Al Khaimah (**"RAK"**) – alleging hacking and a scheme to cover-up that hacking. Mr. Azima has joined other Defendants to his counterclaim, namely: Mr James Buchanan (**"Buchanan"**) (RAKIA's authorised representative at the material time), Dechert LLP (a law firm) (**"Dechert"**), and Mr. Neil Gerrard (an English lawyer and a partner at Dechert at the material time) (**"Gerrard"**) (together with RAKIA **"the UK Defendants"**).  Mr. Stuart Page (a private investigator who was working on RAKIA's behalf at the material

DocuSign Envelope ID: 238AD3C8-C998-4631-801B-ACD8EC401232

time) (**"Page"**) was previously joined as a Defendant but has settled with Mr. Azima and Mr Azima has discontinued his claim against him.

**The Procedural Posture of the UK Proceedings**

5.      On 30 September 2016, RAKIA sued Mr. Azima regarding a commercial dispute. RAKIA's claim relied on a substantial quantity of Mr. Azima's hacked and stolen private and personal data.  RAKIA admitted that the materials were stolen but claimed to have obtained them innocently from sources on the internet.  In addition to resisting the merits of the claim against him, Mr. Azima alleged that RAKIA was responsible for hacking his computers and electronic data and for publishing the hacked material on the internet (such that RAKIA's claim to have discovered the materials on the internet was a sham).  Mr. Azima brought a counterclaim against RAKIA for the hacking and related wrongs, seeking injunctive relief and damages.  He also raised a defence of set-off to the sums claimed by RAKIA.

6.      The trial of RAKIA's claims took place in January and February 2020 (the "**First Trial**") before Mr. Andrew Lenon QC, sitting as a Deputy Judge of the High Court (the "**Deputy Judge**").  Judgment was given on 22 May 2020 ("**HC Judgment**").

7.      The Deputy Judge found that RAKIA's account of having discovered the hacked materials on the internet was not true but found overall that RAKIA's responsibility for the hacking had not been proven.  The Deputy Judge therefore dismissed the counterclaim on the basis that RAKIA's responsibility for the hacking had not been proven.

8.      Mr. Azima was granted leave to appeal the Deputy Judge's findings on the hacking among other findings.  In support of his appeal, Mr. Azima also sought to rely on new evidence indicating RAKIA's responsibility for the hacking.  Following a hearing from 2-4 March

3

DocuSign Envelope ID: 238AD3C8-C998-4631-801B-ACD8FC401232

2021, the Court of Appeal gave judgment on 12 March 2021 (the "**CA Judgment**"). The Court of Appeal, among other things, admitted the new evidence relating to the hacking, overturned the dismissal of the hacking counterclaim, and remitted the counterclaim for a further trial before a new Judge and. The Court of Appeal also noted that the findings of the Deputy Judge on the hacking issue will not be binding in the new trial.

9.    Following the CA Judgment, Mr. Azima applied to the English High Court to amend his Counterclaim by adding additional parties as Defendants, namely, Gerrard, Dechert , Buchanan, and Page. On 16 July 2021, the UK Court ordered that the Additional UK Defendants were to be joined to the UK Proceedings. Mr. Azima has since settled with Mr. Page and amended his counterclaim further. Mr. Azima's most recent amended counterclaim is at (**Exhibit A**) (**"the Counterclaim"**).

10.    In advance of a hearing for purposes of the UK Proceedings on 1 July 2022, RAKIA wrote to the Court asserting that it had dis-instructed its legal team and intended to take no further active part, content for judgment to be entered against it, and made an open (but inadequate) offer to settle the proceedings. It cited the "dishonest and unscrupulous" conduct of Defendant Gerrard as a reason for this stance. The UK Court regarded this approach as unusual, did not accept that RAKIA could withdraw in that way, and gave orders to facilitate the ongoing service of documents on it. The claim against it continues.

11.    Mr Azima has given notice of an intention to seek a further amendment to his claim, to have the judgments previously obtained by RAKIA set aside on the grounds that they were procured by fraud. The application for that amendment remains pending.

**Global Impact Services LLC and Eitan Arusy**

12.    Global Impact Services LLC is a Florida registered entity.   **(Exhibit B) (corporate**

DocuSign Envelope ID: 238AD3C8-C998-4631-801B-ACD8EC401232

**records**).  Eitan Arusy founded the company and is listed on the Articles of Incorporation and Annual Reports as the owner and manager.  At recent depositions of Insight Analysis and Research LLC (**"Insight"**) and SDC-Gadot LLC (**"Gadot"**), we learned that Arusy played an integral role in the investigation conducted by Stuart Page and Amit Forlit.  Page paid Forlit through Insight and Gadot and Insight and Gadot both paid GIS and received payments from GIS related to the investigation.  At the Rule 30(b)(6) depositions of Insight and Gadot, Mr. Forlit revealed for the first time that Mr. Arusy was part of the inner circle of people who, along with UK Defendants Mr. Gerrard and Mr. Buchanan, Mr. Page, and Mr. Forlit, attended regular "staff meetings" to discuss the investigation.  Mr. Forlit estimated that Mr. Arusy met with Mr. Gerrard about the investigation 5-10 times for the investigation into Petitioner and his associates.  Mr. Forlit said that Mr. Arusy's was responsible "analysis and investigations, in-depth investigations."

13.    In addition, bank records of Insight and Gadot obtained through other Section 1782 applications show that Mr. Forlit, through Insight and Gadot, paid $260,000 to GIS in 2017 and received more than $730,000 from GIS from September 2020 to September 2021.  In the account opening documents for Gadot, Mr. Forlit listed "Global Impact" as one of his three largest customers, along with Mr. Page's entity.  **(Exhibit C) (select bank records)**.

## Summary of the factual case against RAKIA and the Additional Defendants

14.    The Re-Re-Amended Counterclaim sets out the case against the UK Defendants.  Rather than repeating the contents of that pleading in detail in this Declaration, I respectfully refer the Court to that document and set out below a summary of the key elements of the case relating to Respondents.  A summary of the case against the UK Defendants is set out at § 101-111 of the Counterclaim (which draw on the more detailed particulars given earlier in

the document).  The below summary is based on the allegations in the Counterclaim, which is supported by documentary and affidavit evidence, as described in more detail below.

*The Hacking of Mr. Azima*

15.    There is no dispute in the UK Proceedings that Mr. Azima was the victim of hacking, or that RAKIA has had possession of the hacked materials:

    a.    In August and September 2016, links to around 30 GB of Mr. Azima's personal and private data appeared online.  Mr. Azima was unable to access the links, but RAKIA has since provided copies of the data, which spanned more than 10 years and included a substantial number of privileged communications. The links were to anonymous peer-to-peer platforms known as BitTorrents and appeared on websites that disparaged Mr. Azima.  At the First Trial, it was common ground that this material had been obtained without Mr. Azima's authority by hacking his electronic devices and/or email accounts.

    b.    On 23 September 2016, RAKIA sent a pre-action letter to Mr. Azima, making allegations based on documents included within the hacked materials.  A claim was issued shortly afterwards, on 30 September 2016, relying very heavily on the hacked material.

    c.    No other party has sought to rely on the hacked material in any proceedings in any jurisdiction.

*Mr. Page and the "Project Update" Identifying Mr. Azima as an Enemy*

16.    In around March 2015, RAKIA believed that Mr. Azima was managing a "*team*" in the U.S. working to draw attention to allegations of human rights abuses in RAK.  The evidence for this is set out in a document created by RAK's advisors and called "RAK

Project Update Report" (the '**Project Update**').  The Project Update makes clear that RAKIA viewed Mr. Azima as an enemy of RAK and proposed that action be taken against Mr. Azima and his team, including steps to "*gather intelligence on their progress in order to monitor their activities and attempt to contain or ruin their plans.*"

17.   In January 2022, Mr. Page provided a sworn affidavit to Mr. Azima (**Exhibit D**) (the "**Page Affidavit**").  The Page Affidavit states that the Project Update was prepared by Mr. Forlit for Mr. Page.  Mr. Forlit worked for Respondents Insight and Gadot.  Mr. Page engaged Respondents to conduct an investigation into a Dr. Khater Massaad (the former CEO of RAKIA) (**"Massaad"**) and others (including Mr Azima) for a project referred to as "Project Beech" or "Project Beach."  For that project, the Respondents prepared monthly reports from February 2015 to May 2020.  Mr. Forlit provided the reports to Mr. Page who then provided them to the UK Defendants: Gerrard and Buchanan, as well as the Ruler of RAK.  At least some Project Update reports contained extracts of hacked communications, and, according to the Page Affidavit, it would have been clear to any reader that the communications were hacked.

18.   According to the Page Affidavit, Mr. Page was paid approximately $300,000 per month for his work, and he paid the Respondents approximately $250,000 per month.   As discussed above, Respondents invoiced Mr. Page and sought payment through US banks.

19.   Shortly after the Project Update was distributed, between March 2015 through August 2016, more than 150[1] malicious 'spear-phishing' emails were received by Mr. Azima and

---

[1] It is likely that significantly more such emails were received than those that have been identified.  A substantial number of emails are likely to have been caught by spam or virus filters and/or deleted by the time the emails were identified (which for the vast majority was in mid-2020).

others associated with him.  Common features of these emails point to a single 'spear-phishing' campaign targeting Mr. Azima and associated persons.

*The threat against Mr. Azima and the creation of the torrent sites*

20.     Evidence at the First Trial established that in July 2016, Mr. Gerrard pressured Mr. Azima to assist RAKIA in its dispute with Massaad.  Mr. Gerrard told Mr. Azima that if he did assist RAKIA, and if Massaad did not agree to a settlement of his dispute, Mr. Azima would be "*collateral damage*" in the ensuing conflict that would then occur between RAKIA and Massaad.  At the time of this threat, Mr. Azima was unaware that he had already been hacked.

21.     The dispute was not settled and within weeks of this meeting, blog sites were created that disparaged Mr. Azima and contained links to over 30GB of Mr. Azima's confidential and/or private data on torrent sites (the '**Torrents'**).  Though Mr. Azima was never able to access all the data, RAKIA was, and has disclosed to Mr Azima a copy of the data that it claimed was on the Torrents.  The stolen data included:

   a.      Emails taken from 10 email accounts belonging to Mr. Azima and Mr. Adams (the Chief Financial Officer of Heavylift, one of Mr. Azima's companies);

   b.      Mr. Azima's appointments, call history, photos, recordings, SMS messages, Viber messages, videos, voicemails, WhatsApps, contacts and notes; around: (i) 161,702 emails; (ii) 13,736 photographs or other images; and (iii) 840 voice recordings; material of a personal nature about Mr. Azima and his family.

22.     In 2018 and 2019, additional links to Mr. Azima's stolen data were added to the blog sites disparaging Mr. Azima.

*Subsequent hacking by Mr. Forlit at the Direction of Mr. Gerrard, Mr. Handjani, and Mr. Page*

DocuSign Envelope ID: 238AD3C8-C998-4631-801B-ACD8EC401232

23.     On February 7, 2022, Mr. Stuart Page provided a witness statement in other proceedings, *Stokoe Partnership Solicitors -v- (1) Mr Patrict Tristram Finucane Grayson (2) Grayson + CO Limited (3) Dechert LLP and (4) Mr David Neil Gerrard* (Claim Number: QB-2020-002492) ("Stokoe Proceedings") (**Exhibit E**) (hereinafter "**Third Page Witness Statement**").  The Third Page Witness Statement states that, in around February 2020, Mr. Handjani invited Mr. Page to two meetings with Mr. Handjani and Mr. Gerrard, at which they instructed Mr. Page and an Israeli hacker, Mr. Amit Forlit, of Insight Analysis and Research LLC ("Insight"), to determine who was funding Mr. Azima's and other's litigation relating to the Emirate of Ras Al Khaimah and Dechert LLP.  Mr. Handjani also received Insight's work product through a report sent by Mr. Page using the Signal encrypted messaging service.

*Perverting the Course of Justice*

24.     In addition to describing the role played by Mr. Forlit in the investigation of Mr. Azima, including the use of hacking, the Page Affidavit also details a widespread campaign by the UK Defendants and others, including Mr. Forlit, to lie to the UK courts about how the UK Defendants came to possess Mr. Azima's hacked data. In February 2022, Mr Majdi Halabi (**"Halabi"**) also swore an affidavit corroborating this conspiracy to commit fraud upon the UK court.  **(Exhibit F)**.

25.     Specifically, at the first UK trial, RAKIA's case to the UK court was that Halabi, an Israeli journalist, "discovered" Mr. Azima's hacked data while conducting regular Google searches.  Page and Halabi both presented witness statements to the UK Court supporting this narrative, and Gerrard and Buchanan – along with Page and Halabi – testified at trial in support of this narrative. The UK trial court judge did not believe this testimony of purported innocent discovery by Halabi.

26.     The Page Affidavit and Halabi Affidavit confirm that this story was false.  The affidavits state that Forlit provided Page with links to Mr. Azima's stolen data.  The affidavits make clear that the UK Defendants, along with Mr. Forlit and others, concocted the false story to avoid telling the UK Court the true story about how RAKIA came into possession of Mr. Azima's stolen data.

27.     According to the Page Affidavit and the Halabi Affidavit, Gerrard, Buchanan, Forlit, Page, and Halabi met several times between 2018 and 2019 in London, Cyprus, and Switzerland to rehearse and coordinate the false story and prepare their fraud on the UK court.  The Switzerland meeting was held at Hotel Moosegg outside of Bern, and at that meeting, Gerrard helped Page and Halabi rehearse their false testimony in detail.

*Additional Evidence of Document Destruction*

28.     On February 7, 2022, Mr. Paul Robinson, another private investigator, provided a witness statement in the Stokoe Proceedings (**Exhibit G**) (hereinafter "**Robinson Witness Statement**"), in which Mr. Robinson explains the following:

   a.     Mr. Robinson (and his companies) had undertaken various engagements for a Mr. Nicholas Del Rosso, including to gather information on Mr. Azima, from 2016 onwards. Between early 2019 and June 2020, Mr. Robinson received instructions

from a Mr Patrick Grayson (another private investigator). Mr. Robinson understood that all but one of those instructions were given to him by Mr. Grayson on behalf of Mr. Del Rosso.

b.   On 25 June 2020, Mr. Robinson met with Mr. Grayson in London, and Mr. Grayson directed him to destroy and sanitise (i.e. create new versions of documents without important information or identifiers) any materials that could connect Mr. Grayson or Mr. Del Rosso to any of the work that Mr. Robinson had carried out for him.

c.   Mr. Robinson destroyed or sanitised various documents, including an invoice that Mr. Robinson had sent to Mr. Del Rosso for gathering information on Mr. Azima.

29.   Mr. Del Rosso is the President and owner of Vital Management Services Inc ("**Vital**"), a private investigations firm. It is Mr. Azima's case that Vital was one of RAKIA's agents who instructed at least two 'hack for hire' firms to carry out the hacking of Mr. Azima's computers on RAKIA's behalf. RAKIA has admitted that Vital was instructed by Dechert (RAKIA's English solicitors) to carry out work for RAKIA and provide certain instructions to one of the 'hack for hire' companies (CyberRoot).

**Discovery Sought**

30.   Prior to the first UK trial, the parties undertook an extensive disclosure/discovery exercise. However, the role of Respondents and Mr. Arusy was concealed by RAKIA at that time and documents within the possession and/or control of Respondents were not included in the search undertaken by RAKIA.

31.     Because of the role played by Mr. Arusy and GIS, detailed above, it is clear that Respondents have documents relevant to Mr. Azima's Amended Counterclaim.   In particular, the information provided by Mr. Forlit at his depositions for Insight and Gadot demonstrate that Mr. Arusy was part of the inner circle of people who, along with UK Defendants Mr. Gerrard and Mr. Buchanan, Mr. Page, and Mr. Forlit, attended regular "staff meetings" to discuss the investigation.  Mr. Forlit estimated that Mr. Arusy met with Mr. Gerrard about the investigation 5-10 times for the investigation into Petitioner and his associates.  Mr. Forlit said that Mr. Arusy's was responsible "analysis and investigations, in-depth investigations."  The bank records corroborate GIS's role.

32.     Accordingly, on information and belief, Respondents have information, documents, and material which would provide evidence directly relevant to the issues in Mr. Azima's Amended Counterclaim, and the information and documents have not yet been disclosed in the UK Proceedings.

33.     Draft subpoenas detailing the documents and communications sought by Mr. Azima are attached (**Exhibit H**). In summary, with regard to GIS and Mr. Arusy, Mr. Azima seeks two narrow and discrete categories of documents.  First, Mr. Azima seeks documents and communications related to Mr. Azima and his associates, who were the subject of the investigation.  Second, Mr. Azima seeks documents and communications related to those who are alleged to be integral members of the conspiracy. With regard to Truist, Mr. Azima simply seeks documents and communications related to the account through which GIS made and received payments from Mr. Forlit's entities.

34.     With regard to the requested depositions, Mr. Azima seeks a Rule 30(b)(1) deposition from Arusy and a Rule 30(b)(6) deposition of a company representative of GIS with knowledge

of the investigation into Petitioner and his associates, the subsequent cover-up, and interactions with the UK Defendants and their conspirators, along the lines of the document subpoena.

35.    For these reasons, it is respectfully requested that this Court grant the Application in its entirety.

36.    Pursuant to 27 U.S.C. § 1746, I declare under penalty of perjury the foregoing is true and correct.

Dated: 5th August 2022

*Dominic Holden*

_____

**Dominic Holden**

# EXHIBIT A

DocuSign Envelope ID: 5D92B91-70E5-40E5-AD06-E2F778243CFD

IN THE HIGH COURT OF JUSTICE                     Case No. HC-2016-002798
BUSINESS AND PROPERTY COURTS
OF ENGLAND AND WALES
BUSINESS LIST (ChD)

Assigned to: THE HON MR JUSTICE MICHAEL GREEN

BETWEEN:

RAS AL KHAIMAH INVESTMENT AUTHORITY

Claimant and Defendant to Counterclaim

-and-

FARHAD AZIMA

Defendant and Counterclaimant

-and-

STUART PAGE

First Additional Defendant to Counterclaim

-and-

DAVID NEIL GERRARD

Second Additional Defendant to Counterclaim

-and-

DECHERT LLP

Third Additional Defendant to Counterclaim

-and-

JAMES EDWARD DENISTON BUCHANAN

Fourth Additional Defendant to Counterclaim

_____

RE-RE-AMENDED COUNTERCLAIM AND
CLAIM AGAINST ADDITIONAL PARTIES

_____

1

As the counterclaim has been remitted for a fresh trial taking account of further evidence, and is also brought against further parties, this pleading sets out the case afresh, as follows.

This Counterclaim is Re-Amended under CPR 17.1(2)(a) by the parties' consent dated 22 October 2021

This Counterclaim is Re-Re-Amended under CPR 17.1(2)(a) by the parties' consent dated 11 March 2022.

## I.   THE PARTIES

1.   The Counterclaimant, Mr Azima, is a businessman and US citizen with many decades of experience in the aviation industry.

2.   The Defendant to the Counterclaim ('**RAKIA**') is the investment authority of the Emirate of Ras Al Khaimah ('**RAK**'), which is one of the seven Emirates that comprise the United Arab Emirates.   Mr Azima has had commercial dealings with RAKIA over several years.

3.   In addition to RAKIA, Mr Azima brings this Counterclaim against ~~four~~ three further defendants (the '**Additional Defendants**') as follows:

    a.   ~~Mr Stuart Page is an investigator.  He operates in the Middle East and other jurisdictions.  Mr Page was RAKIA's agent at all material times.~~

    b.   Mr Neil Gerrard is a solicitor.  In 2014 he was engaged by RAKIA.

    c.   Dechert LLP ('**Dechert**') is the law firm in which Mr Gerrard was a partner until late 2020.  Dechert is liable for the acts and omissions of Mr Gerrard pleaded below.

    d.   Mr James Buchanan was employed by RAK Development LLC from September 2014 following an introduction by Mr Gerrard.  From November 2014, Mr Buchanan was authorised by RAKIA to undertake various activities on its behalf.

    e.   RAKIA is primarily and/or vicariously liable for the acts and omissions of the Additional Defendants pleaded below and/or has ratified them. RAKIA and the Additional Defendants are jointly responsible for the wrongs set out below.

3A.   Mr Azima had previously pursued this counterclaim against Mr Stuart Page, who is an investigator.  Mr Page operates in the Middle East and other jurisdictions.  RAKIA has

2

DocuSign Envelope ID: 8D952B91-7B3E-40FE-ADD6-E2E778243CFD

admitted in these proceedings that Mr Page acted on RAKIA's behalf. RAKIA has also identified Mr Page as one of its agents. Mr Azima has settled with Mr Page and has discontinued the proceedings against him. RAKIA is liable for Mr Page's acts and omissions, and/or has ratified them.

4.  The Defendants and others have sought to conceal the matters complained of and the true facts continue to emerge. As set out below, RAKIA, Mr Gerrard, Mr Buchanan and others engaged in a conspiracy to deceive the Court by dishonestly concocting false evidence. This conspiracy included Mr Gerrard coaching witnesses to give perjured evidence. Mr Azima's right later to seek to join further parties shown to be responsible for the events described below is reserved.

## II.   BACKGROUND AND PROCEDURAL CONTEXT

5.  Between 2015 and 2016, Mr Azima's computers and email accounts were unlawfully hacked, without his knowledge or authority.

6.  Approximately 30GB of Mr Azima's private and confidential data was released on to the internet in August and September 2016 ("**the hacked data**"). Additional links leaks to Mr Azima's private and confidential data were subsequently published including in 2017 and 2019.

7.  RAKIA brought proceedings against Mr Azima in tort in September 2016, alleging fraud and conspiracy; relying on documents and information extracted from the hacked data.

8.  Mr Azima alleged amongst other things that RAKIA was responsible for hacking his emails and other documents and for related wrongdoing including the publication of his data online, and brought a counterclaim against RAKIA.

9.  RAKIA claimed to have discovered the hacked material on publicly available sources on the internet.

DocuSign Envelope ID: 8D9528917B3E-40FE-ADD6-E2E778243CFD

10.    Following a trial ('**the First Trial**'):

   a.    various of RAKIA's claims were upheld and RAKIA was awarded damages, pre-judgment interest and costs;

   b.    it was found that RAKIA's responsibility for the hacking had not been established and the counterclaim was dismissed.

11.    Mr Azima appealed.  By its order made on 15 March 2021, the Court of Appeal:

   a.    set aside the dismissal of the counterclaim and ordered that the hacking issue was to be remitted for a further trial;

   b.    directed that the findings made on the hacking issue were not to be binding in the remitted trial;

   c.    ordered that in the event that Mr Azima succeeded on the hacking issue in the remitted trial, the orders made as to costs and interest were to be set aside and would be in the discretion of the judge hearing the remitted trial;

   d.    granted two applications made by Mr Azima to admit new evidence relating to the hacking issue;

   e.    held that even if Mr Azima succeeds in establishing that RAKIA was responsible for the hacking, its claims should not be struck out and the evidence so obtained should not be excluded.

12.    Mr Azima has sought permission from the Supreme Court to appeal against (i) the latter of those findings; (ii) the rejection of his defence of set-off; and (iii) the dismissal of his appeal against one of RAKIA's claims.  If permission to appeal is granted and the appeal is allowed, Mr Azima will rely on the hacking in defence of RAKIA's claims and will amend this counterclaim as appropriate.

13.    Mr Azima brings this counterclaim in accordance with the Court of Appeal's judgment and Order, adding the Additional Defendants on the basis that they are jointly and severally liable for the hacking and related wrongs.

14.    The hacking was covert, and RAKIA and the Additional Defendants have conspired to cover up and conceal the true facts. The facts have emerged over time, including in the stages summarised below, and continue to emerge.

4

DocuSign Envelope ID: 8D952B91-7B3F-40FB-ADD6-F2F778243CFD

15.     The facts known by the opening of the First Trial included:

a.     In around 2014, RAKIA was in a bitter dispute with its former CEO, Dr Khater Massaad.

b.     By around March 2015, RAKIA had identified that Mr Azima was working with Dr Massaad, managing a "*team*" in the US working to draw attention to allegations of human rights abuses in RAK; and a "Project Update" Report proposed action against Mr Azima and his team, including steps to "*gather intelligence on their progress in order to monitor their activities and attempt to contain or ruin their plans*" ("the March 2015 Project Update").

c.     Shortly after the March 2015 Project Update, the Ruler of RAK (HH Sheikh Saud bin Saqr Al Qasimi, ('**the Ruler**')) gave instructions to Mr Buchanan and other advisers to "*target*" and "*go after*" Mr Azima.

d.     In around October 2015, unauthorised access was obtained to one of Mr Azima's email accounts; and another account was accessed in 2015 and early 2016 from India and Bulgaria (where Mr Azima had not been present).

e.     In late December 2015, a RAKIA document sent to Mr Gerrard stated that "*through a series of investigations*" it had been "*established as fact*" that Mr Azima had "*orchestrated*" certain frauds.

f.     In July 2016, Mr Gerrard told Mr Azima at a meeting between them and Mr Buchanan that if Dr Massaad did not agree to a settlement of his dispute, Mr Azima would be rendered "*collateral damage.*"

g.     The dispute was not settled and within weeks, over 30GB of Mr Azima's confidential and/or private data were placed online on torrent sites (the '**Torrents**') in three tranches.

16.     During the First Trial it emerged amongst other things that:

a.     The March 2015 Project Update had been provided by Mr Page, and his denials in his witness statement that he had provided any written briefings or had any knowledge of Mr Azima in 2015 were false and dishonest.

b.     Mr Gerrard, Mr Buchanan and the Ruler had provided witness statements which deliberately minimised Mr Page's role and the Project Update.

DocuSign Envelope ID: 8D952B91-7B3E-40FE-ADD6-F2E778243CFD

    c.    Mr Buchanan gave evidence that his knowledge of Mr Azima's allegedly fraudulent conduct had been derived from sight of the hacked materials.

    d.    As a matter of law and/or by inference, it followed that RAKIA's knowledge of Mr Azima's allegedly fraudulent conduct had been derived from sight of the hacked materials.

    e.    RAKIA's account that it had 'discovered' the hacked materials on websites through Mr Page and an associate, Mr Halabi, was false and dishonest.

17.    Shortly after Judgment was handed down:

    a.    Mr Gerrard notified the Court that there were 'inaccuracies' in the evidence he had given under cross-examination during the trial concerning his interrogations of the former general counsel of RAKIA, Mr Karam Al Sadeq.

    b.    Mr Gerrard served a 'corrective' witness statement showing that his evidence had been materially wrong; but did not satisfactorily explain how he had come to give 'inaccurate' evidence or the delay in correcting it.

18.    Following the First Trial, searches located more than 150 surviving 'spear-phishing' emails received by Mr Azima and others associated with him in 2015 immediately after the Project Update and in the months following, which:

    a.    had common features including timing, recipients, the use of common spoofed sender accounts and content, and the inclusion of false content tailored specifically to the recipients;

    b.    pointed to a single 'spear-phishing' campaign targeting Mr Azima and associated persons.

19.    ~~A witness statement of an investigator, Mr Jonas Rey, records that he was informed by an unidentified source in India that from about October 2014, multiple firms in India had been approached by Mr Page to hack Mr Azima.~~

20.    Bank statements of an Indian firm, CyberRoot Risk Advisory Private Limited ('**CyberRoot**') were revealed in other proceedings in late January 2021:

    a.    Which show that over $1m had been paid to it between 2015 and 2017 by a company (Vital Management Services - '**Vital**') controlled by Mr Nicholas Del Rosso;

6

DocuSign Envelope ID: 8D952B91-7B3F-40FE-ADD6-E2E778243CFD

     b.    At least a material part of which relate to work for RAKIA on the instructions of Mr Gerrard and/or Dechert.

21.    It has subsequently been revealed that the bank statements also show substantial payments to CyberRoot by Gravitas International LLC (**'Gravitas'**), an enterprise owned and controlled by Mr Buchanan.

22.    A former CyberRoot employee has admitted to Mr Jonas Rey (an investigator):

     a.    that he and others at CyberRoot had hacked Mr Azima's computers and emails;

     b.    that he did so on the instructions of Vital.

22A.    Aditya Jain, a cybersecurity expert who owns a 'hack for hire' firm known as Cyber Defence and Analytics, has admitted also to hacking Mr Azima's data between 2015 and 2016 on the instructions of Vital and Mr Del Rosso.

23.    RAKIA admits that Vital was instructed by Dechert to carry out work for RAKIA, and Mr Del Rosso admits that Vital provided certain instructions to CyberRoot for RAKIA.

24.    In early 2020, Mr Al Sadeq brought proceedings against Mr Gerrard, Dechert, and two other solicitors at Dechert (Mr David Hughes and Ms Caroline Black), alleging that he was mistreated and tortured while in custody in RAK and that they participated in and are liable for this abuse. In those proceedings:

     a.    Mr Al Sadeq's solicitors are Stokoe Partnership (**'Stokoe'**).

     b.    Stokoe obtained *Norwich Pharmacal* relief in regard to attempts to hack its systems and obtain its confidential information, and Mr Patrick Grayson was identified as having given instructions for those activities and having himself received instructions from and worked closely with Mr Del Rosso.

25.    Mr Grayson (working for GPW, a company associated with him) also provided services to RAKIA in regard to the RAK Project, but his involvement was not disclosed by RAKIA when it was ordered in 2018 to identify the investigative entities that it engaged. Mr Grayson was introduced to Mr Jain by Mr Del Rosso in Dubai in August 2019. Mr Grayson indicated to Mr Jain that he was engaged in work relating to RAK. The nature of those services remains under investigation, and Mr Azima reserves the

DocuSign Envelope ID: 8D9D2B91-7D3E-40FE-ADD6-E2E778243CFD

right to apply to join Mr Grayson as a defendant if it emerges that he was party to the hacking or other wrongdoing against Mr Azima alleged herein.

26.     Mr Page has also been sued by Stokoe, and in August / September 2020 told Mr Buchanan that "*if I have to implicate Nick / Patrick, Decherts, Neil and the boss to get me out of this I will*" (referring to Mr Del Rosso, Mr Grayson, Dechert, Mr Gerrard and the Ruler).

26A.    In January 2022, Mr Page swore an affidavit detailing his activities and those of other persons in RAKIA's camp, in which he makes a number of admissions.  In February 2022, Mr Halabi similarly swore an affidavit admitting to giving false evidence and explaining the role of others in his doing so.  Mr Azima relies on these admissions together with other facts, as set out below.

26B.    The March 2015 Project Update was one of a series of similar reports prepared periodically, by Mr Amit Forlit, an Israeli hacker, of Insight Analysis and Research ('Insight'), an entity that uses hacking to obtain information.  Mr Forlit was also associated with another entity, SDC-Gadot ('Gadot'), which also uses hacking to obtain information.  References herein to 'Insight/Gadot' are (save where otherwise indicated) references to one or more of the companies associated with Mr Forlit.  The reports were provided by Mr Page to Mr Buchanan, Mr Gerrard and the Ruler.  At least some of the reports contained information or extracts from hacked communications, referenced so as to make the fact that they had illicitly been obtained obvious to persons reading those report.

26C.    Mr Page's and Mr Halabi's evidence at the First Trial that the hacked materials were 'discovered' by Mr Halabi was dishonest and false.  Links to the hacked material were actually provided to Mr Page by Mr Forlit.  Mr Halabi did not 'discover' the links (either in the manner alleged by RAKIA at the First Trial, or at all).  Mr Forlit has been publicly named in media reports and judicial findings as being involved in hacking and other serious wrongdoing, including kidnapping.

26D.    Mr Page and Mr Halabi agreed with Mr Gerrard, Mr Buchanan, Mr Hughes and Mr Forlit to provide dishonest evidence in their witness statements that Mr Halabi had provided Mr Page with links to the Torrents.  Mr Gerrard then coached Mr Page and Mr Halabi to give false oral evidence at the trial in order to deceive the High Court.

DocuSign Envelope ID: 8D952B91-7B9E-40FB-ADD6-F2E778243CFD

26E.   RAKIA also knowingly and deliberately pleaded the dishonest case of 'discovery' through Mr Halabi in pleadings signed by Mr Hughes.  Mr Hughes knew that that case was false, as did Mr Buchanan (who had conduct of the litigation for RAKIA) and Mr Gerrard (who acted for RAKIA).

26F.   The activities of Mr Forlit and Insight/Gadot, CyberRoot, and Cyber Defence and Analytics (together with their associates, associated companies, employees, contractors, and the parties who instructed them) were covert (and have been and continue to be dishonestly concealed) and the full facts continue to emerge.  Their respective roles in the wrongs against Mr Azima are addressed in more detail below.

27.    Mr Azima reserves the right to develop or amend his case as further information comes to light.

## III.    **THE HACKING**

### A.    **THE "RAK PROJECT"**

28.    Dr Khater Massaad was the CEO of RAKIA for several years until 2012. A dispute developed between Dr Massaad and RAKIA in which:

    a.    Dr Massaad asserted that RAKIA owed him substantial sums in connection with his service as CEO, and

    b.    RAKIA claimed that Dr Massaad had been responsible for mismanagement and wrongdoing including embezzlement.

29.    RAKIA sought to obtain information about Dr Massaad and persons whom it perceived to be associated with him, including Mr Azima.

30.    These activities were at times referred to by individuals on RAKIA's side as the "RAK Project".

**B.    RAKIA'S AGENTS**

31.    In connection with its disputes with Dr Massaad and persons whom it perceived to be associated with him, including Mr Azima, RAKIA engaged Dechert LLP, and its partners Mr Gerrard and Mr David Hughes to act on its behalf.

32.    RAKIA, directly or through Dechert LLP, engaged investigators and other persons and entities, to investigate and gather information from and about Dr Massaad and persons whom it perceived to be associated with him, including, Mr Azima. The persons and entities engaged included:

   a.    Mr Page (and companies controlled by him, including Stuart Page MEFZ);

   b.    Mr Del Rosso (and Vital);

   c.    Karv Communications ('**Karv**'), whose employees included Mr Andrew Frank and Mr Amir Handjani;

   d.    Mr Patrick Grayson (and GPW).

33.    At all material times from late 2014, Mr Buchanan:

   a.    was employed by RAK Development LLC, to manage certain of RAKIA's affairs; and

   b.    had authority to take steps on RAKIA's behalf pursuant to a power of attorney.

34.    On behalf of RAKIA, channels of communication used in relation to the RAK Project and the wrongs set out below included:

   a.    Mr Buchanan providing instructions to Mr Gerrard;

   b.    Mr Gerrard providing instructions to Mr Del Rosso and Vital; and

   c.    Mr Buchanan and Mr Gerrard providing instructions to Mr Page and his companies. Mr Page and his companies also worked alongside Mr Gerrard.

35.    The Additional Defendants, Mr Del Rosso and Mr Grayson (and their companies) were at all material times agents or servants of RAKIA, and:

   a.    As regards Mr Buchanan and Mr Gerrard, their knowledge and conduct in connection with the "RAK Project" is attributable to RAKIA, which is thus primarily liable. Without limitation to the foregoing, Mr Buchanan and Mr Gerrard were authorised to act as or on behalf of RAKIA, and/or acted as the

DocuSign Envelope ID: 8D952B91-7B3E-40FE-ADD6-E2E778243CFD

directing mind and will of RAKIA.  Mr Buchanan had that express authorisation under a power of attorney.  It is inferred that Mr Gerrard had that authorisation under the terms of his engagement and/or in practice acted and was regarded by RAKIA (including by Mr Buchanan) as such;

b.      RAKIA has ratified their acts or omissions.  Without limitation to the foregoing, it did so through the Ruler, who was *de facto* and/or *de jure* the owner and/or director of RAKIA (and/or who had capacity to provide instructions on behalf of RAKIA) and/or (save in relation to their own individual conduct) through Mr Buchanan and/or Mr Gerrard; and/or

c.      RAKIA is vicariously liable for the acts or omissions of all of the Additional Defendants, Mr Del Rosso and Mr Grayson (and their companies), and Mr Page (and his companies).  Without limitation to the foregoing, these persons were engaged in respect of the "RAK Project" (including in respect of RAKIA's actions against Dr Massaad and/or Mr Azima) and the actions they took in that regard were within that scope, and/or were otherwise authorised by RAKIA.

## 1.     Mr Page

36.    Mr Page:

a.      was engaged by RAKIA to perform investigatory and related work on the RAK Project;

b.      provided briefings and reports on the RAK Project approximately once a month;

c.      adopted with RAKIA an intentional policy of destroying the written reports after each briefing with the intention of keeping their contents secret;

d.      received very substantial remuneration of at least $300,000 $100,000 per month; from which it is to be inferred that the services he provided were either very substantial or risky.

DocuSign Envelope ID: 8D952B91-7B3F-40FE-ADD6-E2E778243CFD

37. Mr Page has been implicated in or connected to hacking and other wrongdoing in other proceedings:

   a. In *Dubai Aluminium v Al Alawi* [1998] EWHC 1202 (Comm), it was found that a sub-agent engaged by Mr Page obtained confidential information using illegal pretext calls.

   b. Mr Page was engaged by the Board of Control for Cricket in India to investigate several board members and players in 2013-2014. Following that appointment, confidential emails passing between individuals the subject of the inquiry were circulated to the media.

   c. In *JSC BTA Bank v Ablyazov* [2018] EWHC 259 (Comm), it was found that the claimant bank was contacted in early 2016 by Mr Page, claiming to act for unnamed Israeli hackers who had extracted information from a computer belonging to a Mr Aggarwal, an accountant, and seeking to find out whether the bank was interested in obtaining the information.

   d. In *Re Al M* [2019] EWHC 3415 (Fam) it was found that serious criminal conduct had been undertaken by someone acting for the Ruler of Dubai, later identified by Court order on 28 September 2020 as Mr Page.

38.   ~~A witness statement of an investigator, Mr Rey, records that he was informed by an unidentified source in India that from about October 2014, multiple firms in India had been approached by Mr Page to hack Mr Azima.~~

39. It is to be inferred that Mr Page:

   a. has connections with and access to hackers;

   b. has worked with hackers;

   c. is prepared to undertake serious wrongdoing on behalf of his clients.

39A. Mr Page engaged Mr Forlit and Insight/Gadot in connection with investigations into Dr Massaad and Mr Azima (whether referred to under the name the "RAK Project" or otherwise). The engagement of Mr Forlit and Insight/Gadot was at times referred to by reference to the name "Project Beech" or "Project Beach". Mr Forlit and Insight/Gadot use hacking as a method of gathering information.

39B.   Mr Page, Mr Buchanan, Mr Gerrard, and the Ruler (and through one or more of them, RAKIA) were aware that Mr Forlit and Insight/Gadot used hacking and approved of them doing so in connection with investigations into Dr Massaad and Mr Azima (whether those investigations were referred to under the name the "RAK Project" or otherwise).

39C.   A substantial portion of the remuneration received by Mr Page (around $250,000 / month) was in turn paid to Mr Forlit and/or Insight/Gadot. Mr Buchanan and/or Mr Gerrard (and through them, RAKIA) were aware that Mr Page was paying substantial sums to Mr Forlit and/or Insight/Gadot, and that these sums were necessary in order to retain access to the sources and methods used by Mr Forlit and/or Insight/Gadot. Mr Buchanan and/or Mr Gerrard (and through them, RAKIA) took steps to ensure that Mr Page continued to be paid at around the same level throughout his engagement, which they did in order *to ensure that access was retained to those sources and methods.*

### 2.   Mr Del Rosso

40.   Mr Del Rosso and Vital:

   a.   Acted on behalf of RAKIA in obtaining services from CyberRoot at a cost which indicates that the services were risky or very substantial;

   aa.   Acted on behalf of RAKIA in engaging Cyber Defence and Analytics and Mr Jain to hack Mr Azima's data;

   b.   Acted on behalf of RAKIA in arranging for the download of hacked data from the Torrents.

40A.   Mr Del Rosso gave evidence at the First Trial that he was not involved in any investigation into Mr Azima. That evidence was false and dishonest. In addition to Mr Del Rosso's and Vital's engagement of CyberRoot, Cyber Defence and Analytics and Mr Jain, Mr Del Rosso also engaged in gathering information about Mr Azima, prior to August 2016. Without limitation to the foregoing, Mr Del Rosso and Vital used the services of Mr Paul Robinson and a firm in which Mr Robinson held an interest (Company Documents Limited), to gather information on Mr Azima.

DocuSign Envelope ID: 8D952B91-7D35-40F5-ADD6-E2E778243CFD

40B.   Mr Robinson (and his related companies) had undertaken various engagements for Mr Del Rosso (including engagements concerning matters other than the collection of information referred to in paragraph 40A above) from 2016 onwards.   From early January 2019, Mr Robinson began to receive instructions from Mr Grayson.   Mr Robinson understands that all but one of these instructions were given to him by Mr Grayson on behalf of Mr Del Rosso.

40C.   On 25 June 2020, Mr Robinson met with Mr Grayson in London.   Mr Grayson directed Mr Robinson to destroy and sanitise any materials that could connect Mr Grayson or Mr Del Rosso to any of the work that Mr Robinson had carried out for them.   By 'sanitise', Mr Robinson was to create new versions of documents with important information removed and vague or uninformative details included instead.   It is inferred that Mr Grayson gave this direction to Mr Robinson at Mr Del Rosso's instruction, or with Mr Del Rosso's approval and/or knowledge.   Shortly after the meeting on 25 June 2020, on 1 July 2020, Mr Robinson was served with the proceedings issued by Stokoe seeking *Norwich Pharmacal* relief, referred to in paragraph 24 above.   It is further inferred that the instruction was given to attempt to prevent evidence linking Mr Del Rosso and Mr Grayson with wrongdoing from being available in legal proceedings.   Mr Robinson proceeded to destroy or sanitise various documents, including invoices that had Mr Robinson had sent to Mr Del Rosso.   These invoices included the invoice that Mr Robinson had sent to Mr Del Rosso for gathering information on Mr Azima, as set out above.   Mr Robinson created a new invoice dated 27 June 2016 that omitted any reference to Mr Azima and contained an anodyne description: "Due Diligence – deep web research".

40D.   It is inferred that Mr Del Rosso has sought to conceal his involvement in the matters complained of by Mr Azima by destroying and/or sanitising relevant documents and/or by giving directions to other persons to do so.

41.   Mr Azima has brought separate proceedings against Mr Del Rosso and Vital in respect of the hacking in the US Federal Courts in North Carolina (where Mr Del Rosso and Vital are located).

DocuSign Envelope ID: 8D952B91-7B36-40FE-ADD6-E2E778243CFD

**C.    THE PROJECT UPDATE**

42.    By about February 2015, RAKIA:

a.    had used investigators to gather information on Mr Azima and others working with him;

b.    had identified Mr Azima as an adversary.

42A.    The investigators used to obtain information on Mr Azima and others working with him included Mr Forlit and Insight/Gadot.  Mr Forlit and/or Insight/Gadot used hacking and other techniques to obtain information.  Mr Forlit has been identified as involved in hacking and other wrongdoing (including kidnapping) in press reports (*Financial Times*, "Spies, lies and the oligarch: inside London's booming secrets industry", 28 September 2017) and in the judgment of the Belgian *Tribunal de première instance francophone de Bruxelles* (judgment number 2019/6208, 29 November 2019).

42B.    Mr Forlit and/or Insight/Gadot prepared periodic reports from February 2015 onwards.  These reports on occasion included extracts from confidential documents that had been obtained through hacking.  It was obvious to anyone reading such reports that the documents in question had been obtained without authorisation, through hacking.

42C.    Mr Page arranged for the reports to be provided to Mr Buchanan.  Mr Page provided the reports in person to the Ruler.  Mr Page also arranged for some of the reports to be sent to Mr Gerrard, initially at Dechert's London office, and then at Mr Gerrard's home.  The reports were sent to Mr Gerrard's home to avoid the possibility of others at Dechert opening and reading reports that contained hacked materials.

43.    In March 2015 Mr Page provided the March 2015 Project Update to at least Mr Buchanan and Mr Gerrard, and briefed the Ruler on its contents.

44.    A copy of the March 2015 Project Update:

a.    accidentally survived RAKIA's and Mr Page's deliberate document destruction policy; and

b.    has been disclosed in very redacted form.

45.    Mr Page:

a.    reported "[in] *continuation to our previous report*" that Mr Azima was managing a team in the US working for Dr Massaad to spread information about

human rights abuses in RAK and that Dr Massaad had identified that Mr Gerrard was central to the cover up of those abuses. (The team also included Mr Kirby Behre, a US lawyer who had acted for Dr Massaad and Mr Azima; and Christopher Cooper, a PR consultant, both of whom were later also targeted, as described below);

 b. proposed taking action against Mr Azima and the "*US team*", including steps to "*gather intelligence on their progress in order to monitor their activities and attempt to contain or ruin their plans*".

46. In his witness statement for the First Trial, Mr Page:

 a. gave dishonest evidence that he had "*invariably*" reported to RAKIA orally and had first heard of Mr Azima in 2016;

 b. intentionally concealed the facts that:

  i. he had provided the Project Update to RAKIA;

  ii. he had provided it to both Mr Buchanan and Mr Gerrard;

  iii. he reported to the Ruler and RAKIA, both orally and ~~about half the time~~ in writing, and had provided many ~~some 30~~ such reports over the course of his engagement;

  iv. he and RAKIA had operated a deliberate document destruction policy in order to keep those reports secret.

47. Witness statements for the First Trial were also provided by Mr Gerrard (two), Mr Buchanan (four) and the Ruler (one). As to these:

 a. Mr Gerrard's statements made no reference to the March 2015 Project Update and suggested that Mr Gerrard had first encountered Mr Page in August 2016;

 b. Mr Buchanan's statements made no reference to the March 2015 Project Update or to Mr Buchanan's dealings with Mr Page in 2015;

 c. The Ruler's witness statement made no reference to Mr Page and suggested that he was not aware of the March 2015 Project Update or its contents.

 d. None of Mr Gerrard, Mr Buchanan or the Ruler made reference to any of the other reports prepared by Mr Forlit / Insight/Gadot, which were provided to them by Mr Page. Nor did they refer to the inclusion within those reports of

DocuSign Envelope ID: 8D9528B1-7B3F-40FE-ADD6-E2E778243CFD

information and/or extracts from other documents that was obviously obtained without authorisation, through hacking.

48. ~~It is to be inferred that~~ In the premises:

   a. Each of Mr Page, Mr Gerrard, Mr Buchanan and the Ruler intentionally concealed the true facts about the Project Update and Mr Page's reporting to **RAKIA** (including in other periodic reports, apart from the March 2015 Project Update).

   b. ~~RAKIA and Mr Page intended to procure the obtaining of Mr Azima's confidential information including through hacking.~~

   c. ~~These proposals were acted on including by procuring the hacking.~~

   d. RAKIA, Mr Buchanan, Mr Gerrard, the Ruler and Mr Page sought to obtain information concerning Mr Azima.

   e. RAKIA, Mr Buchanan, Mr Gerrard and the Ruler knowingly used (through Mr Page's engagement of Amit Forlit and Insight) hackers to obtain information concerning Mr Azima. They also willingly received hacked materials obtained by those hackers, provided to them (via Mr Page) in periodic reports.

48B. It is to be inferred that RAKIA, Mr Buchanan, the Ruler and Mr Gerrard were willing to use hacking as a means of obtaining information about Mr Azima and/or information confidential to Mr Azima, and that they in fact did do so.

48C. In particular, it is to be inferred that the proposal in the March 2015 Project Update to "*gather intelligence on their progress in order to monitor their activities and attempt to contain or ruin their plans*" was implemented through, *inter alia*, the use of hacking to obtain confidential information relating to Mr Azima and/or information confidential to Mr Azima.

48D. The full facts as to the precise means by which the hacking of Mr Azima and/or information confidential to him continue to emerge. The respective roles and activities of the various persons involved are addressed further below.

17

**D.**  **THE RULER'S INSTRUCTIONS TO "TARGET" AND "GO AFTER" MR AZIMA**

49.  On or around 4 April 2015, the Ruler instructed Mr Buchanan to "*target*" Mr Azima.

50.  Mr Buchanan discussed that instruction with Mr Handjani and Mr Naser Bustami (who sat on the board of RAK Development LLC), and Mr Bustami proposed that he, Mr Buchanan and Mr Handjani meet so as to "*hook up and coordinate our attack*".

51.  On or around 19 July 2015, the Ruler instructed Mr Bustami to "*go after*" Mr Azima. Mr Bustami passed on that instruction to Mr Buchanan, who discussed it with Mr Handjani.

52.  It is to be inferred that:

    a.  the Ruler's instructions were prompted by the information conveyed in the Project Update and other such reports by Mr Page;

    b.  the Ruler's instructions were acted on by RAKIA's agents taking steps to procure the hacking of Mr Azima's data.

**E.**  **MALICIOUS EMAILS RECEIVED BY MR AZIMA AND OTHERS**

53.  A 'phishing' email is an email that seeks to trick the recipient into clicking on a malicious hyperlink or opening a malicious attachment and a 'spear-phishing' email is a 'phishing email' which targets specific individual(s) by including material specifically pertinent to the target.

54.  At around the time of and in the months following the Project Update, Mr Azima and other persons associated with him and with Dr Massaad received a significant number of malicious emails including 'spear-phishing' and 'phishing' emails. Details of those of them which it has been possible to identify are set out in Schedule A.

55.  The content, timing, provenance and other characteristics of these emails indicates that they (or a significant number of them) were sent as part of a single campaign targeting the recipients. Amongst other things:

    a.  Five emails with identical or very similar content were sent to Dr Massaad, Mr Azima, Mr Cooper and Dr Massaad's assistant (Ms Beudjekian) on 19-21 May 2015:

DocuSign Envelope ID: 8D952B91-7B3E-40FB-ADD6-E2E778243CFD

i. The emails included subject lines and contents referring to "Star Industrial Holdings Limited", which is a company owned by Dr Massaad.

ii. The same spoof sender email address is used in four of the five emails.

iii. The emails contained malicious links that sought to capture personal login details from the recipients.

b.   There are numerous other instances in which the same spoof email address was used to send substantively identical malicious emails to multiple recipients within very short periods of time.

c.   Mr Azima was targeted with phishing emails falsely purporting to be from family members, or business associates, including an email purporting to be from Ms Beudjekian.

d.   Mr Behre was targeted with emails purporting to be from family or business associates.

e.   Mr Behre received a series of emails beginning on 26 March 2015 (which is the date shown on the Project Update document).

f.   Mr Azima received a series of emails beginning on 7 April 2015, several days after the Ruler's instruction to "*target*" Mr Azima.

g.   Mr Azima received further emails in August 2015, following the Ruler's instruction to "*go after*" him.

h.   Mr Cooper received dozens of emails in April and May 2015.

i.   Emails were sent with false news regarding Mr Azima and Dr Massaad and their business operations.

j.   Emails were sent to Mr Adams and Ms Azadeh (who were both associates of Mr Azima, who had dealings with RAKIA in 2015) falsely purporting to be from the other.

k.   Identical or similar technical characteristics are present in the vast majority of the malicious emails. The nature of these characteristics will be addressed in expert evidence.

56.   It is to be inferred that these emails were sent by persons acting on RAKIA's direct or indirect instructions (and/or on the instructions of one or more of the Additional Defendants, acting on behalf of RAKIA).

## F.   SUSPICIOUS ACCESS TO CERTAIN EMAIL ACCOUNTS

57.   Mr Azima's email accounts were accessed on a number of occasions in 2015 and 2016 prior to the publication of the hacked material, including:

a.   On multiple occasions between 13 and 15 October 2015, his account "fa@fa1.us", was accessed from IP addresses that are unfamiliar to Mr Azima;

b.   Another account, "fa@farhadazima.com", was accessed from several countries with which Mr Azima had no connection, including India (in 2015) and Bulgaria (in around May 2016).

c.   Unknown other instances including in regard to both these and other email accounts.

## G.   THE "VIEW FROM THE WINDOW" DOCUMENT

58.   A document prepared by a consultant to RAKIA at the end of December 2015 (entitled '*View from the Window*') and sent by Mr Frank to Mr Gerrard on 4 January 2016 (approximately 7 months prior to the publication of the hacked material on the internet), stated that "*through a series of investigations*" it had been "*exposed as fact*" that, "*FA* [Mr Azima], *a U.S. citizen, appears to have orchestrated, if not (fully) participated in numerous fraudulent activities*".

59.   Mr Buchanan:

a.   was the person within RAKIA leading the "RAK Project";

b.   gave evidence at the First Trial that he had only believed Mr Azima to be involved in alleged fraudulent activities through sight of the hacked material, and claimed not to have seen the View from the Window document.

DocuSign Envelope ID: 8D952B91-7B3E-40FE-ADD6-F2F778243CFD

60.    RAKIA, Mr Buchanan and Mr Gerrard have not explained where any alleged fraud had been "*exposed as fact*" other than through the hacked material.

61.    It is to be inferred that:

      a.    RAKIA or its agents had by then obtained at least some access to Mr Azima's confidential data; and

      b.    that was the basis for the statements in the document.

## H.    THE RULER'S "WIDER OBJECTIVES"

62.    On 2 March 2016, Mr Azima entered into a Settlement Agreement with RAKIA in regard to certain claims against RAKIA by HeavyLift International Airlines FZC (**'HeavyLift'**), a company owned by Mr Azima.

63.    The Settlement Agreement was drafted by Mr Gerrard and/or Dechert, and included:

      a.    an express duty of good faith, binding on Mr Azima and HeavyLift, but not on RAKIA;

      b.    an English jurisdiction and choice of law clause.

64.    Mr Buchanan and Mr Bustami recommended that the Ruler approve RAKIA entering into the Settlement Agreement and described the good faith clause as "*the key clause in this agreement bearing in mind your wider objectives*".

65.    It is to be inferred that:

      a.    The "*wider objectives*" referred to were obtaining the means of attacking Mr Azima through litigation in London and associated publicity;

      b.    The good faith clause was key because it would enable RAKIA later to make damaging allegations against Mr Azima which would attract significant publicity (regardless of whether any claims were ultimately upheld);

      c.    RAKIA already believed at that stage that such claims might be possible, because it had by then already begun to obtain access to and analyse (at least some of) Mr Azima's data.

### I.    THE MEETING OF 16 JULY 2016

66.    On 16 July 2016, a meeting was held between Mr Azima, Mr Buchanan, Mr Gerrard, and an associate in Mr Gerrard's firm, Dechert.

    a.    Prior to the meeting, and with Mr Buchanan's knowledge, Mr Gerrard had questioned Mr Azima on whether he had or had not acted in the interests of the Ruler, and referred to HeavyLift and Eurasia Hotel Holdings Limited (a company that had been incorporated on Mr Azima's instructions).

    b.    That exchange suggested that he had knowledge or suspicions about the conduct of those companies; which would be inconsistent with Mr Buchanan having only believed that Mr Azima had been involved in any alleged fraudulent activities upon seeing the hacked data unless they had already had some sight of that data.

    c.    At the meeting:

        i.    Mr Gerrard wanted Mr Azima to shift his alignment to assist RAKIA in its dispute with Dr Massaad;

        ii.    Mr Gerrard told Mr Azima that if he did not do so and Dr Massaad would not agree to a settlement, Mr Azima would be made "collateral damage" in the ensuing battle.

67.    It is to be inferred that RAKIA. Mr Buchanan and Mr Gerrard by then had knowledge of Mr Azima's confidential data and anticipated that the data would be publicised and otherwise used by RAKIA against Mr Azima.

### J.    THE EMAILS "BREAKING THE NEWS"

68.    On 15 August 2016, Mr Gerrard emailed Mr Del Rosso:

    *"I've had another call from Stuart who confirms again that there is a website on FA. He seems to think it's been generated from a UAE source. I've asked for details. He said he would try and get them to me. Can you undertake a search for it?"*

69.     Mr Gerrard and Mr Del Rosso exchanged further emails on 15 and 16 August 2016 and Mr Gerrard stated that he would ask "*Stuart*" (ie, Mr Page) for further details and information.

70.     On 16 August 2016, Mr Buchanan emailed Mr Frank and Mr Handjani, copying in Mr Gerrard:

> *"Good morning. I have been informed by Stuart last night that there is an internet site that is carrying a huge amount of material relating to FA - 1 will get you the link later. I have asked Neil to have a team start reviewing the material as a matter of urgency. At this time, I have no idea whether this relates to us or whether it is of value in respect of our ongoing dispute with KM. More importantly, I cannot tell you whether there is anything on the site about which we should have any concern. Clearly, it would be very interesting to know who is behind this action - Stuart tells me it is UAE based. We will speak later. Jamie"*

71.     These emails suggest that the existence of the websites was first reported to RAKIA by Mr Page in and around 15 to 16 August 2016.

    a.     That suggestion is false because:

        i.     RAKIA's evidence at the First Trial was that Mr Gerrard and Mr Del Rosso, and Mr Buchanan and Mr Gerrard, had discussed the websites on 8 or 9 August 2016.   Mr Gerrard gave evidence that he discussed the websites with Mr Del Rosso after being told about them by Mr Page.

        ii.    Mr Del Rosso, on Mr Gerrard's instruction, had already engaged NTi to download the data on 12 August 2016.

        iii.   Mr Page gave evidence that he only contacted Mr Gerrard once regarding the websites.

        iv.    Mr Gerrard did not seek details from Mr Page.

        v.     Mr Buchanan did not later send the link to Mr Frank or Mr Handjani.

        vi.    Mr Frank and Mr Handjani did not reply to Mr Buchanan.

        vii.   Mr Handjani gave evidence that he did not in 2016 know who "Stuart" was.

DocuSign Envelope ID: 5D9D2B91-7D9E-40FE-ADD6-E2F778243CFD

b.   It is to be inferred that the emails were intentionally written to confect a documentary trail purporting to evidence the 'innocent discovery' of the Torrents.

### K.   THE TORRENTS

72.   In August and September 2016, around 30 GB of Mr Azima's data appeared in three tranches on online anonymous peer-to-peer platforms known as torrents (the **'Torrents'**).

a.   The data included confidential, personal and private data accumulated over 10 years, and a substantial number of privileged communications.

b.   The first tranche comprised data of around 27.775 GB and appeared on or around 4 August 2016.

c.   The second tranche comprised data of around 10.33 MB and appeared on or around 30 August 2016.

d.   The third tranche comprised data of around 4.43 GB and appeared on or around 8 September 2016.

73.   The data:

a.   was obtained without Mr Azima's authorisation;

b.   included emails taken from 10 email accounts belonging to Mr Azima and Mr Adams (the Chief Financial Officer of Heavylift):

    i.   *cfo@globalsubdive.com*

    ii.   *fa@alphaavia.com*

    iii.   *fa@fa1.us*

    iv.   *farhad@farhadazima.com*

    v.   *farhadazima@yahoo.com*

    vi.   *farhadusa@me.com*

    vii.   *fazima@gmail.com*

    viii.   *HH@fathers.church*

24

DocuSign Envelope ID: 8D952B91-7D3E-40FB-ADD6-F2E778243CFD

        ix.   *ray.adams@algkc.com*

        x.   *ray@jfjintl.com;*

    c.   included Mr Azima's appointments, call history, photos, recordings, SMS messages, Viber messages, videos, voicemails, WhatsApps, contacts and notes;

    d.   included around: (i) 161,702 emails; (ii) 13,736 photographs or other images; and (iii) 840 voice recordings.

    e.   included material of the most personal kind about Mr Azima and his family.

74.   RAKIA:

    a.   accessed all 30 GB of data;

    b.   procured the publication of all of the data on the Torrents (including the personal material);

    c.   analysed the hacked material;

    d.   on 23 September 2016, represented by Dechert, sent a pre-action letter to Mr Azima's referring to various of Mr Azima's confidential documents and attaching some of them;

    e.   on 30 September 2016, commenced proceedings against Mr Azima relying on documents from the hacked material;

    f.   relied on the data in the First Trial.

75.   In the course of First Trial, RAKIA's case as to how it obtained the hacked data and as to its knowledge of who created the Torrents:

    a.   Was first set out in a witness statement from its solicitor, Mr Hughes, on 13 July 2018 - that a public relations company which had been monitoring internet publications on its behalf discovered publicly available links to BitTorrent websites.

    b.   Was changed in pleadings signed on 6 November and 11 December 2018, which said that:

        i.   Mr Page had been informed of the existence on publicly available links of the first Torrent by Mr Majdi Halabi, and that Mr Page then informed Mr Gerrard of this, who informed Mr Buchanan;

25

DocuSign Envelope ID: 8D952891-7B3E-40FE-ADD6-E2E778243CFD

ii. Mr Page later learned of publicly available links to the second Torrent, and informed Mr Gerrard of these.

76. That account was not supported by any documentary evidence at all, and there were significant inconsistencies in it, including the following:

a. Mr Halabi's evidence was that he had found two links to the first Torrent on one occasion which he then provided to Mr Page in a single communication. Mr Page's evidence was to the same effect. However, an email sent by Mr Del Rosso on 9 September 2016 stated that two websites had been identified at two different points in time;

b. The 15 and 16 August 2016 'breaking the news' emails referred to above are inconsistent with the email sent by Mr Del Rosso on 9 August 2016, and with Mr Page's evidence that he contacted Mr Gerrard about the websites only once;

c. While RAKIA said the materials were publicly accessible, they were not accessible when a contractor appointed by Mr Del Rosso to download it (NTi) first attempted to do so (on and prior to 22 August 2016). The first Torrent only became allegedly accessible after NTi raised the difficulty with Mr Del Rosso;

d. The 'public accessibility' of the materials is contradicted by the fact that the materials subsequently could not be accessed by RAKIA's own expert in proceedings brought by Mr Azima in the United States.

76A. The true position is that Mr Halabi had no role in "discovering" Mr Azima's confidential information. The links to the hacked data were provided to Mr Page by Mr Forlit.

77. The case RAKIA presented as to how it obtained the hacked data and as to its knowledge of who created the Torrents was untrue, and was known by RAKIA, Mr Page, Mr Halabi, Mr Buchanan, Mr Gerrard and Mr Hughes to be untrue. Mr Gerrard and Mr Buchanan both gave evidence at the First Trial stating that Mr Halabi had provided links to the Torrents to Mr Page (or that they understood Mr Halabi to have done so). That evidence was dishonest. Further, RAKIA's case was, by inference, also known by Mr Del Rosso and the Ruler to be untrue.

77AA. The circumstances in relation to the creation of the false account presented at the First Trial were as follows:

DocuSign Envelope ID: 8D952B91-7D3E-40FE-ADD6-E2E778243CFD

a.   Mr Buchanan and Mr Gerrard (and through them RAKIA) did not want to disclose that Mr Forlit and/or Insight/Gadot had provided the links to the hacked data. Mr Forlit and Insight have been publicly implicated in hacking and serious wrongdoing, as set out above. Naming Mr Forlit and Insight as having been working with Mr Page would support Mr Azima's case that RAKIA was involved in hacking. Mr Forlit also did not wish to be named in RAKIA's pleadings.

b.   The full facts as to the precise role of each of Mr Forlit, Insight/Gadot, CyberRoot, Cyber Defence and Analytics (and their associates, associated companies, employees, contractors, and the parties who instructed them) continue to emerge. On the facts so far revealed, it is inferred that Mr Forlit had the links because he was associated and/or working with the persons involved in the hacking of the materials placed on the Torrents (including CyberRoot and/or Cyber Defence and Analytics, those who engaged them (including Mr Del Rosso and Vital), and their respective employees and associates, whose roles are addressed further below) and received the links from them, alternatively because he (and/or Insight, and/or his or Insight's employees or contractors) carried out or procured the hacking of certain of the materials placed on the Torrents (and/or did so in conjunction with others), alternatively because Mr Forlit was otherwise targeting Mr Azima.

c.   Mr Forlit suggested using Mr Halabi to act as a "cover" for the discovery. Mr Page, Mr Hughes, Mr Gerrard, Mr Buchanan, Mr Forlit and Mr Halabi met in Cyprus in October 2018, and (other than Mr Buchanan) met again in Cyprus in November 2018. At those meetings, the attendees discussed and agreed that Mr Halabi would falsely tell the Court that he had discovered the links to the Torrents containing the hacked data. It was also agreed that Mr Page and Mr Halabi would provide dishonest evidence to that effect.

d.   Further meetings took place in London on 1-3 May 2019 attended by Mr Halabi, Mr Gerrard, and Mr Forlit (with Mr Buchanan and Mr Hughes each attending one of these meetings). At these meetings, Mr Halabi's false evidence was discussed further. One of these meetings (on 3 May 2019, attended by Mr Hughes) took place in the London offices of Dechert.

DocuSign Envelope ID: 8D952B91-7B3E-40FB-ADD6-E2F778243CFD

    e.    On 20 June 2019 and 24 June 2019, Mr Page and Mr Halabi respectively signed their witness statements, which contained the false evidence that Mr Halabi had "discovered" the links to the Torrents using web searches carried out at Mr Page's request.

    f.    On or around 1-4 December 2019, Mr Page, Mr Forlit, Mr Gerrard and Mr Halabi attended a meeting in Switzerland.  The purpose of the meeting was to rehearse the false evidence to be given in the First Trial. The meeting took place over several days at the Hotel Moosegg.

    g.    At the meeting, Mr Gerrard conducted a "mock trial" in order to help Mr Halabi and Mr Page present their false testimony in oral evidence.

    h.    At one of the sessions at this meeting, Mr Gerrard stated words to the effect that, *"if they ever believe or prove that we are behind the hacking, then this thing is going to drag on for years."*  This statement constitutes an admission by Mr Gerrard of involvement in the hacking, and thus also of his culpability (and that of the other Defendants to this Counterclaim) for the hacking.

a.    ~~untrue;~~

b.    ~~known by Mr Page and Mr Halabi to be untrue;~~

c.    ~~by inference (including in view of the matters set out below in respect of CyberRoot and Cyber Defence and Analytics), known by Mr Buchanan, Mr Gerrard and Mr Del Rosso to be untrue;~~

d.    ~~through all of those individuals, known by RAKIA to be untrue.~~

## L.    VITAL'S ENGAGEMENT OF 'HACK FOR HIRE' FIRMS  ~~CYBEROOT~~

77AB.    In parallel with the activities of Mr Page, Mr Forlit and Insight/Gadot, other hacking entities were also engaged to target Mr Azima, as set out below.

77A.    From 2015, Vital engaged (at least) two 'hack for hire' firms, CyberRoot and Cyber Defence and Analytics, to hack Mr Azima's data and devices on behalf of RAKIA.

77B.    As stated below, certain of the individuals involved in CyberRoot are former colleagues or associates of Mr Aditya Jain, who owns and operates Cyber Defence and Analytics.

DocuSign Envelope ID: 8D352B91-7B3F-40FE-ADD6-F2E778243CFD

**1.    CyberRoot**

78.    Between 28 July 2015 and 22 September 2017, Vital made 35 payments totalling $1,018,046.39 to CyberRoot.

79.    At least a substantial portion of those payments was for work performed for RAKIA, on the instructions of Mr Del Rosso, in turn instructed by Mr Gerrard and/or Dechert.

80.    Gravitas also made substantial payments to CyberRoot in the same period, by inference on behalf of RAKIA.

81.    CyberRoot is a 'hack-for-hire' firm and hacked Mr Azima's emails and devices on behalf of RAKIA. That conclusion is supported by the following facts:

   a.    An employee of Cyber Root, Preeti Thapliyal, was previously employed by BellTrox InfoTech Services ('*BellTrox*').

   b.    BellTrox has been publicly implicated in hacking. On 11 February 2015, the founder and owner of BellTrox, Sumit Gupta, was indicted by the United States in the Northern District of California for hacking.  Mr. Gupta remains at large.

   c.    According to a June 9, 2020 press report by Thomson Reuters, BellTroX was involved in "*one of the largest spy-for-hire operations ever exposed*," helping clients spy on more than 10,000 email accounts over a period of seven years.

   d.    BellTrox and CyberRoot shared servers and hacking infrastructure.

   e.    Preeti Thapliyal has the technical capability to conduct hacking and has stated in her profile and CV that while at BellTrox she, "*Worked on Custom Build Phishing Campaigns Framework*", and "*Created undetectable phishing Payloads*".  Prior to working at BellTrox, she stated that she "*Worked on a project of Hardware hacking using Rfid and Arduino*".

   f.    An employee of CyberRoot, Mr Vikash Kumar Pandey, admitted to an investigator acting for Mr Azima, Mr Jonas Rey - as was true - that:

      i.    CyberRoot was working to carry out hacking of Dr Massaad and Mr Azima by around June or July 2015.

    ii.   In around July 2015, CyberRoot gained access to certain of Dr Massaad's data.

    iii.   In around March/ April 2016, CyberRoot gained access to certain of Mr Azima's data.

    iv.   CyberRoot utilised infrastructure established by BellTrox to carry out this hacking.

g.    In or around April 2014, Aditya Jain, a cybersecurity expert working in the same sphere as CyberRoot, was told by a former colleague, Vibhor Sharma, that he had started a new company, CyberRoot, to conduct 'hack for hire' business. In 2020, Mr Pandey told Mr Jain that CyberRoot had conducted a hack of Mr Azima's data and that CyberRoot was responsible for releasing certain of Mr Azima's hacked data on the internet anonymously via a torrent.

h.    The payments made by Vital on RAKIA's behalf to CyberRoot.

i.    The payments made by Gravitas to CyberRoot.

**2.**    **Cyber Defence and Analytics**

81A.   Mr Jain established Cyber Defence and Analytics in November 2013. Between November 2013 and July 2016, Mr Jain operated Cyber Defence and Analytics as a 'hack for hire' firm.

81B.   Cyber Defence and Analytics hacked Mr Azima's emails and devices on behalf of RAKIA:

a.    Beginning in or around October 2014, Vital engaged Cyber Defence and Analytics to carry out hacking work for RAKIA. The instructions were provided to Mr Jain by Mr Del Rosso. Mr Jain undertook the hacking pursuant to these instructions.

b.    In or around December 2014, Vital instructed Cyber Defence and Analytics to hack Dr Massaad's devices. Around June 2015, Cyber Defence and Analytics gained access to certain of Dr Massaad's data, which it shared with Vital in June 2015.

c.      In or around December 2015, Vital instructed Cyber Defence and Analytics to hack Mr Azima's email.

d.      Mr Jain used spear phishing emails to successfully gain ongoing access to certain of Mr Azima's accounts and data.

e.      From around April 2016 to July 2016, Mr Jain delivered Mr Azima's data, obtained via the hacking, to Vital on a regular basis.

f.      Vital paid Cyber Defence and Analytics $17,480 for the hack of Mr Azima on 3 June 2016; and further $4,000 for further data obtained pursuant to the hack on 27 June 2016.

81C.    Mr Jain has been subject to an ongoing campaign to persuade him not to provide evidence in these proceedings, since August 2020, including:

a.      repeated messages from Mr Del Rosso seeking information about what he was doing and saying it was in his best interests not to assist Mr Azima;

b.      demands from Mr Pandey and others that he back off;

c.      repeated attempts to hack his own communications;

d.      approaches by a person impersonating a police officer investigating an alleged criminal complaint for data theft and seeking to solicit a bribe to make it go away.

## M.      THE DELETION OF MR BUCHANAN'S EMAILS

82.     Mr Buchanan was RAKIA's primary disclosure custodian.

83.     On 3 October 2016, Mr Azima's US lawyers sought assurances from Dechert that RAKIA had complied with its obligations to preserve documents. Dechert gave that assurance on 20 October 2016.

84.     Upon giving disclosure on 25 April 2019, RAKIA for the first time informed Mr Azima's lawyers that a number of emails from Mr Buchanan's email account had allegedly been deleted on 12 October 2016 and allegedly could not be recovered.

DocuSign Envelope ID: 8D952B91-7B3E-40FE-ADD6-F2E778243CFD

85.     The deletions were very substantial: For the First Trial:

    a.     Mr Azima disclosed 198 emails sent from Mr Buchanan to him. Only 1 of those emails apparently appears in the image RAKIA's lawyers have of the "sent" items folder of Mr Buchanan's account.

    b.     Mr Azima disclosed 106 emails that he sent to Mr Buchanan.  Only 83 of these appear in the image of Mr Buchanan's inbox.

86.     Mr Buchanan has claimed that the emails were mistakenly deleted by an Apple store employee without his permission when he attended the Apple store in London in October 2016.

87.     It is to be inferred that this account is false and that Mr Buchanan deliberately destroyed emails (including emails between Mr Buchanan and other parties on RAKIA's side) in order to conceal evidence of wrongdoing:

    a.     It is highly unlikely that an Apple employee would delete substantial numbers of emails without a customer's permission.

    b.     RAKIA accepted that if there had been such a mistaken deletion it would not have affected any part of the inbox or its sub-folders. But around 20% of Mr Buchanan's inbox was missing (in addition to the 99% of his sent items folder).

    c.     Mr Buchanan had been asked about the preservation of his emails by RAKIA's solicitors in August 2017, and had not told them of any incident at the Apple store in October 2016.

    d.     No documents of any kind were disclosed by RAKIA that showed Mr Buchanan to have attended the Apple store.

    e.     Mr Buchanan belatedly said in oral evidence that he had been accompanied to the Apple store by a "witness" but has never identified that person.

## N.     MR GERRARD'S AND MR HUGHES' EVIDENCE AS TO DEALINGS WITH MR AL SADEQ

88.     The Project Update refers to Mr Karam Al Sadeq, who was formerly the general counsel of RAKIA and was detained in RAK in around September 2014.

DocuSign Envelope ID: 8D952B91-7B9F-40FB-ADD6-F2E778243CFD

89.    RAKIA alleged that Mr Azima had sought to spread false media stories regarding abuses against prisoners in RAK, including allegations that Dechert was involved in the mistreatment of prisoners.

90.    The issues in the First Trial included whether allegations that prisoners were mistreated in RAK (and that Dechert was involved) were false.

91.    In the First Trial Mr Gerrard gave evidence that:

a.    he interviewed Mr Al Sadeq only once;

b.    in interviewing Mr Al Sadeq, he had followed the requirements of the Police and Criminal Evidence Act ('**PACE**'), and/or had followed the requirements as closely as possible;

c.    he only interviewed Mr Al Sadeq in the presence of Mr Al Sadeq's lawyer;

d.    when interviewing Mr Al Sadeq, he was accompanied by other local lawyers, from the firm Al Tamimi;

e.    he did not believe that he had interviewed Mrs Al Sadeq;

f.    he did not believe that he had interviewed Mr Al Sadeq before he was charged;

g.    he had interviewed Mr Al Sadeq in prison.

92.    Following publication of the judgment, Mr Gerrard provided a belated "corrective witness statement" in which he admitted that:

a.    he interviewed Mr Al Sadeq at least six times: four times in September and October 2014, once in August 2015, and once in April 2016; and had further 'meetings' with Mr Al Sadeq while Mr Al Sadeq was detained;

b.    a process for interviewing prisoners resembling PACE had been put in place only in October 2015;

c.    Mr Al Sadeq's lawyer was not present for any of the interviews conducted in 2014;

d.    Al Tamimi did not attend any of the "at least" four interviews that occurred in 2014, or the interview in April 2016;

e.    he met with Mrs Al Sadeq on a number of occasions, and that these included multiple occasions that could be regarded as interviews;

DocuSign Envelope ID: 5D9D2B91-7D3F-40FE-ADD6-E2F778243CFD

f.   he interviewed Mr Al Sadeq in: (i) the RAK general police headquarters; (ii) a military prison; and (iii) the RAK central courthouse;

g.   he did in fact interview Mr Al Sadeq before he was charged; and

h.   he learned that Mr Al Sadeq was represented by a lawyer in 2015.

93.   Mr Gerrard has since admitted that he was informed that Mr Al Sadeq had a lawyer on 23 September 2014 (before Mr Al Sadeq was interviewed in October 2014).

94.   It is to be inferred (including in view of the facts alleged above as to Mr Gerrard's role in the concoction of the false evidence as to the 'discovery' of the hacked data) that:

a.   Mr Gerrard knowingly gave false evidence because he wished to minimise the suggestion that prisoners in RAK were improperly treated and to distance himself and Dechert from any allegation of mistreatment;

b.   Mr Gerrard only filed his "corrective statement" because he was served with proceedings brought by Mr Al Sadeq against him, Mr Hughes, another Dechert solicitor (Ms Caroline Black), and Dechert, alleging their role in his mistreatment while in prison and realised that his false evidence might be exposed in those proceedings.

c.   Mr Gerrard deliberately held back his 'corrective evidence' until judgment had been handed down.

95.   *RAKIA v Bestfort Development LLP* (Claim No. HC-2015-003109) is another case in which the Defendants (adverse to RAKIA) complain of hacking. Mr Page was involved in obtaining investigative services for RAKIA; and RAKIA was represented by Mr David Hughes (previously of Dechert, but now of Stewarts, RAKIA's current solicitors).

a.   In an application for an interim order pending an appeal, RAKIA relied upon a witness statement dated 3 December 2015 from Mr Hughes (then still a partner of Dechert) ('**8th Hughes**').

b.   8th Hughes purported to provide information to the Court of Appeal as to new developments in the investigation conducted by Dechert on RAKIA's behalf, and stated in paragraph 8:

34

DocuSign Envelope ID: 8D952B91-7B3E-40FE-ADD6-E2F778243CFD

> *"Furthermore, the Investigation is still ongoing and new information continues to be uncovered: for example, I carried out interviews on 8 October 2015 and 29 October 2015 with Mr Karam Al Sadeq, who was General Counsel of the First Appellant from November 2008 to November 2012, and Deputy CEO of the First Appellant to Dr Massaad from about June 2011 to November 2012. This was the first time that it has been possible to interview Mr Al Sadeq."*

    c.    That evidence was false. Mr Al Sadeq had been interviewed repeatedly in September and October 2014, as well as in August 2015.

    d.    It is to be inferred that Mr Hughes gave false evidence in order to serve RAKIA's interests, and that RAKIA and Mr Gerrard must have been party to him doing so.

## O.    MR PAGE'S THREAT TO "IMPLICATE" OTHERS

96.    In August or September 2020, Mr Page told Mr Buchanan that "*if I have to implicate Nick / Patrick, Decherts, Neil and the boss to get me out of this I will.*" This statement referred to Mr Del Rosso ("*Nick*"), Mr Grayson ("*Patrick*"), Dechert, Mr Gerrard ("*Neil*") and the Ruler ("*the boss*").

97.    Mr Page has admitted making that statement in correspondence, but suggested it was only referring to the possibility that he might identify the working relations of those individuals and their knowledge of each other. That is an implausible attempt to gloss the plain meaning of the word "implicate". In any event, Mr Page's affidavit now confirms wrongdoing by certain of those individuals.

98.    It is to be inferred that Mr Page has information showing those parties to be involved in wrongdoing, including attempts to obtain confidential information from Mr Al Sadeq's legal team and/or from Mr Azima and his associates, and attempts to deceive the Court. His affidavit has now confirmed that to be true.

## P.    FURTHER PUBLICATION ON WETRANSFER SITES

99.    In addition to the Torrents, a large volume of data confidential to Mr Azima was disseminated on WeTransfer sites:

DocuSign Envelope ID: 8D952B91-7B35-40FB-ADD6-E2E778243CFD

     a.     One dataset was made available on WeTransfer on 27 January 2017 (and deleted on or around 9 May 2019).

     b.     A further dataset was made available on WeTransfer on 3 June 2019, and remains available now.

100.    Mr Pandey has admitted to Mr Rey (which is alleged to be true) that CyberRoot made these data available on WeTransfer. It is inferred that CyberRoot did so on instructions from Mr Del Rosso, Vital or another agent of RAKIA.

## IV.    THE HACKING OF MR AZIMA AND THE COVER UP OF THE FACTS RELATING TO IT

101.    The established facts, and the inferences which fall to be drawn from all of the facts, are set out below.

102.    Mr Azima's emails and computers were hacked on one or more occasions, by one or more parties.

103.    Multiple individuals and entities were instructed to hack and disseminate Mr Azima's data or procure others to do so and may have acted either together or in parallel. At least:

     a.     Mr Page ~~sought to~~ engaged Mr Forlit and Insight/Gadot, whom he knew to be hackers, to investigate Mr Azima, and they used hacking in the course of their engagement. Mr Buchanan and Mr Gerrard (and through them RAKIA) willingly received (via Mr Page) reports prepared by Mr Forlit and Insight/Gadot that contained materials that were obviously obtained by hacking, and directed (alternatively, acquiesced in) such hacking taking place and continuing. ~~hackers to attack Mr Azima in connection with his role in the "Project".~~

     b.     Mr Del Rosso and/or Vital engaged both CyberRoot and Cyber Defence and Analytics, to carry out hacking of Mr Azima (and Dr Massaad). CyberRoot was also engaged by Mr Del Rosso and/or Vital ~~and~~ to disseminate Mr Azima's data.

104.    Each of Mr Page and Mr Del Rosso and/or Vital did so as agents of RAKIA, and their knowledge and conduct is attributable to RAKIA.

DocuSign Envelope ID: 8D952B91-7B35-40F5-ADD6-E2E778243CFD

105.   Mr Buchanan paid CyberRoot for unknown services, on behalf of RAKIA.  It is a
reasonable inference that such apparent retainer by Mr Buchanan of CyberRoot was in
furtherance of the conspiracy and unlawful acts of RAKIA against Mr Azima.

105A.   The full facts as to the precise role of each of Mr Forlit, Insight/Gadot, CyberRoot and
Cyber Defence and Analytics (and their associates, associated companies, employees,
contractors, and the parties who instructed them) have been concealed and continue to
emerge.  Mr Azima reserves the right to provide further particulars of the activities of
each of these persons and of the relationships between them.   On the facts so far
revealed:

   a.   Mr Forlit and Insight/Gadot engaged in hacking to obtain information about Mr
Azima.  That hacking included obtaining information confidential to Mr Azima.
It is inferred that the target(s) of the hacking included the emails, electronic
accounts and devices of persons associated with Mr Azima (and with whom Mr
Azima engaged in communications), and may also have included the emails,
accounts and devices of Mr Azima himself.

   b.   CyberRoot engaged in hacking data belonging to Mr Azima and Dr Massaad.

   c.   Cyber Defence and Analytics engaged in hacking data belonging to Mr Azima
and Dr Massaad.

   d.   Mr Forlit and Insight/Gadot, CyberRoot and Cyber Defence and Analytics each
engaged in hacking at different points in time, as set out above.

   e.   Given the number and types of data sources and devices that Mr Azima had
(and which were compromised), it is inferred that some hackers accessed parts
of Mr Azima's data and other hackers accessed other parts.

   f.   CyberRoot arranged for the placing of Mr Azima's confidential data on the
internet, via torrents.  That data included the data obtained by CyberRoot
through hacking.  It may also have included other data obtained by other
hackers, that was provided to CyberRoot.

   g.   It is inferred that Mr Forlit and Insight/Gadot worked together with and/or
otherwise had (direct or indirect) connections to CyberRoot and/or Cyber
Defence and Analytics (and their respective associates, associated companies,
employees, contractors, and/or those responsible for instructing them).
CyberRoot and Cyber Defence and Analytics were also connected as set out
above.  It is inferred that the various hacking entities (or some of them) may

DocuSign Envelope ID: 8D952B91-7B3F-40FE-ADD6-F2E778243CFD

have collaborated or otherwise coordinated in the hacking and dissemination of Mr Azima's data.

106. RAKIA:

    a.    procured the hacking of Mr Azima's emails and computers on one or more occasions;

    b.    procured the release of the Torrents so as to be able fraudulently to claim that it had found and accessed the hacked data innocently on the internet; and

    c.    subsequently sought to cover up the true facts in regard to the hacking;

    d.    is liable primarily and/or vicariously for the acts of Mr Gerrard, Mr Page, Mr Del Rosso, Mr Buchanan and Mr Grayson.

107. That RAKIA did those things is supported by, in summary, the following matters of inference, and circumstantial evidence, in addition to and (in the case of the matters deposed to by Mr Rey set out herein) direct evidence (as set out in detail above):

    a.    RAKIA attempted to obtain information on Dr Massaad and Mr Azima through the "RAK Project".

    b.    RAKIA engaged several agents to carry out the "RAK Project", including Mr Page and Mr Grayson, who have been implicated in wrongdoing in other proceedings.

    c.    The Project Update.

    ca.    RAKIA's engagement (through Mr Page) of Mr Forlit and Insight, who are hackers.

    cb.    RAKIA's receipt in the course of its investigations into Mr Azima of obviously hacked materials from Mr Forlit and Insight (via Mr Page).

    d.    RAKIA and Mr Page's document destruction policy.

    e.    The false evidence at the First Trial about the Project Update and similar reports and Mr Page's role.

    f.    The Ruler's instructions to "*target*" and "*go after*" Mr Azima.

    g.    The malicious email attacks on Mr Azima and other persons identified by RAKIA in the Project Update and their timing.

DocuSign Envelope ID: 8D952B91-7B36-40F5-ADD6-F2E778243CFD

h.    The fact that email accounts belonging to Mr Azima were accessed.

i.    The internal record in December 2015 that it had been *"exposed as fact"* that Mr Azima had participated in fraud, when no such exposure at that time had been demonstrated.

j.    RAKIA's 'wider objectives' in entering into the Settlement Agreement included to bind Mr Azima to a wide-ranging and one-sided duty of good faith, accompanied by an English jurisdiction clause.

k.    Mr Gerrard's threat in July 2016 that Mr Azima would be rendered 'collateral damage'.

l.    The Torrents emerged very shortly after settlement talks with Dr Massaad collapsed.

m.    RAKIA advanced an untrue explanation for the discovery of the Torrents and deliberately provided false evidence and a false pleaded case during the First Trial as to its alleged discovery of the links to the hacked data, and (through Mr Gerrard) coached witnesses to provide that false evidence.

n.    Mr Gerrard and Mr Buchanan sent deceptive emails purporting to 'break the news' of the Torrents.

o.    Mr Del Rosso and/or Vital engaged at least two 'hack for hire' firms on behalf of RAKIA: CyberRoot and Cyber Defence and Analytics. CyberRoot on behalf of RAKIA and

oa.    As to CyberRoot:

    i.    Vital was instrumental in paying CyberRoot over $1m.

    p. ii.    Mr Buchanan (through Gravitas) also made material payments to CyberRoot.

    q. iii.    CyberRoot successfully hacked Mr Azima.

    r. iv.    CyberRoot established the Torrents.

ob.    As to Cyber Defence and Analytics:

    i.    Mr Del Rosso instructed Cyber Defence and Analytics to hack Mr Azima's emails and devices.

ii.   Cyber Defence and Analytics successfully hacked Mr Azima's accounts and shared the hacked data with Vital.

iii.   Vital paid Cyber Defence and Analytics for the hack of Mr Azima.

p.   [Not used]

q.   [Not used]

r.   [Not used]

s.   Mr Buchanan intentionally deleted a significant number of his emails and concocted a false cover story.

t.   Mr Gerrard and Mr Hughes have both given false evidence as to their interviews with Mr Al Sadeq.

u.   Mr Page has stated that he will "*implicate*" Mr Gerrard, Dechert, the Ruler, and Mr Del Rosso, as well as Mr Grayson.

v.   RAKIA's concealment and cover up of the true facts.

w.   No party other than RAKIA has sought to use the hacked materials in proceedings against Mr Azima.

108.  Mr Page (as set out in detail above):

a.   was closely involved in the "RAK Project", and made the proposal to "*gather intelligence on their* [ie, the US team managed by Mr Azima] *progress in order to monitor their activities and attempt to contain or ruin their plans*";

b.   was party to a deliberate document destruction policy as to his work for RAKIA and RAK;

ba.   engaged Mr Forlit and Insight, who (as Mr Page knew and intended) carried out hacking and who provided hacked materials to him, in order for them to be provided by Mr Page to RAKIA and its agents (including Mr Buchanan and Mr Gerrard), which Mr Page then did;

c.   has admitted to giving (and did give) gave false evidence at the First Trial. His false evidence included as to:

i.   his role in the 'Project Update';

ii.   his knowledge of Mr Azima before 2016;

iii.  his explanations for his false evidence on those matters;

iv.  his supposed 'innocent discovery' of the Torrents through Mr Halabi;

d.  has been found in other proceedings to have links to hackers and has been implicated in other serious wrongdoing;

e.  has stated that he would "*implicate*" Mr Gerrard, Dechert, Mr Del Rosso, the Ruler and Mr Grayson in wrongdoing, and has now provided details of serious wrongdoing by various individuals in RAKIA's camp;

f.  received significant remuneration for his work for RAKIA;

g.  has been identified by an unnamed source to an investigator as having sought assistance with hacking Mr Azima from as early as October 2014;

h.  by inference was party to (at least) hacking conducted by Mr Forlit and Insight, the staged release of the data and, the cover up of that hacking, and the provision of false evidence to the court in the First Trial.

109.  Mr Buchanan (as set out in detail above):

a.  was the leading figure in RAKIA's investigations, including the 'RAK Project';

b.  instructed both Mr Page and Mr Gerrard;

ba.  received hacked materials obtained by Mr Forlit and Insight, and approved of Mr Forlit and Insight carrying out hacking;

c.  was instructed by the Ruler to "*target*" and "*go after*" Mr Azima and discussed implementing those instructions with other individuals on RAKIA's side;

d.  briefed the Ruler that RAKIA's "wider objectives" in entering into the Settlement Agreement in March 2016 were to bind Mr Azima to a wide-ranging and one-sided duty of good faith;

e.  attended the meeting on 16 July 2016 at which Mr Gerrard threatened Mr Azima;

f.  through Gravitas made substantial payments to CyberRoot;

g.  was privy to Mr Page's wrongful activities and party to the false evidence about them at the First Trial;

DocuSign Envelope ID: 8D952B91-7D3F-40FB-ADD6-E2F778243CFD

h.   was party to the false version advanced in the First Trial as to the discovery of the Torrents;

i.   was party to the staged 'breaking the news' emails;

j.   deleted a significant number of emails in order to conceal his and RAKIA's complicity in the hacking, and concocted a false cover story;

k.   ~~by inference,~~ was party to the hacking, the staged release of the data and the cover up (including without limitation the false evidence given as to Mr Halabi's role).

110.   Mr Gerrard:

a.   was closely involved in the 'RAK Project' and RAKIA's investigations and was both party to and involved in the development of its strategy in regard to Mr Azima at all material times;

b.   ~~gave instructions to~~ worked alongside Mr Page and was privy to his wrongful activities, and was party to the false evidence about them at the First Trial;

ba.   received hacked materials obtained by Mr Forlit and Insight, and approved of Mr Forlit and Insight carrying out hacking;

c.   gave instructions to Mr Del Rosso and Vital to engage CyberRoot, by inference to procure the hacking;

d.   was party to the staged 'breaking the news' emails;

e.   was party to the false version advanced in the First Trial as to the discovery of the Torrents;

f.   was the recipient of the 'View from the Window' document;

g.   threatened Mr Azima on 16 July 2016, shortly before the release of the hacked data, that he would be rendered "collateral damage" if he did not switch sides to assist RAKIA and a settlement was not reached;

h.   has been identified by Mr Page as someone he will implicate;

i.   gave false evidence as to his involvement with Mr Al Sadeq, and was party to Mr Hughes doing so;

DocuSign Envelope ID: 8D952B91-7B3F-40FE-ADD6-E2E778243CFD

    j.    ~~by inference,~~ was party to the hacking, the staged release of the data and the **cover up** (including without limitation the false evidence given as to Mr Halabi's role, in which he actively encouraged Mr Halabi and Mr Page to give false evidence and attempted to prepare them for doing so).

111.    Mr Gerrard's knowledge and conduct is to be attributed to Dechert; and/or Dechert is vicariously liable for Mr Gerrard's acts.

## V.    **PROPER LAW**

112.    RAKIA has agreed in clause 7 of the Settlement Agreement that English law will apply in respect of it and that the courts of England and Wales have exclusive jurisdiction in respect of the same matters. The US Court of Appeals has determined that the scope of matters covered by this clause includes Mr Azima's complaints of hacking against RAKIA. Mr Azima's claims against RAKIA arising out of the above facts are accordingly subject to English law.

113.    The proper law applicable to Mr Azima's claims against Dechert, Mr Gerrard, Mr Buchanan and Mr Page arising out of the hacking is the Federal law of the United States of America and the State law of the State of Missouri:

    a.    Pursuant to The Law Applicable to Contractual Obligations and Non-Contractual Obligations (Amendment etc.) (EU Exit) Regulations 2019 (the EU Exit Regulations) and subject to the amendments in article 11 of those Regulations, the Rome II Regulation EU 864/2007 ("Rome II") remains applicable in the United Kingdom as Retained EU Law.

    b.    Pursuant to article 4 of Rome II,

        *"(1)    Unless otherwise provided for in this Regulation, the law applicable to a non-contractual obligation arising out of a tort/delict shall be the law of the country in which the damage occurs irrespective of the country in which the event giving rise to the damage occurred and irrespective of the country or countries in which the indirect consequences of that event occur.*

        *(2)    However, where the person claimed to be liable and the person sustaining damage both have their habitual residence in the same country at the time when the damage occurs, the law of that country shall apply.*

DocuSign Envelope ID: 8D352B91-7D3E-40FE-ADD6-E2E778243CFD

> *(3)      Where it is clear from all the circumstances of the case that the tort/delict is manifestly more closely connected with a country other than that indicated in paragraphs 1 or 2, the law of that other country shall apply. A manifestly closer connection with another country might be based in particular on a pre-existing relationship between the parties, such as a contract, that is closely connected with the tort/delict in question."*

c.    Each of the claims arising from the hacking addressed below are claims "*arising out of a tort/delict*" within the meaning of article 4(1).

d.    The damage suffered by Mr Azima occurred internationally upon the publication of the hacked data, but was most directly suffered in Missouri because that was at the time the state in which Mr Azima permanently resided and from which he conducted business.

e.    Further and/or alternatively, in respect of claims brought by Mr Azima for invasions of his privacy, the applicable law is that of the country where the most significant element or elements of the events in issue occurred.  Pending further information as to the acts complained of (and subject to Mr Azima's rights to revise or provide further particulars of his case on applicable law), it is averred that that place is the State of Missouri in the United States:

  i.    At the time of the hacking Mr Azima resided in and conducted business from Missouri.

  ii.   Mr Azima's electronic devices which were hacked were physically stored in Missouri (or were ordinarily physically stored there).

  iii.  Mr Azima ordinarily accessed the data which was ultimately hacked in Missouri.

  iv.   The damage suffered by Mr Azima (including the invasion of his interests in privacy) occurred internationally upon the publication of the hacked data, but was most directly suffered in Missouri because that was at the time the state in which Mr Azima permanently resided and from which he conducted business.

114.    Alternatively, and in any event, the United States of America is the country, and the State of Missouri is the state, to which the torts or delicts are most closely connected (and in respect of the claims in respect of invasions of privacy the significance of the

44

DocuSign Envelope ID: 8D952B91-7B3E-40FE-ADD6-E2E778243CFD

factors connecting those claims to the United States and to Missouri are more significant than those that connect those claims with other jurisdictions), in that:

    a.    At the time of the hacking Mr Azima resided in and conducted business from Missouri.

    b.    Mr Azima's electronic devices which were hacked were physically stored in Missouri (or were ordinarily physically stored there).

    c.    Mr Azima ordinarily accessed the data which was ultimately hacked in Missouri.

    d.    The damage suffered by Mr Azima occurred internationally upon the publication of the hacked data, but was most directly suffered in Missouri because that was at the time the state in which Mr Azima permanently resided and from which he conducted business.

115.    Alternatively,

    a.    the claims against all of the Defendants are subject to English law in consequence of the choice of law in the Settlement Agreement, and the fact that the Additional Defendants were acting as agents of RAKIA; or, further alternatively,

    b.    the claims against RAKIA (as well as the other Defendants) are subject to US Federal law and the State law of the State of Missouri for the reasons given in the previous paragraphs.

116.    References to the Defendants collectively in setting out each of the claims below should in each case be read as references to the Defendants in regard to whom the claims are subject to English law, or US and Missouri law, as the case may be.

DocuSign Envelope ID: 8D952B91-7B3E-40FE-ADD6-E2E778243CFD

VI.    **MR AZIMA'S CLAIMS**

A.    **CLAIMS UNDER ENGLISH LAW**

1.    ~~Claims for unauthorised access, hacking, and theft of data~~

117.    ~~The relevant provisions of the Data Protection Act 1998 ("DPA") continue to have effect notwithstanding its repeal in 2018, pursuant to the Data Protection Act 2018, Schedule 20, paragraph 6.~~

118.    ~~Section 5 of the DPA established territorial limitations on its application. Those limitations are inapplicable and/or RAKIA waived or is estopped from relying on those limitations by reason of having agreed that English law would govern its relations with Mr Azima, as set out above.~~

119.    ~~The unauthorised access to Mr Azima's computers and emails, the hacking and theft of his data~~ and/or of data confidential to him, ~~and~~/or ~~the disclosure on websites and other uses made by the Defendants of Mr Azima's stolen data constituted breaches of the DPA, actionable by Mr Azima against them.~~ For the avoidance of doubt, each instance in which data relating to Mr Azima was obtained without his authorisation (including data relating to Mr Azima that was obtained other than through accessing Mr Azima's own emails or devices), or was then disseminated or otherwise used, constitutes a breach.  ~~In particular:~~

   a.    ~~The data RAKIA and the other Defendants obtained as a result of its hacking of Mr Azima's devices constitutes "data" under section 1(1) of the DPA. The hacking made each of the Defendants a "data controller" under that section.~~

   b.    ~~As data controllers of Mr Azima's data, the Defendants had a duty under s4(4) to comply with the data protection principles in relation to all personal data obtained by their hacking.~~

   c.    ~~The theft of Mr Azima's data and/or of data confidential to him, and/or disclosure~~ Disclosure ~~of Mr Azima's data online and the use of Mr Azima's data in pursuit of a campaign against him was a breach of the data protection principles in Schedule I, Part 1 of the DPA and specifically the principles that~~

DocuSign Envelope ID: 8D952B91-7B3E-40FE-ADD6-E2E778243CFD

~~personal data be "processed fairly and lawfully" and that it be obtained "only for one or more specified and lawful purposes".~~

d. ~~The Defendants are accordingly jointly and severally obliged under section 13 of the DPA, to compensate Mr Azima for all resulting losses, including damages for both pecuniary and non-pecuniary loss and damages for distress occasioned by the breach.~~

e. ~~Mr Azima is also entitled to an injunction to restrain further publication of his personal data obtained as a result of the hacking.~~

120. ~~Further and/or alternatively, to the application of the DPA, the Computer Misuse Act 1990 ("CMA") applies as follows. The CMA establishes territorial limitations on the provisions imposing duties. Those limitations are inapplicable and/or RAKIA waived or is estopped from relying on those limitations by reason of having agreed that English law would govern its relations with Mr Azima, as set out above.~~

121. ~~The unauthorised access to Mr Azima's computers and emails and the hacking and theft of his data was contrary to section 1 of the CMA:~~

a. ~~This breach of statutory duty is actionable by Mr Azima.~~

b. ~~The breach has caused Mr Azima loss and damage, as set out below.~~

c. ~~The Defendants are therefore liable to pay damages.~~

**2.  Breach of Confidence and/ or Misuse of Private Information**

122. The information obtained through the hacking (or a substantial part of it):

a. was private and confidential to Mr Azima;

b. was of a nature such that Mr Azima had a reasonable expectation of privacy in respect of its contents;

c. had the necessary quality of confidence, such that any person obtaining the information without authorisation would come under a duty of confidentiality in respect of it.

123. For the avoidance of doubt, this information included information relating to Mr Azima and confidential to him, regardless of whether it was obtained through hacking Mr Azima's own email or devices. RAKIA and the Additional Defendants were

responsible for the hacking, and thereby infringed Mr Azima's reasonable expectation of privacy. Each instance in which information was obtained through hacking constitutes an infringement of Mr Azima's privacy.

124. Further, RAKIA and the Additional Defendants were under an obligation of confidence with respect to the information from the moment of its acquisition.

125. The publication of the information on internet sources, its distribution and/or unauthorised use in (and in connection with) the proceedings before this Court infringed Mr Azima's reasonable expectation of privacy, and the obligation that these parties had to respect the confidence of the information.

126. These acts have caused serious detriment to Mr Azima.

127. In the premises, the acquisition of the information through the hacking, and/or the publication and misuse by RAKIA of the information obtained through the hacking was a misuse of and/or unjustified publication of private information and/ or a breach of confidence.

128. Mr Azima is therefore entitled to:

    a.    compensation for the financial loss and damage incurred in consequence upon the breach of confidence and/ or misuse of private information;

    b.    damages for the lost right to control private information and for the distress Mr Azima justifiably felt because his private information had been released into the public domain;

    c.    disgorgement of any gains accruing to any of the Defendants from their breach of confidence. The nature of these gains is not yet fully known, but will be particularised further if and when proper information and/or disclosure is provided.

### 3.    Conspiracy to injure

129. In the circumstances described above, RAKIA and the other Defendants (with or without others) entered into a combination and an agreed course of conduct, with the predominant intention of harming Mr Azima. This intention is inferred from the facts and circumstances particularised in Sections II and III above, including (without limitation):

DocuSign Envelope ID: 8D952B91-7D3E-40FE-ADD6-E2E778243CFD

     a.     The nature of the hacking and dissemination of the data, and the creation of websites and materials seeking to publicise the data and/or attacking Mr Azima, each of which indicate an intention to harm him;

     b.     The Ruler's instructions to "*target*" and "*go after*" Mr Azima (and the further discussions as to implementing those instructions between Mr Buchanan and others);

     c.     The proposal in the Project Update to "*contain and ruin*" the plans of Mr Azima and the 'US team';

     d.     The statement by Mr Gerrard (made in Mr Buchanan's presence) that Mr Azima would be rendered "*collateral damage*".

130.   The combination was covert and the full details are not known to Mr Azima, but it is alleged (without limitation) that it began by around late 2014 or early 2015, and was formed and/or furthered:

     a.     when RAKIA (including through Mr Buchanan and Mr Gerrard) gave instructions to Mr Page, Vital and Mr Del Rosso (and through them CyberRoot), and other conspirators as yet not identified, to take steps to obtain Mr Azima's private information and to ensure that it became accessible on the internet;

     b.     by the proposal in the Project Update to "*gather intelligence*";

     c.     by the Ruler's instructions in April and July 2015 to target Mr Azima and the (undisclosed) communications which it can be inferred would have followed acting on those instructions.

131.   The parties to the conspiracy put it into effect by:

     a.     procuring the hacking;

     b.     procuring the publication of Mr Azima's data on the internet;

     c.     procuring or promoting the websites drawing attention to the exposure of his private and confidential information;

     d.     thereafter, seeking to conceal and cover up such unlawful behaviour.

132.   This conspiracy caused significant harm to Mr Azima and his business interests.

DocuSign Envelope ID: 8D953B91-7B3F-40FB-ADD6-F2E778243CFD

133.   In the premises, the Defendants are liable to Mr Azima for damages for conspiracy to injure.

**4.     Unlawful Means Conspiracy**

134.   In addition, and in any event, each of the acts in furtherance of the conspiracy (alternatively, some of them) was unlawful:

a.     Hacking is unlawful under criminal law in England and Wales, as well as in the United States and Missouri.  Insofar as acts of hacking occurred outside those jurisdictions and/or is subject to the criminal laws of other jurisdictions, Mr Azima relies on the presumption that those foreign laws would similarly make hacking unlawful.  It is also a civil wrong, as set out above and below, and based on the same presumption.

b.     The publication of Mr Azima's data is unlawful: (i) in England and Wales as a breach of confidence and/or a misuse of private information; and (ii) in the United States and Missouri as set out below;

c.     The procuring and promoting of websites is unlawful as a further or aggravated infringement of Mr Azima's privacy and/or disclosure of his private information and/or interference with his business interests.

d.     The concealment and cover up of the hacking was unlawful as it involved the giving of false evidence.

135.   To the extent that their acts violated a private right of Mr Azima, or (in the alternative in so far as that is required) in any event, each of the Defendants knew, or were reckless to the fact, that their acts in furtherance of the conspiracy were unlawful.

136.   This unlawful conspiracy caused significant harm to Mr Azima and his business interests.

137.   In the premises, the Defendants are liable to Mr Azima for damages for unlawful means conspiracy.

DocuSign Envelope ID: 8D9D2B01-7B3E-40FE-ADD6-E2E778243CFD

**B.** **CLAIMS UNDER US FEDERAL LAW AND MISSOURI LAW**

138.  As a result of their conduct described above, each of the Defendants are liable to Mr Azima under United States Federal Law and under Missouri Law for the losses which he has suffered particularised below; under one or more of the following causes of action.

> **1.** **Conspiracy to Disclose and Use Intercepted Wire, Oral, or Electronic Communications under the Wiretap Act (18 U.S.C. §§ 2511(1)(d) and 2520, 18 U.S.C. § 371; and Disclosure and Use of Wire, Oral, or Electronic Communications under the Wiretap Act (18 U.S.C. §§ 2511(1)(c) and 2520)**

139.  Each of the Defendants:

> a.  knowingly agreed and conspired with each other and with CyberRoot and others to intercept Mr Azima's data and/or data confidential to him by hacking and to disclose Mr Azima's intercepted data in violation of 18 U.S.C. §§ 2511 and 2520; and

> b.  each of the Defendants took steps in furtherance of the conspiracy.

139A.  It is a violation of 18 U.S.C. § 2511(a) for any person intentionally to intercept, endeavour to intercept, or procure any other person to intercept or endeavor to intercept, any electronic communication, knowing or having reason to know that the information was obtained through the interception of electronic communication, where:

> c.  *"Intercept"* is defined as *"the .. acquisition of the contents of any .. electronic .. communication through the use of any electronic, mechanical, or other device."* 18 U.S.C. § 2510(4); and

> d.  *"Electronic communication"* means *"any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate or foreign commerce."*

139B.  It is a violation of 18 U.S.C. § 2511(b) for any person to use, endeavor to use, or procure any other person to use or endeavour to use any electronic communication, knowing or having reason to know that the information was obtained through the interception of electronic communication.

51

DocuSign Envelope ID: 5D9D2B91-7D3E-40FE-ADD6-E2F778243CFD

140.  It is a violation of 18 U.S.C. § 2511(c) for any person intentionally to disclose, or to make endeavours to disclose, to any other person the contents of any electronic communication, knowing or having reason to know that the information was obtained through the interception of electronic communication., where:

    a.  "*Intercept*" is defined as "*the .. acquisition of the contents of any .. electronic .. communication through the use of any electronic, mechanical, or other device.*" 18 U.S.C. § 2510(4); and

    b.  "*Electronic communication*" means "*any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate or foreign commerce.*"

141.  The Defendants intercepted Mr Azima's data by the hacking of his computers and email accounts and/or the hacking of accounts with data confidential to Mr Azima, and obtaining persistent, real-time access to those Mr Azima's accounts. The persistent access gave the Defendants immediate and contemporaneous copies of Mr Azima's emails and/or data confidential to him in real-time.

142.  The Defendants disclosed and endeavoured to disclose Mr Azima's data by publishing the intercepted data on the Torrents. The Defendants added new links to Mr Azima's data multiple times and as recently as June 2019.

143.  The Defendants used and endeavoured to use the hacked data against Mr Azima including to damage him (and conspired in doing so).

144.  By being party to the hacking and the dissemination of Mr Azima's data the Defendants knew or had reason to know that the data had been intercepted from Mr Azima.

145.  As a result of the interception of Mr Azima's data and/or of data confidential to him, as well as the use conspiracy and the disclosure of the Azima's intercepted data and the conspiracy, Mr Azima suffered damage. For the avoidance of doubt, each instance in which data relating to Mr Azima was intercepted (including data relating to Mr Azima that was obtained other than through accessing Mr Azima's own emails or devices), or was then disclosed or otherwise used, constitutes a breach.

DocuSign Envelope ID: 8D962B91-7B3F-40FE-ADD6-F2F778243CFD

146.    Since at least June 2019, ~~the~~ Mr Azima's stolen data has continued to be publicly available on WeTransfer through links that were created on the instructions of the Defendants (or some of them), resulting in damage to Mr Azima.

**2.      Misappropriation of Trade Secrets, 18 U.S.C. §§ 1831, 1832, 1836**

147.    In US Federal law:

a.      The Defense of Trade Secrets Act creates a cause of action against *"[w]hoever, with intent to convert a trade secret, that is related to a product or service used in or intended for use in interstate or foreign commerce, to the economic benefit of anyone other than the owner thereof, and intending or knowing that the offense will, injure any owner of that trade secret, knowingly . . . steals, or without authorization appropriates, takes, carries away, or conceals, or by fraud, artifice, or deception obtains"* trade secrets. 18 U.S.C. § 1832(a)(1).

b.      *"An owner of a trade secret that is misappropriated may bring a civil action . . . if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."* 18 U.S.C. § 1836(b)(1).

148.    Mr Azima's email accounts and computer systems stored trade secrets (of which Mr Azima was the owner in the sense used in the statute) intended for use in interstate and foreign commerce, including but not limited to highly confidential business plans and proposals, research supporting those plans and proposals (including costs and service projections), information concerning business strategies and opportunities, and contacts for important business relationships.

149.    The Defendants unlawfully conspired:

a.      to take, appropriate, and obtain Azima's trade secrets without authorization, by means of a cyberattack against him, knowing that Azima's email accounts contained trade secrets and intending to steal them in order to harm Azima.

b.      to disseminate those trade secrets and to continue to do so including as recently as June 2019.

150.    As a result of the conspiracy and hacking Mr Azima has suffered damage, which includes, but is not limited to, loss of business goodwill, loss in the value of his trade secrets and confidential business information, and harm to Mr Azima's business.

**3.      The United States Computer Fraud and Abuse Act**

151.    Under the United States Computer Fraud and Abuse Act ("CFAA"), I 8 U.S.C. § 1030, prohibitions and civil remedies are created for unauthorised access to computers in certain circumstances:

   a.      The CFAA designates as *"protected computers"* computers *" used in or affecting interstate or international commerce"*: as defined by 18 U.S.C. § 1030(c)(2)(8).

   b.      Mr Azima's computers were at all material times *"protected computers"* as so defined.

   c.      The CFAA prohibits a person from intentionally accessing a protected computer without authorisation and thereby obtaining information from that protected computer: 18 U.S.C. § 1030(a)(2)(C).

   d.      RAKIA and the other Defendants or persons acting on their behalf knowingly and intentionally accessed Mr Azima's devices without Mr Azima's authorisation, thereby obtaining around 30GB of Mr Azima's data unlawfully.

   e.      In the premises, RAKIA's hacking was a breach of 18 U.S.C. § 1030(a)(2)(C).

152.    It is also contrary to the CFAA intentionally to access a protected computer without authorization, and as a result of such conduct, recklessly cause damage: 18 U.S.C. §1030(a)(5)(B).

   a.      The hacking of Mr Azima's devices enabled the Defendants to alter Mr Azima's data, contrary to this provision.

   b.      The CFAA provides a right to a civil remedy to recover damages including for loss: 18 U.S.C. §1030(e)(11).

153.    As a direct consequence of the hacking, Mr Azima was forced to dispose of and replace the computers infected as part of the hacking, and his business was disrupted.

154.    The Defendants thereby recklessly caused damage in violation of 18 U.S.C. §1030(a)(5)(B): and caused damage and actionable loss (as defined by 18 U.S.C. § 1030(e)(11)) to Mr Azima in violation of§ 1030(a)(5)(C); and are therefore liable to Mr Azima under the CFAA.

DocuSign Envelope ID: 8D952B91-7B3E-40FB-ADD6-E2E778243CFD

### 4.     The Missouri Computer Tampering Act ("MCTA")

155.   In terms of section 569.095.1, a person who undertakes *"computer tampering"* includes a person who:

> *"knowingly and without authorization or without reasonable grounds to believe that he or she has such authorization: ..*
>
> *(3) Discloses or takes data, programs, or supporting documentation, residing or existing internal or external to a computer, computer system, or computer network; or*
>
> *(4) Discloses or takes a password, identifying code, personal identification number, or other confidential information about a computer system or network that is intended to or does control access to the computer system or network; or*
>
> *(5) Accesses a computer, a computer system, or a computer network, and intentionally examines information about another person; or*
>
> *(6) Receives, retains, uses, or discloses any data he or she knows or believes was obtained in violation of this subsection."*

156.   In terms of section 537.525 of the Revised Statutes of Missouri, Tampering with Computer Data, Computer Equipment or Computer Users Act, the owner of a computer system, computer network, or data, that has been tampered with is entitled to recover compensatory damages, including expenditures reasonably and necessary incurred to verify that a system, network, or data was not altered, damaged, or deleted by the access

157.   The hacking amounted to computer tampering within the meaning of the MCTA.

158.   Each of the Defendants were party to the computer tampering, and are therefore jointly and severally liable to Mr Azima for compensatory damages, including expenditures reasonably and necessary incurred to verify that a system, network, or data was not altered, damaged, or deleted by the access.

### 5.     Invasion of Privacy Torts – Intrusion on the Seclusion of Another

159.   By being party to the hacking (including for the avoidance of doubt any hacking of Mr Azima's own emails, accounts and devices, or of data confidential to Mr Azima), each of the Defendants:

55

DocuSign Envelope ID: 8D952B91-7D3E-40FE-ADD6-E2E778243CFD

a.  intentionally intruded on the solitude, seclusion, or private affairs of Mr Azima;

b.  by a means that is unreasonable or highly offensive to a reasonable person in that:

    i.  the hacked data included secret and private subject matter;

    ii.  that the plaintiff had the right to keep secret; and

    iii.  which the defendants obtained in an unreasonable way.

160.  In consequence the Defendants are jointly and severally liable for damages for intrusion into his interest in privacy, for mental distress suffered through invasion of privacy, and for special damages.

**6.  Invasion of Privacy - Public Disclosure of Private Facts**

161.  By being party to the hacking and dissemination of Mr Azima's data, each of the Defendants was party to:

a.  publication to a large number of persons;

b.  without waiver or privilege;

c.  of private matters in which the public had no legitimate concern; and

d.  in such a way as to bring shame or humiliation to an individual of ordinary sensibilities.

162.  In consequence the Defendants are jointly and severally liable for damages for harm to his interest in privacy, for mental distress suffered through invasion of privacy, and for the specific damages caused by their disclosure.

**7.  Tortious Interference with Business Relationship and Business Expectancy**

163.  Each of the defendants knew that Mr Azima conducted business as described above and had a valid expectancy of continuing to do so.

164.  By being party to the hacking and dissemination of Mr Azima's data, the Defendants:

a.  intentionally interfered with Mr Azima's business and business expectancy;

b.  by the employment of improper means,

    c.    causing the severance of business relationships and loss of business expectancy;

    d.    in circumstances in which the defendants had no legal right to interfere,

    e.    resulting in damage as particularised below.

### 8. Conspiracy

165.    By being party to the hacking and dissemination of Mr Azima's data, each of the defendants was party to a civil conspiracy under Missouri law:

    a.    The defendants had a meeting of minds as to the pursuit of the unlawful hacking and the dissemination of the data; and

    b.    Each committed at least one act in furtherance of the conspiracy; and

    c.    The plaintiff (ie, Mr Azima) was thereby damaged.

## C.  LOSS, DAMAGE AND OTHER RELIEF

### 1. Pecuniary Losses

166.    By reason of the above wrongs, Mr Azima has suffered loss and damage for which RAKIA and the Additional Defendants are liable to pay compensation.

167.    As a result of the hacking Mr Azima ~~required professional assistance to investigate it and~~ was forced to dispose of his previous devices and to purchase new ones, and as a result suffered the following damages:

    a.    ~~Cost or professional services required (from ZP Consultants LLC) to investigate and mitigate the hacking, $60,000.~~

    b.    Replacement of 4 computers, $17,274

    c.    Protective software for 5 years, $18,784.

168.    In addition, Mr Azima suffered extensive damage to his business. Mr Azima is unable to particularise those damages pending:

    a.    the application for permission to appeal to the Supreme Court, and (if permission is granted) the appeal; and

DocuSign Envelope ID: 5D92B91-705F-40E5-AD06-E2E778243CFD

b.   the determination of the full extent of such hacking and the parties involved therein and/or its explanation by RAKIA.

## 2.   Non-Pecuniary Losses

169.   The publication of Mr Azima's private information and data caused substantial distress and emotional harm. A significant award is necessary to compensate for the distress and for the gross invasion of his privacy, in addition to damages to compensate for his pecuniary losses pleaded above.

## 3.   Exemplary Damages

170.   The hacking and the dissemination of data gave rise to each of the wrongs particularised above.

171.   RAKIA is an organ of RAK. Each of the Additional Defendants was a servant of the government of RAK. Each of the Additional Defendants was engaged to act either for RAKIA and/or on its behalf, as set out in paragraph 34 above. The actions of (or attributable to) each of the Defendants comprising those wrongs constituted oppressive and/or arbitrary and/or unconstitutional action. Without limitation to that pleading, their actions:

a.   involved deception and fraud;

b.   entailed serious and deliberate breaches of criminal and civil law and Mr Azima's rights;

c.   were motivated (at least in part) by malice towards Mr Azima and others associated with him and/or by a desire to prevent Mr Azima and others from drawing attention to alleged human rights abuses in RAK.

172.   Further and in the alternative, each of these wrongs was done deliberately and cynically by each of the Defendants and was calculated to make a profit or other gain (at Mr Azima's expense or otherwise) that would exceed the compensation that they were at risk of being ordered to pay to Mr Azima (on the basis that it was calculated that Mr Azima would have difficulty in proving their wrongdoing, or recovering compensation exceeding such gains or profits):

a.  As regards RAKIA, it did so through Mr Buchanan and/or Mr Gerrard calculating that it would make a gain (in its dispute with Dr Massaad and/or to undermine efforts to bring attention to alleged human rights abuses in RAK) that would exceed the value of the compensation that they were at risk of being ordered to pay to Mr Azima.

b.  Mr Page calculated that he would receive very substantial remuneration (of at least $100,000 – $300,000 per month) for his activities and otherwise stood to gain from assisting RAKIA in making the gains it intended to make, as pleaded above, and that these gains and remuneration would exceed the compensation that he was at risk of being ordered to pay to Mr Azima.

c.  Mr Buchanan calculated that he would receive substantial remuneration (including a base salary of around £1,200 / day and bonuses of at least $1.5 million in respect of his engagement) and otherwise stood to gain from assisting RAKIA in making the gains it intended to make, as pleaded above, and that these gains and remuneration would exceed the compensation that he was at risk of being ordered to pay to Mr Azima.

d.  Mr Gerrard and Dechert received substantial remuneration (of at least $1 million per month during some periods of their retainer) and otherwise stood to gain from assisting RAKIA in making the gains it intended to make, as pleaded above, and these gains and remuneration were calculated by them to exceed the compensation that Mr Gerrard and Dechert were at risk of being ordered to pay to Mr Azima.

173.  In those circumstances, the Defendants should be liable for exemplary damages.

**4.  Disgorgement**

174.  It is to be inferred that the Additional Defendants accrued gains from their invasion of Mr Azima's privacy and breach of his confidence, including in the form of fees for the provisions of their services. Mr Page was paid between $100,000 and $300,000 per month for his activities. Mr Buchanan received substantial remuneration, of at least £1,200 / day and bonuses of at least $1.5 million in respect of his engagement. Mr Gerrard and Dechert received substantial remuneration, of at least $1 million per month during some periods of their retainer. These gains (or a substantial part of them) were

at Mr Azima's expense, as they were paid for and/or in consideration of the Additional Defendants (or any of them) obtaining, misusing and making available Mr Azima's confidential data.

175. Mr Azima is therefore entitled to an order requiring that each of the Additional Defendants account to Mr Azima for all financial gains made as a result of the invasion of his privacy and breach of his confidence and/or the claims made by Mr Azima under US law.

### 5.   Interest

176. The Defendant is entitled to and claims interest on all compensation recovered pursuant to Section 35A of the Senior Courts Act 1981.

### 6.   Injunctive Relief

177. In addition to the damages claimed, Mr Azima is entitled to and claims injunctive relief against RAKIA and the other Defendants to restrain their continuing wrongs and the ongoing breach of his rights. Mr Azima seeks an injunction requiring RAKIA and/or all of the Defendants:

    a.    to take all reasonable steps to remove or procure the removal of the websites, torrents, WeTransfer links or other internet sources containing statements about Mr Azima, and/or providing means for his private data to be accessed by others;

    b.    to deliver up and/or destroy all copies of his private data in their or their agents' possession;

    c.    to disclose the full extent of such hacking and the parties involved therein including pursuant to the *Norwich Pharmacal* jurisdiction so that Mr Azima may vindicate his rights as against any such additional wrongdoers.

### 7.   Orders made by Deputy Judge Lenon QC

178. In the premises, pursuant to paragraph 12 of the order of the Court of Appeal drawn on 15 March 2021, the orders made by Deputy Judge Lenon QC and drawn on 31 July 2020 as to interest and costs from the trial of RAKIA's claims are to be set aside and

DocuSign Envelope ID: 8D953B91-7B3E-40FE-ADD6-E2E778243CFD

are to be in the discretion of the Judge hearing this counterclaim. Mr Azima will invite the Court: (i) not to award RAKIA interest (alternatively, to discount any interest awarded in view of RAKIA's responsibility for the hacking); and (ii) award costs in Mr Azima's favour, alternatively make no order as to costs, alternatively reduce the amount of costs awarded to RAKIA. Mr Azima will seek to address the Court on the appropriate orders as to interest and costs at the appropriate stage of this counterclaim.

~~TIM LORD Q.C.~~

~~THOMAS PLEWMAN Q.C.~~

~~HUGO LEITH~~

~~TIM LORD Q.C.~~

~~THOMAS PLEWMAN Q.C.~~

~~HUGO LEITH~~

~~SOPHIE BIRD~~

TIM LORD Q.C.

THOMAS PLEWMAN Q.C.

HUGO LEITH

SOPHIE BIRD

Statement of truth

I believe that the facts stated in this Amended Counterclaim and Claim against Additional Defendants are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

DocuSign Envelope ID: 8D952B91-7D3E-40FE-ADD6-E2E778243CFD

Signed:

Date:       11 March 2022

Name:       Farhad Azima

# EXHIBIT B

# Electronic Articles of Organization
## For
## Florida Limited Liability Company

L18000049498
FILED 8:00 AM
February 23, 2018
Sec. Of State
cmwood

## Article I

The name of the Limited Liability Company is:

GLOBAL IMPACT SERVICES, LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

7999 N. FEDERAL HIGHWAY
SUITE 202
BOCA RATON, FL.   33487

The mailing address of the Limited Liability Company is:

7999 N. FEDERAL HIGHWAY
SUITE 202
BOCA RATON, FL.   33487

## Article III

The name and Florida street address of the registered agent is:

GLEN  GOLISH
7999 N. FEDERAL HIGHWAY
SUITE 202
BOCA RATON, FL.   33487

Having been named as registered agent and to accept service of process for the above stated limited
liability company at the place designated in this certificate, I hereby accept the appointment as registered
agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes
relating to the proper and complete performance of my duties, and I am familiar with and accept the
obligations of my position as registered agent.

Registered Agent Signature:   GLEN GOLISH

## Article IV

The name and address of person(s) authorized to manage LLC:

L18000049498
FILED 8:00 AM
February 23, 2018
Sec. Of State
cmwood

Title:  MGR
EITAN  ARUSY
7999 N. FEDERAL HIGHWAY, SUITE 202
BOCA RATON, FL.   33487

## Article V

The effective date for this Limited Liability Company shall be:

02/23/2018

Signature of member or an authorized representative

Electronic Signature: EITAN ARUSY

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

**2019 FLORIDA LIMITED LIABILITY COMPANY REINSTATEMENT**

DOCUMENT# L18000049498

**FILED**
**Oct 11, 2019**
**Secretary of State**
**6062628568CR**

**Entity Name:** GLOBAL IMPACT SERVICES, LLC

**Current Principal  Place of Business:**

7999 N. FEDERAL HIGHWAY
SUITE 202
BOCA RATON,  FL  33487

**Current Mailing Address:**

7999 N. FEDERAL HIGHWAY
SUITE 202
BOCA RATON,  FL  33487

**FEI Number: 81-1083036**                                    **Certificate of Status Desired:**  Yes

**Name and Address of Current Registered Agent:**

GOLISH, GLEN
7999 N. FEDERAL HIGHWAY
SUITE 202
BOCA RATON, FL  33487  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   GOLISH GLEN                                                                                10/11/2019
                         Electronic Signature of Registered Agent                                              Date

**Authorized Person(s) Detail :**

| | |
|---|---|
| Title | MGR |
| Name | ARUSY, EITAN |
| Address | 7999 N. FEDERAL HIGHWAY, SUITE 202 |
| City-State-Zip: | BOCA RATON  FL  33487 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: EITAN ARUSY                                    MANAGING MEMBER        10/11/2019
                     Electronic Signature of Signing Authorized Person(s) Detail                     Date

**2020 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT**

DOCUMENT# L18000049498

**FILED**
**Feb 25, 2020**
**Secretary of State**
**1204504296CC**

**Entity Name:** GLOBAL IMPACT SERVICES, LLC

**Current Principal  Place of Business:**

3010 N MILITARY TRAIL
SUITE 318
BOCA RATON,  FL  33431

**Current Mailing Address:**

3010 N MILITARY TRAIL
SUITE 318
BOCA RATON,  FL  33431  US

**FEI Number: 81-1083036**                              **Certificate of Status Desired:**  Yes

**Name and Address of Current Registered Agent:**

GOLISH, GLEN
3010 N MILITARY TRAIL
SUITE 318
BOCA RATON, FL  33431  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   GOLISH GLEN                                                                                    02/25/2020
_____
                    Electronic Signature of Registered Agent                                                           Date

**Authorized Person(s) Detail :**

| | |
|---|---|
| Title | MGR |
| Name | ARUSY, EITAN |
| Address | 3010 N MILITARY TRAIL SUITE 318 |
| City-State-Zip: | BOCA RATON  FL  33431 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: EITAN ARUSY                                  MANAGER                          02/25/2020
_____
                Electronic Signature of Signing Authorized Person(s) Detail                                         Date

Case 9:22-mc-81229-DMM   Document 1-2   Entered on FLSD Docket 08/08/2022   Page 82 of 228

**2021 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT**

DOCUMENT# L18000049498

**FILED**
**Mar 15, 2021**
**Secretary of State**
**2691769168CC**

**Entity Name:** GLOBAL IMPACT SERVICES, LLC

**Current Principal  Place of Business:**

3010 N MILITARY TRAIL
SUITE 318
BOCA RATON,  FL  33431

**Current Mailing Address:**

3010 N MILITARY TRAIL
SUITE 318
BOCA RATON,  FL  33431  US

**FEI Number: 81-1083036**                          **Certificate of Status Desired:**  No

**Name and Address of Current Registered Agent:**

GOLISH, GLEN
3010 N MILITARY TRAIL
SUITE 318
BOCA RATON, FL  33431  US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE:   GOLISH GLEN                                                      03/15/2021
_____
                Electronic Signature of Registered Agent                        Date

**Authorized Person(s) Detail :**

| | |
|---|---|
| Title | MGR |
| Name | ARUSY, EITAN |
| Address | 3010 N MILITARY TRAIL SUITE 318 |
| City-State-Zip: | BOCA RATON  FL  33431 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: ARUSY, EITAN                          MGR                          03/15/2021
_____
         Electronic Signature of Signing Authorized Person(s) Detail                Date

**2022 FLORIDA LIMITED LIABILITY COMPANY ANNUAL REPORT**

DOCUMENT# L18000049498

**FILED**
**Mar 11, 2022**
**Secretary of State**
**8617662216CC**

**Entity Name:** GLOBAL IMPACT SERVICES, LLC

**Current Principal Place of Business:**

3010 N MILITARY TRAIL
SUITE 318
BOCA RATON, FL 33431

**Current Mailing Address:**

3010 N MILITARY TRAIL
SUITE 318
BOCA RATON, FL 33431 US

**FEI Number: 81-1083036**                    **Certificate of Status Desired:** No

**Name and Address of Current Registered Agent:**

GOLISH, GLEN
3010 N MILITARY TRAIL
SUITE 318
BOCA RATON, FL 33431 US

*The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.*

SIGNATURE: GOLISH GLEN                                          03/11/2022
_____                  _____
Electronic Signature of Registered Agent                              Date

**Authorized Person(s) Detail :**

| Title | MGR |
|---|---|
| Name | ARUSY, EITAN |
| Address | 3010 N MILITARY TRAIL SUITE 318 |
| City-State-Zip: | BOCA RATON FL 33431 |

*I hereby certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am a managing member or manager of the limited liability company or the receiver or trustee empowered to execute this report as required by Chapter 605, Florida Statutes; and that my name appears above, or on an attachment with all other like empowered.*

SIGNATURE: EITAN ARUSY                    OWNER                    03/11/2022
_____                          _____
Electronic Signature of Signing Authorized Person(s) Detail                    Date

# EXHIBIT C

# BUSINESS DEPOSIT ACCOUNT APPLICATION
## (Addendum A-Additional Account Information)


citi®

### MAJOR SUPPLIERS - Provide the names and locations of your top three suppliers

**Please Note:** Basic operating expenses such as office supplies, rent, utilities do not generally need to be listed. If you have no major suppliers, then provide explanation.

| Name | Location |
|---|---|
| GADOT INFORMATION SERVICES | JERUSALEM, ISRAEL |
| Name | Location |
| Name | Location |

**Explanation** (if applicable):

### MAJOR CUSTOMERS

Select one:  ☐ Retail – sells to general public
☒ Other – list top three customers and locations in adjacent fields

| Name | Location |
|---|---|
| PAGE GROUP | DUBAI, UNITED ARAB EMIRATES |
| DCI GROUP | WASHINGTON, USA |
| GLOBAL IMPACT | DELAWARE, USA |

### TRANSACTION DETAILS - Indicate types of transactions you intend to complete and provide details on each. Required for each account except standard CDs.

**Cash Deposits?**   ☒ Yes  ☐ No
If Yes: Will total value of cash deposits be more than $9000 per month?   ☐ Yes  ☒ No
Dollar Range per Month:
☒ Under $25,000
☐ $25,000 - $74,999
☐ $75,000 - $119,999
☐ $120,000 or more

Transactions Per Month
☒ 1-10   ☐ 11-20
☐ 21-50  ☐ 51 or more

**Cash Withdrawals (Including ATMs)?**   ☐ Yes  ☒ No
If Yes:
Dollar Range per Month:
☐ Under $25,000
☐ $25,000 - $74,999
☐ $75,000 - $119,999
☐ $120,000 or more

Transactions Per Month
☐ 1-10   ☐ 11-20
☐ 21-50  ☐ 51 or more

**Deposit Official Checks, Money Orders or Travelers Checks?**   ☐ Yes  ☒ No
If Yes: Will total value of these deposits be more than $9000 per month?   ☐ Yes  ☐ No
Dollar Range per Month:
☐ Under $10,000
☐ $10,000 - $25,000
☐ $25,001 - $50,000
☐ Other: _____

Transactions Per Month
☐ 1-5   ☐ 6-10
☐ 11-20  ☐ 20+

**Purchase Official Checks, Money Orders or Travelers Checks?**   ☐ Yes  ☒ No
If Yes:
Dollar Range per Month:
☐ Under $10,000
☐ $10,000 - $25,000
☐ $25,001 - $50,000
☐ Other: _____

Transactions Per Month
☐ 1-5   ☐ 6-10
☐ 11-20  ☐ 20+

**Receive Wire Transfers (Domestic and/or International)?**   ☒ Yes  ☐ No
If Yes:
Dollar Range per Month:
☒ Under $250,000
☐ $250,000 - Under $1 Million
☐ $1 Million - Under $2.5 Million
☐ $2.5 Million or more

Transactions Per Month
☒ 1-10   ☐ 11-20
☐ 21-50  ☐ 51 or more

**Send Wire Transfers (Domestic and/or International)?**   ☒ Yes  ☐ No
If Yes:
Dollar Range per Month:
☒ Under $250,000
☐ $250,000 - Under $1 Million
☐ $1 Million - Under $2.5 Million
☐ $2.5 Million or more

Transactions Per Month
☒ 1-10   ☐ 11-20
☐ 21-50  ☐ 51 or more

| | Select One | Country (Non-US) | Frequency per Month | Approximate Amount per Wire | Purpose or Reason for Wire |
|---|---|---|---|---|---|
| **Send/Receive Wire Transfers outside the United States?** ☒ Yes  ☐ No If Yes, complete adjacent fields | ☒ Send ☐ Receive | ISRAEL | ☒ 1-10  ☐ 11-20 ☐ 21-50  ☐ 51 or more | $100,000.00 | IT ANALYSIS SERVICES |
| | ☐ Send ☒ Receive | UNITED ARAB EMI | ☒ 1-10  ☐ 11-20 ☐ 21-50  ☐ 51 or more | $250,000.00 | SERVICES |
| | ☐ Send ☒ Receive | UNITED KINGDOM | ☒ 1-10  ☐ 11-20 ☐ 21-50  ☐ 51 or more | $250,000.00 | SERVICES |
| | ☐ Send ☒ Receive | HONGKONG | ☒ 1-10  ☐ 11-20 ☐ 21-50  ☐ 51 or more | $250,000.00 | SERVICES |

© 2017 Citibank, N.A., Member FDIC. Citi with Arc Design is a registered service mark of Citigroup Inc.
(Eff. 04/2017)

1536653  9882  03/17



<strong>Your checking account</strong>

INSIGHT ANALYSIS AND RESEARCH LLC   |   Account # ████ 6319   |   December 1, 2017 to December 31, 2017

## Deposits and other credits

| Date | Description | Amount |
|---|---|---|



| **Total deposits and other credits** | | **$459,950.00** |

## Withdrawals and other debits

| Date | Description | Amount |
|---|---|---|



| 12/26/17 | WIRE TYPE:WIRE OUT DATE:171226 TIME:0525 ET TRN:2017122600130426 SERVICE REF:002384 BNF:GLOBAL IMPACT SERVICES LLC ID:0005163213135 BNF BK:BB&T WASHINGTON DC ID:054001547 PMT DET:219 422898 | -200,000.00 |
| 12/28/17 | TRANSFER INSIGHT ANALYSIS AND:Global Impact Servic Confirmation# 0548366778 | -60,000.00 |

Card account # XXXX XXXX XXXX 7530

| **Subtotal for card account # XXXX XXXX XXXX 7530** | | **-$92.70** |
| **Total withdrawals and other debits** | | **-$430,092.70** |

Bank of America **Business Advantage**

## Thank you for your business.
## Here's to your continued success.

We're committed to finding the smartest path to long-term growth for your business.

Our small business specialists will work to help you strengthen your business and plan for the future. Please visit **bankofamerica.com/smallbusiness** to learn more.

ARLLD94V   SSM-02-17-0642.B



**Your checking account**

INSIGHT ANALYSIS AND RESEARCH LLC   |   Account # REDACTED 6319   |   September 1, 2020 to September 30, 2020

## Deposits and other credits

| Date | Description | Amount |
|------|-------------|--------|
| 09/08/20 | WIRE TYPE:WIRE IN DATE: 200908 TIME:0659 ET TRN:20200908█████1935 SEQ:2020090800001839/453440 ORIG:GLOBAL IMPACT SERVICES LL ID:0005163213135 SND BK:BRANCH BANKING AND TRUST COMP ID:0160 PMT DET: 8734120WTQPINVOICE 1048 | 65,000.00 |
| 09/24/20 | WIRE TYPE:WIRE IN DATE: 200924 TIME:0822 ET TRN:20200924████8005 SEQ:2020092400001941/290680 ORIG:GLOBAL IMPACT SERVICES LL ID:0005163213135 SND BK:BRANCH BANKING AND TRUST COMP ID:0160 PMT DET: 8774918WTQPINVOICE 1049 | 71,000.00 |

**Total deposits and other credits** **$136,000.00**

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|--------|



Card account # XXXX XXXX XXXX 7530

*continued on the next page*

BANK OF AMERICA BUSINESS ADVANTAGE

## What's on your mind?

Business owners like you can join the Bank of America® Advisory Panel to help us understand what you like and don't like. Enter code **SBDD** at **bankofamerica.com/AdvisoryPanel** to learn more and join.

Inclusion on the Advisory Panel subject to qualifications.

SSM-09-19-0761.D1 | ARG5T4RM

CONFIDENTIAL

BANA_Azima 000109

**BANK OF AMERICA** 

## Your checking account

INSIGHT ANALYSIS AND RESEARCH LLC   |   Account # REDACTED 6319   |   October 1, 2020 to October 31, 2020

## Deposits and other credits

| Date | Description | Amount |
|------|-------------|--------|
| 10/16/20 | WIRE TYPE:WIRE IN DATE: 201016 TIME:0706 ET TRN:20201016 [REDACTED] 8269 SEQ:2020101600001128/258057 ORIG:GLOBAL IMPACT SERVICES LL ID:0005163213135 SND BK:BRANCH BANKING AND TRUST COMP ID:0160 PMT DET: 8833188WTQPINVOICE 1050 | 70,000.00 |
| **Total deposits and other credits** | | **$70,000.00** |

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|--------|



Card account # XXXX XXXX XXXX 7530

*continued on the next page*

---

**BUSINESS ADVANTAGE**

## Connect your business apps through Cash Flow Monitor

Manage your finances from a single dashboard. Simply sign in to Online or Mobile Banking[1] to access Cash Flow Monitor and Connected Apps.

**To learn more, visit bankofamerica.com/CashFlowMonitor.**

[1] You must be enrolled in Business Advantage 360, our small business online banking, or Mobile Banking to use Cash Flow Monitor and Connected Apps, and have an eligible Bank of America® small business deposit account. Mobile Banking requires that you download the Mobile Banking app and is only available for select mobile devices. Message and data rates may apply.

SSM-06-20-0720.B | 3137334

CONFIDENTIAL

BANA_Azima 000117

**BANK OF AMERICA**

## Your checking account

INSIGHT ANALYSIS AND RESEARCH LLC   |   Account # REDACTED 6319   |   November 1, 2020 to November 30, 2020

## Deposits and other credits

| Date | Description | Amount |
|------|-------------|--------|
| | ███████████████████████ REDACTED ███████████ | █████ |
| 11/09/20 | WIRE TYPE:WIRE IN DATE: 201109 TIME:0539 ET TRN:20201109██ REDACTED ██9591 SEQ:2020110900000597/244835 ORIG:GLOBAL IMPACT SERVICES LL ID:0005163213135 SND BK:BRANCH BANKING AND TRUST COMP ID:0160 PMT DET: 8891976WTQPINVOICE 1051 | 71,000.00 |

**Total deposits and other credits** **$95,000.00**

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|--------|
| ████ | ████████████████████ REDACTED ████████ | ███ |
| ████ | ████████████████████ REDACTED ████████ | ███ |
| ████ | ████████████████████ REDACTED ████████ | |

Card account # XXXX XXXX XXXX 7530

| | | |
|---|---|---|
| ████ | ████████████████████████ | ██ |
| ████ | ██████████████ | ██ |
| ████ | ████████████████ | ██ |
| ████ | ████████████████████ | ██ |
| ████ | ██████████████████ | ██ |
| ████ | ████████████████████ | ██ |

*continued on the next page*



BANK OF AMERICA BUSINESS ADVANTAGE

## Thanks. Your business means a lot to us.

When you're running a small business, a little personal attention can make a big difference. Our small business specialists will work with you to help strengthen your business and plan for the future.
Visit **bankofamerica.com/SmallBusiness** to learn more.

SSM-01-20-2149.B | 2875325

CONFIDENTIAL

BANA_Azima 000123



**BANK OF AMERICA**

<span style="color:red">**Your checking account**</span>

INSIGHT ANALYSIS AND RESEARCH LLC   |   Account # REDACTED 6319   |   December 1, 2020 to December 31, 2020

---

## Deposits and other credits

| Date | Description | Amount |
|------|-------------|--------|
| 12/22/20 | WIRE TYPE:WIRE IN DATE: 201222 TIME:0656 ET TRN:20201222 REDACTED 0840 SEQ:2020122200001189/291619 ORIG:GLOBAL IMPACT SERVICES LL ID:0005163213135 SND BK:BRANCH BANKING AND TRUST COMP ID:0160 PMT DET: 8998617WTQPINVOICE #1052 | 66,000.00 |
| **Total deposits and other credits** | | **$66,000.00** |

## Withdrawals and other debits



| Date | Description | Amount |
|------|-------------|--------|

Card account # XXXX XXXX XXXX 7530

*continued on the next page*

---

BANK OF AMERICA BUSINESS ADVANTAGE

## Thanks. Your business means a lot to us.

When you're running a small business, a little personal attention can make a big difference. Our small business specialists will work with you to help strengthen your business and plan for the future.
Visit **bankofamerica.com/SmallBusiness** to learn more.

SSM-01-20-2149.B | 2875325

---



**Your checking account**

INSIGHT ANALYSIS AND RESEARCH LLC   |   Account # REDACTED 6319   |   January 1, 2021 to January 31, 2021

## Deposits and other credits

| Date | Description | Amount |
|------|-------------|--------|
| 01/20/21 | WIRE TYPE:WIRE IN DATE: 210120 TIME:0657 ET TRN:20210120▮▮▮▮5572 SEQ:2021012000000734/273434 ORIG:GLOBAL IMPACT SERVICES LL ID:0005163213135 SND BK:BRANCH BANKING AND TRUST COMP ID:0160 PMT DET: 9060576WTQPINVOICE 1053 | 71,000.00 |
| 01/29/21 | WIRE TYPE:WIRE IN DATE: 210129 TIME:0837 ET TRN:20210129▮▮▮▮1066 SEQ:2021012900002085/390044 ORIG:GLOBAL IMPACT SERVICES LL ID:0005163213135 SND BK:BRANCH BANKING AND TRUST COMP ID:0160 PMT DET: 9083530WTQPINVOICE 1054 | 50,000.00 |
| **Total deposits and other credits** | | **$121,000.00** |

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|--------|



Card account # XXXX XXXX XXXX 7530

*continued on the next page*

---

BUSINESS ADVANTAGE

### Connect your business apps through Cash Flow Monitor

Manage your finances from a single dashboard. Simply sign in to Online or Mobile Banking[1] to access Cash Flow Monitor and Connected Apps.

**To learn more, visit bankofamerica.com/CashFlowMonitor.**

[1] You must be enrolled in Business Advantage 360, our small business online banking, or Mobile Banking to use Cash Flow Monitor and Connected Apps, and have an eligible Bank of America® small business deposit account. Mobile Banking requires that you download the Mobile Banking app and is only available for select mobile devices. Message and data rates may apply.

SSM-06-20-0720.B | 3137334

CONFIDENTIAL

BANA_Azima 000137



## Your checking account

INSIGHT ANALYSIS AND RESEARCH LLC   |   Account # REDACTED 6319   |   March 1, 2021 to March 31, 2021

## Deposits and other credits

| Date | Description | Amount |
|------|-------------|--------|
| 03/01/21 | WIRE TYPE:WIRE IN DATE: 210301 TIME:0703 ET TRN:20210301 REDACTED 9634 SEQ:2021030100001738/310385 ORIG:GLOBAL IMPACT SERVICES LL ID:0005163213135 SND BK:BRANCH BANKING AND TRUST COMP ID:0160 PMT DET: 9150487WTQPINVOICE 1055 | 100,000.00 |
| 03/15/21 | WIRE TYPE:WIRE IN DATE: 210315 TIME:0651 ET TRN:20210315 REDACTED 5654 SEQ:2021031500001235/297022 ORIG:GLOBAL IMPACT SERVICES LL ID:0005163213135 SND BK:BRANCH BANKING AND TRUST COMP ID:0160 PMT DET: 9182588WTQPINVOICE 1056 | 70,000.00 |

**Total deposits and other credits** **$170,000.00**

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|--------|



Card account # XXXX XXXX XXXX 7530

*continued on the next page*



BUSINESS ADVANTAGE

# Go paperless today!

Reduce the risk of lost or stolen mail. Plus, you can view your statements securely and easily—online or from our mobile app—24/7 from virtually anywhere.[1]

You can enroll today by logging in to Online Banking at **bankofamerica.com/SmallBusiness** and clicking on **Profiles & Settings** (in the upper right, next to Sign Out).

[1]Mobile Banking requires that you download the Mobile Banking app and is only available for select mobile devices. Message and data rates may apply.   SSM-04-20-0031.B | 3012579

CONFIDENTIAL

BANA_Azima 000151

## Your checking account


**BANK OF AMERICA**

INSIGHT ANALYSIS AND RESEARCH LLC   |   Account # REDACTED 6319   |   June 1, 2021 to June 30, 2021

## Deposits and other credits

| Date | Description | Amount |
|------|-------------|--------|
| 06/25/21 | WIRE TYPE:WIRE IN DATE: 210625 TIME:1004 ET TRN:20210625▮▮▮▮9378 SEQ:2021062500005266/378102 ORIG:GLOBAL IMPACT SERVICES LL ID:0005163213135 SND BK:TRUIST BANK ID:0160 PMT DET:INVOICE 1057 | 30,000.00 |

**Total deposits and other credits** **$31,960.00**

## Withdrawals and other debits

| Date | Description | Amount |
|------|-------------|--------|

Card account # XXXX XXXX XXXX 7530



*continued on the next page*

---

**BUSINESS ADVANTAGE**

### Connect your business apps through Cash Flow Monitor

Manage your finances from a single dashboard. Simply sign in to Online or Mobile Banking[1] to access Cash Flow Monitor and Connected Apps.

**To learn more, visit bankofamerica.com/CashFlowMonitor.**

[1] You must be enrolled in Business Advantage 360, our small business online banking, or Mobile Banking to use Cash Flow Monitor and Connected Apps, and have an eligible Bank of America® small business deposit account. Mobile Banking requires that you download the Mobile Banking app and is only available for select mobile devices. Message and data rates may apply.

SSM-06-20-0720.B | 3137334

 **BANK OF AMERICA**

# Your checking account

INSIGHT ANALYSIS AND RESEARCH LLC   |   Account # REDACTED 6319   |   September 1, 2021 to September 30, 2021

## Deposits and other credits

| Date | Description | Amount |
|---|---|---|
| 09/13/21 | WIRE TYPE:WIRE IN DATE: 210913 TIME:0617 ET TRN:20210913█████5537 SEQ:2021091300000974/267221 ORIG:GLOBAL IMPACT SERVICES LL ID:0005163213135 SND BK:TRUIST BANK ID:0160 PMT DET:INVOICE 1058 | 42,000.00 |
| **Total deposits and other credits** | | **$42,000.00** |

## Withdrawals and other debits

| Date | Description | Amount |
|---|---|---|



Card account # XXXX XXXX XXXX 7530

| | | |
|---|---|---|
| **Subtotal for card account # XXXX XXXX XXXX 7530** | | **-$128.33** |
| **Total withdrawals and other debits** | | **-$73,611.64** |

## Service fees

The Monthly Fee on your primary Business Advantage Relationship Banking account was waived for the statement period ending 08/31/21. A check mark below indicates the requirement(s) you have met to qualify for the Monthly Fee waiver on the account.

✓  $15,000+ combined average monthly balance in linked business accounts has been met

◯  Become a member of Preferred Rewards for Business has not been met

For information on how to open a new product, link an existing service to your account, or about Preferred Rewards for Business please call 1.888.BUSINESS or visit bankofamerica.com/smallbusiness.



SMALL BUSINESS RESOURCES

## Information you need to guide your business every step of the way

Learn cash flow strategies, explore funding options, unlock the secrets of hiring and retaining employees and much more.

Visit **bankofamerica.com/SBR** today.

SSM-06-21-0059.B | 3598723

CONFIDENTIAL

# EXHIBIT D

Appellant
S. Page
First Affidavit
Exhibit: "SRP-1"
7 January 2022

**UKSC 2021/0084**
**ON APPEAL FROM**
**CA No. A3/2020/1271**
**[2021] EWCA Civ 349**

**IN THE SUPREME COURT OF THE UNITED KINGDOM**
**ON APPEAL FROM THE COURT OF APPEAL**
**(ENGLAND)**

**BETWEEN**

### RAS AL KHAIMAH INVESTMENT AUTHORITY

**Respondent**

**and**

### FARHAD AZIMA

**Appellant**

---

### AFFIDAVIT OF STUART ROBERT PAGE

---

I, **STUART ROBERT PAGE**, of 14 Montpellier Road, London, W5 2QP, **STATE ON OATH** as follows:

1      I make this affidavit at the request of Farhad Azima ("**Mr Azima**"), the Appellant, who I understand has a pending application for permission to appeal to the Supreme Court, and that the evidence I give in this affidavit may be relevant to that application.

2      I have prepared this affidavit in a fairly limited time period as I understand that Mr Azima's application may be decided imminently, and so I have not had the opportunity to review the full range of potentially relevant documents that are available to me. I am therefore preparing this affidavit largely from memory and with limited assistance from documents. Subject to this point, and except where I indicate otherwise below, the facts and matters stated in this affidavit are within my own knowledge and are true. Where information has been supplied to me by others, its source is identified and I believe it to be true.

3      In this affidavit I refer to documents which together comprise exhibit **"SRP-1"**. References to page numbers in bold in squared brackets in this affidavit are references to that exhibit.

4      As a result of previous work I carried out on behalf of the Ruler of Ras Al Khaimah ("**RAK**") (the "**Ruler**"), I gave evidence for the Ras Al Khaimah Investment Authority ("**RAKIA**"), the Respondent, in these proceedings during the trial which took place in January and February 2020 before Deputy Judge Lenon QC (the "**First Trial**"). As such, I provided a witness statement dated 20 June 2019 [**SRP-1/1-7**] (my "**Witness Statement**") and gave evidence at the First Trial on 29 January 2020. A transcript of my oral evidence is at [**SRP-1/8-35**].

5      I make this affidavit to supplement the evidence which I gave at the First Trial in the present proceedings. I also want take this opportunity to correct part of that evidence, as set out below.

**My role in the investigation of Khater Massaad**

6      I was engaged by the Ruler to investigate Khater Massaad ("**Khater**") in January 2015, in relation to the misappropriation of a large amount of government funds. Khater had previously been the main advisor to the Ruler and a close confidante and friend, and he sat on the board of a number of RAK entities.

7      The Ruler initially asked me to meet with Mr Jamie Buchanan ("**Jamie**"), to whom I reported during the course of my mandate, until Jamie left RAK in the summer of 2019. In the course of my mandate, I also worked alongside Mr Neil Gerrard ("**Neil**") of Dechert LLP ("**Dechert**"), although I was never instructed by him in relation to the investigation into Khater.

8      In addition to the general mandate described above, Jamie provided more detailed instructions and requested that my investigation looked into:

8.1      Khater's alleged connection with Hezbollah, a prescribed terrorist organisation, in Lebanon, and alleged assistance in relation to their funding;

8.2      Khater's assets and business interests, particularly in Saudi Arabia;

8.3      A concern that Khater was allegedly working with other members of the Ruler's family to overthrow the Ruler;

8.4      Khater's connections with Iran, and in particular an alleged connection to Iran's Islamic Revolutionary Guard Corps (the "**IRGC**"); and

8.5      Khater's business associates, in particular his association with Viktor Bout (to whom I refer in my Witness Statement).

9       Soon after meeting with Jamie in 2015, I instructed Amit (of Insight – the company which I identified during my oral testimony at the First Trial as having assisted me with the preparation of the reports I presented to the Ruler, Jamie and Neil) to assist with the investigation. Amit is a former Israeli intelligence officer, formerly of Shin Bet (Israel's internal security service), and his team of analysts had previous experience in military intelligence on behalf of the Israeli Defence Force. Consequently, Amit and his team had extensive knowledge of the methods used by Iran and the IRGC to move money in support of terrorist organisations. They also had multiple language skills (in particular Arabic and Farsi), and so were a natural choice for this project.

10      This project was given the codename "Project Beech" which was used between me, Amit and his team.

11      The investigation work was undertaken using three main sources of intelligence, namely:

11.1    HUMINT – human intelligence, which constituted cultivating individuals to provide information;

11.2    Open Source – research into corporate and other publicly available records; and

11.3    SIGINT – signal intelligence, which is intelligence-gathering by the interception of communications.

12      SIGINT is a term that originates from intercepting radio signals and tapping a target's phone, and continues to be used in the intelligence world (including the commercial investigations industry) to include the hacking of confidential emails and unauthorised access to other confidential electronic data, to be used as intelligence in support of an investigation.

13      My main point of contact was Amit, but I know that Amit used a number of analysts to assist with the project by analysing the raw data. I understood from Amit that Insight made use of subcontractors located outside of Israel which employed all the above means of intelligence gathering, including SIGINT and the use of hacking techniques for this purpose.

14      In addition to undertaking some of the investigative work for the project, my role also included ensuring that the reports Amit and Insight prepared were shared with the Ruler, Jamie and, later on, Neil as securely as possible (given the sensitivity of the reports and what they contained).

15      Amit and Insight authored monthly reports that spanned from February 2015 to May 2020. One of the reports entitled "Project Update" (dated 26 March 2015) which I have seen (in redacted form) in the context of the First Trial [**SRP-1/36-52**] was the second of these reports. The reports would generally include an executive summary, some raw data that had been obtained as a result of the investigation (usually contained within an appendix to the report), some analysis of this data, and recommendations and action points.

16      I recall that some of these reports also featured extracts from confidential documents (with the document itself then appended to or embedded in the report) which I concluded must have been obtained as part of Amit's and Insight's SIGINT work. It was obvious to me (and it would have been obvious to anyone else reading the reports) that such documents were obtained as a result of unauthorised access to computers.

17      I was paid around $300,000 per month (sometimes more) for this work from a variety of RAK entities. This sum would be subject to occasional uplifts for specific pieces of additional work or expenditure which fell outside the scope of my original mandate. Approximately $250,000 per month was then paid by me to Amit and Insight for their assistance. At various times, Jamie told me that the Ruler was considering cutting my budget. However, when I explained to Jamie and Neil that this would involve us losing access to some of Amit's sources and methods, Neil and Jamie were successful in ensuring that my budget remained at around this level throughout my engagement.

18      Given the nature of the people and organisations we were investigating (including those set out above), we adopted secure communications protocols for handling Amit's reports and sharing them with Jamie, Neil and the Ruler. The goal of this protocol was to leave no paper trail and to ensure that the reports were destroyed after having been read.

19      An email account was created that only Amit and I (and my personal assistant, Caroline Timberlake ("**Caroline**")) could access, and to which we knew the username and password. A draft email would be prepared (and stay in the draft folder of the email account) with instructions and a copy of the report. The report would then be downloaded to a standalone laptop (with no connection to my company's servers), printed from a standalone printer, and the draft message would be overwritten. The procedure is an electronic version of a protocol called a "dead letter box" for ensuring that there is no paper trail connecting a sender to a recipient.

20      Amit (or one of his team) would then use a secure messaging application (in the first instance, Silent Circle, and later on, Signal Messenger) to send a coded message to me (or occasionally Caroline) to indicate that there was something to be reviewed. These messages would then be deleted.

21      To discuss matters relating to Project Beech, other members of the team, including Jamie and Neil also used Confide (originally) and then moved to Signal later on. I also recall that Andrew Frank (who was part of RAKIA's strategy team – see below) routinely used Whatsapp.

22      Once the reports had been downloaded and printed in hard copy, Caroline was instructed to delete the electronic copy. The reports were hand-delivered to Jamie for his review, or would be left for him at his hotel in London with the concierge. I would also deliver the report in person to the Ruler in RAK as part of our regular private audiences.

23      At Jamie's request, I would also arrange for a copy of some of the reports (but not all of the reports) to be sent to Neil, starting in 2016. At first the reports were delivered (via courier or hand-delivered by Caroline) to Neil (or Neil's secretary) at Dechert's office in London. However, on one occasion, a report was opened by someone other than Neil or his secretary at Dechert. Given the obvious make-up of the report (as set out above), this caused Neil real concern, as he asked me to send future reports to his home in Nutley, East Sussex. Courier receipts and emails relating to the delivery of reports to Neil at Decherts and at his home are exhibited at [**SRP-1/53-73**].

24      The Ruler instructed me that I was not to send anything to him via electronic means or by courier: if I had something to give to him or something to report, I was to meet with him in person in RAK. Accordingly, for the duration of Project Beech, I met with the Ruler approximately every three to four weeks to provide an update on our investigation. I would usually meet Jamie beforehand and discuss the report in detail, and he would indicate any part of the report that he thought I needed to highlight to the Ruler. Normally Jamie would then also be present at those meetings with the Ruler, and very occasionally Neil would be in attendance as well.

25      A typical meeting with the Ruler would last about 45 minutes, of which the first fifteen minutes would be spent discussing world affairs, of which the Ruler is very knowledgeable. In my experience in the Arab world, Middle Eastern clients are unlikely to read lengthy documents, so frequently the Ruler asked me to give him an overview of where we were in the investigation, and occasionally would read the executive summary at the front of the report, but not the whole document. I would leave the copy of the report with the Ruler before I left.

26      At this point I wish to correct and clarify my evidence given at the First Trial, as I realise that I was unintentionally misleading when I said that my reports to clients, including the Ruler, were "invariably oral". What I meant was that my reports to the Ruler were invariably face to face, in the manner described above.

27      Every few months, Jamie returned to me the hard copies of the reports he held, on the understanding that I would then arrange for the reports to be destroyed (which I then did).

28      I also arranged meetings with Amit, Jamie, Neil and me between 2015 and 2019 in order to obtain guidance from Jamie and Neil as to the direction of the investigation. They were specifically interested in my investigation into the role played by Khater in RAKIA's sale of the Sheraton Metechi Hotel in Tblisi, Georgia to three Iranian buyers: Houshang Farsoudeh, Houshang Hosseinpour and Pourya Nayebi (who at the time of my investigation were on the US sanctions list). I recall that Jamie told me that Mr Azima had introduced the three buyers to the transaction and asked me to look into the sale of the hotel as part of my investigation. To the best of my recollection, the reports produced by Amit and his team in connection with this part of the investigation contained information derived from SIGINT material.

29      Starting in 2016, multiple meetings took place at Dechert's office in London. Dechert required visitors to sign in and show some form of identification. To the best of my knowledge and belief, towards the end of 2016 or the beginning of 2017, Neil became increasingly concerned about meeting at Dechert's office as he did not want a written record indicating that Amit (or any other member of Amit's team) had visited him. It was after this that when we met in London, we gathered at Jamie's suite in the Churchill Hotel or in Amit's suite at the Metropolitan Hotel.

30 .    Jamie told me that he also attended strategy meetings in New York every four to six weeks with Andrew Frank (of Karv Communications) Amir Handjani ("**Amir**") (a close advisor to the Ruler) and Neil to discuss the investigation and RAK's litigation.

**Discovery of the hacked data**

31      As set out paragraphs 14 to 15 of my Witness Statement, Jamie told me that he understood that a negative publicity campaign had been threatened by Khater against the government of RAK and the Ruler, and asked me to keep my eye and ears open for anything about such a campaign that might be damaging for RAK.

32      I wish to correct the evidence I gave both in my Witness Statement and during my oral testimony at the First Trial as to the circumstances in which Mr Azima's confidential information came to be discovered.

33      The fact of the matter is that Majdi Halabi ("**Majdi**") had no role in the discovery of Mr Azima's confidential information. I provided incorrect testimony, claiming that (i) I had approached in him in relation to the threatened negative publicity campaign, and (ii) he had discovered the data. In fact, I approached Amit (and not Majdi) and asked him

to monitor the internet and dark web for such information, and it was Amit who told me about the data.

34    In August 2016, Amit provided to me the link to a tranche of Mr Azima's confidential data. To the best of my recollection, he shared the link with me using Signal. I do not know whether Amit found the data or whether he was passing on information that had been found by one of his analysts, but at the time I did not believe that Amit or his team had been involved in unlawfully accessing or disseminating the data. I then passed on the information to Jamie and Neil for their further handling. Amit, his team and I were not instructed to download or review the material, and so I had no further involvement in handling this material. However, in 2018, in the context of these proceedings, it became clear that Neil was desperate to rely on this material for RAKIA's claims against Mr Azima.

35    During the second half of 2018, it therefore became necessary for RAKIA to confirm and commit to a case as to how it had discovered the confidential data. In November 2018, my name was disclosed by RAKIA to Mr Azima in the context of these proceedings as being the person who informed them of the existence of the tranches of data. However, Amit, and later on, Jamie and Neil, had concerns about revealing that Amit was in turn the person who had told me about the data, and Amit told me that he did not want his name disclosed in proceedings, for fear that, by inference, Insight would be accused of being responsible for hacking. Further, there was a concern that it would be politically embarrassing for the Ruler if it came to light that an Israeli firm had been working for RAK. At this time there were no diplomatic relations between the State of Israel and the UAE.

**Meeting in Cyprus**

36    Consequently, there were a series of meetings between (variously) Amit, Jamie, Neil and me to discuss how to respond to Mr Azima's enquiries in these proceedings regarding how his data had been discovered by RAKIA.

37    Amit suggested that he would come up with an individual to act as a cover for the discovery, who later turned out to be Majdi, who I knew as one of Amit's subcontractors. I subsequently met with Majdi and Amit and we discussed the idea of Majdi being used as a cover for Amit's discovery of Mr Azima's data. I then discussed the idea of Majdi being used as a cover story with Jamie and Neil, and it was subsequently agreed that we would all meet to work out the plan. Initially Jamie, Neil and I discussed seeing the 'Israeli boys' (i.e. Amit and his team) in Israel as the safest option, but we later agreed to meet in Cyprus to sign off on the use of Majdi as a cover story.

38      We met in Cyprus on or around 21 November 2018. The meeting was attended by David Hughes (a partner, formerly with Neil at Dechert but, by this time, at Stewarts Law ("**David**")), Neil, Jamie, Majdi, Amit and me. It was agreed at this meeting that we would proceed with the cover story that Majdi (and not Amit) had discovered and passed the link to Mr Azima's confidential data to me, and that, if necessary, Majdi and I would be willing to provide witness testimony to this effect.

39      During this meeting, David raised his objection to the cover story, saying it was "*not credible*" and that it would not work, but Neil made it clear that this was going to be the best way forward, and that David needed to fall in line.

40      I subsequently met with Caroline Black and Dorothy Cory-Wright of Dechert and Lucy Ward of Stewarts Law to prepare my Witness Statement, which I signed on 20 June 2019.

41      I apologise unreservedly for the part I played in misleading the Court during the First Trial, and wish to state that the remainder of my evidence was true.

**Meeting with the FBI**

42      In mid-February 2019, Jamie advised me that the Ruler wished for me to attend a meeting with the FBI. On or around 21 February 2019, I therefore attended a meeting in New York at Dechert's office in order to meet with an FBI agent. My understanding was that the purpose of the meeting was to try to persuade the US authorities to open an investigation into Mr Azima. This is based on my understanding that for some while, RAK had been attempting to persuade the Department of Justice and the FBI to open up such an investigation.

43      When I arrived, I met with Jamie, Neil and a Mr Chris Swecker ("**Chris**") who I understand is a lawyer and an ex-FBI agent. However, after we waited for a considerable time in the meeting for the FBI agent to arrive, I was told that the meeting needed to be cancelled due to a scheduling miscommunication. I returned to the UK and awaited further instructions.

44      In early to mid-March 2019, Jamie then advised me that the Ruler wished for me to return to the US for a further meeting, this time to Houston. I had not been briefed on what the meeting related to, but I was told that my expenses would be covered and that I should just make sure that I made myself available. On or around 17 March 2019, I met with Jamie, Neil, Chris and an FBI agent called Paul Zukas ("**Paul**") at the Hyatt Centric The Woodlands hotel in Houston.

45      In the course of my career, I have had numerous interactions with federal law enforcement agencies and the district attorney's office in New York. Those meetings always took place at the offices of the relevant organisation. I therefore found it

strange that the meeting with the FBI in Houston was held at a hotel and not at the field office. At that meeting, Chris told me that I was being considered as a potential witness for a grand jury and that the purpose of the meeting was to assess my credibility. Following the meeting, Jamie, Neil, Chris and I went for dinner with the assistant special agent in charge ("**ASAC**") of the Houston field office, whose name I do not now recall. In the course of that dinner it became apparent that Chris and the ASAC were friends.

**Meeting in Switzerland**

46      As the trial of the proceedings (i.e. the First Trial) approached (due to commence in January 2020), I was asked by Amit (who had in turn been instructed by Neil) to organise and attend a meeting with him, Jamie, Neil, and Majdi to rehearse our testimony for the First Trial. We settled on Switzerland as the location for the meeting.

47      This meeting took place over three days at a small boutique hotel in the mountains outside of Bern. Having reviewed my travel records [**SRP-1/74-90**], I arrived at the hotel on the evening of 1 December 2019 and I left on 4 December 2019.

48      Shortly before the meeting, I was told by Neil that the Ruler had instructed him to tell Jamie that the meeting was no longer going ahead. As far as I am aware, the Ruler had terminated Jamie's employment in the summer of 2019. I was told by Neil that the Ruler therefore had concerns about whether he could be trusted to attend a meeting which required total secrecy.

49      Amit and some of his team also attended the meeting and provided extensive security for the meeting.

50      I had arranged for a special protocol to be in place to ensure maximum security and secrecy. I told Neil to leave his mobile phone at home or to switch it off so that his location could not be tracked. Neil, Caroline and I used burner phones for communication purposes, and I left my mobile phone at home.

51      To avoid detection, I did not fly direct to Switzerland. On 1 December, I took a series of trains from London to Paris Gare du Nord, then I transferred to Gare de l'Est. From Paris, I then took a train to Strasbourg, then to Basel and finally a train from Basel to Bern. In Bern, I was collected by a member of Amit's security team and driven to the hotel.

52      At the hotel, we went through a mock trial, with Neil acting as both the judge and the cross-examining counsel. An effort was made to perfect the narrative that we were to tell the English court about how I had discovered the hacked data through Majdi.

53      We made use of the hotel's private chef and their wine from the hotel's cellar. The day was a mixture of eating, drinking and sections of cross-examination by Neil to drill into our story. During one of the sessions, Neil said something to the effect of "*if they ever believe or prove that we are behind the hacking, then this thing is going to drag on for years*".

**Termination of my engagement**

54      Following the First Trial, my work for RAK continued until 1 June 2020 when my engagement was terminated. I believe that the last report I prepared was for May 2020. I set out below the circumstances leading up to the termination of my engagement.

55      In March 2020, I received a call from Amir who told me that I should have no further contact with Neil. By this time, Amir had become one of my points of contact for the investigation after Jamie's role had been terminated.

56      I assumed at this point that it was Neil who was being pushed out of the picture by the Ruler. I agreed to have no further contact with Neil.

57      It seemed that I was wrong in my assumption when, on 28 May 2020, I received a letter from the Investment & Development Office of the Government of RAK saying that my engagement had been terminated. The language seemed odd to me given that I had never had a formal written agreement with any particular RAK entity that could be terminated.

58      This came as a shock to me as I had frequently been told by Jamie that the Ruler was grateful for the work I had done for him.

59      I therefore telephoned Amir shortly after receiving the letter to ask what was going on. He told me that he knew nothing about this but that he would check the position with the Ruler. He then called me back along the lines that I should not worry, that it was all connected to internal politics and that I should be re-instated in a few months. However, that never happened, and I received a subsequent letter from the Investment & Development Office on 14 June 2020 confirming payment of my final

invoice.

**SWORN** by Stuart Robert Page

Signed:

Date: 7 January 2022

Before me:

Name: CRCAMPTON

Occupation: SOLICITOR

Address:

Ashfords LLP
1 New Fetter Lane
London
EC4A 1AN

CA No. A3/2020/1271
[2021] EWCA Civ 349

**IN THE SUPREME COURT OF THE UNITED KINGDOM**
**ON APPEAL FROM THE COURT OF APPEAL (ENGLAND)**

**BETWEEN**

**RAS AL KHAIMAH INVESTMENT AUTHORITY**

**Respondent**

**and**

**FARHAD AZIMA**

**Appellant**

---

**AFFIDAVIT OF STUART ROBERT PAGE**

---

**Burlingtons Legal LLP**
**5 Stratford Place**
**London**
**W1C 1AX**

**DX 82986 MAYFAIR**

**DH/AZI0003.2**

**Tel:     0207 529 5420**

**Solicitors for the Appellant**

# EXHIBIT E

Claimant

S R Page

3rd

Exhibit SRP3

Dated 7 February 2022

**IN THE HIGH COURT OF JUSTICE**                    **Claim no. QB-2020-002492**

**QUEEN'S BENCH DIVISION**

**B E T W E E N : -**

**STOKOE PARTNERSHIP SOLICITORS**

**Claimant**

**and**

**(1) MR PATRICK TRISTRAM FINUCANE GRAYSON**

**(2) GRAYSON + CO LIMITED**

~~**(3) MR STUART ROBERT PAGE**~~

~~**(4) PAGE CORPORATE INVESTIGATIONS LIMITED**~~

**(5) DECHERT LLP**

**(6) MR DAVID NEIL GERRARD**

**Defendants**

———————————————————

**THIRD WITNESS STATEMENT OF**

**STUART ROBERT PAGE**

———————————————————

I, **STUART ROBERT PAGE,** of 14 Montpelier Road, London, W5 2QP, **WILL SAY** as follows:

482

**A.    INTRODUCTION**

1.    I am the same Stuart Page who has made two previous witness statements in these proceedings (dated 12 March 2021 and 14 May 2021 respectively). I was formerly the Third Defendant to these proceedings.

2.    I make this statement in connection with the application of Stokoe Partnership Solicitors ("**Stokoe**"), the Claimant, to adjourn the trial in these proceedings, which I understand will  be determined at a pre-trial review hearing on  11 February 2022. I have therefore prepared this statement in a limited time period with limited reference to documents, and so it is not as detailed as it could be.

3.    Subject to this point, and except where I indicate otherwise below, the facts and matters set out in this witness statement are within my own knowledge and I believe them to be true. Where information has been supplied to me by others, its source is identified and I believe it to be true.

4.    In this witness statement I refer to documents which together comprise exhibit "**SRP-3**". References to page numbers in bold in squared brackets in this witness statement are references to that exhibit.

**B.    ENGAGEMENT IN RAS AL KHAIMAH**

5.    In 2008, I was approached by Khater Massaad ("**Khater**"), the CEO of RAK Ceramics who was an adviser to His Highness Saud bin Saqr Al Qasimi (**"Sheikh Saud"**, and later, "**the Ruler**"), then the Crown Prince of Ras Al Khaimah ("**RAK**"). I was instructed to assist Sheikh Saud in a dispute with his half-brother. This engagement came to an end in 2010 when Sheikh Saud's father passed away and Sheikh Saud succeeded him as the Ruler.

6.    In 2014, I read a press report that there was an ongoing investigation into financial irregularities at RAK Airways. I contacted an associate and asked whether there was anything I could assist with. I had a meeting with the Ruler but at first nothing came of it. In around January 2015, a meeting was set up between me and Jamie Buchanan ("**Jamie**") who was then CEO of RAK Development LLC and adviser to the Ruler. Shortly afterwards, Jamie and I had another meeting in Dubai and he asked me to assist

483

with an investigation into Khater who it was believed had misappropriated a very significant amount of RAK government funds. At that stage, I was instructed to investigate Khater's assets,  his connections with Iran, his alleged links to Hezbollah in Lebanon and his relationship with Viktor Bout (who was serving a sentence in the US for arms trafficking), and to look into whether Khater was working with other members of the Ruler's family to overthrow the Ruler.

7.    Soon after I received these instructions from Jamie, I instructed Amit Forlit ("**Amit**") from Insight to assist with the investigation. Amit is a former Israeli intelligence officer, formerly of Shin Bet (Israel's internal security service) and his team had experience of working in military intelligence on behalf of the Israeli Defence Force. The project was given the codename "Project Beech" which was used between me, Amit and his team. The investigation work was undertaken using three main sources of intelligence - human intelligence, open-source research, and what is known as SIGINT. SIGINT is a term that originates from intercepting communications such as radio signals and tapping a target's phone. The term is still widely used in the intelligence community (including the commercial investigations industry) to describe the hacking of confidential emails and the unauthorised access to other confidential electronic data, to be used as intelligence in support of an investigation.

8.    My main point of contact was Amit, but I know that he used several analysts, some of whom were located outside Israel.

9.    In about June 2015, approximately five months after receiving Jamie's instructions, I received a telephone call from Neil Gerrard ("**Neil**"), a partner in the law firm Dechert LLP ("**Dechert**") in which he said that he was a lawyer instructed by a mutual client, and he suggested that we should meet. The following day we met in Dechert's London office. Over the course of the following five years, I met Jamie frequently both in RAK and London, and also Neil and Amit on multiple occasions, to discuss various aspects of the investigations that I was engaged in, some of which are detailed below. Some meetings took place in Dechert's London office. However, to the best of my knowledge and belief, there came a time when Neil was uncomfortable with this as he did not want a written record that he was meeting Amit or Amit's team. After this, the meetings took place in other locations, such as hotels. Whilst we all did meet together, I know that Neil and Amit had a direct line of communication that did not involve me.

484

10. I was paid around $300,000 per month (sometimes more) for this work from a variety of RAK entities. This sum would be subject to occasional uplifts for specific pieces of additional work or expenditure which fell outside the scope of my original mandate. Approximately $250,000 per month was then paid by me to Amit and Insight for their assistance. At various times, Jamie told me that the Ruler was considering cutting my budget. However, when I explained to Jamie and Neil that this would involve us losing access to some of Amit's sources and methods, Neil and Jamie were successful in ensuring that my budget remained at around this level throughout my engagement.

C.   **METHOD OF REPORTING AND COMMUNICATIONS**

11. Amit and Insight authored monthly reports that spanned from February 2015 to May 2020. The reports usually included an executive summary, some raw data that had been obtained as a result of the investigation, some analysis of the data and recommendations and action points. I also recall that some of the reports contained extracts from confidential documents, with the document itself appended to or embedded in the report. Given the content of these extracts, it was obvious that they had been obtained as part of Amit and Insight's SIGINT work, in other words as a result of unauthorised access to computers and other devices.

12. Strict protocols for the handling and the sharing of the reports between myself, the Ruler and Jamie (and Neil on occasions where Jamie asked me to provide him a copy of selected reports) were introduced. The object of the protocols was to ensure that there was no paper trail left for others to find and that the reports themselves were destroyed.

13. As part of the effort to make sure that the reports were only seen by those who we wanted to see them, an email account was created that only Amit, specified members of his team and my personal assistant, Caroline Timberlake ("**Caroline**") could access. A draft email would be prepared with instructions and a copy of the report. The email would never be sent, but the report would be downloaded from the draft email account onto a laptop that was not connected to any server, printed from a printer which was not connected to a network, and the draft message was then overwritten. Amit (or one of his team) then sent a secure coded message informing me or Caroline that there was something to be reviewed. The coded message would then be deleted.

485

14.   The printed copy of the report would be hand delivered to Jamie for his review, or would be left at his hotel when he stayed in London. The Ruler instructed me that I was not to send him anything electronically, which meant that I had personally to hand-deliver all the reports to him in RAK. I did this as part of our regular private meetings, which took place every three to four weeks.

15.   As for Neil, when Jamie asked me to send the reports to him, I initially sent them via courier (or Caroline would hand-deliver them) to Neil or his secretary at Dechert's office in London. However, on one occasion, a report was opened by somebody other than Neil or his secretary in Dechert. Given the content of the report, Neil was very concerned and, after this, he asked me to send any future reports to his home address in East Sussex. Courier receipts and emails relating to the delivery of these reports to Dechert's office and Neil's home address are exhibited at [**SRP3/2-22**].

16.   Every few months, Jamie returned the reports to me so that I could destroy them securely, which I did.

17.   Any matters emanating from the reports or wider investigations that required Neil, Jamie and I to discuss them would either be discussed face to face or via Confide, and later Signal, a secure and encrypted network.

## D.   AZIMA MATERIAL

18.   During one of my regular meetings with Jamie in early 2015 he mentioned Farhad Azima ("**Azima**"). This was the first time I had heard that name. Some time after that, Jamie told me that Khater had threatened a negative publicity campaign against the government of RAK and the Ruler and asked me to keep my eyes and ears open for anything that could be considered damaging to RAK.

19.   On 22 January 2020, a trial concerning a dispute between Ras Al Khaimah Investment Authority ("**RAKIA**") and Azima commenced before the High Court in London (the "**Azima Trial**"). On 29 January 2020 I gave evidence at the Azima Trial and exhibit a transcript of that evidence [**SRP3/23-50**]. In my witness statement and testimony at the Azima Trial, I stated things that were inaccurate. I have subsequently corrected these inaccuracies in an affidavit dated 7 January 2022 that was prepared for an application Azima is making before the Supreme Court [**SRP3/51-62**].

486

20.   In summary, my evidence at the Azima Trial was that links to confidential material belonging to Azima, which had been obtained unlawfully and uploaded to the internet, had been drawn to my attention in 2016 by a journalist, Majdi Halabi ("**Majdi**"). That is inaccurate. It was in fact Amit who brought the links to the material to my attention.

21.   However,  between the discovery of the material in 2016 and the Azima Trial, once it became apparent that RAKIA wanted to rely on this material for its claims against Azima, Amit, and later on, Jamie and Neil, had concerns about revealing that Amit had told me about the data, and Amit told me that he did not want his name disclosed in legal proceedings. Further, there was a concern that it would be politically embarrassing for the Ruler if it came to light that an Israeli firm had been working for RAK because, at that time, there were no diplomatic relations between the State of Israel and the UAE. There followed a series of meetings between Neil, Jamie, Amit and me to discuss how to respond to the enquiries from Azima's legal team as to how the material had been discovered by RAKIA. During one of these meetings, Amit suggested that we simply introduce another person to the story and say that this person was the one who discovered the material. It was against that background that I met Majdi. I discussed the cover story with Neil and Jamie and we agreed to meet to work out a plan.

22.   In October and November 2018, there were two meetings in Cyprus, which were attended by Amit, Neil, David Hughes ("**David**") (a former colleague of Neil's at Dechert, where both had been partners, but at the time working at Stewarts Law LLP), Majdi, and me, at which we agreed that we would proceed with the cover story that Majdi had discovered the material. As I recall, Jamie and I travelled together to the first of those meetings, but to the best of my recollection he was not present at the second meeting. I also recall that David voiced his scepticism as to whether the story was credible, and did not think it would work, but Neil made it clear that this was the best way forward and that David would have to go along with it.

23.   As the Azima Trial approached, Amit called me and told me that Neil wanted to meet with me, Amit, Majdi and Jamie to go through the evidence that we were to give at the Azima Trial. We then settled on Switzerland as the location for the meeting because it was convenient for Neil given the time constraints arising from his other work commitments. The meeting took place between 1 and 4 December 2019 in a small hotel outside Bern in Switzerland. The attendees were Neil, Amit, Majdi and me, and Jamie

487

did not attend. During our stay at the hotel, we went through a mock trial, with Neil acting as both judge and cross-examining counsel. This was all done to perfect the cover story as to how the hacked material had been discovered. At one point during the time we spent together, Neil said to me something to the effect of "if they ever believe or prove that we are behind the hacking, then this thing is going to drag on for years."

24. Given the nature of what we were discussing at the hotel, a number of security protocols were put in place. I told Neil to leave his mobile phone at home or to switch it off, and I provided burner phones for me and him to use. To avoid detection, I did not fly to Switzerland but instead took a train via Paris, Strasbourg, Basel and then to Bern.

## E.   RAC MEETING

25. Very shortly after I gave evidence in the Azima Trial, I was contacted by Amir Handjani ("**Amir**"), a very close adviser to the Ruler. I had first seen Amir in the court room during the Azima Trial and I had given him my mobile number. Amir suggested that we meet for a coffee that weekend. On 1 or 2 February 2020, we met in a coffee shop in London's West End for about thirty minutes. One of the topics of conversation during that meeting was the litigation that RAK and the Ruler were involved in. A short time after that meeting, he contacted me again and said that Neil thought it would be a good idea if the three of us met. Neil was a member of the RAC club, a private members' club on Pall Mall, and so we arranged to meet there for breakfast a few days later.

26. During that breakfast, one of the topics of conversation that came up was the funding of various proceedings involving RAK. We had recently been present at the Azima Trial, and the funding of the Azima proceedings had been a topic of conversation for a number of years by that point. A few days beforehand, on 28 January 2020, further proceedings had been issued by Karam Al Sadeq ("**Al Sadeq**") against various defendants, including Dechert and Neil, which related to RAK and which had been reported in the press. Neil then said words to the effect of "we need you to find out who is funding all of this". Neil and Amir then instructed me to do this. At this stage, I was still receiving my payment from RAK and so they paid for whatever investigations I carried out.

27. Shortly after the meeting, I instructed Amit to investigate who was funding these cases. Neil was aware that I used Amit to carry out these types of investigations and he was aware of the type of methods that Amit used, including SIGINT.

488

28.   For completeness, I wish to record that at that stage I did not know about Stokoe's representation of Al Sadeq.

**F.   GATWICK SERVICE STATION MEETING**

29.   On my instructions, and based upon what Neil had asked me to do at the RAC meeting, Amit produced a report sometime in April or May 2020. I recall that he was sensitive about who saw this report.

30.   I sent the report by Signal to Amir. Neil and I agreed to meet at a service station near Gatwick Airport to show him the report. We chose that location because Neil believed that he was under surveillance, and that this was somewhere where he could not be easily observed covertly.

31.   I read the report at the time and whilst I cannot now recall the specific contents, I do remember that it dealt with how the RAK-related litigation was being funded.

32.   When I met Neil, I gave him a copy of the report and he read it, but I did not let him take the document with him, and I took the report away with me and destroyed it. I do recall that Neil did not look surprised or concerned by the contents of the report, which I found strange at the time.

**G.   STOKOE PROCEEDINGS**

33.   Some time before I was served in these proceedings, I received a call from Amir who told me that, on the Ruler's instructions, I should work with the lawyers defending the Al Sadeq proceedings in relation to the allegations that formed part of Al Sadeq's case about surveillance on Stokoe in Dubai. Amir also sent me an extract of the document which contained these allegations Although I contacted Enyo Law and discussed the matter briefly with Edward Allen, a partner at the firm, nothing further came of it. From what I am aware, at that time Enyo Law represented neither the Ruler nor RAK but did represent Neil and Dechert in the Al Sadeq proceedings. For the avoidance of doubt, I had no involvement in the alleged surveillance of those acting on behalf of Al Sadeq as alleged in the Al Sadeq proceedings, and in particular I did not break into the hotel room of one of Al Sadeq's solicitors in Dubai.

489

34. Paul Robinson ("**Paul**") was served with proceedings in a claim by Stokoe on 1 July 2020. I have known Paul for a long time and we have a friendly professional relationship. Shortly after he was served, he sent me some of the documents from that claim via Signal, for the reason that I was named in those proceedings. I then sent them on to Neil to inform him of what was happening.

**<u>STATEMENT OF TRUTH</u>**

I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed        ……………………………………………

Stuart Robert Page

Dated        7 February 2022

490

**IN THE HIGH COURT OF JUSTICE**          Claim no. QB-2020-002492

**QUEEN'S BENCH DIVISION**


B E T W E E N : -


STOKOE PARTNERSHIP SOLICITORS

<u>Claimant</u>

**and**


**(1) MR PATRICK TRISTRAM FINUCANE GRAYSON**

**(2) GRAYSON + CO LIMITED**

~~**(3) MR STUART ROBERT PAGE**~~

~~**(4) PAGE CORPORATE INVESTIGATIONS LIMITED**~~

**(5) DECHERT LLP**

**(6) MR DAVID NEIL GERRARD**

<u>Defendants</u>

_____


**EXHIBIT SRP3**

_____


| ITEM | EXHIBIT | PAGE |
|------|---------|------|
| 1 | Courier receipts and emails relating to the delivery of these reports to Decherts and Neil's home address | 2 - 22 |
| 2 | Transcript of Stuart Page's evidence at trial in RAKIA v Azima | 23 – 50 |
| 3 | Affidavit of Stuart Page dated 7 January 2022 prepared for an application by Farhad Azima before the Supreme Court in RAKIA v Azima [2021] EWCA Civ 349 | 51 – 62 |

491

From:      Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent:      21 April 2016 14:10
To:      Caroline Timberlake
Subject:    Re: Bike to Dechert LLP

Hi Caroline

That's all booked in for you.

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427

<u>Click here to follow us on Linkedin</u>



This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately.  Thank you for your understanding.

On 21 April 2016 at 14:02 Caroline Timberlake wrote:

Howdo Jignesh, need another bike to Decherts this afternoon please:

Pick up:      Page Group Ltd, 1 Catherine Place, 2nd Floor, SW1E 6DX

Deliver to:    Neil Gerrard, 160 Queen Victoria Street, EC4V 4QQ – tel: +44 20 7184 7527 Direct / +44 20 7184 7000 Main

Cheers

C

**From:** Jignesh Shah [mailto:jignesh.shah@apexcouriers.co.uk]
**Sent:** 14 April 2016 11:56
**To:** Caroline Timberlake
**Subject:** RE: Bike to Dechert LLP

Hi Caroline

I am pleased to confirm this was delivered at 1127 and signed for by 'POST JUNIOR'

492

Great to have you on board.

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427

Click here to follow us on Linkedin





This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately.  Thank you for your understanding.

On 14 April 2016 at 11:02 Caroline Timberlake <CTimberlake@pagegroupltd.com> wrote:

Many thanks Jignesh, bike already been and picked up.

Cheers

C

**From:** Jignesh Shah [mailto:jignesh.shah@apexcouriers.co.uk]
**Sent:** 14 April 2016 10:51
**To:** Caroline Timberlake <CTimberlake@pagegroupltd.com>
**Subject:** Bike to Dechert LLP

Hi Caroline

I am pleased to confirm your bike is booked in and your document should be collected in the next 90 minutes.

This will be £15 all in.

Thank you for choosing Apex.

493

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427

Click here to follow us on Linkedin



This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately.  Thank you for your understanding.

494

From:       Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent:       10 May 2016 11:04
To:         Caroline Timberlake
Subject:    Re: Bike to Dechert LLP

Hi Caroline

I am well.  Hope you are too.

Bike should be with you in 30 next minutes.

Thank you for choosing Apex!

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427

<u>Click here to follow us on Linkedin</u>



APEX

This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately.  Thank you for your understanding.

On 10 May 2016 at 10:59 Caroline Timberlake wrote:

Howdo Jignesh, need another bike to Decherts today please:

Pick up:        Page Group Ltd, 1 Catherine Place, 2nd Floor, SW1E 6DX

Deliver to:     Neil Gerrard, 160 Queen Victoria Street, EC4V 4QQ – tel: +44 20 7184 7527 Direct / +44 20 7184 7000 Main

Many thanks.

Cheers

C

495

From:       Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent:       05 July 2016 11:56
To:         Caroline Timberlake
Subject:    Re: Brussels and UK same day please

---

Hi Caroline

The bike is booked in for you.  Email you the label for Belgium very shortly.

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427

<u>Click here to follow us on Linkedin</u>



This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately.  Thank you for your understanding.


On 05 July 2016 at 11:47 Caroline Timberlake wrote:

Howdo Jignesh, hope alls well.  I have been away for a couple of weeks enjoying myself in the US of A (very glad I wasn't around for the EU referendum crap!!).  Please see below, one for Brussels and one for Decherts for this afternoon please.


Many thanks.

Kind regards,

Caroline


A4 Envelope 1kg to:


European External Action Service,

Field Security Division – MDR B1 (EEAS CORT 02/515),

For the attention of Mr Peter Cavendish,

9A Rond Point Schuman,

1046 Brussels

496

Belgium

Ref: May June Inv

Tel +3225843203

And same day to the usual place please:

Pick up:        Page Group Ltd, 1 Catherine Place, 2nd Floor, SW1E 6DX

Deliver to:     Neil Gerrard, 160 Queen Victoria Street, EC4V 4QQ – tel: +44 20 7184 7527 Direct / +44 20 7184 7000 Main

Many thanks.

Cheers

C

497

From:       Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent:       16 September 2016 11:51
To:         Caroline Timberlake
Subject:    Re: London pick up and delivery asap

---

Hi Caroline

No worries.  Should be with you in the next hour.

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427

<u>Click here to follow us on Linkedin</u>



This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately.  Thank you for your understanding.

On 16 September 2016 at 11:42 Caroline Timberlake wrote:

Howdo Jignesh,

Need pick up and delivery in London asap if possible

Pick up:  1 Catherine Place, 2nd Floor, SW1E 6DX

Delivery 1:  A4 envelope; 1kg

Neil Gerrard
Partner

Dechert LLP
+44 20 7184 7672 Direct
+44 7506 910 526 Mobile

Cheers

C

498

From:       Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent:       21 September 2016 13:31
To:         Caroline Timberlake
Cc:         customer.services@apexcouriers.co.uk
Subject:    Re: London pick up and delivery asap

---

Thanks, Caroline.

A rider should be with you in 60 mins.

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427



**APEX**

I am running this year's Royal Parks Half Marathon for World Child Cancer. My fundraising pledge could pay for a life-saving dose of chemotherapy for 7 children with cancer in Ghana. To donate, please visit my fundraising page here.

This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately. Thank you for your understanding.

On 21 September 2016 at 13:22 Caroline Timberlake wrote:

Howdo Jignesh/Shane

Need pick up and delivery in London asap:

Pick up:  1 Catherine Place, 2nd Floor, SW1E 6DX

Delivery 1:  A4 envelope; 1kg

Neil Gerrard
Partner

Decherts

160 Queen Victoria Street

London EC4V 4QQ
Dechert LLP
+44 20 7184 7672 Direct
+44 7506 910 526 Mobile

Many thanks.

Cheers

C

499

From:        Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent:        27 September 2016 15:10
To:          Caroline Timberlake
Subject:     Re: London pick up and delivery asap

---

Hi Caroline

This is booked in for you. Collection within 60 minutes.

Kind Regards

Jignesh Shah
0207 041 9427

On 27 Sep 2016, at 15:02, Caroline Timberlake <CTimberlake@pagegroupltd.com> wrote:


Howdo Jignesh/Shane

 Need pick up and delivery in London before 5pm please

Pick up:  1 Catherine Place, 2nd Floor, SW1E 6DX

Delivery 1:  A4 envelope; 1kg

Neil Gerrard
Partner

Decherts

160 Queen Victoria Street

London EC4V 4QQ
Dechert LLP
+44 20 7184 7672 Direct
+44 7506 910 526 Mobile

Many thanks.

Cheers

C

500

| | |
|---|---|
| From: | Jignesh Shah <jignesh.shah@apexcouriers.co.uk> |
| Sent: | 10 October 2016 13:41 |
| To: | Caroline Timberlake |
| Subject: | Re: London pick up and delivery x 2 |

Hi Caroline

All good with me.  Hope you're well?  These are booked in to be collected in the next hour for you.

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427



I am running this year's Royal Parks Half Marathon in support of World Child Cancer. Did you know for just £4 they could provide a child with life saving chemotherapy? To make a small contribution, feel free to visit my fundraising page here.

This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately.  Thank you for your understanding.

On 10 October 2016 at 13:26 Caroline Timberlake wrote:

Howdo Jignesh/Shane

Need pick up and delivery in London by end of today please:

Pick up:  1 Catherine Place, 2nd Floor, SW1E 6DX

Delivery 1:  A4 envelope; 1kg

Neil Gerrard
Partner

Decherts

160 Queen Victoria Street

London EC4V 4QQ
Dechert LLP
+44 20 7184 7672 Direct
+44 7506 910 526 Mobile

AND

Delivery 2:  A4 envelope; .5kg

F.A.O.: JAMES SMITH
Strictly Private & Confidential

501

c/o Hyatt Regency London - The Churchill
30 Portman Square
London
England
W1H 7BH
Tel: +44 (0) 20 7486 5800

Many thanks.

Cheers

C

From:       Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent:       21 October 2016 11:07
To:         Caroline Timberlake
Subject:    Re: Urgent London pick up and delivery

---

Hey Caroline

This is booked in for you.  Delivery by Noon is going to be really tough but I will see what can be done.

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427


**APEX**

I am running this year's Royal Parks Half Marathon in support of World Child Cancer.  Did you know for just £4 they could provide a child with life saving chemotherapy? To make a small contribution, feel free to visit my fundraising page here.

This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately.  Thank you for your understanding.


On 21 October 2016 at 10:51 Caroline Timberlake wrote:



Happy Friday Gents, could I get a bike asap pretty please, needs delivering before MIDDAY if at all possible.

a4 envelope; 0.5kg; docs

 To:

**NEIL GERRARD**

**Dechert LLP**
160 Queen Victoria Street
London EC4V 4QQ

+44 20 7184 7672 Direct

+44 7506 910 526 Mobile
+44 20 7184 7000 Main

 Many thanks.

Cheers

C

503

From:       Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent:        02 December 2016 09:54
To:          Caroline Timberlake
Subject:    Re: London pick up and delivery

---

Hi Caroline

Happy Friday!

Will have someone with you in the next hour.

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427



**APEX**

Please note our new address is Suite 4 Joanna House, 34 Central Road, Worcester Park, KT4 8XZ

This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately.  Thank you for your understanding.

On 02 December 2016 at 09:45 Caroline Timberlake wrote:

Howdo,

Need pick up and delivery in London by 2pm today please:

Pick up:  1 Catherine Place, 2nd Floor, SW1E 6DX

Delivery 1:  A4 envelope; 1kg

Neil Gerrard
Partner

Decherts

160 Queen Victoria Street

London EC4V 4QQ
Dechert LLP
+44 20 7184 7672 Direct

Many thanks.

Cheers

C

504

From:      Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent:      12 December 2016 15:25
To:      Caroline Timberlake
Subject:      Re: London pick up and delivery

---

Hey Caroline

That's all booked in for you.  Someone will be with you in the next 60-90 minutes.

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427



APEX

Please note our new address is Suite 4 Joanna House, 34 Central Road, Worcester Park, KT4 8XZ

This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately.  Thank you for your understanding.

On 12 December 2016 at 15:19 Caroline Timberlake wrote:


Howdo,

Need pick up and delivery in London this afternoon please:

Pick up:  1 Catherine Place, 2nd Floor, SW1E 6DX

Delivery 1:  A4 envelope; 0.2kg

Neil Gerrard
Partner

Decherts

160 Queen Victoria Street

London EC4V 4QQ
Dechert LLP
+44 20 7184 7672 Direct


Many thanks.

Cheers

C

| | |
|---|---|
| From: | Jignesh Shah <jignesh.shah@apexcouriers.co.uk> |
| Sent: | 21 December 2016 14:12 |
| To: | Caroline Timberlake |
| Subject: | Re: London pick up and delivery |

Hi Caroline

That's booked in to be collected in the next hour for you!

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427

Do have a look at our short introductory video!



This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately. Thank you for your understanding.
On 21 December 2016 at 14:08 Caroline Timberlake wrote:

Howdo,

Need pick up and delivery in London this afternoon please, before 4.30pm if poss please.

Pick up: 1 Catherine Place, 2nd Floor, SW1E 6DX

Delivery: A4 sized box; 6cm wide approx. ; 2kg

Neil Gerrard
Partner

Decherts

160 Queen Victoria Street

London EC4V 4QQ
Dechert LLP
+44 20 7184 7672 Direct


Many thanks.

Cheers

C

506

From:      Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent:      21 December 2016 16:11
To:        Caroline Timberlake
Subject:   Re: ANOTHER urgent London pick up and delivery

---

Its booked!  Can't guarentee timings but will do our best.

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427

Do have a look at our short introductory video!



This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this from your system and notify the sender immediately.  Thank you for your understanding.

On 21 December 2016 at 16:07 Caroline Timberlake wrote:

Thanks Jignesh, good to talk to you earlier.

Afraid need another pick up this afternoon to go to Dechert's again, is that possible please.

A4 Envelope; 0.3kg; Document

Neil Gerrard
Partner

Decherts

160 Queen Victoria Street

London EC4V 4QQ
Dechert LLP
+44 20 7184 7672 Direct

Cheers

C

**From:** Jignesh Shah [mailto:jignesh.shah@apexcouriers.co.uk]
**Sent:** 21 December 2016 14:12
**To:** Caroline Timberlake
**Subject:** Re: London pick up and delivery

507

Hi Caroline

That's booked in to be collected in the next hour for you!

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427

Do have a look at our short introductory video!





This email is confidential. If you are not the intended addressee, you should not read the contents of this email, disclose them to any other person or use them in any way. Please delete this email from your system and notify the sender immediately. Thank you for your understanding.

On 21 December 2016 at 14:08 Caroline Timberlake <CTimberlake@pagegroupltd.com> wrote:

Howdo,

Need pick up and delivery in London this afternoon please, before 4.30pm if poss please.

Pick up:  1 Catherine Place, 2nd Floor, SW1E 6DX

Delivery:  A4 sized box; 6cm wide approx. ; 2kg

Neil Gerrard
Partner

Decherts

160 Queen Victoria Street

London EC4V 4QQ
Dechert LLP
+44 20 7184 7672 Direct

Many thanks.

Cheers

508

From:       Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent:       13 February 2017 16:00
To:         Caroline Timberlake; Shane Hawke
Subject:    Re: UK delivery
Attachments: Page group UK 130217.pdf

---

Hey Caroline

This is booked in for you.  Page 1 on the package and page 2 to the driver please.

Have a nice evening!

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427


On 13 February 2017 at 15:48 Caroline Timberlake wrote:


Howdo, need UK delivery please, needs to be there tomorrow morning if possible please


A4 envelope, docs; 0.5kg


NEIL GERRARD

HUNTERS FARM

NUTLEY

EAST SUSSEX

TN22 3LS


Tel: +44 7506 910 526


Cheers

C

**DOM EXPRESS 12:00** **D O T** _-DHL-_

2017-07-13 Printed@ (7.2) / '30-1410'

From : PAGE GROUP LTD
CAROLINE TIMBERLAKE 02079309200
CATHERINE PLACE 1
2ND FLOOR
SW1E 6DX LONDON
GB United Kingdom

Origin:
**LON**

To : NEIL GERRARD
HUNTERS FARM

Contact:
NEIL GERRARD
07506910526

**TN22 3LS NUTLEY**
⌞ **GB United Kingdom**

# GB-LGW-LGW

| | Day | Time |
|--|--|--|
| | | **X12** |

Account No 417414782
Ref code PAG007
DOCUMENT

Pce/Shpt Weight  Piece
**0.50 kg  1 / 1**



WAYBILL 89 5510 3916



(2L)GBTN223LS*34002000

(J) JD01 3054 7887 8430 4875

510

From:        Jignesh Shah <jignesh.shah@apexcouriers.co.uk>
Sent:        17 February 2017 15:51
To:          Caroline Timberlake
Subject:     Re: UK delivery
Attachments: Page Group SAturday delivery Nutley 170217.pdf

---

Hey Caroline

This is booked in for collection today for you.  The label is attached.

Have a nice weekend!

Kind Regards

Jignesh Shah

Tel: +44 207 041 9427

Mob: 07530 848242


On 17 February 2017 at 15:26 Caroline Timberlake wrote:

Howdo, another UK delivery please, needs to be there tomorrow morning if possible please

 A4 envelope, docs; 0.5kg

 NEIL GERRARD

HUNTERS FARM

NUTLEY

EAST SUSSEX

TN22 3LS

 Tel: +44 7506 910 526

 Cheers

C



512

 1      nothing in Hebrew about this matter.
 2  MR TOMLINSON: Thank you. May this witness be released?
 3  JUDGE LENON: Yes. Thank you, Mr Halabi.
 4  A.  Thank you, my Lord.
 5  MR TOMLINSON: My Lord, before calling the next witness,
 6      I want to make sure how we're doing in timetabling terms
 7      because we've put Mr del Rosso off until tomorrow. The
 8      position is that Mr King can only do tomorrow morning,
 9      Mr Leach can't do tomorrow morning and --
10  MR LORD: Sorry, my Lord, I'm eight minutes ahead of time or
11      ten minutes which is unusual, so I have a little bit
12      of time. I would anticipate that I won't need more
13      than -- I don't think I will need more than an hour with
14      Mr Leach and I would estimate roughly half a day -- it
15      might be longer -- with Mr Page. So I'm trying to
16      finish both Mr Leach and Mr Page today. I hope to be
17      able to do that. But if my learned friend wants to call
18      Mr Leach first to be sure that he can get away today,
19      because Mr Page could come back tomorrow if required,
20      then that would be fine as far as we're concerned. But
21      I'm in your Lordship's hands and those of my learned
22      friend, of course, whose evidence he is calling.
23  MR TOMLINSON: Unfortunately I don't have Mr Leach here at
24      the moment.
25      My Lord, the possibilities are I think that Mr Leach

                            49

 1      is interposed in Mr Page's evidence at, say, 3.00, if my
 2      friend thinks -- or 3.30 if my friend thinks he will be
 3      an hour or that we put Mr Leach off till -- I think he
 4      can do tomorrow afternoon.
 5  MR LORD: My Lord, I was expecting to deal with -- I spoke
 6      to my learned friend about this yesterday -- I was
 7      expecting to deal with Mr Page and Mr Leach today, so
 8      I would prefer to start with Mr Page, as planned, and
 9      interpose Mr Leach if necessary, but if I finish Mr Page
10      in time, with an hour to go, then we can just go on in
11      the normal way and he will be away this afternoon.
12  JUDGE LENON: Let's carry on on that basis.
13  MR TOMLINSON: If we revisit at the break in the afternoon.
14      I'm certainly going to call Mr Page next. I just wanted
15      to ensure what we were going to do about Mr Leach.
16  JUDGE LENON: That's very helpful. Thank you.
17  MR TOMLINSON: So, my Lord, I call Mr Page.
18              MR STUART ROBERT PAGE (sworn)
19          Examination-in-chief by MR TOMLINSON
20  MR TOMLINSON: Could you give the court your address,
21      Mr Page?
22  A.  Number 14 -- sorry, my business address, your Honour, or
23      my home address?
24  Q.  I think your home address is on the witness statement.
25  A.  Right, number 14 --

                            50

 1  Q.  No, perhaps that's your business address. I apologise.
 2      The business address.
 3  A.  It's The Sanctuary and it's -- shall I give the full
 4      address? It's The Sanctuary, Westminster, SW1.
 5  Q.  Could you look -- there should be a bundle there in
 6      front of you labelled "D", and then if you go to tab 3.
 7      {D/3/1} --
 8  A.  Correct, yes, I have it, yes.
 9  Q.  -- that should be a document that says "Witness
10      statement of Stuart Robert Page" on the first page.
11  A.  Yes.
12  Q.  Then if you turn to page {D/3/7}, is that your
13      signature?
14  A.  That is my signature, my Lord.
15  Q.  Are there any matters in that statement that you wish to
16      correct or clarify, Mr Page?
17  A.  Yes, there are.
18  Q.  Do you want to indicate what they are?
19  A.  In reference to my police service, which is on
20      "Background" at 3, the date I left the police was 1978,
21      not 1979 {D/3/2}.
22  Q.  Thank you.
23  A.  And there is a reference, my Lord, to the name of my
24      company in Dubai. It's actually called "Page Group
25      Middle East FZE". I think it's in the statement as

                            51

 1      "SZE".
 2      The other part of my statement, my Lord, is where
 3      I talk about reference to reviewing documents, but then
 4      I mention in my statement, my Lord, that I did not --
 5      I'm not familiar with the name of Farhad Azima.
 6  Q.  And what did you want to correct in relation to that,
 7      Mr Page?
 8  A.  Having been shown a report which was prepared by my
 9      firm, I'm now aware that I was -- should have been
10      familiar with that name.
11  Q.  What report is that?
12  A.  It's a report which I was shown by the -- by
13      Stewarts Law.
14  Q.  I'm sorry, Mr Page?
15  A.  Sorry, my Lord, I was asked to look at a document by
16      Stewarts Law and asked to confirm whether that was my
17      report or not.
18  Q.  Can you be shown {H7/298} please? It is {H7/299}, the
19      next page. Sorry. Is that the document you are
20      referring to?
21  A.  That is the document, my Lord.
22  Q.  And sorry, Mr Page, what's your evidence about that
23      document?
24  A.  Well, I was not -- when I prepared my witness statement,
25      my Lord, I was not -- did not recall that we submitted

                            52

```
 1        this report to the client in which Farhad Azima's name
 2        is quite clearly given.
 3   Q.   Thank you.  Is there anything else that you wish to
 4        clarify or correct in your statement, Mr Page?
 5   A.   No, my Lord.
 6   MR TOMLINSON:  Thank you, Mr Page.  If you wait there, there
 7        will be some questions.
 8   JUDGE LENON:  Can I just be clear what part of the statement
 9        you want to correct?
10   A.   Sorry, my Lord, it was the reference to my police
11        service.
12   JUDGE LENON:  You've done that.  In relation to Mr Azima, is
13        it paragraph 13?
14   A.   Yes, paragraph 13.  Yes, my Lord.  {D/3/4}.
15   JUDGE LENON:  So what do you want to say instead of that?
16   A.   Well actually what I'm saying, my Lord, is of course
17        I should have remembered the name, but at the time
18        I prepared my statement in June of 2019 I could not
19        recall Farhad Azima's name.
20   MR TOMLINSON:  And that was the result of having been shown
21        that document, the RAK project update?
22   A.   That is correct, my Lord, yes.
23   MR TOMLINSON:  Thank you, Mr Page.  If you wait there, there
24        will be some questions.
25   MR LORD:  My Lord, I've raised this with my learned friend,
```

                                    53

```
 1        but in view of the matters I am going to be putting to
 2        Mr Page, I thought I should raise with him whether it
 3        may become appropriate for him to be given any sort of
 4        warning about the privilege against self-incrimination.
 5        I'm not saying that I advocate that, but I just wanted
 6        to make sure that that was something that I had at least
 7        broached in case your Lordship or my learned friend or
 8        somebody thought that at some point in my questioning,
 9        if at all, that was an appropriate warning that should
10        be given to this witness.  I didn't want it to be said
11        that I had crashed on in my forensic eagerness and had
12        not allowed that to be considered.  So I'm not
13        suggesting it or advocating it.  I just thought I ought,
14        as a matter of sort of good order, really, to flag that,
15        my Lord.
16   JUDGE LENON:  Thank you.
17                Cross-examination by MR LORD
18   MR LORD:  Mr Page, I'm going to ask you first about the
19        nature of your relevant businesses, if I may.
20             Have you got your witness statement there, Mr Page?
21   A.   Yes, I do, my Lord.
22   Q.   In paragraph 1 and paragraph 5 you set out the
23        businesses which you say are relevant to the matters in
24        this dispute, don't you {D/3/1-2}?
25   A.   Yes, my Lord.
```

                                    54

```
 1   Q.   And it looks from paragraphs 1 and 5 as if the
 2        businesses are Page Corporate Investigations Limited --
 3        is that right?
 4   A.   That is correct, my Lord, yes.
 5   Q.   -- and Page Protective Services Limited?
 6   A.   That is correct, my Lord.
 7   Q.   And those are both English companies -- well, English
 8        and Welsh companies, are they?
 9   A.   Well, there is a Page Protective Services in Cyprus and
10        there is a Page Protective Services in Hong Kong.
11   Q.   So when you say "based in England", what do you mean by
12        that in paragraph 1?
13   A.   Well, the company that was performing the contract for
14        the European Commission in -- well, sorry, the company
15        that was performing the contracts for the European Union
16        was Page Protective Services UK.
17   Q.   What about the company which did the work in this case?
18   A.   Page Group Middle East.
19   Q.   That's a Dubai company, is it?
20   A.   It's a Dubai -- what they call a "DMCC company".
21   Q.   Apart from the matters that you refer to in your witness
22        statement, do you or any of your companies or firms --
23        do they do any other work for any RAK-related entity?
24   A.   I'm sorry, my Lord, I don't understand the question.
25   Q.   Well, apart from the work that you've explained in your
```

                                    55

```
 1        witness statement in paragraphs 1 and 5 {D/3/1-2} and
 2        then the work that you've described starting at
 3        paragraph 13 {D/3/4} -- 12 and 13 -- have you or any of
 4        your businesses done any other work for RAK, the Ruler,
 5        any RAK entity?
 6   A.   Yes, prior to this project, yes.
 7   Q.   Are any of the companies that you identify in this
 8        statement of yours -- are any of those licensed or
 9        regulated in any way?
10   A.   Well, there is no regulation in the United Kingdom
11        regarding security companies providing security in
12        hostile environments.  We are signatories to the code of
13        conduct, which is part of the UN Charter on how you
14        operate in conflict zones.  There is no requirement to
15        be a licensed investigation company in this country.  In
16        Israel, where I operate, I do have a security licence
17        issued by the Government of Israel, as I do in
18        Palestine.
19   Q.   If we go to paragraph 5 of your witness statement
20        {D/3/2}, where you're explaining the Page Group, and you
21        set out some companies there.  Can you see -- you say
22        "Page Protective Services Limited".  It looks as if that
23        does security and Page Corporate Investigations Limited
24        does the investigation work; is that right?
25   A.   That is partially correct, yes.
```

                                    56

1  Q.  Because you say there they focus respectively on (1)
2      providing security services and (2) undertaking
3      investigations and due diligence.
4  A.  That would be correct, my Lord, yes.
5  Q.  And would it be right to say that the investigative work
6      that you did in this case in 2015 and 2016 in relation
7      to RAK or RAKIA, that was carried out through
8      Page Corporate Investigations Limited?
9  A.  No, that is not correct, my Lord.
10 Q.  Through which Page entity did you carry that work out?
11 A.  Page Group Middle East Limited, which is a wholly owned
12     subsidiary of Page Group Hong Kong.
13 Q.  And you've said in paragraph 6 of your witness statement
14     at page {D/3/2} -- you're explaining the investigation
15     side of your business, aren't you?
16 A.  That is correct, my Lord.
17 Q.  And you say about six lines down:
18         "We do not generally work directly for law firms."
19         Can you see that?
20 A.  Yes, that is correct, my Lord.
21 Q.  Is that because, Mr Page, law firms would generally not
22     be comfortable with your methods of investigation?
23 A.  That is not correct, my Lord.
24 Q.  So why would it be that you don't generally work
25     directly for law firms?

57

1  A.  Because I -- getting instructed, it is the norm that
2      I get instructed with a client that has a problem, an
3      issue, and he would ask me to work alongside his legal
4      team in gathering information for their -- in support of
5      their litigation.
6  Q.  If you go, please, to paragraph 3 of your witness
7      statement, Mr Page, at {D/3/2}, you explain how you
8      began your career in the police force, 1970 to 1979,
9      first in Sussex and subsequently the
10     Metropolitan Police. Can you see that?
11 A.  Correct, yes. That's correct.
12 Q.  And you say:
13         "Towards the end of my time in the police I was
14     seconded to Scotland Yard's Anti-Terrorist Squad and
15     Special Branch during the period of the Troubles in
16     Northern Ireland."
17         To what rank did you rise, Mr Page, when you were in
18     the police?
19 A.  Police constable.
20 Q.  So you were police constable throughout your time in the
21     force, were you?
22 A.  I was a police constable, yes.
23 Q.  You were never in fact promoted, were you, then?
24 A.  I never sought to be promoted.
25 Q.  And you were in the force for nearly ten years; is that

58

1      right?
2  A.  No, I was in the force for eight years, my Lord.
3  Q.  Then you said in paragraph 4:
4         "I left the police in [1978] in order to take
5      a career break and went to work in Saudi Arabia as
6      a security and investigations adviser in the
7      construction and oil industry. I returned to the UK in
8      around 1983 ..."
9         Can you see that?
10 A.  Yes.
11 Q.  What prompted you to take a career break from the police
12     force in 1978?
13 A.  My Lord, in 1978, as a young detective, I was working in
14     the region of 60 to 70 hours a week. The opportunity
15     came to go and work in the Middle East with a tax-free
16     salary which was twice that which I was earning in the
17     police service, and the rule at that time within the
18     police service is that you could take a career break, if
19     you rejoined the service within five years, you
20     maintained all your pension contributions and you could
21     rejoin without the need to be retrained. And it was
22     always my intention, my Lord, to rejoin the police
23     service when I finished working in Saudi Arabia.
24 Q.  But in the event you did not rejoin the police force?
25 A.  I did not.

59

1  Q.  No. Could you please go to paragraph 8 of your witness
2      statement at {D/3/3}?
3  A.  Yes, I have that.
4  Q.  You can see in paragraphs 8 to 9 you give some evidence
5      about your initial engagement in Ras Al Khaimah. Can
6      you see that, Mr Page?
7  A.  I can see that, my Lord.
8  Q.  Have you read your statement recently, your witness
9      statement?
10 A.  I have been reading it fairly consistently, my Lord,
11     yes.
12 Q.  Since when have you been reading it consistently?
13 A.  In preparation for this trial, my Lord.
14 Q.  And when do you think you first started reading it by
15     way of preparation for the trial? How far ago, how long
16     ago?
17 A.  Well, my Lord, I just recently returned from a trip to
18     the Far East and I took it with me to read so I could
19     refresh my memory on the testimony that I will be giving
20     for your court.
21 Q.  So what's the answer to my question? Approximately
22     when -- how long ago did you first re-read this
23     statement of yours that you've given in the middle of
24     last year? Two weeks? Three weeks?
25 A.  Well, I left for Hong Kong a week ago last Monday.

60

1    I took it with me then.  I would have been shown it by
2    the solicitors for the client because of the mistake
3    I made regarding the report on -- when -- Mr Azima's
4    name.  So it's not a very long statement, my Lord.
5    I would have refreshed my memory as and when.
6  Q.  And when did you first appreciate that there were
7    matters in the statement that you ought to correct?
8  A.  When -- well, first of all when I read that I got the
9    date of leaving the police service wrong; more recently
10   when I became aware that I got the name of my company or
11   the designation of the company in Dubai wrong; and of
12   course, when I was shown this report on the screen here,
13   where obviously I should have been aware of
14   Farhad Azima's name.
15 Q.  So the first time you thought you ought to revise this
16   statement was when Stewarts Law showed you a copy of the
17   project update that you've referred to this morning?
18 A.  That is correct, my Lord.
19 Q.  And had that not been shown to you, it's unlikely you
20   would have sought to revise your evidence in that
21   regard, isn't it, Mr Page?
22 A.  My Lord, I would like to, if I may, put into context
23   what was going on in my life in June of 2019 when
24   I prepared this report.
25      In August of 2019 I was diagnosed with clinical

                              61

1    depression, which takes me back to June of 2019, where
2    my psychiatrist is clear that I would have been
3    suffering from depression at that point.  Therefore, my
4    Lord, with respect, my recollection of events that
5    occurred some four years previously was slightly shaded.
6  Q.  Could you please look at paragraphs 8 to 9 of your
7    witness statement {D/3/3}?
8  A.  Yes.
9  Q.  You're referring there, aren't you, to some work that
10   you did from 2008 to 2010 for the current Ruler of
11   Ras Al Khaimah?
12 A.  It was on behalf of the current Ruler of Ras Al Khaimah,
13   yes.
14 Q.  Yes, when he was the Crown Prince?
15 A.  That is correct, my Lord.
16 Q.  And it's right, isn't it, that there was something of
17   a struggle for power within Ras Al Khaimah around that
18   time?
19 A.  I would not, my Lord, describe it as a "struggle for
20   power".
21 Q.  So what was the work that you did at that time in terms
22   of investigation services?
23 A.  So, my Lord, His Highness Sheikh Saud had been appointed
24   Crown Prince after his half-brother had been removed
25   from that position on instructions of the late

                              62

1    Sheikh Zayed of Abu Dhabi.
2       So my instructions were that the information that
3    I -- or the brief that I received was to ascertain
4    whether Sheikh Khalid was intending to try and -- not
5    de-throne, but to reappoint himself as a Crown Prince.
6  Q.  So there was potentially going to be a challenge to the
7    current Ruler and you helped him in that regard?
8  A.  Well, there was a challenge to the current Ruler.
9  Q.  And you were retained by or on behalf of the then
10   current Ruler?
11 A.  No, I was retained by Khater Massaad in his position as
12   chairman of RAK Ceramics, who in turn was reporting to
13   His Highness Sheikh Saud.
14 Q.  Could you be shown, please, {Day2/85:1}?  Mr Page,
15   you'll see starting at paragraph 9 -- on Day 2,
16   page 85 --
17 A.  Yes, I can see it, my Lord.
18 Q.  -- Mr Buchanan was asked about certain matters
19   pertaining to you.  And he said at line 9:
20      "Answer: Mr Page had worked for the RAK Government
21   previously."
22      And I asked him.
23      "Question:  Doing what?"
24      And he said:
25      "Answer: I believe it was during the time of --

                              63

1    there was certain dissent taking place over the
2    leadership at RAK, and I believe it was at that time
3    that Mr Page worked for His Highness who was then
4    Crown Prince."
5       And I said.
6       "Question:   ...  So Mr Page worked for the
7    Crown Prince before he took over as Ruler of RAK?"
8       And Mr Buchanan said:
9       "Answer: That is speculation on my part because
10   I was not involved at the time."
11      Was Mr Buchanan right to be giving evidence that you
12   were involved in relation to certain dissent within
13   Ras Al Khaimah at around that time?
14 A.  I'm sorry, my Lord, I didn't quite understand the
15   question.  Again?
16 Q.  What were you doing, Mr Page?  What were doing at that
17   time?  What was the remit?  What were you doing?
18 A.  Okay, so the remit was to try and ascertain what plans
19   Sheikh Khalid had to try and destabilise His Highness'
20   position as the Crown Prince of Ras Al Khaimah.
21 Q.  And what did you do in terms of investigating or
22   ascertaining what those plans were or might be?
23 A.  We conducted surveillance in London.  My Lord, I'm not
24   quite sure that it's appropriate to talk about what is
25   a confidential matter between myself and His Highness

                              64

516

January 29, 2020                     Ras Al Khaimah Investment Authority v Farhad Azima                     Day 6

```
 1      unrelated to Khater Massaad, but if you instruct me to
 2      do so, I will do so.
 3   JUDGE LENON: Will you answer the question, please?
 4   A.  Okay.  So we were undertaking intelligence-gathering,
 5      trying to understand what his plans were, who he was
 6      meeting with, how he was being supported, what his PR
 7      campaign was, and things along those lines.
 8   MR LORD: You did that for how long?  Over what period?
 9   A.  To the best of my knowledge and my belief, my Lord --
10      well, it was at least two -- I presume two years prior
11      to the death of the Ruler.
12   Q.  And what form did the surveillance and monitoring that
13      you're describing -- what form did that take?  How did
14      you actually carry it out?
15   A.  Well, at that time, Sheikh Khalid was living -- or still
16      does, I believe -- living in Kensington, so we were
17      physically putting him under surveillance.
18   Q.  You had people following him?
19   A.  That is correct, my Lord.
20   Q.  And were there any other forms of intelligence-gathering
21      that you used?
22   A.  No, the purpose was -- is to understand who his advisers
23      were.  So the purpose of physical surveillance was to
24      see who he met, where he went and nothing else, my Lord.
25   Q.  Mr Page, just seeing where the Sheikh went and who he
```

65

```
 1      spoke to, who he met, that wouldn't tell you, would it,
 2      what he was talking about, what his plans were?  That
 3      would just tell you his physical movements, wouldn't it,
 4      Mr Page?
 5   A.  My Lord, with respect, if you conduct surveillance in
 6      a proper manner, you are able to determine what someone
 7      is meeting with because the whole purpose of
 8      surveillance -- and it was a very large surveillance
 9      operation -- is you would have multiple teams, and the
10      architect of a multiple team is if Sheikh Khalid met
11      Mr A and we didn't know who Mr A was, we would then
12      follow off -- a part of the team would follow off Mr A
13      to ascertain who he was.
14         So from memory -- and it's a long time ago, my
15      Lord -- he had a lawyer representing him, so we needed
16      to find out -- we identified who that lawyer was.  He
17      had a PR company representing him.  We found out who
18      that was.  And we at one point -- I think, my Lord, from
19      memory, we followed him to the Israeli Embassy.
20   Q.  So, so far you've got the Sheikh, you've got the PR
21      company, the lawyer and the Israeli Embassy.  That's
22      four bits of information.  That doesn't allow you,
23      Mr Page, does it, to ascertain what the plans are?  How
24      do you know what the plans are?  They may be just having
25      a lunch at the Israeli Embassy.
```

66

```
 1   A.  My Lord, His Highness Sheikh Saud has his own sources of
 2      information.  I was just one of those sources of
 3      information, carrying out the instructions given to me
 4      by Khater Massaad to try and understand -- for example,
 5      my Lord, we followed Sheikh Saud [sic] to Geneva because
 6      we believed that he was going to attend an important
 7      meeting in Geneva.  That is a very complicated and very
 8      expensive operation and it was successful.
 9         We followed him to the United States for the
10      inauguration -- where he went to the inauguration of
11      President Obama. He also met Hillary Clinton, so we
12      were understanding how he was trying to elicit support
13      from the United States for his potential attempt to
14      regain power or -- correct -- to regain his position in
15      Ras Al Khaimah as the Crown Prince.
16   Q.  Sorry, Mr Page, when you said that the Sheikh had his
17      own sources of information, what were you there
18      referring to?
19   A.  I presume, my Lord, coming from sources within --
20      sources within Ras Al Khaimah.
21   Q.  Mr Page --
22   A.  But, my Lord, I never met His Highness during the whole
23      engagement on this issue.  In fact, the first time I met
24      His Highness is when he instructed me in relation to the
25      issue before the court now -- correction, the matter of
```

67

```
 1      Khater Massaad.
 2   Q.  Mr Page, you would have wanted, wouldn't you, to obtain
 3      what was likely confidential information at that time in
 4      order to be able to tell -- to inform the Sheikh --
 5      sorry, the Ruler -- about the Sheikh's plans?
 6   A.  By "confidential information", what are you referring
 7      to?
 8   Q.  You'd want information from people who were on the
 9      inside, as you would see it, of the Sheikh's gang,
10      wouldn't you?  That's what you'd want, isn't it,
11      Mr Page?
12   A.  That is correct.
13   Q.  You'd want some inside information, wouldn't you,
14      Mr Page?
15   A.  That is correct, my Lord.
16   Q.  And are you telling his Lordship that over the period of
17      two years, all you did was physically tail these people
18      and you didn't actually obtain any inside information at
19      all?
20   A.  Not at all, my Lord.  In fact we developed intelligence
21      that Sheikh Saud [sic] and/or his wife were involved in
22      a number of industrial tribunal cases before the courts
23      in England, involving members of his entourage who had
24      sued him for unfair dismissal.  We then cultivated those
25      people as what we call a "confidential source" to know
```

68

January 29, 2020                    Ras Al Khaimah Investment Authority v Farhad Azima                    Day 6

```
 1     what they knew about his plans in respect of
 2     Ras Al Khaimah. So they were former employees of
 3     Sheikh Khalid who may or may not have been privy to
 4     information concerning his plans to regain his position
 5     as the Crown Prince.
 6  Q. You're talking about Sheikh Khalid there, aren't you?
 7     The Ruler was Sheikh Saud and Sheikh Khalid was the
 8     person --
 9  A. Yes, I beg your pardon.
10  Q. That's all right.  I think it's clear.
11        So you were getting information from ex-employees at
12     that time?
13  A. We were seeking to get information from ex-employees,
14     yes.
15  Q. I suggest that you succeeded, didn't you, Mr Page, in
16     all likelihood?
17  A. I cannot recall whether we -- we have a number of ways,
18     my Lord, of cultivating sources, and I can't, after all
19     these years, remember whether we succeeded or didn't
20     succeed.  I seem to recall that his former security
21     adviser was one of those people that we managed to talk
22     to and he provided information because he was a very
23     aggrieved ex-employee of His Highness -- sorry, of --
24     well, he's still His Highness -- Sheikh Khalid and he
25     wished to vent his anger by sharing information.  That's
```

69

```
 1     how we operate in this business.
 2  Q. In other words, this aggrieved employee would have told
 3     you confidential things that he'd learnt when he was
 4     working as a security officer for Sheikh Khalid?
 5  A. Yes, and it's not for me to question whether he was in
 6     breach of any of his employment obligations.
 7  Q. Or for you to question whether he was breaching any duty
 8     of confidentiality presumably, Mr Page?
 9  A. It's -- that was not for me to consider.
10        My Lord, he was what we call in this industry --
11     it's called "HUMIT", which stands for "human
12     intelligence", but in everyday speak, it's
13     a confidential source.  And that confidential source may
14     well be, my Lord, a journalist that Sheikh Khalid is
15     seeking to get him to write some positive PR spin.
16     I have a number of -- then and to this day -- a number
17     of journalist sources who would let me know if
18     they're -- in fact, my Lord, it was all out there on the
19     internet that Sheikh Khalid -- what his plans were.  He
20     was spinning his story on the internet as to how he
21     should be the Ruler of -- sorry, he should be the
22     Crown Prince of Ras Al Khaimah, not Sheikh Saud, which
23     included a disinformation programme, including
24     publishing a report which is known as the "Rogue
25     Report", claiming that Sheikh Saud and the Emirate of
```

70

```
 1     Ras Al Khaimah had illegal, unsavoury relationships with
 2     Iran.
 3        So it was out there on the internet, my Lord.
 4     I didn't have to find it -- sorry, I did not have to get
 5     it from a source.  Sheikh Khalid was employing a company
 6     called Californian Strategies to lead his PR campaign
 7     against His Highness Sheikh Saud.
 8  Q. I think from that answer you've just given, Mr Page, it
 9     wouldn't concern you when gathering intelligence if the
10     source disclosed confidential information to you
11     because, as far as you were concerned, that was their
12     responsibility, whether it was confidential or not;
13     would that be fair?
14  A. That would be fair, my Lord, yes.
15  Q. Who did you deal with -- when you were working around
16     about 2008 to 2010 for the current Ruler, as you've
17     described, I think you said that you were engaged
18     through Dr Massaad; is that right?
19  A. That is correct, my Lord.
20  Q. And who else did you come across at RAK or the Palace or
21     part of the Ruler's group in the widest sense during
22     that engagement of yours over that two-year period?
23  A. Okay, my Lord, so how this came about is I was in
24     Brussels meeting the European Union in relation to one
25     of my contracts.  I received a phone call from someone
```

71

```
 1     called Wahid Attalla, an Egyptian gentleman, who I'd
 2     known since my engagement with the Government of Dubai
 3     in relation to other matters which were before the --
 4     other matters.
 5        Wahid Attalla said basically, my Lord, "Where are
 6     you?  Can you make it to Geneva?", and I said, "If it's
 7     important, I can make it to Geneva".  So I flew to
 8     Geneva, I then met Dr Massaad and I was then taken on
 9     his private jet and I was flown to Lebanon to be briefed
10     on this issue of Sheikh Khalid.
11  Q. Do you want to answer the question, please, Mr Page?
12  A. Only Dr Massaad and Wahid Attalla and no one else.
13  Q. And so when you reported back on the fruits of your
14     information-gathering and monitoring at that time, to
15     whom did you report?
16  A. Dr Massaad.
17  Q. Did you ever report directly to the Ruler?
18  A. Absolutely not.
19  Q. And why was that?
20  A. Because this is the way that Dr Massaad wanted the case
21     to be run.  I didn't question his instructions.
22  Q. And how often did you report back in that engagement?
23  A. We used to have regular updates, but I would say six,
24     eight, ten weeks; for example, if Dr Massaad was
25     travelling in Europe, I would meet him. Such meetings
```

72

```
 1     I had in Nice with him, I met him in Germany, I met him
 2     in Switzerland, occasionally I met him in Ras Al Khaimah
 3     or in Dubai, because I've been a frequent traveller, my
 4     Lord, to Dubai since -- as long as I can remember, but
 5     certainly since 1995.
 6  Q. It's right, isn't it, that that was really how you
 7     became a trusted adviser as far as the current Ruler of
 8     Ras Al Khaimah is concerned?  That's how you gained his
 9     trust, through this engagement, wasn't it, Mr Page?
10  A. I would not say that, my Lord, no.
11  Q. How else do you think that you managed to gain the trust
12     of the Ras Al Khaimah Ruler or government bodies?
13  A. My Lord, without sounding big-headed, I'm a known entity
14     in the UAE.  I have worked for the Government of Dubai
15     since 1995.  I continue to work for the Government of
16     Dubai until this date.  My reputation in the UAE -- they
17     respect my knowledge, they respect my ability and
18     His Highness' wife is married to someone called
19     Abdul Aziz Al Ghurair.  Abdul Aziz Al Ghurair is the
20     sister -- I beg your pardon, Abdul Aziz Al Ghurair is
21     the chairman of Mashreq Bank.  I was worked for
22     Mashreq Bank, so therefore in looking for an adviser --
23     or -- correction -- looking for someone to service his
24     needs, it would be not too difficult for His Highness to
25     check into my bona fides.
```

```
 1  Q. Did you do any work for the Ruler or for RAK, any
 2     RAK-based entity, after 2010 but before the end of 2014?
 3  A. I did not.
 4  Q. Can we come on to your work in 2015 in RAK, please,
 5     Mr Page?  Would you go to paragraph 12 of your witness
 6     statement at {D/3/4}?  You see you say this:
 7        "About a couple of months later ..."
 8        So I think we should probably look at paragraph 11,
 9     where you say that you went to see Mr Buchanan in
10     January 2015 -- can you see that?
11  A. Yes, I do, yes.
12  Q. -- and you say you cannot recall who arranged the
13     meeting.
14  A. Well, it's more than likely it was His Highness'
15     personal secretary.
16  Q. But who instigated it?  Was it you or Mr Buchanan who
17     initiated it?  Who called who first?
18  A. So from recollection I received a call from
19     His Highness' secretary saying she wished me to meet
20     someone -- sorry, on instructions of His Highness, I was
21     to meet one of his advisers, and then it's possible, but
22     I cannot recall exactly, my Lord, that Mr Buchanan
23     phoned me and said, "When can we meet?" I don't think
24     Mr Buchanan even knew I was in the UAE at that point.
25  Q. In paragraph 12 you say this:
```

```
 1     "About a couple of months later Jamie and I had
 2     another meeting in Dubai and at that point we discussed
 3     a specific mandate."
 4        That's around about March 2015, isn't it, Mr Page?
 5  A. Yes, but Mr Buchanan's evidence is wrong.
 6  Q. In what respect?
 7  A. So in the chronology of the events, my Lord, which is
 8     referred to in my statement, I saw information in the
 9     local media regarding an investigation or issues to do
10     with RAK Airways.  I am very knowledgeable about how
11     they report things in the Gulf papers, and when they say
12     "issues", there is an underlying issue.  So I reached
13     out for Wahid Attalla, the gentleman I referred to who
14     introduced me to Khater Massaad, and asked him if he
15     would effect me an introduction to His Highness, who I'd
16     never met before.
17        So I went to the Palace with Wahid Italia, I met
18     His Highness, we had a get-to-know-you conversation.  It
19     was then, some months later, that His Highness summoned
20     me back to the Palace, after I had met Jamie Buchanan.
21        My Lord, it's important to understand that
22     His Highness has a habit of compartmentalising things.
23     He would ask me to do certain things, but not involve
24     Jamie Buchanan. So, therefore, I had this Chinese wall
25     between what His Highness wishes me to undertake and
```

```
 1     what he wishes Mr Buchanan to understand.
 2  Q. In your witness statement, Mr Page, at paragraph 10
 3     {D/3/3}, you set out I think some evidence about what
 4     you've just said.  Is that what you're talking about?
 5     You had one meeting with Sheikh Saud?
 6  A. Sorry, paragraph which are we looking --
 7  Q. 10 of your witness statement at {D/3/3}.
 8  A. Paragraph 10 of my witness statement?  That talks about
 9     RAK Airways.  Is that what you're referring to?  I'm
10     sorry, my Lord, I --
11  Q. You've just explained how you basically contacted --
12     well, read paragraph 10.  I assumed that paragraph 10
13     was a summary form of what you have just said, Mr Page.
14  A. Yes, I'm sorry, my Lord.  That is correct, yes.
15  Q. Well, it's your statement.  You must know what you meant
16     by it, Mr Page.
17  A. I think, my Lord, I have actually reported how it
18     actually -- sorry, presented to you how it occurred.
19  Q. It wasn't a trick there.  I was just trying to help you.
20  A. Oh, I'm sorry.  Thank you.
21  Q. So then we can pick the story up in paragraph 11
22     {D/3/3}.  You've now helpfully explained that you did
23     have a meeting with Sheikh Saud in 2014 and the next
24     involvement you had with RAK in January 2015 was
25     likely -- it sounds as if it was initiated by the Sheikh
```

 1  who, through his personal assistant, invited you to come
 2  to meet Mr Buchanan.
 3  A. Well, no, I think -- yes, he asked me to meet
 4     Mr Buchanan, but there was a subsequent meeting at
 5     the Palace with His Highness.
 6  Q. And when was that?
 7  A. Some time -- right, so, if I put it into context --
 8  Q. No, sorry, Mr Page --
 9  A. No, this is important. In December 2014 through to
10     early -- to the middle of January 2015, I was in the
11     UAE -- I was in the UAE on an assignment for another
12     member of a royal family.
13        So, yes, there was the initial meeting with
14     Jamie Buchanan, but that was a get-together meeting and
15     nothing else at the Park Hyatt Hotel in Dubai.
16  Q. Mr Page, I was just asking you when did you have this
17     meeting with His Highness.
18  A. It could have been three days later, it could have been
19     four days later. I honestly can't remember. Certainly
20     before I left the UAE, somewhere around mid-January.
21  Q. So some time in the first half of January --
22  A. Correct.
23  Q. -- 2015?
24  A. No, not the first half of January because I left Dubai
25     on or around 10 January.

                              77

 1  Q. So some time in the first half of January 2015?
 2  A. Well, I wouldn't -- okay, semantics, my Lord, but
 3     I would agree with you, yes.
 4  Q. And what did you discuss with the Ruler on that
 5     occasion?
 6  A. My Lord, I am in some difficulty here because it was
 7     a confidential discussion and instructions from
 8     His Highness in relation to a personal matter which
 9     I don't believe relates to the matter before the court
10     today. I am happy to disclose it to you, my Lord, but
11     I don't think it's appropriate, when we have members of
12     the press in the back of the court, for me to disclose
13     what is a confidential discussion between myself and
14     His Highness because, my Lord, to do so would destroy my
15     reputation as someone who deals in confidential matters.
16  JUDGE LENON: At the moment I don't see why it's necessary
17     to go into any detail as to the nature of the personal
18     matter, if that's the evidence.
19  MR LORD: No, I'm happy with that, my Lord, but
20     your Lordship will see I am anxious to get to the
21     bottom --
22  A. My Lord, I am prepared to share a piece of information
23     if you feel, but it's very limited as to what I'm
24     prepared to say in open court.
25  Q. It may become relevant, my Lord, this point, but we'll

                              78

 1  move on because all I want to establish, as
 2  your Lordship will appreciate, is the relevant remit for
 3  this gentleman. So it looks like this is part of the
 4  run-in. That's all. That's why I ask the question.
 5     Can I ask a different question, then?
 6     Mr Page, in paragraph 12 of your witness statement
 7  {D/3/4}, you say this:
 8     "About a couple of months later, Jamie and I had
 9  another meeting in Dubai and at that point we discussed
10  a specific mandate."
11     You're not here talking about this confidential
12  personal matter, are you?
13  A. No, I'm not.
14  Q. You're talking about something different, aren't you,
15     Mr Page?
16  A. I am, my Lord, yes.
17  Q. So is your evidence right there that around about
18     March 2015 you had this meeting with Mr Buchanan when
19     you discussed a specific mandate?
20  A. Yes, my Lord, because the reason this is now -- when
21     I've corrected my witness statement is the report that
22     is before -- that has now been disclosed and I have
23     shown is dated March 2015 and it refers in this report
24     to a previous report, so it is inconceivable that
25     in March 2015 I was receiving an instruction from

                              79

 1  Jamie Buchanan in relation to -- well, I received
 2  a mandate, but I was obviously mandated before this
 3  report, and that's the matter that I said is before
 4  His Highness which I don't think I can disclose any more
 5  at this point.
 6  Q. Sorry, so are you saying that the report we --
 7  A. My Lord, the timeline doesn't work because you're
 8     talking of a report dated 26 March 2015 and in
 9     Mr Buchanan's evidence he talks about briefing me in --
10     sorry, in -- at the same period. It doesn't work.
11     There was a previous engagement, which is the one I'm
12     referring to, with His Highness, who I don't think I can
13     disclose in open court.
14  Q. Well, I'm sorry about that -- I'm sorry, my Lord, I'm
15     troubled by that answer. If you go to {H7/299/3} -- get
16     that page up first, Mr Page.
17  A. Yes.
18  Q. This is an extract from the report that you or your firm
19     did -- and we'll come back to it in more detail today --
20  A. Correct.
21  Q. -- on 26 March 2015. It's your firm's report, isn't it?
22  A. Yes, it is my firm's report, yes.
23  Q. Can you see at the top it says:
24     "KM efforts against the client."
25  A. Yes.

                              80

January 29, 2020                    Ras Al Khaimah Investment Authority v Farhad Azima                    Day 6

 1  Q.  "FA and the US Advisory Team."
 2  A.  That is correct, my Lord.
 3  Q.  "FA" refers to Mr Azima, doesn't it, Mr Page?
 4  A.  It does, my Lord.
 5  Q.  And it says -- this is the words of your firm's report:
 6      "In continuation to our previous report, we were
 7      informed by several new sources that FA is managing KM's
 8      efforts in the US and perhaps even paying their bills ."
 9      Now, Mr Page, it looks, doesn't it, on the face of
10      this report of yours in March, that there is a link
11      between this report, in this part of it anyway, and
12      a previous report. Is that right?
13  A.  That is correct, my Lord.
14  Q.  So what is the link between what we see here and what
15      you covered in your previous report?
16  A.  My Lord, this is where I'm in some difficulty because,
17      as I tried to explain, the meeting with His Highness
18      in January of 2015 gave me a specific mandate of which
19      this is just part of that mandate. But again, my Lord,
20      I'm happy to disclose it, but I don't think I would be
21      happy to disclose it in the presence of the media.
22  Q.  But it says:
23      "In continuation to our  ..."
24      It's under the heading "FA and the US Advisory
25      Team".

                          81

 1  A.  My Lord, it's impossible to put this report into context
 2      if you don't understand the mandate that I received from
 3      His Highness based on the information that he had
 4      received.
 5      My Lord, I really am in some difficulty here because
 6      you're asking me to breach a confidence and I don't feel
 7      comfortable.
 8  MR TOMLINSON: My Lord, it's not something that I know
 9      anything about, but obviously this witness is concerned
10      about it and, my Lord, there are two ways of dealing
11      with it.
12      The first is that Mr Page can write something down
13      on a note to be shown to your Lordship and my friend,
14      indicating the general nature of the matter, or the
15      second is that the court can go into private for this
16      evidence to be explored.
17      It's probably sensible that the first option be
18      explored first because then we may get some clearer idea
19      of what the ambit of it is. But obviously it's
20      appropriate for -- if this is a -- your Lordship will
21      appreciate the Ruler isn't my client and I don't know
22      anything about this matter that's been talked about, but
23      obviously this witness is in some discomfort about
24      disclosing what he regards as confidential professional
25      matters and it wouldn't be right, if it's not relevant

                          82

 1      to any issue in this case, for confidential professional
 2      matters to be disclosed in open court of an irrelevant
 3      nature.
 4  MR LORD: My Lord, the difficulty with that is that this
 5      problem has arisen because of the way in which the
 6      claimant has gone about explaining Mr Page's role
 7      because it's clear from these answers that there is
 8      potentially a relevant connection between the previous
 9      report and mandate and matters that I am allowed to ask
10      him about because clearly they relate to Mr Azima and
11      this case.
12      So if there is some overarching concern or some
13      ability to pass the earlier report and the earlier
14      mandate, that's something that should have been dealt
15      with before if in fact -- through RAKIA factoring in
16      that this report was that of Mr Page and not adducing
17      evidence, as it has done, of a sort that your Lordship
18      has seen that disguises Mr Page's role because -- I am
19      anxious that we go into private and we don't have the
20      rigour of open court when I'm asking this witness
21      questions because it would be my submission that he has
22      told lies on oath, and I'll tell your Lordship that
23      Mr Page has lied on oath in relation to the written
24      reports and in relation to his coming across Mr Azima,
25      and in those circumstances, in my submission,

                          83

 1      your Lordship should think very long and hard before we
 2      abandon the usual approach of staying in open court.
 3      I can ask questions -- I'll try and ask my questions
 4      more slowly to establish the link to Mr Azima. I'm
 5      happy to do that. But I am anxious that we should keep
 6      the public forum here to make sure that we get
 7      a truthful answer, if your Lordship understands what I'm
 8      saying.
 9  JUDGE LENON: I'm certainly at this stage not going to go
10      into any sort of closed session. What do you say to the
11      proposal that Mr Page should write down on a piece of
12      paper the nature of the issue that he's uncomfortable
13      about?
14  A.  My Lord, it is quite -- I beg your pardon.
15  MR LORD: Well, we can try that, my Lord. I'm very happy to
16      try that, but I am going to have to ask about the
17      connection with the -- this witness has said that there
18      is a connection so I am going to have to ask him about
19      that.
20  JUDGE LENON: I see that and I see that's on the face of it
21      plainly relevant.
22  A.  My Lord, it is quite -- with respect to everybody, it's
23      quite difficult for me to put this in succinct format in
24      two or three lines. I will repeat. I am happy to
25      breach the confidence. There are representatives of

                          84

 1    His Highness here who would have no knowledge of the
 2    mandate I was given because this is a personal
 3    conversation between a sovereign ruler and myself, but
 4    I am happy to disclose it to the court, but not in the
 5    presence of the media.
 6  MR LORD: My Lord, this is likely to be relevant because
 7    a private conversation between Mr Page and the Ruler
 8    that establishes some direct line of communication
 9    between those two gentlemen is obviously relevant to
10    this case. It's relevant. The subject matter may not
11    be relevant, but the fact of the communication is
12    relevant, and I repeat that the problem has arisen
13    because of the way in which -- the evidence that RAKIA
14    has disclosed about Mr Page and his previous work in and
15    about relevant matters.
16  MR TOMLINSON: With great respect to my friend, these are
17    wholly bad points. The position is that this RAK
18    project update which he talks about a lot, doesn't
19    feature in his pleaded case and it's a matter that
20    hasn't been dealt with in evidence because it didn't
21    appear to be part of the issues before the court at all.
22    He can't criticise me now for not addressing a case
23    which only first appears in his note of opening and not
24    addressed in my evidence. But, my Lord --
25  MR LORD: Sorry, no, I'm going to correct that because that

85

 1    is flatly wrong because Mr Azima referred to the project
 2    update in his evidence. My learned friend successfully
 3    had those bits, I think, maybe struck out. I can't
 4    remember now. But the Ruler of Ras Al Khaimah deals
 5    with this document in his evidence, and your Lordship
 6    should go to that because my learned friend's case is
 7    that this is really the first time that it's really
 8    arising in this case and that's --
 9  MR TOMLINSON: No, it's not my case it's the first time it
10    arises, but you can't criticise me for not dealing with
11    something in evidence when it's not part of the pleaded
12    case. The fact that it's referred to in witness
13    statements subsequently -- my friend actually amended
14    his pleadings to deal with certain matters that were
15    dealt with in disclosure, and if he wanted to deal with
16    this, he could have amended his pleadings to deal with
17    it. He choses not to.
18  JUDGE LENON: Yes, but presumably that's partly because he
19    doesn't know who wrote it.
20  MR TOMLINSON: Well, my Lord, if this was relied on as
21    a document, he doesn't actually have a pleaded case
22    about Mr Page's role either. The position is if this
23    is -- this is a document which we know refers to
24    Mr Azima. He could have had a pleaded case that this
25    was -- some inferences could therefore be drawn from

86

 1    this as to the role of Mr Azima in the thinking of
 2    RAKIA. He didn't plead that case. So I'm not objecting
 3    to him now putting all these points to my witness in
 4    cross-examination, but I am objecting to him complaining
 5    that somehow I've suppressed reference to these in
 6    evidence when they're not part of the case.
 7      But, my Lord, what we've got to deal with here is --
 8    my friend says, "Well, it's relevant that Mr Page was in
 9    communication with the Ruler". That may be relevant,
10    but that's not in dispute. That's clear on the face of
11    the evidence. It's been -- it's mentioned in Mr Page's
12    witness statement. He's mentioned it again in evidence
13    today.
14      If he wants to go further into private, confidential
15    conversations between the Ruler and Mr Page, then that
16    is not an appropriate matter to be dealt with in open
17    court because one simply doesn't know where that goes
18    and how that relates to the Ruler's private affairs. It
19    doesn't matter whether it's the Ruler. It would be the
20    same if it was anybody whose private affairs were
21    discussed with a confidential agent. The idea that then
22    they could be explored in open court to see whether
23    something relevant comes out, my Lord, can't possibly be
24    right. The court has -- as your Lordship knows, the
25    court has a duty to protect people's rights to privacy

87

 1    under Article 8. The court is a public authority and
 2    it's important that those rights are protected.
 3      One simply doesn't know exactly what's being
 4    adverted to here. I'm perfectly happy for it to be
 5    explored and if it turns out to be relevant to some
 6    issue in the case, of course it must be dealt with. But
 7    as a general piece of exploration, it's not right just
 8    to go into it on the off-chance it might be.
 9  JUDGE LENON: No, but you would presumably accept that the
10    nature of any mandate that the Ruler gave to Mr Page is
11    of relevance?
12  MR TOMLINSON: The nature of any mandate, my Lord, yes, but
13    what concerns me is that the question then goes into the
14    details of the mandate and what the Ruler said and,
15    you know, what information he provided and so on.
16    Certainly the general nature of the mandate I think must
17    be -- I accept that, and I think Mr Page was actually
18    about to volunteer it at one point.
19  A. My Lord --
20  MR LORD: I'm in your Lordship's hands. I am going to want
21    to pursue the dealings that Mr Page had with the Ruler
22    and obviously matters that relate to this project report
23    that we've had which appear to refer back to earlier
24    work and engagements concerning Mr Azima, which is what
25    this case is about.

88

1  A.  My Lord, I am prepared to answer certain questions, but
2      they will be vague and I think that's the best I can
3      help the learned counsel here -- and I'm happy to answer
4      a question, but without going into too many specifics.
5  MR LORD:  My Lord, my concern is I'm not going to be held to
6      be giving Mr Page any licence to give anything other
7      than exactly truthful answers, so I'm not going to agree
8      to that.  If in fact there's a staging post here which
9      we can go through in writing or otherwise that's
10     sufficient, then I'm more than happy for that approach
11     to happen.  I'm not happy with Mr Page having, if you
12     like, licence, editorial licence, as to how he puts
13     things under the guise of this alleged confidentiality
14     that can't be looked behind.
15 JUDGE LENON:  I am going to invite you, Mr Page, to write
16     down on a piece of paper what it is that you are
17     concerned about and to do it in as succinct a way as you
18     can.
19 A.  My Lord, may I request I do that in the break for lunch
20     because first of all I need to write it and it would be
21     much better, if you accepted, my Lord, for me to sit
22     with the lawyers for the Government and I will write it.
23 MR LORD:  I'm sorry, my Lord, but obviously --
24 JUDGE LENON:  That's not going to be possible.
25 A.  My Lord, then I'm prepared to say certain things which

89

1      I think will be helpful to counsel here.  If he wishes
2      to expand on them, then I may have to revert to that.
3          I think what I will tell him, my Lord, will be
4      useful to him and I think it answers the concerns he may
5      have.
6  MR LORD:  My Lord, would it be better to go into private for
7      this initial exploration and then to see whether
8      your Lordship feels, in the light of that, we should
9      continue in private, go into public or desist with that
10     line of questioning at all?  I wonder if that would be
11     a safer way of doing it.  It's just an offer.
12 JUDGE LENON:  Yes, if that's going to be a way through this.
13 MR TOMLINSON:  My Lord, I'm happy to deal with it in that
14     way if everybody thinks that's appropriate.  It may be
15     that there's an earlier stage that Mr Page is offering
16     a general explanation, if he gives that general
17     explanation and it becomes clear that there's no need to
18     go any further, then we don't need to go into private.
19     If he gives that general explanation and my friend wants
20     to explore further, then we may need to.
21 JUDGE LENON:  Let's try that.  I'm anxious not to delay
22     matters too much with this.  Let's see if we can get by
23     without --
24 MR LORD:  Very well, my Lord.  Very well.
25         Mr Page, you were going to explain the sensitivity.

90

1  A.  Yes, my Lord.  His Highness' instructions were --
2      His Highness' information was that a member of his
3      family was working with Khater Massaad in gathering
4      information from the Palace and my instructions were to
5      ascertain whether that was in fact correct, that they
6      were working in collusion.  But, my Lord, before I'm
7      asked a question, I can say on oath I was never asked --
8      I never heard the name of Farhad Azima.
9  Q.  So, Mr Page, you were asked by the Ruler to carry out
10     some sort of surveillance or investigation into what
11     the Ruler thought was some leak within the Palace?
12 A.  No, that's not correct.  The request was could
13     I establish, because he'd heard a rumour, that
14     Khater Massaad was working with a member of his family
15     to the detriment of His Highness and the Government of
16     Ras Al Khaimah.
17 Q.  And so -- we'll come back to what you did in that
18     regard, please, but is that something that -- that was
19     an engagement that was set up simply between you and
20     the Ruler; is that right?
21 A.  That is correct, my Lord.
22 Q.  And is your evidence that nobody else knew about that?
23 A.  No one else was present at the meeting and no one else
24     knew my mandate.
25 Q.  And how long did that mandate last for?

91

1  A.  It's --
2  Q.  Still going on?
3  A.  No -- correction -- it's not still going on.  It was
4      dealt with in the first report, which is obviously
5      not -- we do not have -- and it was dealt with partly in
6      the second report, the one -- the redacted report we
7      have here.  Again I'm happy to share, my Lord, that
8      there was no information to suggest that His Highness'
9      belief was correct --
10 Q.  Right.
11 A.  -- ie that he was working with a member of his family.
12 Q.  And what sort of investigation work did you do in order
13     to establish the true position?
14 A.  Well, it was to review the previous investigation into
15     Sheikh -- His Highness, both his family members --
16     I nearly gave it away then.  I beg your pardon -- and to
17     see what was going on and to try to ascertain whether
18     there was a connection, and this report is partly
19     prepared in relation to that.  And I can take you
20     through chapter and verse, my Lord, if you want, but it
21     is the fact that we knew from previous intelligence
22     people who had worked for Sheikh Khalid in relation to
23     the bad -- the negative PR campaign that he launched
24     against His Highness when he was the Crown Prince and
25     therefore we explored that evidence as a possibility of

92

January 29, 2020                    Ras Al Khaimah Investment Authority v Farhad Azima                    Day 6

---

 1   the -- where we might find a link through
 2   His Highness -- sorry, that Khater Massaad was working
 3   with parties against the Ruler.
 4   Q.  Sorry, was the concern of the Ruler that somebody in
 5       the -- somebody within his family was working with
 6       Dr Massaad or was it the fact of Dr Massaad's alleged
 7       campaign? I'm not sure what the concern was.
 8   A.  It was that they were working, my Lord, together for
 9       whatever reason -- I have no reason why -- that they
10       were working together for the purposes of destabilising
11       or causing harm to His Highness.
12   Q.  And as part of that engagement you looked at Mr Azima?
13   A.  That is not correct.
14   Q.  So at {H7/299} of your report, you say:
15          "FA and the US Advisory Team.
16          "In continuation to our previous report, we were
17       informed by several new sources that FA is managing KM's
18       efforts in the US and perhaps even paying their bills ."
19   A.  That is correct, but I was never mandated by
20       His Highness to investigate then, subsequently,
21       Farhad Azima.
22   Q.  Can I ask you, please, about the scope of the retainer?
23       Go back to paragraph 12 of your witness statement,
24       please.  {D/3/4}.
25   A.  Yes.

93

 1   Q.  Can you see what you say in paragraph 12 about the scope
 2       of your retainer pursuant to this specific mandate?
 3   A.  I do, my Lord.
 4   Q.  "Jamie said that he was involved in investigating
 5       wrongdoing by Khater Massaad and the misappropriation of
 6       assets.  He wanted my assistance in tracing assets,
 7       investigating Khater Massaad's involvement with Iran,
 8       his links to Hezbollah and Lebanon and his relationship
 9       with Viktor Bout ...  I understood my engagement to be
10       for the government generally but I did not know which
11       specific government entity.  There was no letter of
12       engagement ..."
13          Can you see that?
14   A.  Yes, I can, my Lord.
15   Q.  Then, "Knowledge of Farhad Azima", paragraph 13:
16          "During this period in 2015 when I was undertaking
17       the investigations described above in relation to
18       Khater Massaad, I did not come across the name
19       Farhad Azima. The first time I recall hearing his name
20       was in early 2016 at one of my regular catch ups with
21       Jamie."
22          Now, Mr Page, you knew when you gave this witness
23       statement that it was in relation to a dispute between
24       RAKIA and Mr Azima about whether -- amongst other
25       things, about whether RAKIA had been involved in the

94

---

 1      illegal access of Mr Azima's data, didn't you?
 2   A.  I do.
 3   Q.  And you're here giving evidence in a written statement
 4       about the extent of your engagement by RAK or RAKIA,
 5       aren't you?
 6   A.  I am, yes.
 7   Q.  And if you put together paragraph 12 and paragraph 13,
 8       you are claiming, aren't you, that you did not come
 9       across the name Farhad Azima until early 2016?
10   A.  That is correct, my Lord.
11   Q.  If we go to the one surviving project update at
12       {H7/299}, you can see at pages {H7/299/2-4} that there
13       are three pages of this report -- it looks like it's
14       17 pages.  So three of the 17 pages concern matters
15       involving Mr Azima, don't they?
16   A.  That is correct.
17   Q.  So, Mr Page, can you explain to his Lordship why you put
18       in a witness statement and signed it and verified it to
19       be true back in June 2019 where you said this:
20          "During this period in 2015 when I was undertaking
21       the investigations described above in relation to
22       Khater Massaad, I did not come across the name
23       Farhad Azima. The first time I recall hearing his name
24       was in early 2016 at one of my regular catch ups with
25       Jamie."

95

 1   A.  That is correct, my Lord.
 2   Q.  Can you tell his Lordship why, when we've seen that in
 3       March 2015 you have prepared a report which discusses
 4       Mr Azima's alleged management of Dr Massaad's US team in
 5       the context of a concern about Dr Massaad's strategy
 6       that leads on to discussion of intelligence -gathering
 7       and monitoring activities and containing and ruining
 8       plans -- how could you possibly put in evidence what you
 9       said in paragraph 13? What's the explanation for it,
10       Mr Page?
11   A.  It's very simple, my Lord.  Farhad Azima was just -- was
12       a side issue in this report.  There were matters I was
13       investigating across the globe, including, as I have
14       said, Lebanon, Iran, Hezbollah, arms trafficking, people
15       trafficking , and his name at the time I wrote that
16       statement no more than perhaps some of the other 20, 30,
17       40 names that we came across in the course of this
18       investigation rang a bell to me, and, my Lord, that is
19       my evidence. Plus, my Lord, as I explained, in June of
20       2019 there were certain things going on in my personal
21       life which affected my ability to remember events that
22       occurred as far back as -- sorry -- as 2015, four years,
23       and if my Lord wishes me to expand on what those issues
24       were, I'm more than happy to do so.
25   Q.  No, thank you, Mr Page.  Could you go, please, to

96

---

```
 1    paragraph 7 at {D/3/3}?
 2  A. Are you talking about my statement or --
 3  Q. Yes, please, Mr Page. I want to just finish this
 4     matter, if you don't mind. I'm aware of the time.
 5     Thank you.
 6        In paragraph 7 of your witness statement you say
 7     this in the last sentence:
 8        "I don't keep contemporaneous documents and my
 9     briefings to clients are invariably oral, especially in
10     the Middle East where this is very normal."
11        Now, Mr Page, I wasn't sure this morning whether you
12     were clarifying this bit of your witness statement as
13     well. What's the answer?
14  A. I'm sorry, my Lord, I still don't understand that
15     question.
16  Q. Where you say in this paragraph 7 that your briefings to
17     clients are invariably oral, that means that your client
18     briefings are always oral, doesn't it?
19  A. No, not always oral, my Lord. My Lord, the one thing
20     I learnt, having worked in Saudi Arabia for three years,
21     was a knowledge of the Middle Eastern culture and, with
22     the greatest of respect to counsel, it is a quite unique
23     learning experience. Even to this day, my Lord, I will
24     go before a client from the Middle East who will read
25     more -- less than one page. So, therefore -- you're
```

97

```
 1     saying "Verbal briefings?" My Lord, the answer to that
 2     question is "Yes, verbal briefings ".
 3  Q. Mr Page, you're not answering the question. What you
 4     were telling the court in this witness statement at
 5     paragraph 7 was that you always briefed clients
 6     especially in the Middle East.
 7  A. Well --
 8  Q. Sorry, Mr Page. Sorry, Mr Page. The word "invariably"
 9     means "without exception".
10  A. Well --
11  Q. You shrug. Sorry, Mr Page --
12  A. No, I beg your pardon. Sorry.
13  Q. Did you know what "invariably" means?
14  A. Well, I think I do, but perhaps that was a misleading
15     line in my statement.
16  Q. So what do you think it means? It means always, except
17     for the 27 written reports in this case that you made?
18     Is that what you meant to say?
19  A. My Lord, I would go before His Highness and I would have
20     an audience of perhaps 30 minutes. The first 15 minutes
21     of that audience, because His Highness is extremely
22     knowledgeable about world affairs, will be discussing
23     with me -- who he thinks I'm also quite knowledgeable
24     about issues in the Middle East -- affairs of the
25     Middle East.
```

98

```
 1        I would then present him with a verbal briefing and
 2     he would not even look sometimes at the reports, but
 3     sometimes he would read an executive summary, and I mean
 4     an executive summary, because it is the custom, my Lord,
 5     that in the Middle East you are very lucky, no matter
 6     what it relates to, if they will read more than one
 7     page.
 8        What His Highness did subsequently with the verbal
 9     briefings and if I'd given him a written report I cannot
10     comment on, but I know until this day that the culture
11     is a verbal briefing. They prefer it because they like
12     to hear what you're saying. And I'm sorry, my Lord, if
13     it goes against protocol that people understand, but
14     that is an experience I have learned since 1995. So I'm
15     a -- long standing practitioner in the Middle East.
16  MR LORD: Would that be a convenient point, my Lord?
17  MR TOMLINSON: Mr Page, you're in the middle of your
18     evidence so you know you mustn't talk to anybody about
19     your evidence until you have concluded?
20  A. I understand.
21  (1.04 pm)
22            (The luncheon adjournment)
23  (2.00 pm)
24  MR LORD: May it please your Lordship, Mr Page, I was asking
25     you about your witness statement in which you said that
```

99

```
 1     you invariably briefed clients orally . Do you remember?
 2  A. That is correct.
 3  Q. And I was putting to you that that was untruthful
 4     because we know at least in this case that you provided
 5     many written project updates, didn't you?
 6  A. Yes, that is correct, in addition to verbal updates.
 7  Q. In addition to your oral updates, yes. And Mr Buchanan
 8     gave evidence that you updated about every month; would
 9     that be right?
10  A. Every month, six weeks, depending on when His Highness
11     wanted to see me.
12  Q. Yes. And Mr Buchanan estimated that probably roughly at
13     least half of the time there would be a written update
14     from you.
15  A. That is correct, my Lord.
16  Q. It's right, isn't it, that you still work for RAK or
17     RAKIA?
18  A. That is correct, my Lord.
19  Q. And so, since the beginning of 2015, you'd have provided
20     probably something in the region of 30 written project
21     updates, wouldn't you?
22  A. I think that the number has diminished over the last
23     12 months, but you may be right, my Lord. It may be 30.
24     I cannot recall exactly .
25  Q. By it's going to be in the order of around 25 to
```

100

1    30 reports in writing?
2  A.  That is possible. I can't -- you know, I can't remember
3    exactly how many I did.
4  Q.  Mr Buchanan gave evidence that all the reports were in
5    the same format; that's right, isn't it?
6  A.  Yes.
7  Q.  And how were the reports prepared? Did you type them
8    all up yourself or were others involved?
9  A.  No, others involved.
10  Q.  Who was involved?
11  A.  The agent that I employed to assist me in this complex
12    investigation.
13  Q.  And who's that?
14  A.  It's a company in the State of Israel.
15  Q.  Pardon?
16  A.  A company in the state of Israel.
17  Q.  What's the name of that?
18  A.  Insight.
19  Q.  And that's a company -- that's an Israeli company, is
20    it?
21  A.  That is an Israeli company, yes.
22  Q.  And what do they specialise in?
23  A.  Well, the founder of the company is the former head of
24    the Lebanese desk of Shin Bet and Shin Bet is the
25    Israeli equivalent of MI5.

101

1  Q.  Right.
2  A.  So they specialise in collating information,
3    particularly in the Middle East. They obviously
4    specialise in collating information on Iran, on
5    Hezbollah, on Lebanon, and they were the -- the
6    expression I use, my Lord, is the "think tank".
7  Q.  So would it be fair to say, Mr Page, that in relation to
8    the matters covered by your project updates, you had in
9    fact subcontracted at least some of that work to this
10    Israeli company called Insight?
11  A.  That is correct.
12  Q.  And they were, amongst other things,
13    intelligence -gathering specialists?
14  A.  They were specialists at obtaining information from
15    confidential sources and, my Lord, the important thing
16    was to analyse a significant amount of data being
17    recovered from multiple jurisdictions and
18    cross-referencing it, seeing really how it related to
19    Khater Massaad and his links. So, in answer, my short
20    answer is, yes, they were the conduit to receive all the
21    information from my other subcontractors.
22  Q.  And they were really -- they were the people, were they,
23    who you enlisted to carry out some of this electronic
24    data-gathering?
25  A.  By which you mean electronic -- I don't understand. By

102

1    "electronic", you mean open source information on the
2    internet?
3  Q.  I mean of any source.
4  A.  Well, they were -- yes, they were using the dark web,
5    open source information on the internet. That was the
6    limit to what they were doing.
7  Q.  And they could have been unlawfully accessing electronic
8    information for all you knew, Mr Page, couldn't they?
9  A.  Absolutely not.
10  Q.  How do you know what they did?
11  A.  Because my instructions from Mr Buchanan -- and not
12    simply his instructions -- it is my principle that no
13    information that is recovered must be obtained by
14    illegal means, and to hack is illegal .
15  Q.  You see, Mr Page, I suggest that we may be getting a bit
16    warmer here on how Mr Azima's data came to end up on the
17    internet.
18    Can you tell his Lordship a bit more about Insight?
19    I think you said people work for them who used to be the
20    equivalent of the Israeli MI5; is that right?
21  A.  Well, they have a number of people in their employment,
22    either who serve in the IDF -- you understand what the
23    IDF is, my Lord? Israeli Defence Force. The Israeli
24    Defence Force has a specialist unit that collates
25    intelligence, military intelligence. So they are

103

1    specialists from the IDF, from Mossad, from Shin Bet.
2    There are lawyers, there are accountants, because we
3    were analysing a lot of information from public sources
4    which was financial information.
5  Q.  Insight would have the capability, wouldn't they, to
6    access Mr Azima's emails if they'd wanted to?
7  A.  No, I have no knowledge whether they do that type of
8    work.
9  Q.  But given the high-powered natured of the people at
10    Insight you've described, their expertise would extend,
11    wouldn't it, into that sort of covert operation?
12  A.  Not to my knowledge.
13  Q.  I suggest, Mr Page, that that's not a truthful answer.
14  A.  Well, my Lord, I can only express to you the mandate
15    they received from me on behalf of the Government of RAK
16    was to use their intelligence community contacts to
17    deliver information or provide information regarding
18    Dr Massaad and his associations as outlined in my
19    witness statement.
20  Q.  And that would include -- and it was thought, wasn't it,
21    that Dr Massaad's associate included Mr Azima?
22  A.  Absolutely not. My Lord, the report of 26 May --
23    Farhad Azima's name came out -- completely out of the
24    blue. It was not part of our mandate to look at
25    Farhad Azima. This information came from a confidential

104

```
 1       source.  The confidential  source was not even given --
 2       because we weren't instructed  to look at Farhad Azima.
 3       He provided what he heard in the marketplace, if that's
 4       the expression, my Lord.
 5   Q.  Were there some written instructions  or documents that
 6       recorded your retainer of Insight in relation to these
 7       matters?
 8   A.  No.
 9   Q.  Why not?
10   A.  Because that's not how -- my Lord, I work in a very
11       strange world, without sounding over-dramatic.
12          I neither trust telephones, nor I do trust the email, so
13       any briefings  that they received  from me would have been
14       face  to  face.
15   Q.  And how were they paid?
16   A.  By bank transfer.
17   Q.  From whom?
18   A.  From my company in the Middle East.
19   Q.  And how much did you pay them in 2015?
20   A.  Without access to my records, I have no recollection.
21          It's dealt with by my finance director.
22   Q.  Roughly how much?
23   A.  In the whole of 2015?
24   Q.  Yes.  Millions?
25   A.  In relation to Khater Massaad or in relation to other
```

                                    105

```
 1       matters instructed  to me by His Highness?  There were
 2       other matters which -- again I have the same problem.
 3   Q.  Did His Highness -- did the Ruler know that you were
 4       essentially  acting as a bridgehead into Insight?  It
 5       sounds like he probably did.
 6   A.  I'm sorry, my Lord, I don't understand the question.
 7   Q.  Did His Highness know that when he asked you to carry
 8       out various tasks, you were actually retaining this
 9       Israeli  operation called Insight to carry them out?
10   A.  My Lord, there's no secret that I operate in the
11       State of Israel and it is no secret, my Lord --
12   Q.  What's the answer to the question?
13   A.  Well, I would not have told him, nor would he have asked
14       me the question.
15   Q.  But it sounds as if what you may have been doing,
16       Mr Page, is acting as something of a go-between, really
17       hooking up the Ruler's wishes with what sounds like
18       a very effective  Israeli  intelligence -gathering and
19       surveillance  operation.
20   A.  Absolutely not.  They were just one of a number of
21       subcontractors that I used.
22   Q.  Presumably Insight would have copies of the project
23       updates that they prepared for you, wouldn't they?
24   A.  They have exactly the same protocol that I adopted when
25       we commenced this project.  In fact it is not
```

                                    106

```
 1       a protocol -- a new protocol.  It was a protocol that
 2       I -- that was commenced as far back as 2008/2010, when
 3       I was working against Sheikh Khalid.
 4   Q.  I suggest, Mr Page, that you didn't forget about these
 5       30 or so written reports when you gave your witness
 6       statement.  You would have known about those written
 7       reports, I suggest to you.
 8   A.  But, my Lord, I thought we dealt with the fact  that
 9       I don't actually  recall how many reports there were.
10       I don't have any reports because, on the instructions of
11       His Highness --  if I may I step back.  As early
12       as January 2015 His Highness expressed to me his
13       concerns that his palace and other government
14       organisations  had been compromised. By "compromised",
15       my Lord, I mean information had been obtained illegally
16       from within his organisation.
17          In my report there's a reference  to someone called
18       Joseph Abu.  That is not Joseph Aboud.  It is
19       Joseph Assad, who is a former CIA agent attached to the
20       US Embassy in Abu Dhabi who ran a company in Abu Dhabi.
21       So, you know, we had good reason to believe  that Joseph
22       Assad was running a campaign.  We had no evidence, but
23       we believe he was.
24          So His Highness' concern about his information being
25       compromised were well founded and on that basis
```

                                    107

```
 1       I created a form of protocol.  And also, my Lord, it
 2       should be remembered, we are talking about investigating
 3       links to Iran.  This is a government agency that has
 4       enormous capability to access information.  So, with
 5       respect, my Lord, why it might seem a bit  bizarre,  it
 6       may seem a bit  fanciful,  I live in the world populated
 7       by former spooks --  I beg your pardon, former
 8       intelligence  agents and we take drastic  measures to
 9       protect not only the information, but the people engaged
10       in gathering the information.
11   Q.  And I suggest that you lied in your witness statement
12       about the way in which you report only orally.
13   A.  I don't think, my Lord, I was intending to lie.  It may
14       have been misleading, for which I apologise to the
15       court, but, as I told you, at the time I prepared that
16       witness statement there were issues in my life which
17       were causing me considerable distress and to this  day
18       that continues.
19   Q.  And you did that in order to avoid -- and you omitted to
20       make any mention of the project  updates in your report,
21       didn't you, the written project  updates?
22   A.  Because, my Lord, we're talking  about something that
23       happened five years ago, and in the last  five years
24       I have had my 19-year-old son committed to a mental
25       health hospital on numerous occasions, I have had my son
```

                                    108

```
 1    assault me, I have had my wife have a stroke, and, in
 2    fairness, my mind was not focused on trying to remember
 3    back to 2014, and to this day my son is in a mental
 4    health hospital. So, with respect, my Lord, what
 5    counsel is suggesting, that I sought to mislead your
 6    court, is absolutely not true.
 7  Q. And you did so in order to seek to avoid being
 8    identified as the author or as the producer of the only
 9    surviving version of your project update, dated
10    26 March 2015. That's why you told those lies --
11  A. Absolutely not, my Lord. My Lord, my name was disclosed
12    in the discovery proceedings prior to this trial. Why
13    would I seek to hide behind the fact that I would have
14    been the author of this report?
15  Q. And you did that, you lied, Mr Page, because the March
16    project update showed that you, Mr Page, were
17    investigating, amongst other people, Mr Farhad Azima?
18  A. Absolutely not.
19  Q. And because that one surviving project update showed
20    that you were investigating the human rights campaign on
21    behalf of the Ruler?
22  A. The human rights campaign?
23  Q. Sorry, the concern about a campaign being mounted of the
24    sort we see described in the March project update.
25  A. My Lord, the campaign that we foresaw or what we think
```

                                        109

```
 1    was going to happen is no different to the campaign that
 2    was mounted by Sheikh Khalid to embarrass His Highness.
 3    So our answer -- our emphasis was what is the nature of
 4    the complaint and what they intended to do with it, and,
 5    as I said in my evidence, earlier evidence, my brief
 6    was: was Dr Khater Massaad working with a member of
 7    His Highness' family? And this is a follow-on from that
 8    investigation.
 9  Q. And you lied because the March project update showed
10    that you had been investigating, amongst others,
11    Mr Azima from as early as March 2015?
12  A. My Lord, with respect, I've answered that question.
13    Absolutely not. I was never mandated to or instructed
14    to, then or now, investigate Farhad Azima.
15  Q. And in paragraphs 12 to 15 of your witness statement
16    {D/3/4-5} you gave an untruthful account of your
17    Farhad Azima-related work in 2015, didn't you?
18  A. Would you mind if I just read it?
19  Q. You may.
20  A. Paragraph 15?
21  Q. 12 to 15. You can read those paragraphs. I'm
22    suggesting to you that what it does not reveal --
23  A. No.
24  Q. -- is the full extent to which you were looking at
25    Mr Azima as shown by the project update, which we will
```

                                        110

```
 1    come to, Mr Page -- we are going to come to that -- and
 2    don't -- remember that there are three and a half pages
 3    concerning Mr Azima -- right? -- before you answer the
 4    question I put to you. I think you said that you didn't
 5    look at Mr Azima at all in 2015, so be very careful
 6    because you're on oath now, Mr Page.
 7  A. Yes, I appreciate I'm on oath and I've already mentioned
 8    that, when I prepared my statement in June of 2019,
 9    I could not recall the name of Farhad Azima because this
10    was a massively complex investigation involving many,
11    many people, and if Farhad Azima had been -- I think, my
12    Lord, I have a fairly retentive memory. If Farhad Azima
13    had been the focus of my investigation I would have
14    remembered. The answer is he was not and never was and
15    to this day is.
16  Q. Could we turn to what Mr Page you actually were doing in
17    2015 in relation to Mr Azima?
18  A. I'm sorry, you're talking about the paragraph 15 again?
19  Q. No, I'm going to ask you if you could try to call upon
20    your retentive memory to help with what you were
21    actually doing in 2015 as it may have concerned
22    Mr Azima; all right, Mr Page? That's what I'm looking
23    at now; all right? It doesn't matter whether you're
24    looking at Mr Azima by himself or as part of
25    Dr Massaad's team allegedly or as part of a campaigning
```

                                        111

```
 1    group or for some wider very, very confidential
 2    sensitive reason. Just think about, Mr Page, the extent
 3    to which Mr Azima was the subject -- double underline --
 4    of your, Mr Page's, attention in 2015. Do you
 5    understand that, Mr Page?
 6  A. I understand the question, my Lord.
 7  Q. Right. Well, let's try, shall we, to tell his Lordship
 8    truthfully now on oath what you actually did in relation
 9    to looking at Mr Azima in 2015?
10  A. My Lord, if I may -- my Lord, if I may -- I find this
11    slightly offensive. I am a former police officer.
12    I left the police with an exemplary conduct certificate.
13    I joined the police to uphold the rule on law and order.
14    And to propose that I'm lying on oath, I find, my Lord,
15    very offensive because I do not lie on oath.
16    I understand the oath and I continue to uphold the
17    values that I had when I was a police officer. So the
18    answer is to your question, my Lord -- is I did not
19    investigate Farhad Azima. The only reference to
20    Farhad Azima is in this report dated March 2016, and
21    this part of the project finished very quickly
22    thereafter.
23  Q. Can we have the project update up, please, {H7/299}?
24    You know, Mr Page, by now that it's dated 26 March 2015.
25    And his Lordship can take it, can he, that this was
```

                                        112

1    prepared by Insight, this Israeli investigative outfit
2    that you've described today?
3  A.  That is correct.
4  Q.  Will we find details of Insight and their work on the
5    internet?
6  A.  I would think not.
7  Q.  Oh, why not?
8  A.  Because in our -- in the nature of the business they
9    undertake, we do not -- we don't go on Yellow Pages.  We
10   are a very -- as I am -- a very boutique, respectable
11   investigation and corporate intelligence agency.  So we
12   don't need to put our name on the internet.  My name is
13   on the internet because my group provides security in
14   hostile environments, and the reference to the
15   investigation division, which is in my witness
16   statement, is a minute part of the work that I do for
17   governments in hostile environments.
18 Q.  So how would somebody get to know about Insight's work,
19   then?
20 A.  Right.  Okay.  So 2005, my Lord, I am providing security
21   support to the European Commission aid mission to the
22   Palestinian people, which is in Jerusalem.  I am the
23   only foreign company to be given a licence in Israel to
24   carry weapons, which is part of the requirement to
25   protect the diplomats of the European Commission.

                            113

1    I also have a licence in Palestine, which is very
2    rare, because I have to work both sides of the divide.
3    To perform the service that I need to provide to my
4    clients, I need to gather intelligence from the
5    Palestinian Authority and from the Israeli authorities,
6    and that puts me into contact, my Lord, with people from
7    the Israeli intelligence service.
8      So, as will be my evidence when it comes to
9    Mr Halabi, I have numerous connections within the --
10   both the Palestinian Authority intelligence service and
11   the Israeli intelligence service, and when I was seeking
12   a company to help me on this project, that's how I came
13   across this company.
14 Q.  And why, in a case concerning Dr Khater Massaad and the
15   UAE, did you think to -- that actually an Israeli
16   investigative outfit would be the right people to help
17   you?
18 A.  My Lord, the allegations against Khater Massaad were
19   links to Iran, links to Hezbollah, which is in Southern
20   Lebanon.  Who better -- who has more knowledge of Iran
21   and Hezbollah and Lebanon than the Israelis?  Certainly
22   not British intelligence.
23 Q.  And is your evidence that you thought that none of
24   Insight's information-gathering would be through illicit
25   obtaining of electronic material, none of it at all?

                            114

1  A.  No, it is from confidential sources, from what I would
2    call "covert operations", and by "covert", my Lord, I do
3    not mean electronic covert operations; I mean
4    cultivating a source by means of under-cover operation.
5    And I don't feel too comfortable giving away all the --
6    I'm happy to expand if you wish, but if you want an
7    example, I knew that Khater Massaad -- because I know
8    Khater Massaad personally.  I have worked with him for
9    two years, I travelled with him, I socialised with
10   him -- so I knew he liked women, just an example -- and
11   I don't mean his wife, I mean other women.
12     Now, if I wanted to get information on
13   Khater Massaad, the English thing is to put someone
14   beside him to cultivate him in a way that I don't think
15   I need to explain, my Lord.  And that's how it works.
16   And it's bizarre, I know, and, my Lord, I'm sure it's
17   bizarre to this court, but the world in which I live in
18   is populated by former intelligence services, officers,
19   and they're the skill sets to this day that are
20   converted into the commercial world.
21 Q.  It would also include, wouldn't it -- your particular
22   knack of getting confidential information, that would
23   extend to paying people, wouldn't it, Mr Page?
24 A.  The payment may be no more than a lunch.
25 Q.  But it would include paying people for information,

                            115

1    wouldn't it, Mr Page?
2  A.  Potentially, yes.
3  Q.  Paying people to get confidential information; yes?
4  A.  Absolutely not.
5  Q.  Can you look at {H7/299/2}, please, which is the project
6    report.
7  A.  Right, yes.
8  Q.  "In the US, KM's team hired a team of advisers managing
9    Farhad Azima ... in order to spread allegations against
10   our client.  The main allegations against the client are
11   on human rights issues ..."
12     Can you see that?
13 A.  Yes.
14 Q.  "FA, who might also be responsible for paying the
15   US team, handles all KM's activities in the US."
16     Can you see that?
17 A.  Yes.
18 Q.  Then a bit further on down it says:
19     "According to our source, FA also hired a private
20   investigator ..."
21     Now, who was your source?
22 A.  It's not my source.
23 Q.  Well, who is the source you're talking about there?
24 A.  Well, I actually don't know who the source is.
25 Q.  Oh, I see.  So this is an Insight source and you don't

                            116

 1    know who they're referring  to?
 2  A.  My Lord, how it works is  that everybody within my
 3    industry  is  over-protective with sources, for one of two
 4    reasons:  to disclose  the source,  they put the source at
 5    risk and no one  in our industry  gives  up the source
 6    unless asked to do, and I  did not ask my colleagues to
 7    give up their source.  I believe  that  this information
 8    that  they had obtained  from the source and the
 9    information I  have asked them, the  source, was over
10    a  series  of meetings over lunch.
11  Q.  And then the  last paragraph:
12         "Our sources have reported that  KM's team suspects
13    that  they have an information leak  since they noticed
14    some of RAK's actions  in  the  last few months.  They
15    believe  that  the  client  is  having someone monitor their
16     activities  either  electronically  or in other methods."
17         Now stopping there, Mr Page, do you know who the
18    "sources" -- plural  -- are who are referred  to  there?
19  A.  I have absolutely  no idea, my Lord.
20  Q.  And therefore  --  well, in going on, they  say:
21         "...  have reported that  KM's team suspects that  they
22    have an information leak ."
23  A.  I can't  comment on why he says that.  But, my Lord, if
24    this  information been obtained in  an  illegal  way, I  am
25    lost  as  to  know how we got Joseph Assad's name wrong in

                              117

 1    the report because he's called  "Joseph Aboud".  His name
 2    is  not  "Joseph Aboud".
 3  Q.  Mr Page, you're  in  no position to say to his Lordship
 4    whether Insight did or didn't use  illegal  means to
 5    obtain information that fed into these project updates
 6    of yours.
 7  A.  I am, my Lord, in  a position .
 8  Q.  How?
 9  A.  Because, my Lord, I said in evidence previously that
10    Insight  were mandated by me and were told that we must
11    not break the law because the information that  we may be
12    producing for the client  may be the subject of legal
13    proceedings and, therefore ,  cannot be tainted by any
14     possibility  of  illegality .
15         Now, if you ask me, my Lord, if  approaching someone
16    under pretext,  cultivating them, talking to them, is
17     illegal , I think  it 's probably questionable, but it  is
18    not  illegal  activity .  If someone volunteers  -- if the
19    former mistress  of Khater Massaad volunteers information
20    to  me about him, I 'm not sure where the duty of
21     confidentiality  lies .  It 's as simple as that.  And in
22    this  case the source knew various people named in this
23    report and heard through the grapevine that a campaign
24    was about to  be launched against His Highness, and it 's
25    the same source that  actually  was against His Highness

                              118

 1    on the Sheikh Khalid case.  That 's how we got from this
 2    quantum leap of finding  someone who might be involved in
 3    working with Khater Massaad against His Highness.
 4  Q.  Mr Page, you didn't  actually  know, did you, the way in
 5    which Insight  were going about getting  information or
 6     intelligence  for you and the Ruler,  did you?
 7  A.  Yes, I did.
 8  Q.  You weren't involved  in  the actual
 9     intelligence -gathering  itself , were you?
10  A.  My Lord, I have 40 years  in  this industry.  I know when
11    information that  has been provided to  me has come from
12    an  illegal  source.  This was clearly and unequivocally
13    information obtained from covert  sources.
14         Now, if  they used a pretext , ie  met someone
15    pretending to be a  journalist , I  have no idea, but what
16    I  do know is that  they were never authorised or mandated
17    or did anything illegal .
18  Q.  Well, I suggest, Mr Page, that you would have known that
19    Insight would potentially  carry out hacking or  illegal
20    accessing  of electronic  data.
21  A.  Absolutely not.
22  Q.  And when it says here, "Our sources have reported that
23    KM's team suspects ...  an information leak  ...  They
24    believe  that  the  client  is  having someone monitor their
25     activities  either  electronically  or in other methods",

                              119

 1    they were right,  weren't they, to  be suspicious in  that
 2    way?
 3  A.  No, because the timeline  does not work --
 4  Q.  Then if  we go to  {H7/299/3} --
 5  A.  My Lord, may I just finish  that answer? Sorry.  The
 6    timeline  does not work.  I  was not mandated until
 7    January of 2015, okay?  The report stated March 2015.
 8    They were not mandated to go after  --  sorry, to put it
 9    in the timeline,  what you're saying is that  their team
10    are saying that  they were subject to  electronic
11    interception .
12         Now, the worrying part for my client  in  this  report
13    is , if you look at Joseph Assad -- and I apologise, my
14    Lord, to go on --  it  refers  to Joseph Aboud, AKA
15    Joseph Assad, being an expert in SIGINT, and for the
16    benefit  of my Lord, "SIGINT" is  spook language for
17    "hacking".
18         So the concerns that  my client  had raised about
19    information being leaked from his palace were well
20    founded because Joseph Assad is  a known specialist  in
21    that  field  from his CIA days.
22  Q.  If  we go to  {H7/299/3}, please, heading,  "KM efforts
23    against the client .
24         "FA and the US Advisory Team."
25         Can you see that?

                              120

530

1  A.  Yes.
2  Q.  "In [consideration] to our previous report, we were
3      informed by several new sources ..."
4          Can you see that?
5  A.  Yes.
6  Q.  What were those new sources?
7  A.  My Lord, I've no idea.
8  Q.  And it reads on:
9          "At the moment, KM's strategy in the US is to spread
10     human rights violations allegations against the client ."
11         Can you see that?
12  A.  Yes.
13  Q.  Then a bit further on down it says:
14         "According to our sources, KM's US lawyer,
15     Kirby Behre ... hired a consultant ..."
16         What are the sources that are being referred to
17     there, Mr Page, can you tell his Lordship?
18  A.  My Lord, I can't answer the question.  I have never
19     asked, nor would I ask, unless I had reason to ask, "Who
20     actually are you talking to?", because, as I explained
21     in my previous evidence, I don't -- no one gives up
22     a confidential source unless required to by law.
23     A source is a source, and you don't -- because you may
24     have a source that is in a very difficult position, and
25     if they are to disclose to a third party who that source

121

1     is, you may end up compromising your source.
2        So, for example, during the investigation
3     of Khater Massaad I had a source within Lebanese
4     intelligence .  He was sharing information that he was
5     getting from Lebanese intelligence -- because it was
6     a quid pro quo.  I was giving him information, he was
7     giving me.
8        If I were to give up the source, bearing in mind we
9     are talking about links to Hezbollah, there is a good
10     possibility that my source may actually suffer physical
11     harm, so therefore I am -- as my colleagues are -- I am
12     overprotective of my sources.  And it's well founded and
13     it 's something that has been drilled into me and
14     disciplined in me since I've been in this industry for
15     a number of years.
16  Q.  It's right, isn't it, Mr Page, that information
17     concerning Mr Azima's alleged management of Massaad's
18     team in the US, including as to the advisers that were
19     working for the team, was likely to be confidential
20     information?
21  A.  No.
22  Q.  And what's been described here, I suggest, Mr Page, is
23     the procurement on behalf of -- the procurement as part
24     of this project of confidential information --
25     information confidential to Dr Massaad or Mr Azima or

122

1     others.
2  A.  No.
3  Q.  And advisers are likely to be agents, aren't they, owing
4     a duty of confidence to their principal?
5  A.  To my knowledge, this information that's contained in
6     this report was provided by someone who had had a lunch,
7     a social gathering, with somebody else within this team,
8     and -- pardon my expression, my Lord -- had spilled the
9     beans.  We didn't -- we just wanted to ascertain what --
10     if there was any substance to what His Highness
11     believed, that Khater Massaad was working with
12     a relative of His Highness to create damage and harm to
13     his reputation.
14  Q.  It's likely, isn't it, that a plan or strategy of
15     Dr Massaad's in relation to, for example, to some human
16     rights concerns or campaign, that is likely to have been
17     confidential to Dr Massaad, isn't it -- likely to be?
18  A.  No, because I'm sure that on the internet there's
19     a thing called , I think -- well, Amnesty International
20     certainly , but Banged Up in Dubai talk about numerous
21     human rights abuses in the UAE.  So the fact that
22     Khater Massaad was privy to allegedly human rights
23     abuses is probably something that's reported in open
24     source, I would believe.
25  Q.  How do you think, Mr Page, that Dr Massaad's team came

123

1     to suspect that there was an information leak?  What did
2     you understand to be the reason that, if you like --
3  A.  My Lord, it's very simple.  As I said, His Highness had
4     good reason to believe that his information had been
5     compromised, so, therefore, it follows that they may
6     have -- somebody may have conducted a covert operation
7     into His Highness' palace, the RAK prosecutor's office ,
8     which was fed back to Khater Massaad.
9        Now, my Lord, I can tell you that to this day or --
10     sorry -- that there's certainly -- during the course of
11     my investigation into Khater Massaad, it is clear that
12     Khater Massaad maintains contacts with Ras Al Khaimah
13     that is feeding in information and we're getting that
14     from human intelligence sources.
15        So, my Lord, I'm trying to make the point is we were
16     well founded in our belief that there's -- something was
17     really amiss within the security of the Palace and the
18     RAK prosecutor's office and perhaps in RAKIA.  I'm just
19     repeating what I said previously.
20  Q.  Could you go to page 16 of this document, please
21     {H7/299/16}, which is the summary.  It's the summary:
22        "As we reported above ..."
23        Can you see that?
24  A.  Yes.
25  Q.  You're reporting here, aren't you, for the benefit of

124

1     the Ruler and for RAK, basically, aren't you?
2  A.  Yes.
3  Q.  And that would include RAKIA?
4  A.  Correct.
5  Q.  You say this:
6       "As we reported above, KM's US team has a certain
7     plan to smear RAK and its Ruler with human rights
8     allegations."
9       That would be a serious concern, wouldn't it, at
10    that time, to the Ruler?  It would go beyond merely --
11    it would go on -- it would go beyond merely a concern
12    about what you've alleged to be some information leak in
13    the Palace, wouldn't it, Mr Page?
14 A.  No, that's not correct, my Lord.  Given that as far back
15    as 2008/2009 his step-brother -- sorry, his
16    half-brother, Sheikh Khalid, had produced a report
17    criticising His Highness and the way His Highness acted
18    as the Crown Prince.
19       It goes -- therefore follows that of course he would
20    be concerned if there was going to be a campaign against
21    him, but it would be following -- and again, my Lord,
22    it's on the internet if anyone wants -- it's called the
23    "Rogue Report", and if anybody wanted to follow it
24    through, this would make sense, that this is where they
25    tried to discredit His Highness.

125

1  Q.  Mr Page, have I understood your evidence correctly?  Is
2     it your evidence that the Ruler was concerned that his
3     half-brother was in cahoots with Dr Massaad to start
4     some campaign against the --
5  A.  That is not my evidence.
6  Q.  Don't interrupt, please.  Don't interrupt, please.
7       I understand your evidence to be that the Ruler was
8     concerned, as you understood it, that his half-brother
9     was in league with Dr Massaad and that together they
10    were mounting some campaign in order to destabilise
11    the Ruler and RAK.  I think that's a summary of what
12    you've said today.
13 A.  My evidence is that a member of his family, which is
14    what I raised with my Lordship before we broke for
15    lunch.
16 Q.  But the concern of the Ruler was that there was a plot
17    to destabilise him and RAK; in other words, to
18    destabilise his Rulership of RAK.  Is that right?
19 A.  Yes.
20 Q.  That would be something of enormous concern to
21    the Ruler, wouldn't it?
22 A.  Well, it would not only be of great concern to the
23    Ruler, it would be of great concern to the federal
24    government.  The Emirate of Ras Al Khaimah is a federal
25    emirate and anybody who tried to destabilise an emirate

126

1     would be guilty of a very serious criminal offence in
2     UAE.
3  Q.  What would happen to them?
4  A.  I have no idea.
5  Q.  There's an ominous tone there when you said that.  What
6     would happen to them?
7  A.  I have no idea.  I imagine trying to plot a coup d'état
8     would have serious consequences.  What that would mean,
9     I don't know.  I'm not familiar --
10 Q.  Capital consequences?
11 A.  Well, I'm not familiar with UAE law so I can't answer
12    you.
13 Q.  So his Lordship can take it -- if you wouldn't mind
14    answering the question as well -- that the Ruler would
15    have been very, very exercised by this alleged plot
16    against him?
17 A.  You mean concerned?
18 Q.  Yes.
19 A.  Well, I would imagine so, but he never voiced those
20    concerns to me.
21 Q.  I suggest that's not true, Mr Page.
22 A.  What is not true?
23 Q.  You spoke to the Ruler about various matters at this
24    time and you're saying that the Ruler didn't express to
25    you concerns about what we see you writing about on

127

1     these three or four pages in this report?
2  A.  No.
3  Q.  Is that what you're saying to his Lordship?
4  A.  His brief to me was that, "I believe that my family
5     member may be working with Khater Massaad".  We didn't
6     stray into, "They're trying to plot my overthrow".  We
7     didn't -- what I can say on oath, my Lord, is it is
8     apparent that His Highness has great concerns about what
9     is going on within his emirate because, during the time
10    at which I served him, I have seen that he has enhanced
11    considerably the security at the Palace.  For what
12    reason, I cannot comment.  But I had seen it at my first
13    hand.  I go to the Palace.  When I first went to the
14    Palace in 2015, there were no armed security at the
15    Palace.  To this day there are armed UAE soldiers
16    guarding his palace.
17 Q.  Mr Page, can you answer the question rather than give
18    sort of lengthy speeches all the time?
19 A.  I'm sorry.  Please ask your question again.
20 Q.  I'm going to take longer, I'm afraid, because if you
21    look at the transcript, I ask you a question and then
22    you give a very long answer.
23 A.  I beg your pardon, my Lord.
24 Q.  Now, you can give a long answer, but do please try to
25    answer the question.

128

```
 1   A.  I understand, my Lord.
 2   Q.  I was asking you about the -- what we see in the project
 3       update, the three and a half pages that refer to
 4       Mr Azima, they do so, don't they, in terms that Mr Azima
 5       is apparently managing Dr Massaad's US team?  That's
 6       right, isn't it?
 7   A.  That's what the report says, yes.
 8   Q.  And this report records that this team is in effect
 9       working on Dr Massaad's side of things, doesn't it?
10   A.  That is correct.
11   Q.  And I think from your evidence the concern was -- there
12       was a concern with the Ruler that actually this was part
13       of some attempt to threaten the Ruler's stability and
14       position.
15   A.  No, I would not say that.
16   Q.  And I suggest that that was the case, Mr Page, and that,
17       since that was the case, the Ruler would have been very,
18       very focused on anybody whom the Ruler suspected of
19       being part of that alleged plot.
20   A.  That is not correct.
21   Q.  That's fair, isn't it, Mr Page?
22   A.  No, I think the Ruler's concern was that information
23       regarding the ongoing investigation into
24       Dr Khater Massaad and the case being prepared by the RAK
25       prosecutor was being shared outside the confines of his
```

                                    129

```
 1       organisation.
 2   Q.  And, Mr Page, if we go to {H7/299/16} -- I think we can
 3       go through this little paragraph:
 4           "As we reported above, KM's US team ..."
 5           That was viewed by the authors of this report to be
 6       being managed by Mr Azima, wasn't it?
 7   A.  Yes.
 8   Q.  So we can read it as follows, if for "KM's US team" we
 9       replace -- if we replace "KM's US team" in this
10       paragraph with "KM's US team managed by Mr Azima", we
11       can read as follows:
12           "As we reported above, KM's US team, managed by
13       Mr Azima, has a certain plan to smear RAK and its Ruler
14       with human rights allegations.  As far as we know, at
15       this point, they do not have any evidence to back up
16       these allegations, but they started gathering
17       information for a campaign, based on hearsay and
18       testimonies, and started searching for a platform to
19       make it public.  The campaign is not public yet, so we
20       will be able to gather intelligence on their progress in
21       order to monitor their activities and attempt to contain
22       or ruin their plans."
23           Now, Mr Page, the reference to "their progress" and
24       "their activities" and "their plans" is a reference to
25       KM's US team managed by Mr Azima, isn't it, Mr Page?
```

                                    130

```
 1   A.  It is.
 2   Q.  Thank you, Mr Page.  And it follows from that, doesn't
 3       it, that what you put in train on behalf of RAK and
 4       RAKIA or the Ruler at this time was some serious
 5       intelligence -gathering on the US team and Mr Azima,
 6       didn't you?
 7   A.  Correct, using human intelligence sources.
 8   Q.  And I suggest that you wouldn't have stopped at human
 9       intelligence sources, Mr Page.  You would have been
10       content to use illegal intelligence -gathering services
11       in order to achieve the information that you were
12       required to produce for the Ruler.
13   A.  With respect, no, because this operation actually --
14       this part of my mandate ended shortly after we produced
15       this report.
16   Q.  And there's no evidence, is there, Mr Page, that you
17       produce -- there's no project update that we've
18       seen in which there's any suggestion that the
19       intelligence -gathering and monitoring we see referred to
20       here have been brought to an end?
21   A.  Well, it was brought to an end because, my Lord, we
22       decided -- and this operation I think -- that
23       the source that we was using for this -- to obtain this
24       information might be compromised.  So for his own safety
25       we decided to withdraw continuing to obtain information
```

                                    131

```
 1       in respect of this campaign.
 2   Q.  What did you understand the intelligence -gathering would
 3       comprise, then?  Just human sources; is that right?
 4   A.  Yes, human sources.  I mean, if you are to mount
 5       a campaign of this -- of that described in my report,
 6       Dr Massaad would have been talking to PR agencies,
 7       corporate communications.  We have a number of sources
 8       which we had used in the Khater Massaad -- I beg your
 9       pardon -- in the Sheikh Khalid investigation, who would
10       hear -- I mean a mandate -- I apologise if I'm teaching
11       you to suck eggs.  Under US law, if you work for a --
12       against the interests of a foreign government, you are
13       required to register that with a certain organisation in
14       the United States.  So therefore we were seeking to see
15       whether any of the main PR agencies had registered an
16       interest representing Khater Massaad or whoever to go
17       after His Highness.
18   Q.  Mr Buchanan gave evidence that you were being paid
19       directly by the Palace in 2015 and 2016.  Is that right,
20       Mr Page?
21   A.  That is correct.
22   Q.  Mr Buchanan gave evidence that in 2017 to 2018 you were
23       being paid about US $300,000 per quarter.  Would that be
24       right?
25   A.  That's -- well, from my knowledge.  I can't -- without
```

                                    132

January 29, 2020    Ras Al Khaimah Investment Authority v Farhad Azima    Day 6

 

 1  referencing my invoices -- if he says that, he would
 2  have been authorising my invoices, so perhaps he's got
 3  the better handle on this than I have.
 4 Q. How much were you being paid in 2015 for this work?
 5 A. Again, my Lord, it would vary. It would be 100,000
 6  a month, it might be -- it depended on the scope of work
 7  that we were undertaking. I mean, bear in mind that we
 8  were working, my Lord, in 14 or 15 jurisdictions .
 9  That's a lot of resources to commit, and not only
10  consultancy fees or contractors' fees, there's travel
11  costs, etc, etc. So I -- honestly, my Lord, I can't
12  give you a figure because I just don't know it without
13  referencing material which I don't have before me.
14 Q. Can you be shown {H7/268}, please, Mr Page? Bear in
15  mind that that project update is 26 March 2015. Do you
16  think it likely that the Ruler -- sorry, go to {H7/268}
17  first .
18  Mr Buchanan gave evidence that one of the prompts
19  for the emails -- you'll see there's some emails in
20  early April 2015, {H7/268}.
21 A. Do you wish me to read them?
22 Q. I just want you to -- now you've got the page, listen to
23  the context. You know context is important. If I could
24  set some context for once and then I'll ask you the
25  question.

 1  Mr Buchanan gave evidence that the March project
 2  update report that I have just taken you to was, he
 3  thought, one of the prompts for what we see in these
 4  emails referred to as "the Ruler's instruction in
 5  relation to Mr Azima"; all right?
 6 A. If you say so, my Lord. I'm not familiar with this
 7  correspondence.
 8 Q. No, and you've got no basis to challenge that, have you?
 9 A. I've never seen it , my Lord, so I don't know -- I'm
10  not -- the only person I reported to was His Highness
11  directly or Jamie Buchanan. I had no idea what the
12  internal politics were within the Palace about what was
13  going to be decided or not decided. It's not part of my
14  mandate.
15 Q. No. So at the foot of the page Mr Buchanan says this to
16  Mr Handjani on 4 April 2015:
17  "Good afternoon. HHSS had wanted us to target FA --
18  on what basis would we do this?"
19  Can you see that, "to target"? And "FA" is
20  a reference to Farhad Azima; all right?
21 A. I see that, my Lord.
22 Q. If you go on, please, to {H7/273} you will see some
23  more emails on 4 April 2015, featuring Mr Bustami,
24  Mr Handjani and Mr Buchanan. Can you read that,
25  Mr Page? (Pause)

 1 A. Yes, I've read it .
 2 Q. And you can see that Mr Bustami says this:
 3  "I have had few discussions with boss [that's
 4  a reference to the Ruler, Mr Page] about FA and he is
 5  adamant that we bring charges against him."
 6  And then a bit later on it says:
 7  "He wants me to get you on the case to file some
 8  sort of charges against Farhad."
 9  And then later on:
10  "When are you next in town so that me you and Jamie
11  could hook up and coordinate our attack ."
12  Do you see that, Mr Page?
13 A. I can, my Lord, yes.
14 Q. And you at this time -- you had meetings, didn't you,
15  with Mr Buchanan and the Ruler?
16 A. That is correct.
17 Q. And I put it to you, Mr Page, that you would have been
18  made aware at or around that time that the Ruler was
19  adamant that charges should be brought against Mr Azima.
20  That's right, isn't it?
21 A. Absolutely not, my Lord.
22 Q. And you would have been made aware that the Ruler wanted
23  to target Farhad Azima?
24 A. Absolutely not, my Lord.
25 Q. And you would have been made aware that one -- that you

 1  were -- in effect , that you were being instructed to
 2  obtain information on Mr Azima because the Ruler wanted
 3  that to be done?
 4 A. No, my Lord. I already said I was never instructed by
 5  His Highness or anybody else in Ras Al Khaimah to
 6  conduct an operation or investigate Farhad Azima, and
 7  that is my evidence.
 8 Q. If you go to {H7/464}, please, you'll see an email on
 9  20 July 2015. Have you got that, Mr Page?
10 A. Not yet. (Pause)
11 Q. Have you got that?
12 A. Yes, I have, my Lord, yes.
13 Q. You can see that on 19 July 2015 -- it's the bottom
14  email -- Mr Buchanan sent this email, saying:
15  "NB [that's Mr Bustami] says the Boss wants criminal
16  stuff taken out of [the] letter and to go after FA ..."
17  Can you see that?
18 A. I can, my Lord, yes.
19 Q. And "FA" is a reference to Mr Azima; all right?
20 A. It must be, my Lord, yes.
21 Q. Yes, it must be. So it looks, doesn't it , Mr Page, as
22  if, in July 2015, the Ruler was still letting it be
23  known that he wanted Mr Azima to be targeted?
24 A. My Lord, I can't possibly comment. I had no
25  instructions from His Highness to go after Farhad Azima.

1   What His Highness was talking about I have no
2   comprehension.
3   Q. And I suggest, Mr Page, you were having -- you were
4      involved with the Ruler and Mr Buchanan at that time,
5      weren't you?
6   A. In 2015?
7   Q. Yes.
8   A. Yes, that is correct, my Lord.
9   Q. And you were working on the project for them,
10     weren't you?
11  A. I was working on the mandate as described in my witness
12     statement.
13  Q. And that project included, didn't it, concerning
14     yourself with the alleged campaign by Dr Massaad and his
15     associates?
16  A. I just said in evidence previously we shut down that
17     particular project as early as April because to continue
18     with the project would have compromised the source and
19     I have said we decided not to continue with it because
20     it was not necessary.
21  Q. And I suggest that you would have been told that your
22     remit to target Mr Azima by getting information for the
23     Ruler had become all the more important as at July 2015.
24  A. My Lord, I report what -- I said it once and I will say
25     it again.  I was never instructed by His Highness or any

137

1   of his advisers to target, investigate -- and by
2   "target", I don't know what that means -- Farhad Azima.
3   Q. And I suggest that around about July, when it was made
4      plain to you that the Ruler still wanted Mr Azima gone
5      after, you would have redoubled your
6      intelligence-gathering efforts on Mr Azima.
7   A. Absolutely not, my Lord.  I wasn't doing anything
8      against Farhad Azima.  Why would I double something I'm
9      not doing?
10  Q. And I suggest that around about October and
11     November 2015 you caused or procured the hacking of
12     Mr Azima's emails through spear-phishing attacks on his
13     data.
14  A. Absolutely not, my Lord.
15  Q. And that you continued to procure illegal access to
16     Mr Azima's data through 2016?
17  A. Absolutely not, my Lord.
18  Q. And you made that illegally obtained information
19     available to those you were working for, namely
20     the Ruler, RAK and RAKIA?
21  A. I did not, my Lord.
22  Q. Can we go, please, to paragraph 16 of your witness
23     statement at page {D/3/5}?  You refer there to
24     a conversation you allegedly had with Mr Buchanan.
25  A. Yes.

138

1   Q. And you placed this in 2016.
2   A. Yes.
3   Q. And you say in paragraph 15:
4        "During that conversation, Jamie asked me to keep my
5      ears and eyes open for anything I heard about a negative
6      publicity campaign that might be damaging for RAK."
7        Do you see that?
8   A. Yes, I do.
9   Q. We've seen, haven't we, Mr Page, that a negative
10     publicity campaign that might be damaging for RAK was
11     something that you were looking at back in March 2015,
12     as recorded in that project update?
13  A. No.  The instructions from His Highness in January of
14     2015 were to establish whether Khater Massaad was
15     working in collaboration with a member of his family to
16     orchestrate obtaining information illegally from his
17     palace, understanding the strategy, understanding the
18     investigation.  It was not about ascertaining if there
19     was a plan to launch a smear campaign.  That came as
20     a result of our -- we think outside the box, and it just
21     happened, in trying to understand whether Khater Massaad
22     was working against His Highness' interest with a member
23     of his family, we developed a source who gave us this
24     information which is in the report.  We were never
25     mandated to go after it.  It's something that we used as

139

1   part of the ongoing investigation into the link between
2   Khater Massaad and a member of His Highness' Royal
3   Family.
4   Q. And in paragraph 16 you say this {D/3/5}:
5        "Following this conversation with Jamie, I spoke to
6      a few contacts I use occasionally in the investigations
7      business, journalism and PR industry and asked them to
8      keep their ear to the ground."
9        Now without giving a lengthy speech, please,
10     Mr Page, who were the contacts you're there talking
11     about?
12  A. I cannot remember.
13  Q. You can't remember?
14  A. I cannot remember.
15  Q. Including the contacts in the investigations business,
16     you can't remember?
17  A. My Lord, the --
18  Q. Can you remember or not?
19  A. I cannot remember.
20  Q. I suggest, Mr Page, that what you're talking about in
21     paragraphs 15 and 16 were simply a continuation of the
22     intelligence-gathering and monitoring project that we
23     saw evidenced in the March 2015 project update.
24  A. Absolutely not.  Absolutely not, my Lord.
25  Q. I'm going to ask you about the alleged discovery of this

140

```
 1    data in August 2016. You claim, Mr Page, don't you,
 2    that you learnt of the hacked data on the internet
 3    through Mr Halabi?
 4  A. That is correct.
 5  Q. And you give evidence there in paragraph 18 {D/3/5-6}.
 6    Can you see that?
 7  A. Yes.
 8  Q. You were in court today, weren't you, when Mr Halabi
 9    gave his evidence --
10  A. I was, my Lord.
11  Q. -- and when he indicated the way in which he came by
12    this information?
13  A. I was, my Lord.
14  Q. And it's right, isn't it, that by the time Mr Halabi
15    came by this information, you had worked for many, many
16    months using the expert services of Insight,
17    a specialist Israeli outfit?
18  A. Absolutely not, my Lord.
19  Q. Had you stopped using Insight by August?
20  A. No, they were working on the mandate that we were given
21    by Mr Buchanan in March of 2015, which was to
22    investigate Khater Massaad's links to Iran, Hezbollah --
23    it's in my evidence -- but Iran, Hezbollah, we were
24    looking at -- we were looking in Kyrgyzstan, I was
25    looking in DRC, I was looking in -- all over the place,
```

141

```
 1    at least six or seven jurisdictions, my Lord. But we
 2    were not looking at Dr Farhad -- sorry, correction -- we
 3    were not looking at Farhad Azima.
 4  Q. So I suggest, Mr Page, that if you had Insight, with all
 5    its expertise, information-gathering for you at that
 6    time, if there was something interesting and new
 7    concerning Mr Azima or the alleged campaign that he was
 8    involved in for Khater Massaad, you'd have got wind of
 9    it straightaway from someone like Insight, wouldn't you,
10    Mr Page?
11  A. No, my Lord, they had a limited mandate and it's in my
12    evidence. Jamie asked me to do this not as a mandate.
13    I was not mandated. I was not paid. Just, "If you're
14    out and about, keep your eyes to the -- ears to the
15    ground in case you hear anything". That was it and they
16    were never mandated by me to do that, because had
17    I mandated them, they would have been paid. I was not
18    being paid for this.
19  Q. I suggest, Mr Page, that the alleged involvement of
20    Mr Halabi in relation to discovering this hacked data is
21    entirely invented.
22  A. My Lord, no, it's not. That is -- Mr Halabi and I have
23    had a long-standing relationship. This mandate -- and,
24    my Lord, just to answer your question that you raised to
25    me, I do not -- I am not computer literate. I'm
```

142

```
 1    embarrassed to say that I'm a dinosaur. I do not use
 2    the computer. Because this was going to be searches in
 3    the Arabic language, Mr Halabi was one of the people
 4    that I reached out for.
 5  Q. And I suggest that you have used Mr Halabi -- that you,
 6    rather, asked Mr Halabi to sign a statement claiming he
 7    found this hacked data in order that Mr Halabi could
 8    serve as some source for that discovery --
 9  A. That is not true, my Lord.
10  Q. -- in order to place the source of that discovery at
11    least one step further removed from you and/or the
12    people working for you.
13  A. My Lord, I'm repeating what I said. I was never
14    mandated by His Highness, by any of His Highness'
15    advisers, to go after Farhad Azima. So I can't answer
16    the question any farther. I'm telling you that I was
17    never mandated and that's on oath.
18  Q. And I put it to you, Mr Page, that you arranged for
19    Azima's confidential data, that by this stage had been
20    illegally obtained by or through your offices, to be
21    published online in August 2016.
22  A. Absolutely not, my Lord.
23  Q. And you were working for RAK and/or RAKIA and the Ruler
24    at that time, weren't you?
25  A. Well, I would say, my Lord, I was actually working for
```

143

```
 1    His Highness, not RAK or RAKIA. I was working for the
 2    Government of Iraq, of which His Highness is the Ruler.
 3  Q. And the Government of Iraq ultimately --
 4  A. I beg your pardon, "RAK", nor "Iraq".
 5  Q. Yes, and RAKIA is the investment authority of the
 6    RAK Government?
 7  A. That is my understanding, my Lord.
 8  Q. And you would have been aware that there was a plan
 9    afoot there to ruin Mr Azima through some sort of
10    offensive which RAKIA had by then launched?
11  A. No, my Lord, I was not privy to any of those
12    conversations with His Highness' advisers.
13  Q. Who else did you tell about the hacking of Mr Azima's
14    data, please? Who did you tell about that?
15  A. As outlined in my statement.
16  Q. I'd suggest that you illegally obtained that data and --
17    did you discuss the illegal obtaining of it with
18    anybody?
19  A. I didn't obtain the information illegally so I'm not
20    sure who I would have discussed it with.
21  Q. Can I ask you, by August 2016 the negotiations between
22    RAK and RAKIA and Dr Massaad had broken down, hadn't
23    they?
24  A. I believe so, my Lord, but again I'm not party -- I'm
25    not privy to that sort of conversation.
```

144

```
 1   Q.  And by the end of September litigation had been started,
 2       hadn't it, by RAKIA against Mr Azima?
 3   A.  Again, my Lord, I'm not privy to that type of -- I'm not
 4       part of the litigation team.
 5   Q.  Are you aware of what, if any, campaigning has been
 6       carried out on behalf of RAK or RAKIA since
 7       September 2016 against Mr Azima?
 8   A.  Sorry, my Lord --
 9   Q.  Since --
10   A.  No -- sorry -- by "campaigning" you mean what?
11   Q.  I mean online campaigning, I mean spreading stories,
12       trying to promulgate stories adverse to Mr Azima --
13       stories adverse to Mr Azima.
14   A.  I am aware that they hired media communications
15       consultants, but what their mandate was is not within my
16       knowledge, my Lord.
17   Q.  So you don't know what, if any, steps RAK or RAKIA took
18       to mount some sort of publicity campaign against
19       Mr Azima since that date; is that right?
20   A.  My Lord, I'm not privy to that type of information.
21   Q.  What have you done for RAK or RAKIA since August 2016?
22       What services have you performed since then?
23   A.  Continued to investigate Khater Massaad; I have
24       continued to look at issues involving their dispute in
25       Georgia; I have continued to look at issues in
```

145

```
 1       Kyrgyzstan where money went missing; I have continued to
 2       look at money that went missing in India; I have
 3       continued to look at money that went missing in
 4       I believe Bulgaria -- it may be Romania, my Lord,
 5       I can't remember; and, more importantly, the Iranian
 6       issue.  But that is really of great concern to the
 7       Government of Ras Al Khaimah.
 8   Q.  It's right, isn't it -- if you want to go in your
 9       witness statement, please, Mr Page, to {D/3/6} --
10   A.  Sorry, which?
11   Q.  If you go to paragraph 20, please.  Start at
12       paragraph 19, please, Mr Page.
13   A.  Yes.
14   Q.  Thank you.  You say in paragraph 19 -- this is your
15       account that Mr Halabi called you.  Do you remember
16       giving -- well, you've given evidence of that in
17       paragraph 19.  Can you see?
18   A.  Yes, I vaguely remember he called me, yes.
19   Q.  You say in paragraph 20:
20           "When I received this information from Majdi,
21       I would have picked up the phone to Jamie although I do
22       not specifically remember doing so."
23           Do you remember that?
24   A.  Yes, I do remember that.
25   Q.  And then a bit later on you say:
```

146

```
 1           "I believe I spoke to Jamie first because he was my
 2       client and that he asked me then to contact Neil Gerrard
 3       at Dechert and let him know what I had heard but it may
 4       have been the other way round.  I think I may have
 5       spoken to them more than once in this period.  I do not
 6       recall how I provided them the links that Majdi had
 7       given to me."
 8           Can you see that?
 9   A.  That is my recollection, my Lord.
10   Q.  Then you go on to say:
11           "I do not know what Jamie and Neil did with the
12       information ..."
13           Can you see that?
14   A.  No, I passed on the information -- as I said, this was
15       not a mandate from Mr Buchanan.  This was, "Please have
16       a look".  I found it.  I passed it on.  That was my --
17       the end of my involvement in that particular exercise,
18       which again was not a mandate.  It was just, "Can you do
19       this?"
20   Q.  So after you had passed on this information to
21       Mr Buchanan and Mr Gerrard for the first time -- after
22       you'd initially passed it on -- that was the end of your
23       contacting them in that regard?
24   A.  Other than that I am aware, because I am aware, that
25       they hired a specialist -- computer forensic specialist
```

147

```
 1       to download the material.  Other than that, I'm not
 2       aware of -- and I am aware, my Lord, that Decherts have
 3       reviewed, interrogated the information, but other than
 4       that, I'm not aware of anything else.
 5   Q.  But as far as you're concerned, Mr Halabi gave you the
 6       information, the two links, you then passed it on the
 7       phone to Messrs Buchanan and Gerrard or one or both of
 8       them; is that right?
 9   A.  Yes, that's correct, my Lord.
10   Q.  And you didn't pass on any further links to either of
11       those gentlemen subsequently?
12   A.  My Lord, I run at that time a company turning over --
13       I am the chairman of a company turning over £27 million
14       a year.  I am running complex contracts in hostile
15       environments.  This was a favour for Mr Buchanan.  It
16       was not -- I didn't keep -- it was literally, "Can you
17       do it?", I passed the information on and that was it.
18       I don't recall, I could not possibly recall,
19       four years -- nearly four years down the road or
20       something, my Lord -- four years after the event, what
21       exactly was said and what I said and who I said because
22       I run a very big organisation.  I'm the chairman of the
23       group.
24   Q.  Could you go, please, to {G/26.10}?
25   A.  Yes, I have it in front of me.
```

148

537

 1 Q. This is a copy of the judgment of Mr Justice Rix, as he
 2   then was, in Dubai Aluminium v Sayed Reyadh Sayed
 3   Abdulla --
 4 A. "Riyadh".
 5 Q. I defer to you, Mr Page.  3 December 1998.
 6     You'll recollect this case, won't you, Mr Page?
 7 A. Yes, it was one of the first cases I did with the -- for
 8   the Government of Dubai.
 9 Q. And if we go, please -- I don't think we need to bother
10   with the case except for the way it deals with your role
11   in it.  If you go to {G/26.10/4} please -- that's the
12   fourth page of this --
13 A. Yes.
14 Q. -- can you see what Mr Justice Rix records from lines 19
15   down to 31, please?
16 A. Yes, I can read it, yes.
17 Q. Have you read it?
18 A. Yes, I'm familiar with it because --
19 Q. You're familiar with it?
20 A. Yes.
21 Q. And that's a reference to you, Mr Page, isn't it, in
22   that page?
23 A. It is, my Lord, yes.
24 Q. And there was evidence, wasn't there, filed through an
25   affidavit before Mr Justice Rix, in relation to this

 1   particular application, "... that information in
 2   relation to certain of Mr Al Alawi's accounts had been
 3   obtained by a sub-agent instructed by Page Associates
 4   making what Mr Page of that firm called 'pretext calls'
 5   to the banks concerned ..."
 6     Do you see that?
 7 A. Yes, my Lord.
 8 Q. And from your evidence today, it sounds as if you don't
 9   think making pretext calls to banks would be unlawful;
10   is that right?
11 A. My Lord, my instructions to my agent at the time
12   I commissioned them to conduct the work into
13   Mr Al Alawi, who by, my Lord -- at that point was
14   subject to a criminal investigation both in Dubai and
15   Switzerland, was to undertake investigations.  I had no
16   knowledge until this case arose as to how they obtained
17   that information.
18 Q. What's the answer to my question?
19 A. That I -- sorry, was your question did I authorise
20   pretext calls?
21 Q. I said that from your evidence today it sounds as if you
22   didn't think that making pretext calls to banks to
23   obtain information would be unlawful.
24 A. Sorry, I said -- I did not say I did not think it was
25   unlawful.  I'm saying that my instructions to my agents,

 1   both in the United Kingdom and in Switzerland, were to
 2   obtain the information.  I at all times --
 3 Q. What's the answer?  You seem to have given the same
 4   answer again not to my question.  What's the answer to
 5   my question?
 6 A. You're asking me the question did I authorise or
 7   sanction --
 8 Q. No, I didn't.  I didn't ask you that.  I asked you
 9   whether you thought making pretext calls to the banks in
10   the way that Mr Justice Rix describes and with which you
11   must be familiar -- whether you think that's unlawful or
12   not.  You, Mr Page, here today, what do you think about
13   it?
14 A. Yes, Mr Justice Rix said it was unlawful.  I cannot
15   argue with the decision of Mr Justice Rix.
16 Q. So it's only because he made that finding that you think
17   it's unlawful, is it?  You didn't think independently --
18 A. No, no, I'm sorry, my Lord.  I did not instruct my
19   agents to obtain information illegally by pretext
20   information.  I only became aware of it when this case
21   came before Mr Justice Rix.  My instructions to my
22   agents then and to this day is: you operate within the
23   law.
24 Q. I'm sorry, Mr Page, I suggest that's not truthful and
25   that you would -- that you are perfectly happy to nod

 1   and wink at sub-agents so that they get information by
 2   whatever means necessary.
 3 A. My Lord, this was an enormously complex investigation
 4   involving what I would only describe as an organised
 5   crime gang working within Dubai Aluminium. I did not
 6   commission or authorise them to do it.  I accept
 7   unreservedly that this is in breach of the law as
 8   prescribed in Mr Justice Rix's decision, for which
 9   I have apologised to the court, but I can say no more on
10   it.  It was not something I sanctioned; it came out
11   after the event.
12 Q. If we go to {G/26.10/5}, can you read lines 16 to 27,
13   please, Mr Page?
14 A. Sorry?
15 Q. It starts --
16    "This evidence is not answered on behalf of Dubai."
17   Can you see?
18 A. Oh, sorry, you're talking -- all right.
19 Q. Lines 16 down to 27.
20 A. Yes, understood.
21 Q. That's all right.  Just read that to yourself, please.
22   (Pause)
23 A. Yes, I can see what it says, yes.
24 Q. Mr Justice Rix found, didn't he, that there was a strong
25   prima facie case of criminal or fraudulent conduct in

538

```
 1    the obtaining of such information concerning
 2    Mr Al Alawi's accounts?
 3 A. I accept that, my Lord, yes.
 4 Q. And that was something which had arisen as a result of
 5    your use of the sub-agent to get information for
 6    a client?
 7 A. That is correct, my Lord, yes.
 8 Q. Can we go, please, to {G/26.15}? Have you got that,
 9    Mr Page?
10 A. Yes.
11 Q. Do you see that?
12 A. Yes.
13 Q. This is a piece by the Hindustan Times on December 15,
14    2015. You can see what it says:
15        "BCCI wants all details of snooping from UK firm.
16        "With the previous cricket Board secretary
17    Sanjay Patel clarifying his position on the payment of
18    US$900,000 ... made in 2013-2014 for a controversial
19    surveillance that is being alleged was aimed at fellow
20    officials, the focus has shifted to the UK-based
21    security and investigations company, Page Protective
22    Services (PPS) that carried it out."
23        Can you see that, Mr Page?
24 A. I can, my Lord, yes.
25 Q. You can see that the article then runs on over the page.
```

153

```
 1        If you go to the second page, please, {G/26.15/2}, you
 2    can see -- if you just read it to yourself and then I'll
 3    ask you some questions.
 4 A. I'm familiar with this publication, my Lord.
 5 Q. Yes. So what this piece suggests is that there was
 6    going to be some enquiry into work which your company
 7    had carried out in relation to a certain Indian cricket
 8    board; is that right?
 9 A. That is correct, my Lord, yes, although the company is
10    actually -- the article is -- the name of the company
11    that undertook the work is not PPS UK.
12 Q. And is it right that you carried out the surveillance
13    that's referenced here, you or your firm?
14 A. My Lord, I'm in some difficulty again. This is -- the
15    instructions from the BCCI, the Board of Cricket Control
16    in India, is a confidential instruction between myself
17    and the then chairman of the board. I'm not sure --
18    I know the article refers -- I'm not sure, my Lord, I'm
19    at liberty to tell you what my instructions were or the
20    background to this instruction. It's -- my Lord, I'm
21    being asked to breach confidentiality again and I don't
22    feel very comfortable about it.
23 Q. And one of the quotes here is {G/26.15/2}:
24        "'If this is the case, we are interested to find out
25    from where and how email exchanges between
```

154

```
 1    Shashank Manohar (BCCI president) and Lalit Modi and the
 2    secretary's (Anurag Thakur) pictures with an alleged
 3    bookie were generated and circulated to a section of the
 4    media', said the official ."
 5        There was a concern, wasn't there, about the illegal
 6    obtaining of emails and their disclosure to the press?
 7    Is that right?
 8 A. No, because at that time, my Lord, Lalit Modi was under
 9    investigation by what is called the "CBI", which is the
10    Central Bureau of Investigation, ie the Indian
11    equivalent of the FBI, in relation to criminal activity.
12    I have no idea whether they sought to get information
13    from Lalit Modi, but the reference to -- this is not
14    something I took part of.
15 Q. Were you involved in any alleged illegal obtaining of
16    emails at this time?
17 A. No, my Lord.
18 Q. Can I ask you finally, please, to go to {H10/353},
19    please, where you'll see a copy of a judgment of
20    Sir Andrew Smith in the case called
21    JSCBTA Bank v Ablyazov and others. Can you see that,
22    Mr Page?
23 A. I can, my Lord, yes.
24 Q. I'm sure you're familiar with this litigation, aren't
25    you, enough --
```

155

```
 1 A. Relatively so, yes.
 2 Q. This records a judgment of Mr Justice Smith on
 3    15 February 2018. You can see from paragraph 1 he
 4    refers to the fact that this is a long-running dispute,
 5    with allegations of conspiracy made by the bank against
 6    the defendants, and freezing injunctions have been
 7    obtained and receivership orders made against the
 8    defendants in relation to this litigation; all right?
 9        Then if you go to paragraph 7 at {H10/353/2}, you'll
10    see the matters before Sir Andrew Smith. Can you see
11    there?
12 A. Yes, my Lord, yes.
13 Q. One of the defendants had applied to challenge the
14    orders the bank had obtained on two grounds: one was
15    that there had been non-disclosure and the second was
16    that the bank did not have clean hands; all right?
17    Those were the two grounds of challenge. And the
18    learned judge dismissed those challenges, but he dealt
19    with the clean hands argument at page 21 of this
20    judgment, starting at paragraph 113 {H10/353/21}. Can
21    you see that?
22 A. Yes.
23 Q. And one of the defendants raised four complaints in
24    relation to the clean hands argument. You can see (i),
25    (ii), (iii), (iv). It's the fourth one. It was said by
```

156

 1    one of the defendants that the bank had:
 2          "... misled the court when applying for a disclosure
 3    order against Mr Eesh Aggarwal."
 4          Right?
 5  A.  Yes.
 6  Q.  It's that fourth aspect that concerns you.  If you go,
 7    please, to page 24 of this judgment, to the heading
 8    "Disclosure order against Mr Aggarwal" {H10/353/24} --
 9  A.  Sorry.
10  Q.  That's all right.  Take your time.
11  A.  Which paragraph are you reading?
12  Q.  It starts at paragraph 128.  Do you have that at the top
13    of page {H10/353/24}?
14  A.  Yes.
15  Q.  Paragraph 129 -- sorry, 128, this is where the judge is
16    dealing with the fourth bit of the clean hands thing; in
17    other words, that there's been -- the disclosure by the
18    bank has not been right.  Paragraph 129:
19          "The evidence in support of the application was
20    a statement made by Mr Tucker and dated 14 June 2016.
21    He said that the Bank had 'recently discovered that
22    Mr Ablyazov and Mr Khrapunov [had] been working [with]
23    Mr Aggarwal'.  He complained that the Bank was contacted
24    in early 2016 by a Mr Stuart Page, who had claimed to
25    act for unnamed Israeli 'hackers' who had extracted

                                    157

 1    information from Mr Aggarwal's computer.  At a meeting
 2    with Mr Hardman and a Mr Nurlan Nurgabylov, a senior
 3    official of the Bank, on 17 February 2016 Mr Page showed
 4    documents indicating that Mr Aggarwal was involved with
 5    a number of named companies.  Mr Khrapunov's complaint
 6    is that the Bank was dishonest about when it learned
 7    about Mr Aggarwal administering Mr Ablyazov's assets and
 8    dealing with Mr Khrapunov: that it had information
 9    obtained by unlawful hacking and wanted to appear to
10    have come by the information legitimately."
11          Can you see that?
12  A.  I can, my Lord, yes.
13  Q.  And in paragraph 130 the judge goes on:
14          "It appears from Mr Jenkins' evidence ..."
15          Then that runs on.
16          Can you see the last sentence:
17          "It is said that the UAE would have responded to the
18    request and provided information about assets managed by
19    Mr Aggarwal.  (According to Mr Jenkins, between
20    November 2011 and September 2013 the Republic of
21    Kazakhstan made other requests of other states for legal
22    assistance that referred to companies of which,
23    according to the Bank, it had later learned from
24    Mr Page ...)."
25          Can you see that?  Then paragraph 134:

                                    158

 1          "During the hearing, Mr Samek introduced an
 2    alternative version of this complaint: that the Bank
 3    knew of Mr Aggarwal's involvement with Mr Khrapunov and
 4    with Mr Ablyazov's assets through meetings that
 5    Mr Nurgabylov and Mr Rakishev had with Mr Page before
 6    the meeting in February 2016 to which Mr Tucker
 7    referred.  In support of this allegation Mr Khrapunov
 8    relied on a letter from Mr Page's solicitor,
 9    Stewarts Law LLP ..."
10          Can you read on?  Can you read on, please, the rest
11    of paragraph 134, please, {H10/353/24-25} -- to the end
12    of 134?
13  A.  Yes, my Lord.  I'm familiar with that.
14  Q.  So there was evidence, wasn't there, Mr Page, in this
15    Ablyazov judgment of Sir Andrew Smith, that you,
16    Mr Page, had been saying, claiming, that you had bank
17    information derived from Israeli hackers.  That's right,
18    isn't it?
19  A.  My Lord, the affidavit in support of Hogan Lovells was
20    written by Mr Tucker.  I did not meet with Mr Tucker.
21    I met with Mr Chris Hardman, who is a partner.  I did
22    not say -- and I do not know where this information has
23    come from -- that it was Israeli hackers.  I'm in some
24    difficulty because I -- that -- Mr Tucker was not
25    present at that meeting so I have no idea as to how

                                    159

 1    Mr Tucker made that assumption.
 2  Q.  It's right, isn't it, Mr Page, that you do have access
 3    to expert hackers, don't you?
 4  A.  No, I do not have access -- and, my Lord, I was provided
 5    information from a source in Dubai that showed that
 6    Mr Eesh Aggarwal had knowingly assisted in the
 7    commission of a laundering of $700 million stolen from
 8    the BTA Bank.  My first approach -- and I go back to my
 9    Lord -- is that I saw that this is evidence of
10    a criminal conspiracy.  I presented the information to
11    the bank and to the legal -- to the Ministry of Justice
12    and told them that they should seek MLAT -- MLAT
13    assistance.  I'm sure you know what "MLAT" stands for.
14    I did not commission nor was I paid to access
15    Eesh Aggarwal's information.
16  Q.  And I suggest, Mr Page, that you caused or procured the
17    hacking of Mr Azima's emails in this matter and made
18    that material available to RAK and RAKIA.
19  A.  Absolutely not, my Lord.
20  MR LORD:  Thank you, Mr Page.
21  MR TOMLINSON:  My Lord, I've no re-examination, unless
22    your Lordship has any questions.
23  JUDGE LENON:  No, I don't have any questions.  Thank you,
24    Mr Page.
25  A.  Thank you, my Lord.

                                    160

Appellant
S. Page
First Affidavit
Exhibit: "SRP-1"
7 January 2022

**IN THE SUPREME COURT OF THE UNITED KINGDOM**
**ON APPEAL FROM THE COURT OF APPEAL**
**(ENGLAND)**

**UKSC 2021/0084**
**ON APPEAL FROM**
**CA No. A3/2020/1271**
**[2021] EWCA Civ 349**

**BETWEEN**

**RAS AL KHAIMAH INVESTMENT AUTHORITY**

**Respondent**

**and**

**FARHAD AZIMA**

**Appellant**

---

**AFFIDAVIT OF STUART ROBERT PAGE**

---

I, **STUART ROBERT PAGE**, of 14 Montpellier Road, London, W5 2QP, **STATE ON OATH** as follows:

1    I make this affidavit at the request of Farhad Azima ("**Mr Azima**"), the Appellant, who I understand has a pending application for permission to appeal to the Supreme Court, and that the evidence I give in this affidavit may be relevant to that application.

2    I have prepared this affidavit in a fairly limited time period as I understand that Mr Azima's application may be decided imminently, and so I have not had the opportunity to review the full range of potentially relevant documents that are available to me. I am therefore preparing this affidavit largely from memory and with limited assistance from documents. Subject to this point, and except where I indicate otherwise below, the facts and matters stated in this affidavit are within my own knowledge and are true. Where information has been supplied to me by others, its source is identified and I believe it to be true.

3       In this affidavit I refer to documents which together comprise exhibit "**SRP-1**". References to page numbers in bold in squared brackets in this affidavit are references to that exhibit.

4       As a result of previous work I carried out on behalf of the Ruler of Ras Al Khaimah ("**RAK**") (the "**Ruler**"), I gave evidence for the Ras Al Khaimah Investment Authority ("**RAKIA**"), the Respondent, in these proceedings during the trial which took place in January and February 2020 before Deputy Judge Lenon QC (the "**First Trial**"). As such, I provided a witness statement dated 20 June 2019 [**SRP-1/1-7**] (my "**Witness Statement**") and gave evidence at the First Trial on 29 January 2020. A transcript of my oral evidence is at [**SRP-1/8-35**].

5       I make this affidavit to supplement the evidence which I gave at the First Trial in the present proceedings. I also want take this opportunity to correct part of that evidence, as set out below.

**My role in the investigation of Khater Massaad**

6       I was engaged by the Ruler to investigate Khater Massaad ("**Khater**") in January 2015, in relation to the misappropriation of a large amount of government funds. Khater had previously been the main advisor to the Ruler and a close confidante and friend, and he sat on the board of a number of RAK entities.

7       The Ruler initially asked me to meet with Mr Jamie Buchanan ("**Jamie**"), to whom I reported during the course of my mandate, until Jamie left RAK in the summer of 2019. In the course of my mandate, I also worked alongside Mr Neil Gerrard ("**Neil**") of Dechert LLP ("**Dechert**"), although I was never instructed by him in relation to the investigation into Khater.

8       In addition to the general mandate described above, Jamie provided more detailed instructions and requested that my investigation looked into:

8.1    Khater's alleged connection with Hezbollah, a prescribed terrorist organisation, in Lebanon, and alleged assistance in relation to their funding;

8.2    Khater's assets and business interests, particularly in Saudi Arabia;

8.3    A concern that Khater was allegedly working with other members of the Ruler's family to overthrow the Ruler;

8.4    Khater's connections with Iran, and in particular an alleged connection to Iran's Islamic Revolutionary Guard Corps (the "**IRGC**"); and

8.5    Khater's business associates, in particular his association with Viktor Bout (to whom I refer in my Witness Statement).

9          Soon after meeting with Jamie in 2015, I instructed Amit (of Insight – the company which I identified during my oral testimony at the First Trial as having assisted me with the preparation of the reports I presented to the Ruler, Jamie and Neil) to assist with the investigation. Amit is a former Israeli intelligence officer, formerly of Shin Bet (Israel's internal security service), and his team of analysts had previous experience in military intelligence on behalf of the Israeli Defence Force. Consequently, Amit and his team had extensive knowledge of the methods used by Iran and the IRGC to move money in support of terrorist organisations. They also had multiple language skills (in particular Arabic and Farsi), and so were a natural choice for this project.

10         This project was given the codename "Project Beech" which was used between me, Amit and his team.

11         The investigation work was undertaken using three main sources of intelligence, namely:

11.1       HUMINT – human intelligence, which constituted cultivating individuals to provide information;

11.2       Open Source – research into corporate and other publicly available records; and

11.3       SIGINT – signal intelligence, which is intelligence-gathering by the interception of communications.

12         SIGINT is a term that originates from intercepting radio signals and tapping a target's phone, and continues to be used in the intelligence world (including the commercial investigations industry) to include the hacking of confidential emails and unauthorised access to other confidential electronic data, to be used as intelligence in support of an investigation.

13         My main point of contact was Amit, but I know that Amit used a number of analysts to assist with the project by analysing the raw data. I understood from Amit that Insight made use of subcontractors located outside of Israel which employed all the above means of intelligence gathering, including SIGINT and the use of hacking techniques for this purpose.

14         In addition to undertaking some of the investigative work for the project, my role also included ensuring that the reports Amit and Insight prepared were shared with the Ruler, Jamie and, later on, Neil as securely as possible (given the sensitivity of the reports and what they contained).

15      Amit and Insight authored monthly reports that spanned from February 2015 to May 2020. One of the reports entitled "Project Update" (dated 26 March 2015) which I have seen (in redacted form) in the context of the First Trial [**SRP-1/36-52**] was the second of these reports. The reports would generally include an executive summary, some raw data that had been obtained as a result of the investigation (usually contained within an appendix to the report), some analysis of this data, and recommendations and action points.

16      I recall that some of these reports also featured extracts from confidential documents (with the document itself then appended to or embedded in the report) which I concluded must have been obtained as part of Amit's and Insight's SIGINT work. It was obvious to me (and it would have been obvious to anyone else reading the reports) that such documents were obtained as a result of unauthorised access to computers.

17      I was paid around $300,000 per month (sometimes more) for this work from a variety of RAK entities. This sum would be subject to occasional uplifts for specific pieces of additional work or expenditure which fell outside the scope of my original mandate. Approximately $250,000 per month was then paid by me to Amit and Insight for their assistance. At various times, Jamie told me that the Ruler was considering cutting my budget. However, when I explained to Jamie and Neil that this would involve us losing access to some of Amit's sources and methods, Neil and Jamie were successful in ensuring that my budget remained at around this level throughout my engagement.

18      Given the nature of the people and organisations we were investigating (including those set out above), we adopted secure communications protocols for handling Amit's reports and sharing them with Jamie, Neil and the Ruler. The goal of this protocol was to leave no paper trail and to ensure that the reports were destroyed after having been read.

19      An email account was created that only Amit and I (and my personal assistant, Caroline Timberlake ("**Caroline**")) could access, and to which we knew the username and password. A draft email would be prepared (and stay in the draft folder of the email account) with instructions and a copy of the report. The report would then be downloaded to a standalone laptop (with no connection to my company's servers), printed from a standalone printer, and the draft message would be overwritten. The procedure is an electronic version of a protocol called a "dead letter box" for ensuring that there is no paper trail connecting a sender to a recipient.

20      Amit (or one of his team) would then use a secure messaging application (in the first instance, Silent Circle, and later on, Signal Messenger) to send a coded message to me (or occasionally Caroline) to indicate that there was something to be reviewed. These messages would then be deleted.

21      To discuss matters relating to Project Beech, other members of the team, including Jamie and Neil also used Confide (originally) and then moved to Signal later on. I also recall that Andrew Frank (who was part of RAKIA's strategy team – see below) routinely used Whatsapp.

22      Once the reports had been downloaded and printed in hard copy, Caroline was instructed to delete the electronic copy. The reports were hand-delivered to Jamie for his review, or would be left for him at his hotel in London with the concierge. I would also deliver the report in person to the Ruler in RAK as part of our regular private audiences.

23      At Jamie's request, I would also arrange for a copy of some of the reports (but not all of the reports) to be sent to Neil, starting in 2016. At first the reports were delivered (via courier or hand-delivered by Caroline) to Neil (or Neil's secretary) at Dechert's office in London. However, on one occasion, a report was opened by someone other than Neil or his secretary at Dechert. Given the obvious make-up of the report (as set out above), this caused Neil real concern, as he asked me to send future reports to his home in Nutley, East Sussex. Courier receipts and emails relating to the delivery of reports to Neil at Decherts and at his home are exhibited at [**SRP-1/53-73**].

24      The Ruler instructed me that I was not to send anything to him via electronic means or by courier: if I had something to give to him or something to report, I was to meet with him in person in RAK. Accordingly, for the duration of Project Beech, I met with the Ruler approximately every three to four weeks to provide an update on our investigation. I would usually meet Jamie beforehand and discuss the report in detail, and he would indicate any part of the report that he thought I needed to highlight to the Ruler. Normally Jamie would then also be present at those meetings with the Ruler, and very occasionally Neil would be in attendance as well.

25      A typical meeting with the Ruler would last about 45 minutes, of which the first fifteen minutes would be spent discussing world affairs, of which the Ruler is very knowledgeable. In my experience in the Arab world, Middle Eastern clients are unlikely to read lengthy documents, so frequently the Ruler asked me to give him an overview of where we were in the investigation, and occasionally would read the executive summary at the front of the report, but not the whole document. I would leave the copy of the report with the Ruler before I left.

26      At this point I wish to correct and clarify my evidence given at the First Trial, as I realise that I was unintentionally misleading when I said that my reports to clients, including the Ruler, were "invariably oral". What I meant was that my reports to the Ruler were invariably face to face, in the manner described above.

27    Every few months, Jamie returned to me the hard copies of the reports he held, on the understanding that I would then arrange for the reports to be destroyed (which I then did).

28    I also arranged meetings with Amit, Jamie, Neil and me between 2015 and 2019 in order to obtain guidance from Jamie and Neil as to the direction of the investigation. They were specifically interested in my investigation into the role played by Khater in RAKIA's sale of the Sheraton Metechi Hotel in Tblisi, Georgia to three Iranian buyers: Houshang Farsoudeh, Houshang Hosseinpour and Pourya Nayebi (who at the time of my investigation were on the US sanctions list). I recall that Jamie told me that Mr Azima had introduced the three buyers to the transaction and asked me to look into the sale of the hotel as part of my investigation. To the best of my recollection, the reports produced by Amit and his team in connection with this part of the investigation contained information derived from SIGINT material.

29    Starting in 2016, multiple meetings took place at Dechert's office in London. Dechert required visitors to sign in and show some form of identification. To the best of my knowledge and belief, towards the end of 2016 or the beginning of 2017, Neil became increasingly concerned about meeting at Dechert's office as he did not want a written record indicating that Amit (or any other member of Amit's team) had visited him. It was after this that when we met in London, we gathered at Jamie's suite in the Churchill Hotel or in Amit's suite at the Metropolitan Hotel.

30 .   Jamie told me that he also attended strategy meetings in New York every four to six weeks with Andrew Frank (of Karv Communications) Amir Handjani ("**Amir**") (a close advisor to the Ruler) and Neil to discuss the investigation and RAK's litigation.

**Discovery of the hacked data**

31    As set out paragraphs 14 to 15 of my Witness Statement, Jamie told me that he understood that a negative publicity campaign had been threatened by Khater against the government of RAK and the Ruler, and asked me to keep my eye and ears open for anything about such a campaign that might be damaging for RAK.

32    I wish to correct the evidence I gave both in my Witness Statement and during my oral testimony at the First Trial as to the circumstances in which Mr Azima's confidential information came to be discovered.

33    The fact of the matter is that Majdi Halabi ("**Majdi**") had no role in the discovery of Mr Azima's confidential information. I provided incorrect testimony, claiming that (i) I had approached in him in relation to the threatened negative publicity campaign, and (ii) he had discovered the data. In fact, I approached Amit (and not Majdi) and asked him

to monitor the internet and dark web for such information, and it was Amit who told me about the data.

34    In August 2016, Amit provided to me the link to a tranche of Mr Azima's confidential data. To the best of my recollection, he shared the link with me using Signal. I do not know whether Amit found the data or whether he was passing on information that had been found by one of his analysts, but at the time I did not believe that Amit or his team had been involved in unlawfully accessing or disseminating the data. I then passed on the information to Jamie and Neil for their further handling. Amit, his team and I were not instructed to download or review the material, and so I had no further involvement in handling this material. However, in 2018, in the context of these proceedings, it became clear that Neil was desperate to rely on this material for RAKIA's claims against Mr Azima.

35    During the second half of 2018, it therefore became necessary for RAKIA to confirm and commit to a case as to how it had discovered the confidential data. In November 2018, my name was disclosed by RAKIA to Mr Azima in the context of these proceedings as being the person who informed them of the existence of the tranches of data. However, Amit, and later on, Jamie and Neil, had concerns about revealing that Amit was in turn the person who had told me about the data, and Amit told me that he did not want his name disclosed in proceedings, for fear that, by inference, Insight would be accused of being responsible for hacking. Further, there was a concern that it would be politically embarrassing for the Ruler if it came to light that an Israeli firm had been working for RAK. At this time there were no diplomatic relations between the State of Israel and the UAE.

**Meeting in Cyprus**

36    Consequently, there were a series of meetings between (variously) Amit, Jamie, Neil and me to discuss how to respond to Mr Azima's enquiries in these proceedings regarding how his data had been discovered by RAKIA.

37    Amit suggested that he would come up with an individual to act as a cover for the discovery, who later turned out to be Majdi, who I knew as one of Amit's subcontractors. I subsequently met with Majdi and Amit and we discussed the idea of Majdi being used as a cover for Amit's discovery of Mr Azima's data. I then discussed the idea of Majdi being used as a cover story with Jamie and Neil, and it was subsequently agreed that we would all meet to work out the plan. Initially Jamie, Neil and I discussed seeing the 'Israeli boys' (i.e. Amit and his team) in Israel as the safest option, but we later agreed to meet in Cyprus to sign off on the use of Majdi as a cover story.

38     We met in Cyprus on or around 21 November 2018. The meeting was attended by David Hughes (a partner, formerly with Neil at Dechert but, by this time, at Stewarts Law ("**David**")), Neil, Jamie, Majdi, Amit and me. It was agreed at this meeting that we would proceed with the cover story that Majdi (and not Amit) had discovered and passed the link to Mr Azima's confidential data to me, and that, if necessary, Majdi and I would be willing to provide witness testimony to this effect.

39     During this meeting, David raised his objection to the cover story, saying it was "*not credible*" and that it would not work, but Neil made it clear that this was going to be the best way forward, and that David needed to fall in line.

40     I subsequently met with Caroline Black and Dorothy Cory-Wright of Dechert and Lucy Ward of Stewarts Law to prepare my Witness Statement, which I signed on 20 June 2019.

41     I apologise unreservedly for the part I played in misleading the Court during the First Trial, and wish to state that the remainder of my evidence was true.

**Meeting with the FBI**

42     In mid-February 2019, Jamie advised me that the Ruler wished for me to attend a meeting with the FBI. On or around 21 February 2019, I therefore attended a meeting in New York at Dechert's office in order to meet with an FBI agent. My understanding was that the purpose of the meeting was to try to persuade the US authorities to open an investigation into Mr Azima. This is based on my understanding that for some while, RAK had been attempting to persuade the Department of Justice and the FBI to open up such an investigation.

43     When I arrived, I met with Jamie, Neil and a Mr Chris Swecker ("**Chris**") who I understand is a lawyer and an ex-FBI agent. However, after we waited for a considerable time in the meeting for the FBI agent to arrive, I was told that the meeting needed to be cancelled due to a scheduling miscommunication. I returned to the UK and awaited further instructions.

44     In early to mid-March 2019, Jamie then advised me that the Ruler wished for me to return to the US for a further meeting, this time to Houston. I had not been briefed on what the meeting related to, but I was told that my expenses would be covered and that I should just make sure that I made myself available. On or around 17 March 2019, I met with Jamie, Neil, Chris and an FBI agent called Paul Zukas ("**Paul**") at the Hyatt Centric The Woodlands hotel in Houston.

45     In the course of my career, I have had numerous interactions with federal law enforcement agencies and the district attorney's office in New York. Those meetings always took place at the offices of the relevant organisation. I therefore found it

strange that the meeting with the FBI in Houston was held at a hotel and not at the field office. At that meeting, Chris told me that I was being considered as a potential witness for a grand jury and that the purpose of the meeting was to assess my credibility. Following the meeting, Jamie, Neil, Chris and I went for dinner with the assistant special agent in charge ("**ASAC**") of the Houston field office, whose name I do not now recall. In the course of that dinner it became apparent that Chris and the ASAC were friends.

**Meeting in Switzerland**

46      As the trial of the proceedings (i.e. the First Trial) approached (due to commence in January 2020), I was asked by Amit (who had in turn been instructed by Neil) to organise and attend a meeting with him, Jamie, Neil, and Majdi to rehearse our testimony for the First Trial. We settled on Switzerland as the location for the meeting.

47      This meeting took place over three days at a small boutique hotel in the mountains outside of Bern. Having reviewed my travel records [**SRP-1/74-90**], I arrived at the hotel on the evening of 1 December 2019 and I left on 4 December 2019.

48      Shortly before the meeting, I was told by Neil that the Ruler had instructed him to tell Jamie that the meeting was no longer going ahead. As far as I am aware, the Ruler had terminated Jamie's employment in the summer of 2019. I was told by Neil that the Ruler therefore had concerns about whether he could be trusted to attend a meeting which required total secrecy.

49      Amit and some of his team also attended the meeting and provided extensive security for the meeting.

50      I had arranged for a special protocol to be in place to ensure maximum security and secrecy. I told Neil to leave his mobile phone at home or to switch it off so that his location could not be tracked. Neil, Caroline and I used burner phones for communication purposes, and I left my mobile phone at home.

51      To avoid detection, I did not fly direct to Switzerland. On 1 December, I took a series of trains from London to Paris Gare du Nord, then I transferred to Gare de l'Est. From Paris, I then took a train to Strasbourg, then to Basel and finally a train from Basel to Bern. In Bern, I was collected by a member of Amit's security team and driven to the hotel.

52      At the hotel, we went through a mock trial, with Neil acting as both the judge and the cross-examining counsel. An effort was made to perfect the narrative that we were to tell the English court about how I had discovered the hacked data through Majdi.

53      We made use of the hotel's private chef and their wine from the hotel's cellar. The day was a mixture of eating, drinking and sections of cross-examination by Neil to drill into our story. During one of the sessions, Neil said something to the effect of "*if they ever believe or prove that we are behind the hacking, then this thing is going to drag on for years*".

**Termination of my engagement**

54      Following the First Trial, my work for RAK continued until 1 June 2020 when my engagement was terminated. I believe that the last report I prepared was for May 2020. I set out below the circumstances leading up to the termination of my engagement.

55      In March 2020, I received a call from Amir who told me that I should have no further contact with Neil. By this time, Amir had become one of my points of contact for the investigation after Jamie's role had been terminated.

56      I assumed at this point that it was Neil who was being pushed out of the picture by the Ruler. I agreed to have no further contact with Neil.

57      It seemed that I was wrong in my assumption when, on 28 May 2020, I received a letter from the Investment & Development Office of the Government of RAK saying that my engagement had been terminated. The language seemed odd to me given that I had never had a formal written agreement with any particular RAK entity that could be terminated.

58      This came as a shock to me as I had frequently been told by Jamie that the Ruler was grateful for the work I had done for him.

59      I therefore telephoned Amir shortly after receiving the letter to ask what was going on. He told me that he knew nothing about this but that he would check the position with the Ruler. He then called me back along the lines that I should not worry, that it was all connected to internal politics and that I should be re-instated in a few months. However, that never happened, and I received a subsequent letter from the Investment & Development Office on 14 June 2020 confirming payment of my final

invoice.

**SWORN** by Stuart Robert Page

Signed: _____

Date: 7 January 2022

Before me: _____

Name: _____ CRAMPTON _____

Occupation: _____ SOLICITOR _____

Address:     Ashfords LLP
             1 New Fetter Lane
             London
             EC4A 1AN

551

CA No. A3/2020/1271
[2021] EWCA Civ 349

**IN THE SUPREME COURT OF THE UNITED KINGDOM**
**ON APPEAL FROM THE COURT OF APPEAL (ENGLAND)**

**BETWEEN**

**RAS AL KHAIMAH INVESTMENT AUTHORITY**

**Respondent**

**and**

**FARHAD AZIMA**

**Appellant**

---

**AFFIDAVIT OF STUART ROBERT PAGE**

---

**Burlingtons Legal LLP**
**5 Stratford Place**
**London**
**W1C 1AX**

**DX 82986 MAYFAIR**

**DH/AZI0003.2**

**Tel:**     **0207 529 5420**

**Solicitors for the Appellant**

552

# EXHIBIT F

Appellant
M. Halabi
First Affidavit
Exhibit "MH1"
2 February 2022

**IN THE SUPREME COURT OF THE UNITED KINGDOM**
**ON APPEAL FROM THE COURT OF APPEAL**
**(ENGLAND)**

**BETWEEN**

**RAS AL KHAIMAH INVESTMENT AUTHORITY**

**Respondent**

**and**

**FARHAD AZIMA**

**Appellant**

-----------------------------------------------------

**AFFIDAVIT OF**

**MAJDI EL HALABI**

-----------------------------------------------------

I, **MAJDI EL HALABI**, of 68 Har Kitron St., Zur Hadassa, Israel, 9987500, state as follows:

1.  I am an Israeli journalist and lawyer (non-practising). I make this affidavit on behalf of the Appellant, Farhad Azima.

2.  In this affidavit I refer to documents which together comprise exhibit "**MH1**". Reference to page numbers in bold square brackets in this affidavit are references to that exhibit.

3.  I have prepared this Affidavit without having had the opportunity to review the full range of my documents in detail. I have prepared the statement on an urgent basis as I understand that Mr Azima has a pending application for permission to appeal to the Supreme Court, which may be decided at any time, and that the evidence I give in this Affidavit may be relevant to that application.

2708596.2

4.   I believe that the facts stated in this Affidavit are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

## My evidence in the RAKIA -v- Mr Azima proceedings

5.   I provided a prior witness statement dated 24 June 2019 in support of the Ras Al Khaimah Investment Authority ("**RAKIA**"), the Claimant in RAKIA -v- Azima (Claim no. HC-2016-002798) ("**RAKIA Proceedings**") (**MH1/1-4**).

6.   My witness statement was inaccurate in several key respects regarding the data belonging to Mr Azima. As discussed more fully below, contrary to my witness statement and testimony, I did not find links to Mr Azima's data on the internet in August 2016, I was never asked by Stuart Page ("**Stuart**") to search for information about Mr Azima, and I did not conduct any such searches. The cover story that I gave in my witness statement was concocted during a number of meetings which took place between 2017 and 2019 between (variously), Neil Gerrard ("**Neil**"), David Hughes ("**David**"), Amit Forlit ("**Amit**"), Stuart and Jamie Buchanan ("**Jamie**").

7.   On 29 January 2020, I testified as one of RAKIA's witnesses during the Trial in RAKIA's Proceedings. The transcript of my testimony is at **MH1/5-17**. As with my witness statement, my oral testimony regarding Mr Azima's documents was untrue and inaccurate.

## Preparation of my False Witness Statement and Testimony

8.   As I explain in more detail below, I believe that other witnesses for RAKIA – specifically, Neil, Jamie and Stuart – knew that my testimony was false given that we all worked together to plan in detail and rehearse my false testimony over a series of meetings prior to the actual Trial.

9.   Those meetings occurred during 2018 and 2019 at different locations including in Dechert LLP's offices in London, a hotel conference room in Cyprus, and the Hotel Moosegg in Switzerland, among other places.

## The Development of my False Cover Story

10.   I have worked with Amit on a number of his projects since 2014/2015, after he left

2708596.2

government service and became a private investigator. Amit introduced me to Stuart in around 2017 at a social event in Tel Aviv. As I explain further below, I met with Stuart again in 2018 and 2019.

11.     In 2017, Amit asked me and I agreed to provide a cover story in which I would say that I had discovered links to Mr Azima's data to avoid the need for him to be revealed as the individual who had provided the links to Mr Page.

**Meetings in Cyprus**

12.     On around 25 October 2018, Amit arranged for me to meet with David, Jamie, Neil, Stuart and him in Cyprus to work further on the cover story.

13.     After arriving at Larnaca airport, Cyprus, Amit and I travelled to the Hilton, where we met in a conference room. Amit and I started to discuss the cover story with Neil, Jamie, David and Stuart. This was the first time I had met Neil and Jamie. Amit introduced Jamie to me as working for the Ruler of Ras Al Khaimah and Neil as being a big lawyer at the law firm Dechert. The meeting started with Amit introducing me to Neil and David. Jamie and Stuart, together, joined part-way through.

14.     The meeting only lasted about half an hour, when I was abruptly asked to leave the room as there appeared to be a disagreement. Amit apparently continued the meeting with the others and after another hour or so he joined me for lunch and told me we were going to return to Israel together that afternoon.

15.     On around 21 November 2018, Amit arranged for a second meeting in Cyprus to take place to discuss the cover story. Amit and I met with David, Neil and Stuart to discuss. Neil ran the meeting and proceeded to go into more detail in relation to the cover story whilst David took detailed notes.

16.     I was assured by Amit that it was very unlikely that the cover story would ever need to be used in Court.

17.     I enclose at **MH1/18-19**, a copy of the relevant pages from my passport showing my entry to and exit from Cyprus for both meetings.

**<u>Meetings in London</u>**

18.     On around 1 May 2019 , at Amit's request, I travelled to London (from Paris via Eurostar Paris) for a further meeting to discuss the cover story about the data. I travelled from Paris to London for the meeting.

19.     I met with Amit, Stuart, and Neil at Amit's rental apartment which was part of the Metropolitan Hotel on Park Lane. I recall that a man named Sean was also at the meeting and another woman who I believe was either Amit's or Sean's girlfriend. Neil, Amit and I discussed further how I was to tell the cover story. Neil invited me to a further meeting at the Holmes Hotel the following day for lunch.

20.     On 2 May, I met with Neil, Jamie and Amit for lunch at the Holmes Hotel to get to know each other better and discuss the cover story further for around an hour.

21.     On 3 May 2019, I met with Neil, Amit, David at Dechert's London offices and we sat and talked through the cover story some more.  This meeting lasted approximately one hour.

22.     After it was finished, I had coffee with Neil, Amit and David in a separate area within the office. Neil and Amit then went to talk separately, and I was left with David. I was then collected by Lucy Ward (**"Lucy"**) who took me to another room in Dechert's offices and introduced me to a partner from Dechert, Dorothy Cory-Wright (**"Dorothy"**) who attended the meeting via video link. A third more junior person was there taking a note. I was then left alone with Lucy and Dorothy and the notetaker, and they asked me to tell them the cover story I had just rehearsed on how I had discovered the links to the data.

23.     After this meeting I flew to Istanbul. A copy of my passport showing my entry to France and my exit to Istanbul is at **MH1/20**.

**Meeting in Switzerland**

24.     As the Trial approached, I was asked by Amit to attend a meeting in Switzerland with him, for Neil to test and rehearse Stuart's and my testimony for Trial during 1 to 3 December 2019.

25.     Amit and I, together with several bodyguards, flew to Zurich, Switzerland and we drove to the Hotel Moosegg near Bern for the meeting.

26.     I attach at **MH1/21-40**, photographs I took of the hotel gardens and the hotel wifi password during my stay. I also attach copies of the stamps in my passport showing when I entered and left Switzerland (**MH1/41**).

27.     Over the course of two days, Neil cross-examined me and Stuart repeatedly to fine-tune and test our testimony that we would give at trial. He spent considerable time

explaining to me details of the cover story which were still unclear to me.

28.   At several points throughout my stay, I would be asked to step out of the room so that Neil and Amit could discuss matters privately. I got the impression that Neil and Amit were quite close.

29.   I was originally booked to stay at the hotel for three nights. However, by the third day of my stay, Amit said that I could leave early.

30.   Amit arranged my flight back to Israel and for one of the bodyguards to drive me to the airport.

31.   Following the meeting in Switzerland, I again travelled to London to Stewarts Law for a witness familiarisation process at their offices.

32.   I apologise for the false testimony I provided in my witness statement and trial testimony. I wish to submit this corrective Affidavit to address the falsehoods in my prior testimony. I understand that this Affidavit includes admissions that I have previously misled the English Court in my written and oral evidence, and I am aware that this could lead to proceedings against me for contempt of court and / or perjury and have had the opportunity to seek independent legal advice in relation to the consequences of making this Affidavit.

**SWORN** by Majdi Halabi

Signed:

Date:        2 February 2022

Before me:

Name:        DAVID  CONNICK

Occupation:  SOLICITOR

Address:     PHILIP ROSS Solicitors
             34 Oneen Anne Mews
             London W1G 8HE

2708596.2

# EXHIBIT G

Claimant

P Robinson

2nd

Exhibit PR2

Dated 7 February 2022

**IN THE HIGH COURT OF JUSTICE**          Claim no. QB-2020-002492
**QUEEN'S BENCH DIVISION**

**B E T W E E N : -**

**STOKOE PARTNERSHIP SOLICITORS**

**Claimant**

**and**

**(1) MR PATRICK TRISTRAM FINUCANE GRAYSON**
**(2) GRAYSON + CO LIMITED**
~~**(3) MR STUART ROBERT PAGE**~~
~~**(4) PAGE CORPORATE INVESTIGATIONS LIMITED**~~
**(5) DECHERT LLP**
**(6) MR DAVID NEIL GERRARD**

**Defendants**

_____

**SECOND WITNESS STATEMENT OF**
**PAUL ROBINSON**

_____

I, **PAUL ROBINSON**, of 6 Belvedere Walk, Haywards Heath, West Sussex, RH16 4TD, **WILL SAY** as follows:

**INTRODUCTION**

1.      I am a director of a corporate research and investigation firm.

2.      The facts and matters set out in this witness statement are either derived from my own knowledge or are derived from other sources or documents that I have seen and which, in all cases, I believe to be true. Where I refer to facts and matters below that are within my own knowledge, they are true. Where I refer to information supplied to me by others, its source is identified and it is true to the best of my knowledge and belief. I do not waive privilege in relation to any information or materials which I reference in my statement.

3.      There is now produced and shown to me, marked "**PR2**", an exhibit containing true copies of paginated documents to which I will refer in this statement. References below to page numbers are to the contents of that exhibit.

4.      I make this witness statement further to the affidavit I swore on 6 July 2020 in Claim No. QB-2020-002218 and my witness statement dated 14 May 2021.

5.      The purpose of this statement is to provide further details of my dealings with Mr Grayson and to provide details of my understanding of Mr Nicholas Del Rosso's involvement in the enquiries that Mr Grayson instructed me to carry out.

6.      This witness statement has been prepared on the basis of my own knowledge and records of the relevant events and through consultation with my legal advisers.

## BACKGROUND

(1)     **Nicholas Del Rosso**

7.      Mr Del Rosso is a private investigator and managing director of Vital Management Services ("**VMS**"), based in North Carolina, USA. I was first introduced to him through another private investigator in around 2016. Over the following years, Mr Del Rosso instructed me to carry out a number of different enquiries for which I received payment.

8.      In my first witness statement, I describe in detail the instructions I received from Mr Grayson between early 2019 and June 2020. With the exception of one enquiry, Project Maxwell, which I give further details of below, my understanding is that all of these enquiries were carried out on behalf of Mr Nicholas Del Rosso ("**the Grayson enquiries**").

9.      With the exception of the £5,000 I refer to in my first witness statement and the Project Maxwell enquiry, Mr Del Rosso's company, VMS, paid my company for all of the Grayson enquiries.

## CONTACT WITH MR GRAYSON

**(1)     Signal Messages**

10.     In my first witness statement, I exhibited a number of Signal messages between Mr Grayson and me. These messages mostly covered the period from January 2020 to June 2020. I now refer to a number of additional Signal messages between Mr Grayson and me spanning the period June 2019 to January 2020 (**PR2/1-16**).

11.     With the exception of a number of messages on 9 October 2019 concerning Project Maxwell (**PR2/13** - "Maxwell Wright – profile"), all are connected to the enquiries that Mr Grayson instructed me to carry out and paid for by Mr Del Rosso.

**(2)     Meeting on 25 June 2020**

12.     On 24 June 2020 I travelled to London to meet Sharon Leahy Clark and Adrian Davidson to discuss the possibilities of my company merging with Page Corporate Investigations Limited. At 12:02 I received a call from Mr Grayson (**PR2/1580**). Whilst I cannot recall the precise details of what he said, I remember that he said there was a problem. It was as a consequence of that conversation that Mr Grayson and I changed

the phone settings on the Signal App, so as to ensure that the messages disappeared within 30 seconds **(PR2/1580).** There was a further call and resetting of message deletion times by Mr Grayson **(PR2/1579)** that evening and in one of these calls he asked me to meet him urgently at the Goring Hotel the following day.

13.    On 25 June 2020 I purchased a train ticket to travel to London (**PR2/17**) for the meeting with Mr Grayson. As I walked towards the Goring Hotel at about 10:30 am my attention was drawn to a black minivan parked at the side of the road. Mr Grayson was in the back and beckoned me to get in, which I did. When I got into the vehicle Mr Grayson asked me for my mobile phone, I gave it to him and after initially trying to turn it off, he handed it to the driver of the minivan, who he referred to by first name. I thought this was odd but nevertheless did what he asked me to. The minivan moved off and we drove around Hyde Park. I cannot recall the precise details of the conversation, but the gist of what Mr Grayson said was that "we" have a problem and that one of the people I had been using to carry out the Grayson enquiries, had been passing information to "the other side". Mr Grayson told me that there may be legal proceedings. Mr Grayson then asked me to name my sources and I told him I had instructed Mr John Gunning to deal with the sensitive work. Mr Grayson was clearly very anxious and concerned.

14.    During the journey, Mr Grayson asked me to destroy and / or sanitise any material which could connect both him and Mr Del Rosso to any of the work that I had carried out for them. This concerned me greatly. Before the minivan dropped me at Victoria Station, Mr Grayson handed me an envelope with cash inside. He told me it was half of the money he had agreed to pay me for an investigation into the Claimant in these proceedings. When I later counted the money, it was £5,000.

15.    After the meeting I went straight back to my office and told my colleagues, Michelle Jenkins, my sister, and Owain Jenkins, her husband, what had happened. I asked them to help me identify the documents that I was to either destroy or sanitise. Over the course of the next several days, this is what we did.

**(3)**    **Invoices**

16.    I have collated a number of invoices which were issued by both Company Diligence and Company Documents Ltd to both Mr Del Rosso and VMS for work which I carried out from January 2016 to April 2020. These documents include invoices for the work that was carried out as part of the Grayson enquiries (**PR2/18-54**).

17.    Some of the invoices have been sanitised, as Mr Grayson requested, and six invoices (dated 1/11/2019, 26/02/2020, 16/03/2020, 2/04/2020, 9/04/2020 and 7/06/2020) are not the original invoices which I sent to Mr Del Rosso. When these invoices were first issued, I sent them by email to Mr Del Rosso at reverendmack@protonmail.com and they were subsequently paid. Following service of proceedings in claim QB-2020-002218 upon me on 1 July 2020, I spoke to Mr Del Rosso who told me not to mention his name in relation to this work and to keep his name out of the entire matter. In an effort to distance myself from Mr Del Rosso, I deleted the six invoices. Before I deleted the invoices, I made a note of the detail set out therein. I subsequently used this detail to recreate the six invoices that I now exhibit. Whilst the handwritten note is no longer available, I have checked my bank statements, and confirm that payment for the invoices entered my bank account within days of the invoice date.

18.     Two further points of detail concerning the invoices:

18.1.   The narrative on the spreadsheet for the invoice dated 16 March 2020 (**PR2/22**) refers to "RS" (Radha Stirling) and to "P" (Patrick Grayson).

18.2.   The 10 July 2019 invoice (**PR2/27**) contains the following narrative: "*OP Dotty – Adress (sic) Trace – as instructed by PG £250*". The PG referred to is Mr Grayson.

19.     I have collated a number of relevant Company Diligence bank statements for the period November 2018 to June 2020. Copies of these statements are exhibited at **PR2/55-70**. I have redacted a number of entries as they are not relevant to the present matter. The ones that have been left unredacted show that payments were received from VMS and paid out to John Gunning. All of these payments (both receipts and debits) were for work carried out in relation to the Grayson enquiries. The one exception is the £750 payment from Mr Grayson on 23 January 2020. This payment was for an enquiry Mr Grayson instructed me to carry out, which was unconnected to these proceedings. The reference on the bank statement is "Project Maxwell", this was the name attributed to this particular enquiry.

**NICHOLAS DEL ROSSO**

(1)     **Payments**

20.     From about 2016, Mr Del Rosso instructed me to carry out a number of different enquiries for which I received payment. On 28 January 2018, my company (Company Diligence) entered into a consultancy agreement with VMS for which VMS made a payment of £500 per month (**PR2/71-73**).

21.     Whilst the Grayson enquiries centred upon what I now understand to have been matters related to litigation linked to Ras Al Khaimah ("RAK"), some of the prior research investigations upon which I was directly instructed by Mr Del Rosso also concerned UAE matters. An example of this concerns Mr Farhad Azima who, I understand from press reports, was involved in litigation with RAK. Mr Del Rosso instructed me to carry out investigations including research on the deep web concerning Mr Azima. I instructed a subcontractor who undertakes deep web research and they produced a lengthy report on Mr Azima (**PR2/74-1552**). I then delivered this report to Mr Del Rosso. The invoice for that particular investigation is dated 27 June 2016 and has the narrative "Due Diligence – deep web research" (**PR2/46**). This is an example of how an invoice might be sanitised, removing details of the target of the enquiry (in this case Azima) and replacing it with an anodyne description.

22.     Prior to the Grayson enquiries, all instructions I received from Mr Del Rosso came directly from him and not through Mr Grayson, with payment made by Mr Del Rosso. When I first spoke to Mr Grayson in connection with the Grayson enquiries he informed me that he had only recently returned from visiting Mr Del Rosso in North Carolina where he and Mr Del Rosso had discussed the matters which Mr Grayson was about to instruct me to carry out. When Mr Grayson did instruct me in relation to the Grayson enquiries, he informed me that invoices for this work should be directed to Mr Del

Rosso who would settle them. As things turned out, whilst Mr Grayson paid me the £5,000 in cash to which I refer in my first witness statement, VMS made the remaining payments in respect of the Grayson enquiries.

23.     I believed that the reason for the change in the way that Mr Del Rosso instructed me was due to the sensitive nature of the material sought and I assumed that Mr Del Rosso may have wished to distance himself from the actual instructions.

(2)     **Legal Fees**

24.     On 1 July 2020, I received a letter from the Claimant, enclosing among other things the claim form in QB-2020-002218 and an application notice seeking *Norwich Pharmacal* relief against me: (**PR2/1561-1564**).

25.     On the same date I called Mr Del Rosso and explained what had happened. The conversation was brief and he asked me not to mention his name. He informed me that his American lawyer would contact me and that he would pay any legal fees I incurred in relation to the proceedings. A short time later, Brandon Neuman (Mr Del Rosso's American lawyer) called me. A number of emails were exchanged (**PR2/1565-1568**) between him and me in connection with the matter.

26.     In a conversation over Signal, Mr Neuman informed me that, as he was based in the USA, he could not assist me and he advised me to contact a lawyer based in the United Kingdom, which I did. Mr Neuman also informed me that rather than Mr Del Rosso paying for my legal fees directly, he would set up a loan agreement to facilitate this, which is what happened. On 2 July 2020, Company Documents entered into a loan agreement with VMS for the sum of $25,000. The money was due to be repaid on 1 July 2021 and the rate of interest was 8 % per annum (**PR2/1569**).

27.     The loan was never repaid, and I have not been asked to repay it to date.

**STATEMENT OF TRUTH**

I believe that the facts stated in this witness statement are true. I understand that proceedings for contempt of court may be brought against anyone who makes, or causes to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

Signed

Paul Robinson

Dated        07th February 2022

# EXHIBIT H

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | |
|---|---|
| Farhad Azima | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. |
| Global Impact Services, LLC; Eitan Arusy; Truist Financial Corporation | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          Global Impact Services, LLC
3010 N Military Trail, Suite 318, Boca Raton, FL 33431

*(Name of person to whom this subpoena is directed)*

☛ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Schedule A.

| Place: Carlton Fields, P.A. 700 NW 1st Ave Suite 1200, Miami, FL 33136 | Date and Time: |
|---|---|

❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

CLERK OF COURT

OR

_____                 _____
*Signature of Clerk or Deputy Clerk*                                   *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
_____ , who issues or requests this subpoena, are:

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
     **(i)** is a party or a party's officer; or
     **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
     **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
     **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
     **(i)** fails to allow a reasonable time to comply;
     **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
     **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
     **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
     **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

     **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
     **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
     **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
     **(i)** expressly make the claim; and
     **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

Pursuant to 28 U.S.C. § 1782, Farhad Azima, by and through undersigned counsel, requires that Global Impact Services LLC ("GIS") produce for inspection each of the documents and tangible things described below at "DOCUMENTS AND THINGS TO BE PRODUCED."

## INSTRUCTIONS

1.       This Subpoena calls for you to undertake a diligent search and produce all documents, electronically stored information, and tangible things identified below under the heading "DOCUMENTS AND THINGS TO BE PRODUCED," that are within your possession, custody, or control, including documents, electronically stored information, and tangible things in the possession, custody, or control of your directors, officers, agents, employees, consultants, representatives, or in the possession, custody, or control of any "person" (as defined herein) whom you control, and, unless privileged, your attorneys.

2.       All documents that respond, in whole or in part, to any portion of this Subpoena are to be produced in their entirety, without abbreviation or expurgation, including all attachments or other matter affixed thereto.

3.       If you object to any of these document requests, then you shall state the reasons for your objections. If you object to any part of a document request, then you shall further specify the part. Similarly, if you do not object to a particular document request, but are unable to comply fully with that request, then you shall comply to the fullest extent possible and provide an explanation for your lack of full compliance.

4.       When information is withheld from discovery on a claim that it is privileged, subject to protection as trial preparation materials, or otherwise privileged or protected from

1

disclosure, the claim shall be made expressly and shall be supported by a description of the nature of the document, communications, or things not produced that is sufficient to enable the propounding party to contest the claim of privilege, as provided in Fed. R. Civ. P. 45(e)(2)(A).

5.      If no documents are responsive to a particular request, you are to state that no responsive documents exist.

6.      If any document responsive to this request was, but no longer is, in your possession, state whether it is missing or lost; if it has been destroyed; if it has been transferred, voluntarily or involuntarily, to others; or if it has otherwise been disposed of. In each instance, identify the document fully, explain the circumstances, and identify the people having knowledge of such circumstances.

7.      If you contend that any documents covered in these requests are not reasonably accessible or would be unduly burdensome to locate or produce, identify such documents by category and source and provide detailed information regarding the burden or cost you claim is associated with the search for or production of such documents.

8.      Please produce electronically stored information in accordance with the instructions, data delivery standards, delivery formats, and Adobe PDF file production formats, and with the fields specified, in **Exhibit A ("Miller & Chevalier Standard Production Guidelines")** hereto.

9.      To the extent you intend to not produce a requested document, you are directed to make and safeguard a copy of the requested information.

10.     The relevant time period for documents responsive to the following requests shall be between January 1, 2014 until now unless otherwise specified.

**DEFINITIONS**

1.        The term "any" shall be understood to include and encompass "all." As used herein, the singular shall always include the plural, and the present tense shall also include the past tense. The words "and" as well as "or" shall be construed disjunctively or conjunctively as necessary to bring within the scope of this request all documents or things which might otherwise be construed to be outside its scope.

2.        The term "communication" shall be defined and construed to the broadest extent possible and shall have the same meaning as used in Fed. R. Civ. P. 34.  "Communication" shall include any oral, written, or electronic transmission of information, including without limitation any face-to-face meetings, letters, emails, text messages, social media messaging, or telephone calls, chat rooms, or group list serves.

3.        The term "document" shall be defined and construed to the broadest extent possible and shall have the same meaning as used in Fed. R. Civ. P. 34.

4.        The term "person" means any natural person, corporation, partnership, firm, proprietorship, limited liability company, association trust, department, organization, joint venture, governmental entity, group of persons or any other entity of whatever nature.

5.        The terms "relate to" or "relating to" means consisting of, referring to, regarding, reflecting, supporting, prepared in connection with, used in preparation of, or being in any way logically or factually connected with the matter discussed.

6.        The term "RAKIA" refers to the Ras Al Khaimah Investment Authority, the state-owned investment arm of the United Arab Emirate kingdom of Ras Al Khaimah.

7.        The term "Mr. Neil Gerrard" refers to the Dechert LLP partner who represented RAKIA during its investigation of Mr. Azima.

3

8.      The term "Mr. Stuart Page" refers to the investigator employed by the Ruler of Ras Al Khaimah to investigate Mr. Azima. Mr. Page also employed and paid Mr. Amit Forlit and Gadot over the course of the investigation.

9.      The term "Mr. David Hughes" refers to the former Dechert LLP and Stewarts Law LLP partner who assisted Mr. Neil Gerrard in RAKIA's investigation of Mr. Azima.

10.      The term "Mr. Jamie Buchanan" refers to the former CEO of RAK Development LLC. Beginning from November 2014, Mr. Buchanan was authorized to act on RAKIA's behalf.

11.      The term "Page Group" refers to Mr. Page's network of companies through which he operates, including but not limited to Page Group ME, Page Risk Management DMCC, and Stuart Page MEFZ.

12.      The term "Mr. Amit Forlit" refers to the individual who owns and controls SDC-Gadot LLC and Insight Analysis and Research LLC, as well as Gadot Information Services.

13.      The term "Forlit's Entities" refers to Mr. Forlit's network of companies through which he operates, including but not limited to SDC-Gadot LLC, Insight Analysis and Research LLC, and Gadot Information Services.

14.      The term "Mr. Majdi Halabi" refers to the Israeli journalist and associate of Mr. Forlit who testified falsely on RAKIA's behalf at Mr. Azima's trial that he discovered links to the hacked data through online Google searches.

15.      The term "Dechert" refers to the international law firm Dechert LLP and all employees, agents, representatives, subsidiaries, affiliates, assignees, or other persons acting or purporting to act on its behalf.

16.     The term "Stewarts Law" refers to the London-based law firm Stewarts Law

LLP and all employees, agents, representatives, subsidiaries, affiliates, assignees, or other

persons acting or purporting to act on its behalf.

17.     The term "the Project" refers to the investigation, targeting, and hacking carried

out by Mr. Stuart Page, Mr. Nicholas Del Rosso, Mr. Amit Forlit and others on behalf of

RAKIA, alternatively known as "the RAK Project," "Project Beech, or "Project Beach."

18.     The terms "torrents" and "WeTransfer links" refer to links to file distribution

sites used by the hackers to distribute Mr. Azima's hacked data over the internet.

19.     The term "websites" includes all web pages or blogs, including but not limited to

https://farhadazimascams.blogspot.com/ and https://farhadazima.wordpress.com/ and

https://azimafraud.wordpress.com/

20.     The term "Mr. Azima's trial" refers to the January 2020 U.K. trial between

RAKIA and Mr. Azima, captioned *Farhad Azima -v- (1) RAKIA (2) David Neil Gerrard (3)*

*Dechert LLP and (4) James Edward Deniston Buchanan* (Claim Number: HC-2016-002798).

21.     The term "hacked data" refers to Mr. Azima's data stolen by hackers in 2016 and

subsequently used by RAKIA during Mr. Azima's trial in January 2020.

22.     The term "Azima's Associates" includes but is not limited to the following

individuals who are associated with Mr. Azima or otherwise targets of the conspiracy to hack:

- Khater Massaad
- Karem Al Sadeq
- Stokoe Partnership Solicitors
- Jihad Quzmar
- Ray Adams
- Afsaneh Azadeh
- Kirby Behre
- Chris Cooper
- Cynthia Beudjekian

5

23.     The terms "you" and "GIS" refers to Global Impact Services LLC and all employees, agents, representatives, subsidiaries, affiliates, assignees, or other persons acting or purporting to act on its behalf.

## DOCUMENTS AND THINGS TO BE PRODUCED

1.      All documents and communications from September 2014 to present related to Farhad Azima or Azima's Associates, including but not limited to: (1) documents related to the investigation of Azima or Azima's Associates; (2) documents related to Project Beech; (3) documents related to all Project Updates and similar reports prepared about Mr. Azima and Azima's Associates, including but not limited to those referred to as Project Updates; (4) documents related to the instructions to "target" and "go after" Mr. Azima; (5) documents related to meetings with Mr. Gerrard, Mr. Buchanan, and others regarding the investigation; (6) documents related to the bank accounts used to send and receive money related to Azima or Azima's Associates; (7) documents related to the websites published about Mr. Azima and links published on those websites between August 2016 and June 2019; (8) documents related to the subsequent cover up of the hacking of Azima or Azima's Associates; and (9) documents related to the trial in January 2020 related to Azima.

2.      All documents and communications from September 2014 to present related to the following persons or entities: Amit Forlit, Forlit's Entities, Neil Gerrard, Dechert LLP, James Buchanan, Gravitas International LLC, Amir Handjani, Stuart Page, Page Group, Nicholas Del Rosso, Vital Management Services, Aviram Azari, Aviram Hawk Consulting, Patrick Grayson, Paul Robinson, Majdi Halabi, CyberRoot, BellTroX, RAK Ruler Sheikh Saud bin Saqr Al Qasimi, Dinka Analysis Services, BMI Analysis Limited, Omri Gur Lavie, Yesodot, Insight GSIA, Effie Lavie.

**General Instructions:**

Electronic files must be produced in their native format, i.e. the format in which they are ordinarily used and maintained during the normal course of business. For example, an MS Excel file must be produced as an MS Excel file rather than an image of a spreadsheet. (Note: An Adobe PDF file is not considered a native file unless the document was initially created as a PDF.)

If your production will be de-duplicated it is vital that you
1. preserve any unique metadata associated with the duplicate files, for example, custodian name, and,
2. make that unique metadata part of your production.

**Data Delivery Standards**

General requirements for ALL document productions are:
1. A cover letter should be included with each production and include the following:
    1. Case number
    2. A list of each piece of media included in the production with its unique production volume number
    3. A list of custodians, identifying the Bates range for each custodian.
    4. The time zone in which the emails were standardized during conversion.
2. Productions may be submitted via Secure File Transfer.
3. Alternatively, data can be produced on CD, DVD, thumb drive, hard drive, using the media requiring the least number of deliverables.
4. All submissions must be organized by custodian unless otherwise instructed.
5. All document family groups, i.e. email attachments, embedded files, etc., should be produced together and children files should follow parent files sequentially in the Bates numbering.
6. All load-ready collections should include only one data load file and one image pointer file.
7. All load-ready text must be produced as separate text files.
8. All load-ready collections should account for custodians in the custodian field.
9. Only alphanumeric characters and the underscore character are permitted in file names and folder names. Special characters are not permitted.
10. All productions must be produced using industry standard self-extracting encryption software.
11. All productions must be encrypted using a complex, unique password.
12. Passwords for electronic documents, files, compressed archives and encrypted media must be provided separately either via email or in a separate cover letter from the media.
13. All electronic productions should be produced free of computer viruses.

**Delivery Formats**

**I. Concordance® Imaged Productions**
All scanned paper and electronic file collections should be converted to TIFF files, Bates numbered, and include fully searchable text files.
1. Images
    a. Black and white images must be 300 DPI Group IV single-page TIFF files.
    b. Color images must be produced in JPEG format.
    c. File names cannot contain embedded spaces or special characters (including the comma).

d. Folder names cannot contain embedded spaces or special characters (including the comma).

e. All TIFF image files must have a unique file name, i.e. Bates number.

f. Images must be endorsed with sequential Bates numbers in the lower right corner of each image.

g. The number of TIFF files per folder should not exceed 1,000 files.

h. Excel spreadsheets should have a placeholder image named by the Bates number of the file.

i. AUTOCAD/photograph files should be produced as a single page JPEG file.

2. Concordance Image® OR Opticon Cross-Reference File

The image cross-reference file (.LOG or .OPT) links the images to the database records. It should be a comma-delimited file consisting of seven fields per line with a line in the cross-reference file for every image in the database with the following format:

*ImageID,VolumeLabel,ImageFilePath,DocumentBreak,FolderBreak,BoxBreak,PageCount*

3. Concordance®Data File

The data file (.DAT) contains all of the fielded information that will be loaded into the Concordance® database.

a. The first line of the .DAT file must be a header row identifying the field names.

b. The .DAT file must use the following Concordance® default delimiters:

        Comma ASCII character (020)

        Quote þ ASCII character (254)

c. Date fields should be provided in the format: mm/dd/yyyy

d. Date and time fields must be two separate fields.

e. If the production includes imaged emails and attachments, the attachment range must be included to preserve the parent/child relationship between an email and its attachments.

f. A TEXT LINK field must be included to provide the file path and name of the extracted text file on the produced storage media. The text file must be named after the BEGDOC. Do not include the text in the .DAT file.

g. For productions with native files, a NATIVE LINK field must be included to provide the file path and name of the native file on the produced storage media. The native file must be named after the BEGDOC.

h. BEGATT and ENDAT fields must be two separate fields.

i. A complete list of metadata fields is available as a separate attachment.

4. Text

Text must be produced as separate text files, not as fields within the .DAT file. The full path to the text file (TEXT LINK) should be included in the .DAT file. We require document level text files, named per the BEGDOC/Image Key. Extracted text files must be in a separate folder, and the number of text files per folder should not exceed 1,000 files. There should be no special characters (including commas in the folder names). For redacted documents, provide the full text for the redacted version.

5. Linked Native Files

Copies of original email and native file documents/attachments must be included for all electronic productions.

a. Native file documents must be named per the BEGDOC number.
b. The full path of the native file must be provided in the .DAT file for the NATIVE LINK field.
c. The number of native files per folder should not exceed 1,000 files.

**II. Adobe PDF File Production**

With prior approval, Adobe PDF files may be produced in native file format.

1. PDF files should be produced in separate folders named by the custodian. The folders should not contain any special characters (including commas).
2. All PDFs must be unitized at the document level, i.e., each PDF must represent a discrete document.
3. All PDF files must contain embedded text that includes all discernible words within the document, not selected text or image only. This requires all layers of the PDF to be flattened first.
4. If PDF files are Bates endorsed, the PDF files must be named by the Bates range.

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| Farhad Azima | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. |
| Global Impact Services, LLC; Eitan Arusy; Truist Financial Corporation | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:          Eitan Arusy
3010 N Military Trail, Suite 318, Boca Raton, FL 33431

*(Name of person to whom this subpoena is directed)*

☙ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Schedule A.

| Place: Carlton Fields, P.A.<br>700 NW 1st Ave Suite 1200, Miami, FL 33136 | Date and Time: |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

CLERK OF COURT

OR

_____          _____
*Signature of Clerk or Deputy Clerk*                          *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
_____ , who issues or requests this subpoena, are:

## Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c)  Place of Compliance.**

  **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d)  Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e)  Duties in Responding to a Subpoena.**

  **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g)  Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

Pursuant to 28 U.S.C. § 1782, Farhad Azima, by and through undersigned counsel, requires that Mr. Eitan Arusy produce for inspection each of the documents and tangible things described below at "DOCUMENTS AND THINGS TO BE PRODUCED."

## INSTRUCTIONS

1.      This Subpoena calls for you to undertake a diligent search and produce all documents, electronically stored information, and tangible things identified below under the heading "DOCUMENTS AND THINGS TO BE PRODUCED," that are within your possession, custody, or control, including documents, electronically stored information, and tangible things in the possession, custody, or control of your directors, officers, agents, employees, consultants, representatives, or in the possession, custody, or control of any "person" (as defined herein) whom you control, and, unless privileged, your attorneys.

2.      All documents that respond, in whole or in part, to any portion of this Subpoena are to be produced in their entirety, without abbreviation or expurgation, including all attachments or other matter affixed thereto.

3.      If you object to any of these document requests, then you shall state the reasons for your objections. If you object to any part of a document request, then you shall further specify the part. Similarly, if you do not object to a particular document request, but are unable to comply fully with that request, then you shall comply to the fullest extent possible and provide an explanation for your lack of full compliance.

4.      When information is withheld from discovery on a claim that it is privileged, subject to protection as trial preparation materials, or otherwise privileged or protected from disclosure, the claim shall be made expressly and shall be supported by a description of the

1

nature of the document, communications, or things not produced that is sufficient to enable the propounding party to contest the claim of privilege, as provided in Fed. R. Civ. P. 45(e)(2)(A).

5.      If no documents are responsive to a particular request, you are to state that no responsive documents exist.

6.      If any document responsive to this request was, but no longer is, in your possession, state whether it is missing or lost; if it has been destroyed; if it has been transferred, voluntarily or involuntarily, to others; or if it has otherwise been disposed of. In each instance, identify the document fully, explain the circumstances, and identify the people having knowledge of such circumstances.

7.      If you contend that any documents covered in these requests are not reasonably accessible or would be unduly burdensome to locate or produce, identify such documents by category and source and provide detailed information regarding the burden or cost you claim is associated with the search for or production of such documents.

8.      Please produce electronically stored information in accordance with the instructions, data delivery standards, delivery formats, and Adobe PDF file production formats, and with the fields specified, in **Exhibit A ("Miller & Chevalier Standard Production Guidelines")** hereto.

9.      To the extent you intend to not produce a requested document, you are directed to make and safeguard a copy of the requested information.

10.      The relevant time period for documents responsive to the following requests shall be between January 1, 2014 until now unless otherwise specified.


**DEFINITIONS**

1.      The term "any" shall be understood to include and encompass "all." As used herein, the singular shall always include the plural, and the present tense shall also include the past tense. The words "and" as well as "or" shall be construed disjunctively or conjunctively as necessary to bring within the scope of this request all documents or things which might otherwise be construed to be outside its scope.

2.      The term "communication" shall be defined and construed to the broadest extent possible and shall have the same meaning as used in Fed. R. Civ. P. 34.  "Communication" shall include any oral, written, or electronic transmission of information, including without limitation any face-to-face meetings, letters, emails, text messages, social media messaging, or telephone calls, chat rooms, or group list serves.

3.       The term "document" shall be defined and construed to the broadest extent possible and shall have the same meaning as used in Fed. R. Civ. P. 34.

4.       The term "person" means any natural person, corporation, partnership, firm, proprietorship, limited liability company, association trust, department, organization, joint venture, governmental entity, group of persons or any other entity of whatever nature.

5.       The terms "relate to" or "relating to" means consisting of, referring to, regarding, reflecting, supporting, prepared in connection with, used in preparation of, or being in any way logically or factually connected with the matter discussed.

6.       The term "RAKIA" refers to the Ras Al Khaimah Investment Authority, the state-owned investment arm of the United Arab Emirate kingdom of Ras Al Khaimah.

7.       The term "Mr. Neil Gerrard" refers to the Dechert LLP partner who represented RAKIA during its investigation of Mr. Azima.

3

8.      The term "Mr. Stuart Page" refers to the investigator employed by the Ruler of Ras Al Khaimah to investigate Mr. Azima. Mr. Page also employed and paid Mr. Amit Forlit and Gadot over the course of the investigation.

9.      The term "Mr. David Hughes" refers to the former Dechert LLP and Stewarts Law LLP partner who assisted Mr. Neil Gerrard in RAKIA's investigation of Mr. Azima.

10.     The term "Mr. Jamie Buchanan" refers to the former CEO of RAK Development LLC. Beginning from November 2014, Mr. Buchanan was authorized to act on RAKIA's behalf.

11.     The term "Page Group" refers to Mr. Page's network of companies through which he operates, including but not limited to Page Group ME, Page Risk Management DMCC, and Stuart Page MEFZ.

12.     The term "Mr. Amit Forlit" refers to the individual who owns and controls SDC-Gadot LLC and Insight Analysis and Research LLC, as well as Gadot Information Services.

13.     The term "Forlit's Entities" refers to Mr. Forlit's network of companies through which he operates, including but not limited to SDC-Gadot LLC, Insight Analysis and Research LLC, and Gadot Information Services.

14.     The term "Mr. Majdi Halabi" refers to the Israeli journalist and associate of Mr. Forlit who testified falsely on RAKIA's behalf at Mr. Azima's trial that he discovered links to the hacked data through online Google searches.

15.     The term "Dechert" refers to the international law firm Dechert LLP and all employees, agents, representatives, subsidiaries, affiliates, assignees, or other persons acting or purporting to act on its behalf.

16.     The term "Stewarts Law" refers to the London-based law firm Stewarts Law

LLP and all employees, agents, representatives, subsidiaries, affiliates, assignees, or other

persons acting or purporting to act on its behalf.

17.     The term "the Project" refers to the investigation, targeting, and hacking carried

out by Mr. Stuart Page, Mr. Nicholas Del Rosso, Mr. Amit Forlit and others on behalf of

RAKIA, alternatively known as "the RAK Project," "Project Beech, or "Project Beach."

18.     The terms "torrents" and "WeTransfer links" refer to links to file distribution

sites used by the hackers to distribute Mr. Azima's hacked data over the internet.

19.     The term "websites" includes all web pages or blogs, including but not limited to

https://farhadazimascams.blogspot.com/ and https://farhadazima.wordpress.com/ and

https://azimafraud.wordpress.com/

20.     The term "Mr. Azima's trial" refers to the January 2020 U.K. trial between

RAKIA and Mr. Azima, captioned *Farhad Azima -v- (1) RAKIA (2) David Neil Gerrard (3)

Dechert LLP and (4) James Edward Deniston Buchanan* (Claim Number: HC-2016-002798).

21.     The term "hacked data" refers to Mr. Azima's data stolen by hackers in 2016 and

subsequently used by RAKIA during Mr. Azima's trial in January 2020.

22.     The term "Azima's Associates" includes but is not limited to the following

individuals who are associated with Mr. Azima or otherwise targets of the conspiracy to hack:

- Khater Massaad
- Karem Al Sadeq
- Stokoe Partnership Solicitors
- Jihad Quzmar
- Ray Adams
- Afsaneh Azadeh
- Kirby Behre
- Chris Cooper
- Cynthia Beudjekian

5

23.     The terms "Global Impact Services" and "GIS" refers to Global Impact Services LLC and all employees, agents, representatives, subsidiaries, affiliates, assignees, or other persons acting or purporting to act on its behalf.

24.     The term "you" refers to Mr. Eitan Arusy who manages Global Impact Services LLC and all employees, agents, representatives, subsidiaries, affiliates, assignees, or other persons acting or purporting to act on his behalf.

## DOCUMENTS AND THINGS TO BE PRODUCED

1.      All documents and communications from September 2014 to present related to Farhad Azima or Azima's Associates, including but not limited to: (2) documents related to Project Beech; (3) documents related to all Project Updates and similar reports prepared about Mr. Azima and Azima's Associates, including but not limited to those referred to as Project Updates; (4) documents related to the instructions to "target" and "go after" Mr. Azima; (5) documents related to meetings with Mr. Gerrard, Mr. Buchanan, and others regarding the investigation; (6) documents related to the bank accounts used to send and receive money related to Azima or Azima's Associates; (7) documents related to the websites published about Mr. Azima and links published on those websites between August 2016 and June 2019; (8) documents related to the subsequent cover up of the hacking of Azima or Azima's Associates; and (9) documents related to the trial in January 2020 related to Azima.

2.      All documents and communications from September 2014 to present related to the following persons or entities: Amit Forlit, Forlit's Entities, Neil Gerrard, Dechert LLP, James Buchanan, Gravitas International LLC, Amir Handjani, Stuart Page, Page Group, Nicholas Del Rosso, Vital Management Services, Aviram Azari, Aviram Hawk Consulting, Patrick Grayson, Paul Robinson, Majdi Halabi, CyberRoot, BellTroX, RAK Ruler Sheikh Saud bin Saqr Al Qasimi, Dinka Analysis Services, BMI Analysis Limited, Omri Gur Lavie, Yesodot, Insight GSIA, Effie Lavie.

**General Instructions:**

Electronic files must be produced in their native format, i.e. the format in which they are ordinarily used and maintained during the normal course of business. For example, an MS Excel file must be produced as an MS Excel file rather than an image of a spreadsheet. (Note: An Adobe PDF file is not considered a native file unless the document was initially created as a PDF.)

If your production will be de-duplicated it is vital that you
1. preserve any unique metadata associated with the duplicate files, for example, custodian name, and,
2. make that unique metadata part of your production.

**Data Delivery Standards**

General requirements for ALL document productions are:
1. A cover letter should be included with each production and include the following:
   1. Case number
   2. A list of each piece of media included in the production with its unique production volume number
   3. A list of custodians, identifying the Bates range for each custodian.
   4. The time zone in which the emails were standardized during conversion.
2. Productions may be submitted via Secure File Transfer.
3. Alternatively, data can be produced on CD, DVD, thumb drive, hard drive, using the media requiring the least number of deliverables.
4. All submissions must be organized by custodian unless otherwise instructed.
5. All document family groups, i.e. email attachments, embedded files, etc., should be produced together and children files should follow parent files sequentially in the Bates numbering.
6. All load-ready collections should include only one data load file and one image pointer file.
7. All load-ready text must be produced as separate text files.
8. All load-ready collections should account for custodians in the custodian field.
9. Only alphanumeric characters and the underscore character are permitted in file names and folder names. Special characters are not permitted.
10. All productions must be produced using industry standard self-extracting encryption software.
11. All productions must be encrypted using a complex, unique password.
12. Passwords for electronic documents, files, compressed archives and encrypted media must be provided separately either via email or in a separate cover letter from the media.
13. All electronic productions should be produced free of computer viruses.

**Delivery Formats**

**I. Concordance® Imaged Productions**
All scanned paper and electronic file collections should be converted to TIFF files, Bates numbered, and include fully searchable text files.
1. Images
   a. Black and white images must be 300 DPI Group IV single-page TIFF files.
   b. Color images must be produced in JPEG format.
   c. File names cannot contain embedded spaces or special characters (including the comma).

    d.   Folder names cannot contain embedded spaces or special characters (including the comma).

    e.   All TIFF image files must have a unique file name, i.e. Bates number.

    f.   Images must be endorsed with sequential Bates numbers in the lower right corner of each image.

    g.   The number of TIFF files per folder should not exceed 1,000 files.

    h.   Excel spreadsheets should have a placeholder image named by the Bates number of the file.

    i.   AUTOCAD/photograph files should be produced as a single page JPEG file.

2.  Concordance Image® OR Opticon Cross-Reference File

The image cross-reference file (.LOG or .OPT) links the images to the database records. It should be a comma-delimited file consisting of seven fields per line with a line in the cross-reference file for every image in the database with the following format:

*ImageID,VolumeLabel,ImageFilePath,DocumentBreak,FolderBreak,BoxBreak,PageCount*

3.  Concordance®Data File

The data file (.DAT) contains all of the fielded information that will be loaded into the Concordance® database.

    a.   The first line of the .DAT file must be a header row identifying the field names.

    b.   The .DAT file must use the following Concordance® default delimiters:

            Comma ASCII character (020)

            Quote þ ASCII character (254)

    c.   Date fields should be provided in the format: mm/dd/yyyy

    d.   Date and time fields must be two separate fields.

    e.   If the production includes imaged emails and attachments, the attachment range must be included to preserve the parent/child relationship between an email and its attachments.

    f.   A TEXT LINK field must be included to provide the file path and name of the extracted text file on the produced storage media. The text file must be named after the BEGDOC. Do not include the text in the .DAT file.

    g.   For productions with native files, a NATIVE LINK field must be included to provide the file path and name of the native file on the produced storage media. The native file must be named after the BEGDOC.

    h.   BEGATT and ENDAT fields must be two separate fields.

    i.   A complete list of metadata fields is available as a separate attachment.

4.  Text

Text must be produced as separate text files, not as fields within the .DAT file. The full path to the text file (TEXT LINK) should be included in the .DAT file. We require document level text files, named per the BEGDOC/Image Key. Extracted text files must be in a separate folder, and the number of text files per folder should not exceed 1,000 files. There should be no special characters (including commas in the folder names). For redacted documents, provide the full text for the redacted version.

5.  Linked Native Files

Copies of original email and native file documents/attachments must be included for all electronic productions.

a.  Native file documents must be named per the BEGDOC number.
b.  The full path of the native file must be provided in the .DAT file for the NATIVE LINK field.
c.  The number of native files per folder should not exceed 1,000 files.

**II. Adobe PDF File Production**

With prior approval, Adobe PDF files may be produced in native file format.

1. PDF files should be produced in separate folders named by the custodian. The folders should not contain any special characters (including commas).
2. All PDFs must be unitized at the document level, i.e., each PDF must represent a discrete document.
3. All PDF files must contain embedded text that includes all discernible words within the document, not selected text or image only. This requires all layers of the PDF to be flattened first.
4. If PDF files are Bates endorsed, the PDF files must be named by the Bates range.

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| Farhad Azima | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No. |
| Global Impact Services, LLC; Eitan Arusy; Truist Financial Corporation | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:
Truist Financial Corporation
214 N Tryon Street, Charlotte, NC 28202

*(Name of person to whom this subpoena is directed)*

✔ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Schedule A.

| Place: Carlton Fields, P.A. 700 NW 1st Ave Suite 1200, Miami, FL 33136 | Date and Time: |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

|  |  |
|---|---|
| *CLERK OF COURT* | |
| | OR |
| _____ | _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____
_____ , who issues or requests this subpoena, are:

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❑  I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❑  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

 **(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

---

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

Pursuant to 28 U.S.C. § 1782, Farhad Azima, by and through undersigned counsel,

requires that Truist Financial Corporation ("Truist") produce for inspection each of the

documents and tangible things described below at "DOCUMENTS AND THINGS TO BE

PRODUCED."

## INSTRUCTIONS

1.      This Subpoena calls for you to undertake a diligent search and produce all

documents, electronically stored information, and tangible things identified below under the

heading "DOCUMENTS AND THINGS TO BE PRODUCED," that are within your possession,

custody, or control, including documents, electronically stored information, and tangible things

in the possession, custody, or control of your directors, officers, agents, employees, consultants,

representatives, or in the possession, custody, or control of any "person" (as defined herein)

whom you control, and, unless privileged, your attorneys.

2.      All documents that respond, in whole or in part, to any portion of this Subpoena

are to be produced in their entirety, without abbreviation or expurgation, including all

attachments or other matter affixed thereto.

3.      If you object to any of these document requests, then you shall state the reasons

for your objections. If you object to any part of a document request, then you shall further

specify the part. Similarly, if you do not object to a particular document request, but are unable

to comply fully with that request, then you shall comply to the fullest extent possible and provide

an explanation for your lack of full compliance.

4.      When information is withheld from discovery on a claim that it is privileged,

subject to protection as trial preparation materials, or otherwise privileged or protected from

disclosure, the claim shall be made expressly and shall be supported by a description of the nature of the document, communications, or things not produced that is sufficient to enable the propounding party to contest the claim of privilege, as provided in Fed. R. Civ. P. 45(e)(2)(A).

5.      If no documents are responsive to a particular request, you are to state that no responsive documents exist.

6.      If any document responsive to this request was, but no longer is, in your possession, state whether it is missing or lost; if it has been destroyed; if it has been transferred, voluntarily or involuntarily, to others; or if it has otherwise been disposed of. In each instance, identify the document fully, explain the circumstances, and identify the people having knowledge of such circumstances.

7.      If you contend that any documents covered in these requests are not reasonably accessible or would be unduly burdensome to locate or produce, identify such documents by category and source and provide detailed information regarding the burden or cost you claim is associated with the search for or production of such documents.

8.      Please produce electronically stored information in accordance with the instructions, data delivery standards, delivery formats, and Adobe PDF file production formats, and with the fields specified, in **Exhibit A ("Miller & Chevalier Standard Production Guidelines")** hereto.

9.      To the extent you intend to not produce a requested document, you are directed to make and safeguard a copy of the requested information.

10.     Unless otherwise indicated, these Requests refer and relate to the time period of January 1, 2015 through the present.

# DEFINITIONS

1.       The term "any" shall be understood to include and encompass "all." As used herein, the singular shall always include the plural, and the present tense shall also include the past tense. The words "and" as well as "or" shall be construed disjunctively or conjunctively as necessary to bring within the scope of this request all documents or things which might otherwise be construed to be outside its scope.

2.       The term "communication" shall be defined and construed to the broadest extent possible and shall have the same meaning as used in Fed. R. Civ. P. 34.  "Communication" shall include any oral, written, or electronic transmission of information, including without limitation any face-to-face meetings, letters, emails, text messages, social media messaging, or telephone calls, chat rooms, or group list serves.

3.       The term "document" shall be defined and construed to the broadest extent possible and shall have the same meaning as used in Fed. R. Civ. P. 34.

4.       The term "person" means any natural person, corporation, partnership, firm, proprietorship, limited liability company, association trust, department, organization, joint venture, governmental entity, group of persons or any other entity of whatever nature.

5.       The terms "relate to" or "relating to" means consisting of, referring to, regarding, reflecting, supporting, prepared in connection with, used in preparation of, or being in any way logically or factually connected with the matter discussed.

6.       The term "Mr. Eitan Arusy" refers to Global Impact Services' Authorized Member and Manager Mr. Eitan Arusy, listed in Global Impact Services' 2022 Annual Report as living at 3010 N. Military Trail, Suite 318, Boca Raton, FL 33431, and his attorneys,

representatives and agents, affiliates, or any legal entities Mr. Arusy owns or controls, whether foreign or domestic.

7.      The term "Global Impact Services" refers to Global Impact Services, LLC, a corporate entity with the address of 3010 N. Military Trail, Suite 318, Boca Raton, FL 33431. Global Impact Services is a corporate account holder with Truist.


### DOCUMENTS AND THINGS TO BE PRODUCED

All documents and communications related to Mr. Eitan Arusy and Global Impact Services, LLC.  The request includes all bank statements, any records showing or communications (including SWIFT payment records) relating to transfer of money, and any other financial instrument including but not limited to checks, wire transfers, loans, lines of credit, or any other banking services. The request also includes all account opening documents, and extends to all responsive bank accounts with Truist.

**General Instructions:**

Electronic files must be produced in their native format, i.e. the format in which they are ordinarily used and maintained during the normal course of business. For example, an MS Excel file must be produced as an MS Excel file rather than an image of a spreadsheet. (Note: An Adobe PDF file is not considered a native file unless the document was initially created as a PDF.)

If your production will be de-duplicated it is vital that you
1. preserve any unique metadata associated with the duplicate files, for example, custodian name, and,
2. make that unique metadata part of your production.

**Data Delivery Standards**

General requirements for ALL document productions are:
1. A cover letter should be included with each production and include the following:
    1. Case number
    2. A list of each piece of media included in the production with its unique production volume number
    3. A list of custodians, identifying the Bates range for each custodian.
    4. The time zone in which the emails were standardized during conversion.
2. Productions may be submitted via Secure File Transfer.
3. Alternatively, data can be produced on CD, DVD, thumb drive, hard drive, using the media requiring the least number of deliverables.
4. All submissions must be organized by custodian unless otherwise instructed.
5. All document family groups, i.e. email attachments, embedded files, etc., should be produced together and children files should follow parent files sequentially in the Bates numbering.
6. All load-ready collections should include only one data load file and one image pointer file.
7. All load-ready text must be produced as separate text files.
8. All load-ready collections should account for custodians in the custodian field.
9. Only alphanumeric characters and the underscore character are permitted in file names and folder names. Special characters are not permitted.
10. All productions must be produced using industry standard self-extracting encryption software.
11. All productions must be encrypted using a complex, unique password.
12. Passwords for electronic documents, files, compressed archives and encrypted media must be provided separately either via email or in a separate cover letter from the media.
13. All electronic productions should be produced free of computer viruses.

**Delivery Formats**

**I. Concordance® Imaged Productions**
All scanned paper and electronic file collections should be converted to TIFF files, Bates numbered, and include fully searchable text files.
1. Images
    a. Black and white images must be 300 DPI Group IV single-page TIFF files.
    b. Color images must be produced in JPEG format.
    c. File names cannot contain embedded spaces or special characters (including the comma).

    d.  Folder names cannot contain embedded spaces or special characters (including the comma).

    e.  All TIFF image files must have a unique file name, i.e. Bates number.

    f.  Images must be endorsed with sequential Bates numbers in the lower right corner of each image.

    g.  The number of TIFF files per folder should not exceed 1,000 files.

    h.  Excel spreadsheets should have a placeholder image named by the Bates number of the file.

    i.  AUTOCAD/photograph files should be produced as a single page JPEG file.

2. Concordance Image® OR Opticon Cross-Reference File

The image cross-reference file (.LOG or .OPT) links the images to the database records. It should be a comma-delimited file consisting of seven fields per line with a line in the cross-reference file for every image in the database with the following format:

*ImageID,VolumeLabel,ImageFilePath,DocumentBreak,FolderBreak,BoxBreak,PageCount*

3. Concordance®Data File

The data file (.DAT) contains all of the fielded information that will be loaded into the Concordance® database.

    a.  The first line of the .DAT file must be a header row identifying the field names.

    b.  The .DAT file must use the following Concordance® default delimiters:

           Comma ASCII character (020)

           Quote þ ASCII character (254)

    c.  Date fields should be provided in the format: mm/dd/yyyy

    d.  Date and time fields must be two separate fields.

    e.  If the production includes imaged emails and attachments, the attachment range must be included to preserve the parent/child relationship between an email and its attachments.

    f.  A TEXT LINK field must be included to provide the file path and name of the extracted text file on the produced storage media. The text file must be named after the BEGDOC. Do not include the text in the .DAT file.

    g.  For productions with native files, a NATIVE LINK field must be included to provide the file path and name of the native file on the produced storage media. The native file must be named after the BEGDOC.

    h.  BEGATT and ENDAT fields must be two separate fields.

    i.  A complete list of metadata fields is available as a separate attachment.

4. Text

Text must be produced as separate text files, not as fields within the .DAT file. The full path to the text file (TEXT LINK) should be included in the .DAT file. We require document level text files, named per the BEGDOC/Image Key. Extracted text files must be in a separate folder, and the number of text files per folder should not exceed 1,000 files. There should be no special characters (including commas in the folder names). For redacted documents, provide the full text for the redacted version.

5. Linked Native Files

Copies of original email and native file documents/attachments must be included for all electronic productions.

    a. Native file documents must be named per the BEGDOC number.
    b. The full path of the native file must be provided in the .DAT file for the NATIVE LINK field.
    c. The number of native files per folder should not exceed 1,000 files.

## II. Adobe PDF File Production

With prior approval, Adobe PDF files may be produced in native file format.

1. PDF files should be produced in separate folders named by the custodian. The folders should not contain any special characters (including commas).
2. All PDFs must be unitized at the document level, i.e., each PDF must represent a discrete document.
3. All PDF files must contain embedded text that includes all discernible words within the document, not selected text or image only. This requires all layers of the PDF to be flattened first.
4. If PDF files are Bates endorsed, the PDF files must be named by the Bates range.